## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID A. SMILEY,       )
                       )
       Plaintiff,    )
                       )     C.A. No. 1:07-005-SLR
      v.           )
                       )
DAIMLER CHRYSLER,   )     JURY TRIAL DEMANDED
                       )
      Defendant,   )
                       )

## PLAINTIFF DAVID A. SMILEY'S  MOTION TO AMEND COMPLAINT

David A. Smiley
26 Mackay Lane
Newark, DE 19713
(302) 266-8245
(302) 345-3395
Dasmyle2@aol.com

Dated:  September 26, 2007

# TABLE OF AUTHORITIES

**CASES**

Ramunno v. Cawley,
705 A.2d 1029 (Del. 1998)…………………………….........................................................1

Harris v. Forklift Systems, Inc.,
510 U.S. 17 (Del. Super.1993) …………………………….................................................6

Kanaga v. Garrett Co.,
687 A.2d 177 (Del. 1997)

Fox v. GMC,
247 F. 3d 169, 177 (4th Cir. 2001) …………………………….........................................5

Meritor v. Vinson,
477 U.S. 57 (1986)

Connolly v. Labowitz,
519 A.2d 138, 143 (Del. Super. 1986) …………………………….....................................5


**STATUTES**

Title VII of the Civil Rights Act of 1964 …………………………….................................9

Title 42 U.S.C. 2000e-2, A (1),C(1)(2)(3) ……………………….……….........................3

Federal Rules of Civil Procedure 15(a) …………………….…………..............................3

Federal Rules of Civil Procedure 15 (c)(2) …………………..……………........................3

**OTHER AUTHORITIES**

Council on Ethical and Judicial Affairs,
American Medical Association. Report 5-A-99, 1999 … …………………………….........................6

## STATEMENT OF FACTS

On January 4, 2007, an employment discrimination action against

Defendant Daimler Chrysler, LLC (" Defendant") was brought by pro se

Plaintiff David A. Smiley ("Plaintiff") who is proceeding in forma

pauperis. A Title VII discrimination form was issued by the Court and filed

by Plaintiff as his initial pleading. Daimler Chrysler was named as

Defendant. The Plaintiff was ordered to complete USM 285 forms to

facilitate service of the complaint by the office of the United States Marshal

on January 17, 2007, the completed forms were returned on May 4, 2004.

At that time, Plaintiff did request service of complaint to include Dr.

S.J. Sabo, Dr. Carol Tinklepaugh, and Dawn Ford as additional defendants

in his lawsuit. On May 9, 2007, the Plaintiff's attempt to serve the

above named individuals was rejected by the Court on the basis that they

were not parties to Plaintiff's law suit. On July 5, 2007, Defendant Daimler

Chrysler response to the Plaintiff's complaint was filed.

A letter addressed to the Court was mailed by the Plaintiff seeking to

amend his complaint to include Dr. S.J. Sabo, Dr. Carol Tinklepaugh, and

Dawn Ford as defendants and stating additional cause of action claims

perpetrated within the scope of their employment at Daimler Chrysler;

including work place retaliation, conspiracy, defamation, slander, and

liable, which is based upon presented documentation provided by the
Defendant Daimler Chrysler.

It is for the above stated reasons that the Plaintiff's motion to amend
his complaint be granted. Each averment contained in Plaintiff's complaint
is the result of the documented libel, defamatory and retaliatory actions
perpetrated by the Defendant's employees Dr. S.J. Sabo, Dr. Carol
Tinklepaugh, and Dawn Ford, which culminated in the wrongful termination
of employment of the Plaintiff.

Therefore, the Plaintiff prays that the Court shall grant permission to
amend his complaint enjoining the above named parties.

## SUMMARY OF ARGUMENT

Rule 15(a) of the Federal Rules of Civil Procedure, provides that a party may amend his complaint after a responsive pleading only by leave of the court or by the written consent of the opposing party; and leave shall be given freely when justice so requires. F.R.C.P. 15(a).

Additionally, an amendment of a pleading relates back to the date of the original pleading when the claim or defense asserted in the amended arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. F.R.C.P. 15(c)(2).

A breach of a duty of fair representation occurs when the Union acts based on improper motivation or in a manner which is arbitrary, perfunctory, or inexcusably neglectful.

Title 42 U.S.C. 2000e-2, A (1). States that it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Sub paragraph (c) Labor organization practices, continues with it

shall be an unlawful employment practice for a labor organization, (1) to

exclude or to expel from its membership, or otherwise to discriminate

against, any individual because of his race, color, religion, sex, or national
origin; (2) to limit, segregate, or classify its membership or applicants for

membership, or to classify or fail or refuse to refer for employment any

individual, in any way which would deprive or tend to deprive any

individual of employment opportunities, or would limit such employment

opportunities or otherwise adversely affect his status as an employee or as

an applicant for employment, because of such individual's race, color,

religion, sex, or national origin; or (3) to cause or attempt to cause an

employer to discriminate against an individual in violation of this section.

Title 42 U.S.C. 2000e-2, A (1),C(1)(2)(3).


In suits for Liable and defamation, dictionary definitions do not

control the interpretation of allegedly defamatory statements. Rather, the

courts must take the words in their plain and natural meaning and

understand as would a person of average intelligence and perception .

Ramuno v. Cawley, 705 A.2d 1029 ( Del. Super. 1998).


In determining whether statement is one of fact or opinion, four

factors to consider are (1). common usage (2). Objective verifiability (3).

Context (4). Social setting.

A speaker cannot insulate himself from liability simply by phrasing defamatory statements as opinions where imbedded defamatory fact may be inferred. Id. at 1036., quoting Kanaga, at 79.

The court in Ramuno, further states that a defamation action may lie where an opinion implies the existence of an undisclosed defamatory factual basis, and reasoning that, " An opinion may often imply an assertion of object fact and if the implied fact may be found to be false the trier of fact may find the plaintiff to have been libeled", concluding that if the speaker states the facts upon which he basis his opinions, if those facts are either incorrect or incomplete, or if his or her assessment is erroneous, the statement may still imply a false assertion of fact. Ramuno.

A complaint of Civil Conspiracy must set forth specific facts such as, "meetings, conferences, telephone calls, or joint signatures on written recommendations...to indicate a conspiracy".

In Fox v. GMC, 247 F. 3d 169, 177 (4th Cir. 2001)

Industry Employed Physicians (IEP) are physicians who are employed by businesses or insurance companies for the purpose of

conducting medical examinations. Industry employed physicians have contractual obligations to the business or insurer and depend on these parties for payment. Council on Ethical and Judicial Affairs, American Medical Association. Report 5-A-99, 1999.

Physicians in this context have the same obligations to conduct an objective medical examination, maintain patient confidentiality, and to disclose potential and perceived conflicts of interest. The CEJA also states in relevant part, that in order to preserve the objective nature of the examination physicians should not be influenced by the preferences of neither patient-employee, employer, or insurance company when making a diagnosis. Id.

Opinion 5.09 states,…The information obtained by the physician as a result of such examination is confidential and should not be communicated to a third party without the individual's prior written consent unless it is required by law; further Opinion 5.09 continues with if an individual authorizes the release of medical information to an employer or potential employer, the physician should release only that information which is of relevance to the employer's decision regarding that individual's ability to perform the work required by the job. Id. at 2, quoting CEJA,

American Medical Association. "Opinion 5.09: <u>Confidentiality: IEPs.</u>",
<u>Code of Medical Ethics Current Opinions and annotations</u>. Chicago, IL,
1998.

Ones educational endeavors have no relation to a report
chronologing the employees occupational abilities to perform a job function
differ from the submitted writings by Doctors S.J. Sabo and Caroline N.
Tinklepaugh, reflect dialog shared in my Occupational Incident Report,
concerning the dates of 11/10/2004 and 02/14/2004.

I am injured because of the discriminatory conduct of the defendant
Dr. S.J. Sabo, Carolyn K. Tinklepaugh, and Dawn Ford; No other attending
plant IMP treatment diagnosis entrees result in the personalized attention
received by the above named. Resulting in a negative and medically
unrelated inference as to a documented medical injury maliciously entered
into my employment medical history file.

The UAW Local 1183 violated my Title VII rights and the Civil
Rights Act of 1967, and 42 U.S.C.A. sec. 2000e-2(a)(1). When the
Defendant discriminated against my race as an American of African Decent,
in addition to discriminating against me because of my color, when it
it intentionally refused to honor the negotiated Local Agreement and failed
to adequately represent a union member.

Sub paragraph (c) Labor organization practices, continues with it
shall be an unlawful employment practice for a labor organization, (1) to
exclude or to expel from its membership, or otherwise to discriminate
against, any individual because of his race, color, religion, sex, or national
origin; (2) to limit, segregate, or classify its membership or applicants for
membership, or to classify or fail or refuse to refer for employment any
individual, in any way which would deprive or tend to deprive any
individual of employment opportunities, or would limit such employment
opportunities or otherwise adversely affect his status as an employee or as
an applicant for employment, because of such individual's race, color,
religion, sex, or national origin; or (3) to cause or attempt to cause an
employer to discriminate against an individual in violation of this section.

Title 42 U.S.C. 2000e-2, A (1),C(1)(2)(3).

# ARGUMENT

## I.    Defamation of Character

On 11/10/2004 Defendant S.J. Sabo did commit a slanderous act when he communicated intentionally and without merit, false and defamatory statements about my injury and personal character, prior to entry into my permanent employee medical record. Doc.# C

Additionally, Defendant S.J. Sabo did commit libel when he maliciously entered false and derogatory information into my corporate medical record.

S.J. Sabo breached that duty of confidentiality between treating IEP and patient, and did Conspire, with other Daimler Chrysler physician(s) because on 11/10/2004 S.J. Sabo, M.D. did communicate and intentionally and without merit, enter into my permanent employee medical record false and defamatory statements about my person and character.

In suits for Liable and defamation, dictionary definitions do not control the interpretation of allegedly defamatory statements. Rather, the courts must take the words in their plain and natural meaning and understand as would a person of average intelligence and perception.

1

Ramuno v. Cawley, 705 A.2d 1029 (Del. Super. 1998).

In Ramuno, upon appeal the Court reversed in large part, a lower court decision to dismiss his case of libel and civil conspiracy against both media and non-media defendants.

It is for the following reason (s) that I respectfully request to include Carole N. Tinklepaugh, M.D.; because she had a fiduciary duty of confidentiality between treating doctor and patient, at the least there is an expectation of confidentiality between a treating physician and patient.

Carole N. Tinklepaugh, M.D. breached that duty of confidentiality between treating doctor and patient, because on the date of 11/10/2004; Carole N. Tinklepaugh, M.D. did commit a Slanderous act when she communicated intentionally and without merit, false and defamatory statements about my absence as the result of my work related injury and personal character, prior to entry into my permanent employee medical record. Doc.# C

Carole N. Tinklepaugh, M.D. breached that duty of confidentiality between treating doctor and patient, and did commit Libel, because 11/10/2004 Carole N. Tinklepaugh, M.D., intentionally and without merit

2

enter into my permanent employee medical record false and defamatory statements about my person and character.

Carole N. Tinklepaugh, M.D. breached that duty of confidentiality between treating doctor and patient, and did Conspire, with other Daimler Chrysler physician(s) because on 11/10/2004 Carole N. Tinklepaugh, M.D. did communicate and intentionally and without merit enter into my permanent employee medical record false and defamatory statements about my person and character.

It is for the following reason (s) that I respectfully request to include Dawn Ford; it is because of her utterance of Slanderous statements made to other Daimler Chrysler employees, when on May 13, 2005, without merit or cause as to the validity of the notes of my treating physician, maliciously stating that I had forged them.

As a direct result of the tortuous retaliatory actions of Daimler Chrysler employee Dawn Ford, I have been harmed because of the opportunities missed because of my termination"…that I had attempted to utilize the same photocopy of a prior doctor note submitted earlier by way of another employee later that same day". Doc.# s G, H, I.

As a direct result of the tortuous retaliatory actions of Daimler

have received harm to my reputation, because prior to my termination I have

held the positions of Alternate Committeeman and Alternate Shop Steward,

all by appointment because of my work ethic and person.

As a direct result of the tortuous and retaliatory actions of Daimler

Chrysler employee Dawn Ford, I have experienced harm because of the

opportunities missed due to my termination.

Economically, the Daimler Chrysler Corporation and its agents

because of its retaliatory actions which resulted in my termination shortly

after my work, related injuries have harmed me.

## II      Civil Conspiracy

The court in Ramuno found that civil conspiracy is not an

independent cause of action…and it must arise from some underlying

wrong. Id. at 1039, quoting Connolly v. Labowitz, 519 A.2d 138, 143 (Del.

Super. 1986).

The writings of both Dr. Sabo and Caroline N. Tinklepaugh

intentionally communicated that that my personal treating physician "kept

him totally disabled…, till he finished school"; entering disparaging

information into my medical records. Doc.# C

I was terminated on May 13, 2005, when Dawn Ford alleged that I

Chrysler employee Dawn Ford, I have experienced harm. Because of missed opportunities due to my termination, due to the false statement made that, "I did not return on May 13, 2005, to the Newark Assembly Plant facility".

On or about May 4-15, 2004, Dawn Ford did conspire with other Daimler Chrysler employees when she knowingly and willingly engaged in Libel and Slander because of her deliberate communication of misinformation regarding my person.

I was harmed economically and professionally when on or about the period of May 4-15, 2004, Dawn Ford did conspire with other Daimler Chrysler employee's had willingly engaged in the deliberate communication of misinformation regarding my person, and events which resulted in my wrongful termination after sixteen years of continuous employment.

Utterances of May 13, 2005 made by Dawn Ford have harmed me professionally. Prior to my termination, I was a facilitator instructor for the Daimler Chrysler Corporation, my job description required travel to other facilities for workshops and upon my return to the plant teach classes for both management and union personnel the new procedures and doctrine implements of the corporation via video and class interaction.

In addition, as a direct result of the retaliatory acts of Dawn Ford, I

4

did not return with my correct doctors note which had the correct DX code provided by my physicians office which she claimed I had forged.

Exhibit I, of the complaint filed with the E.E.O.C. introduced this issue as a note written by my treating physician addresses this discovery.

## III   Retaliation

To demonstrate case for retaliation a Plaintiff must show that he or she engaged in a protected activity. Second an action is taken against him or her that, ..." a reasonable employee would have found...materially adverse ", and the third requirement is that the action had a casual connection to the protected activity.

In the instant case, because of my documented workman's Compensation claim I was at the time called back to Daimler Chrysler in order to fulfill its request to show documentation substantiate with doctors notes my absences. I presented notes I received from the only treating physician and supplied them to Daimler Chrysler Corporation as requested.

I was terminated on May 13, 2005, when Dawn Ford alleged that I did not return with my correct doctors note which had the correct DX code provided by my physicians office which she claims I had forged and then

6

later states that I attempted to circumvent her but further states that I did
not return on May 13, 2005.

Documentation provided and evidenced through documented
exhibits within the accompanying EEOC file show that my doctor did in
fact attempt to correct the deficiency addressed by the Defendant; which
have never in the past proved to be a source of contention, in a note from
The treating physician and the Defendant Daimler Chrysler terminated me
and additional evidence from the Red Clay School district, informing
parents of early dismissal for the date of May 13, 2005 was provided, I was
terminated. Exhibit K

## IV   TITLE VII CIVIL RIGHTS ACT OF 1964

The court in Harris v. Forklift Systems, Inc., 510 U.S. 17 (Del.
Super.1993), applied its standard to that of Meritor v. Vinson, 477 U.S. 57
(1986); found that, "Title VII is violated when the work place is permeated
with discriminatory behavior that is sufficiently severe or pervasive to
create a discriminatorily hostile or abusive working environment." Id, at 64.

Plaintiff Harris brought suit against a former employer Respondent
Forklift Systems, Inc. on the grounds that an abusive hostile work

7

environment existed because of insults, unwanted sexual innuendoes

attributed to Harris' gender by Forklifts president in violation of

Title VII of the Civil Rights Act of 1967 and 42 U.S.C.A. sec. 2000e-

2(a)(1).

Reversing and Remanding the lower court decision; its reasoning

that whether an environment is hostile or abusive can only be determined

by looking at all the circumstances which include the frequency of the

discriminatory conduct, e.g., its severity, whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance. Harris, at 18.

In the current case I have been discriminated against because of the

severity of conduct exhibited by the Defendant is a clear over

reaction in a disciplinary matter it is clear that the Defendants motive is to

terminate my employment with the company.

I have because of the Defendant have been the subject of negative

utterances made attributable my work related injury by the Defendants

regarding the legitimacy of my medical care, and that of my credibility,

integrity, and honesty because of my race as I am an American of African

Decent and because of my color as I am Black, I am made to endure these

8

wrongful acts perpetrated by the Defendant.

## V    Failure to Represent

Prior to my termination of employment with the Daimler Chrysler Corporation, there was no history of disciplinary occurrences, absence abuse, work product, however, the only documented contact between UAW Local Union 1183 representatives was by letter dated February 13, 2006.Dkt.# M

UAW Local 1183 through its representatives, including its president, representative shop stewards and committeemen created a breach of its duty of fair representation for its membership, when upon my termination on May 5, 2005, U.A.W. Local 1183, failed to enter a grievance on my behalf.

The UAW Local 1183 violated my Title VII rights and the Civil Rights Act of 1967, and 42 U.S.C.A. sec. 2000e-2(a)(1). When the Defendant discriminated against my race as an American of African Decent, in addition to discriminating against me because of my color, when it intentionally refused to honor the negotiated Local Agreement and failed to

9

adequately represent a union member.

Sub paragraph (c) Labor organization practices, continues with it shall be an unlawful employment practice for a labor organization, (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin; (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

Title 42 U.S.C. 2000e-2, A (1),C(1)(2)(3).

The U.A.W. acted in a perfunctory manner in regards to its failure to properly conduct an investigation into the facts concerning my termination of employment from Daimler Chrysler Corporation and the ineffective representation of a union member. Doc.# N

A proximate cause of the breach of fair representation by U.A.W.

10

Union Local 1183 I have suffered and continue to experience an economic

loss due its union officials failure of representation regarding my

termination of employment at the Daimler Chrysler Corporation.

As a consequence of the inaction of the leadership of the U.A.W.

Local Union 1183, I have suffered a loss of opportunity and undue

economic disparity, for a period of over two and one half years straight time,

totaling Two Hundred Thousand Dollars.

An additional effect of this consequence is a loss of income in the

amount of 15% of my yearly income dispersed into my retirement accounts.

Whereas the Plaintiff seeks compensatory damages and punitive

damages awarded because of the harm suffered but for the Defendants

wrongful actions.

Therefore, it is for the above stated reasons the Plaintiff preys that the

Court accepts this amended complaint.

Respectfully Submitted,

David A. Smiley
Pro Se

## Conclusion

Whereas, the court has the authority to allow a suit to proceed upon

its own merits, and statement of facts thus the Plaintiff preys that the court

will allow this motion to amend the complaint.

Respectfully Submitted,

David A. Smiley
Pro Se
26 Mackay Lane
Newark, DE 19713
(302) 266-8245
(302) 345-3395
Dasmyle2@a9l.com

## CERTIFICATE OF SERVICE

I hereby certify this 27th day of September, 2007, that two (2) true and correct copies of

the foregoing **Plaintiff DAVID A. SMILEY'S MOTION TO AMEND COMPLAINT** was served by

U.S. First Class Mail, postage prepaid, to the following:

> Jennifer Wasson (No. 4933)
> Hercules Plaza - Sixth Floor
> 1313 North Market Street
> Wilmington, DE 19801
> (302) 984-6165 (Telephone)
> (302) 658-1192 (Facsimile)
> Jwasson@potteranderson.com (Email)

David A Smiley, *pro se*
26 Mackay Lane
Newark, DE 19713
(302) 266-8245 (Residence)
(302) 345-3395 (Cellular)
Dasmyle2@aol.com (Email)

Witness Questions
Smiley v. Daimler Chrysler Corporation
Name:  Rulherford  (302) 453-5243
Date Interviewed:  03/24/06
Dates Contacted: 03/24/06

1. 

Been with the company 18 years, been a union rep for 4 years; use to work opn the line, title now is union rep/shop stewart; yes, was CP's shop stewart up until he was sent to second shift; wqiorks in the material department but represents several departments; material department

2. 
Yes, working with him

3. 

Only disability is what he went out with, can;'t really remember what it was, because he was the union rep and he went out on PQX; when a person is deemed to have a medical problem (PQX) then they place them wherever and what ever shift there may be a position available that management feels that CP can do and last he heard C{P was moved to 2nd shift because there were no available positions on day shift; they would have had to a been if CP was PQX

4.

Policy states that they will  try to get the employee back to workl; that's why they have PQX meetings; currently the union had had discussions with management and apparently management has told the committee man (John Mahlevick) to get ahold of CP and bring him back to work; usually when they come back they get reinstated ; person has to show up to personnel and they have to go and see the plant doctor who gives his/her approval to return to work but if the plant doctor puts PQX restrictions on the person and they look for a position for the person to fill, if nothing available on their shift they go to another shift – if person doesn't have much seniority they may wait out on the street to be pl;acewd in a position that meets medical restrictions

5.

CEJA Report 5 – A-99
Patient-Physician Relationship in the Context
of Work-Related and Independent Medical Examinations

INTRODUCTION

Resolution 2 (I-97), "Patient-Physician Relationship," asked the American Medical Association to
recommend that patients be informed of the lack of a patient-physician relationship during pre-
employment physical examinations or examinations to determine if an employee who has been ill or
injured can return to work. This resolution was referred to the Council on Ethical and Judicial Affairs.
This report addresses the scope of the patient-physician relationship in the context of work-related and
independent medical examinations.

DEFINITIONS AND SCOPE

In this report, the term "industry employed physician" (IEP) refers to physicians who are employed by
businesses or insurance companies for the purpose of conducting medical examinations. "Independent
medical examiners" (IMEs) differ in that they are not employees, but instead, independent contractors
who provide medical examinations for employees or others within the realm of their specialty.
Intuitively, one might believe that the conflict of interest experienced by the IEP is greater than that of the
IME since the former answers directly to his or her employer. However, both types of physicians have
contractual obligations to the business or insurer and depend on these parties for payment.

Both IEPs and IMEs can perform employment, pre-employment, and work-related examinations, which
include those aimed at determining whether an individual is suitable for a particular occupation or if an
employee who has been ill or injured can return to work. They may perform a variety of other types of
examinations as well. This report does not address IEPs or IMEs who continually monitor the health of
patients or treat a company's employees. Instead, this report will address the scope of the patient-
physician relationship when a physician is responsible for performing an isolated assessment of an
individual's health or disability for an employer, business, or insurer.

UNALTERED RESPONSIBILITIES AND OBLIGATIONS

Despite their ties to a third party, the responsibilities of IEPs and IMEs are in some basic respects very
similar to those of other physicians. Physicians in this context have the same obligations to conduct an
objective medical examination, maintain patient confidentiality, and disclose potential or perceived
conflicts of interest.

*Objectivity*

One of the foremost responsibilities of physicians, regardless of the circumstances, is to evaluate the
health of patients in an objective manner. Initially, IEPs and IMEs may be thought to have conflicting
obligations because they do not consider patient preferences when making a diagnosis.[1] Although
physicians are expected to involve patients in decision making to the greatest extent possible, limitations
exist on all physicians' obligations to consider patients' desires or preferences when making a diagnosis.

Considering the preferences of the patient when making a diagnosis during a work-related examination
could affect the objective nature of the exam. For example, even though a patient may not want to return
to work, an exam could reveal that he or she is able to resume employment duties. On the other hand,
reporting to an insurance company or employer that an employee is not ready to return to work may not

© 1999 American Medical Association. All Rights Reserved.

coincide with what the employer wants, but it may be what is revealed by an objective examination. IEPs and IMEs have the same obligations as physicians in other contexts to evaluate objectively the patient's health or disability. In order to preserve the objective nature of the exam, physicians should not be influenced by the preferences of the patient-employee, employer, or insurance company when making a diagnosis.

*Confidentiality*

In addition to a general requirement of objectivity, IEPs and IMEs have an obligation to maintain confidentiality. The Council has stated in Opinion 5.09, "Confidentiality: Physicians in Industry," that:

> ...the information obtained by the physician as a result of such examinations is confidential and should not be communicated to a third party without the individual's prior written consent, unless it is required by law.[2]

This responsibility of IEPs and IMEs is the same as it is for other physicians. As always, the information obtained by the physician is confidential and should not be communicated to an outside party without the individual's consent, unless required by law. Opinion 5.09 also states that if an individual authorizes the release of medical information to an employer or a potential employer, the physician should release only that information which is relevant to the employer's decision regarding that individual's ability to perform the work required by the job.

*Disclosure of Potential or Perceived Conflicts of Interest*

Besides the aforementioned obligations of the physician during and after the examination, the physician has an obligation to the patient before the work-related or independent medical exam. In Opinion 8.03, "Conflicts of Interest: Guidelines," the Council stated that "conflict[s] must be resolved to the patient's benefit."[3] This entails not only conducting the examination as objectively as possible, but also disclosing to the patient that conflicting obligations might exist.

The Council has previously addressed the importance of disclosing conflicts of interest. For example, in Opinion 8.032, "Conflicts of Interest: Health Facility Ownership by a Physician," the Council stated that "physicians should disclose their investment interest to their patients when making referrals." The Council expressed similar regard for the disclosure of conflicts of interest in Opinion 8.031, "Conflicts of Interest: Biomedical Research," Opinion 8.051, "Conflict of Interest Under Capitation," Opinion 8.09, "Laboratory Services," Opinion 8.13, "Managed Care," and Opinion 8.132, "Referral of Patients: Disclosure of Limitations." The Council explained the utility in disclosing conflicts of interest in the report "Conflicts of Interest in Biomedical Research:"

> Even when ethically permissible...arrangements exist, safeguards are needed to protect against the appearance of impropriety. Perhaps the best mechanism available to assuage public (and professional) doubts about the propriety of a[n]...arrangement is full disclosure.[4]

In other words, full disclosure is an effective mechanism for minimizing the adverse effects of conflicts of interest that may arise. Therefore, the physician should disclose fully the terms of the agreement between himself or herself and the third party as well as the fact that he or she is acting as an agent of that entity. This should be done at the outset of the examination, before health information is gathered from the patient. Before the physician proceeds with the exam, he or she should ensure to the extent possible that the patient understands the physician's unaltered ethical obligations, as well as the distinct differences that exist between the physician's role in this context and the physician's traditional role (see below).

3

## ALTERED RESPONSIBILITIES AND OBLIGATIONS

The narrowly defined role of IEPs and IMEs places limits on the patient-physician relationship during work-related or independent medical examinations. Because physicians during these types of examinations do not have all of the duties held by other physicians, a limited patient-physician relationship should be considered to exist. For example, primary care physicians are responsible for monitoring a patient's health over time, promoting wellness, advocating healthy lifestyles, anticipating medical problems, and serving the patient's overall, long-term health needs. While the traditional duties of a physician normally extend well beyond the administration of an objective medical examination, the IEP or IME is charged only with assessing objectively an individual's health or disability at that one point in time.

IEPs and IMEs are obliged, however, to inform patients about abnormalities discovered during the course of the examination. The Council has stated in Opinion 5.09, "Confidentiality: Physicians in Industry," that:

> A physician is obligated to divulge important health information to the patient
> which the physician discovers as a result of the examination.

The physician conducting a work-related or independent medical exam clearly has a duty to inform the patient about abnormalities discovered during the course of an examination. However, recognizing that the patient-physician relationship is limited to that encounter, the IME or IEP should not be held to the same standards as other physicians who are expected to serve patients' long-term health needs. For example, after discovering important health information or abnormalities through an objective evaluation, a primary care physician would be expected to provide sound advice, discuss treatment options, and perhaps treat the patient. However, it would be beyond the scope of the limited patient-physician relationship to require IEPs and IMEs to do the same. In the context of this limited relationship, IEPs and IMEs are required, like other physicians, to inform the patient about abnormalities discovered during the course of the examination. In addition, they should ensure to the extent possible that the patient understands the problem or diagnosis. Finally, when appropriate, they should suggest that the patient seek care from a qualified physician and provide reasonable assistance in securing a mechanism to receive follow-up care if requested. However, IEPs and IMEs are not required to discuss treatment options or to provide treatment.

## CONCLUSION

Industry employed physicians (IEPs) and independent medical examiners (IMEs) are responsible for administering an objective medical evaluation but not for monitoring patients' health over time, treating patients, or fulfilling many other duties traditionally held by physicians. Consequently, a limited patient-physician relationship should be considered to exist. IEPs and IMEs still are expected to evaluate objectively patients' health or disability, maintain confidentiality, and disclose potential or perceived conflicts of interest. In addition, upon discovering important health information or abnormalities during the course of the examination, IEPs and IMEs are expected to inform the patient about the condition, ensure that they understand fully the diagnosis, and suggest that they seek care from a qualified physician. IEPs and IMEs also should provide reasonable assistance in securing a mechanism to receive follow-up care if requested.

## RECOMMENDATIONS

4

For the foregoing reasons, the Council recommends the following be adopted and that the remainder of this report be filed:

For purposes of these guidelines, the term "industry employed physicians" (IEPs) refers to physicians who are employed by businesses or insurance companies for the purpose of conducting medical examinations. "Independent medical examiners" (IMEs) differ in that they are not employees, but instead, independent contractors who provide medical examinations within the realm of their specialty. Both IEPs and IMEs can perform employment, pre-employment, work-related, and other types of medical examinations. This report does not address IEPs or IMEs who continually monitor the health of patients or treat a company's employees. Instead, this report will address the scope of the patient-physician relationship when a physician is responsible for performing an isolated assessment of an individual's health or disability for an employer, business, or insurer.

1)   Despite their ties to a third party, the responsibilities of IEPs and IMEs are in some basic respects very similar to those of other physicians. IEPs and IMEs have the same obligations as physicians in other contexts to:

   a)   evaluate objectively the patient's health or disability. In order to maintain objectivity, IEPs and IMEs should not be influenced by the preferences of the patient-employee, employer, or insurance company when making a diagnosis during a work-related or independent medical examination.

   b)   maintain patient confidentiality as outlined by Opinion 5.09, "Confidentiality: Physicians in Industry."

   c)   disclose fully potential or perceived conflicts of interest. The physician should inform the patient about the terms of the agreement between himself or herself and the third party as well as the fact that that he or she is acting as an agent of that entity. This should be done at the outset of the examination, before health information is gathered from the patient-employee. Before the physician proceeds with the exam, he or she should ensure to the extent possible that the patient understands the physician's unaltered ethical obligations, as well as the differences that exist between the physician's role in this context and the physician's traditional fiduciary role.

2)   IEPs and IMEs are responsible for administering an objective medical evaluation but not for monitoring patients' health over time, treating patients, or fulfilling many other duties traditionally held by physicians. Consequently, a limited patient-physician relationship should be considered to exist when performing work-related and independent medical examinations.

3)   As stated in Opinion 5.09, the physician has a responsibility to inform the patient about important health information or abnormalities that he or she discovers during the course of the examination. In addition, the physician should ensure to the extent possible that the patient understands the problem or diagnosis. Furthermore, when appropriate, the physician should suggest that the patient seek care from a qualified physician and provide reasonable assistance in securing a mechanism to receive follow-up care if requested.

5

## REFERENCES

1. Murray, Thomas H. "Divided Loyalties for Physicians: Social Context and Moral Problems" Social Science Medicine 1986; 23, 8: 827-832.

2. Council on Ethical and Judicial Affairs, American Medical Association. "Opinion 5.09: Confidentiality: IEPs." *Code of Medical Ethics Current Opinions and annotations.* Chicago, IL, 1998.

3. Council on Ethical and Judicial Affairs, American Medical Association. "Opinion 8.03: Conflicts of Interest: Guidelines." *Code of Medical Ethics Current Opinions and annotations.* Chicago, IL, 1998.

4. Council on Ethical and Judicial Affairs, American Medical Association. "Conflicts of Interest in Biomedical Research" *JAMA.* 1990; 263: 2790-2793.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID A. SMILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:07-005-SLR |
| v. | ) | |
| | ) | |
| DAIMLER CHRYSLER, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant, | ) | |
| | ) | |

## PLAINTIFF DAVID A. SMILEY'S  SUPPLEMENTAL  AMENDED COMPLAINT

David A. Smiley
26 Mackay Lane
Newark, DE 19713
(302) 266-8245
(302) 345-3395
Dasmyle2@aol.com

2007 SEP 27  PM 3: 13

CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

Dated:  September 26, 2007

## SUPPLIMENTAL AMENDED COMPLAINT

Prior to my termination of employment with the Daimler Chrysler Corporation, there was no evidence of disciplinary occurrences, absence abuse, work product, however, the only documented contact between UAW Local Union 1183 representatives was by letter dated February 13, 2006. Doc. # L

A breach of a duty of fair representation occurs when the Union acts based on improper motivation or in a manner which is arbitrary, perfunctory, or inexcusably neglectful.

UAW Local 1183 through its representatives, its president, representative shop stewards and insurers created a breach of its duty of fair representation, when upon my termination on May 5, 2005, U.A.W. Local 1183, failed to enter a grievance on my behalf.

The UAW Local 1183 violated my Title VII rights and the Civil Rights Act of 1967, as an American of African Decent, in addition to discriminating against me because of my color, when it intentionally refused to honor the negotiated Local Agreement and failed to adequately represent a union member.

Sub paragraph (c) of Labor organization practices, states that it

shall be an unlawful employment practice for a labor organization, (1) to

exclude or to expel from its membership, or otherwise to discriminate

against, any individual because of his race, color, religion, sex, or national

origin; (2) to limit, segregate, or classify its membership or applicants for

membership, or to classify or fail or refuse to refer for employment any

individual, in any way which would deprive or tend to deprive any

individual of employment opportunities, or would limit such employment

opportunities or otherwise adversely affect his status as an employee or as

an applicant for employment, because of such individual's race, color,

religion, sex, or national origin; or (3) to cause or attempt to cause an

employer to discriminate against an individual in violation of this section.

     Title 42 U.S.C. 2000e-2, A (1),C(1)(2)(3).

     The U.A.W. acted in a perfunctory manner in regards to

Its failure to properly conduct an investigation into the facts concerning my

termination of employment from Daimler Chrysler Corporation and the

ineffective representation of a union member.

     A proximate cause of the breach of fair representation by U.A.W.

Union Local 1183 suffered  economic loss due its union officials failure of

representation regarding my termination of employment at the Daimler

Chrysler Corporation.

Because of the inaction of the leadership of the U.A.W. Local Union 1183, its agents and insurers I have suffered harm to my reputation and also as a direct result of the retaliatory   actions of the Defendants Daimler Chrysler Corporation, Union 1183 and its agents and isurers for its violation of title VII of the Civil Rights Act of 1964, and 42 U.S.C. 2000e-2, A (1),C(1)(2)(3).

The plaintiff seeks both compensatory and punitive damages for the harm inflected by the breach caused by UAW Local 1183, its agents and insurers and its indifference to its minority membership.

Therefore, it is for the above stated reasons the Plaintiff prays that the Court accepts the facts contained within this Supplemental Amended Complaint and find in favor of the Plaintiff's Supplemental Amended Complaint.

Respectfully Submitted

David A. Smiley
Pro Se

## CERTIFICATE OF SERVICE

I hereby certify this 27th day of September, 2007, that two (2) true and correct copies of

the foregoing **Plaintiff DAVID A. SMILEY'S SUPPLEMENTAL AMENDED COMPLAINT** was
served by

U.S. First Class Mail, postage prepaid, to the following:

> Jennifer Wasson (No. 4933)
> Hercules Plaza - Sixth Floor
> 1313 North Market Street
> Wilmington, DE 19801
> (302) 984-6165 (Telephone)
> (302) 658-1192 (Facsimile)
> Jwasson@potteranderson.com (Email)

David A. Smiley, pro se
26 Mackay Lane
Newark, DE 19713
(302) 266-8245 (Residence)
(302) 345-3395 (Cellular)
Dasmyle2@aol.com (Email)