## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID A. SMILEY,     )
            )
   Plaintiff,      )
            )  C.A. No. 1:07-005-SLR
   v.         )
            )
DAIMLER CHRYSLER,    )  JURY TRIAL DEMANDED
            )
   Defendant.     )
            )

## DEFENDANT CHRYSLER LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Jennifer Gimler Brady (#2874)
Jennifer Wasson (#4933)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000 – Telephone
(302) 658-1192 - Facsimile
jbrady@potteranderson.com
jwasson@potteranderson.com

*Attorneys for Defendant Chrysler LLC*

Dated:  May 15, 2008
861948v3 / 31959

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS ....................................................................1

SUMMARY OF ARGUMENT ...............................................................................................2

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT ......................................................................................................................12

I.      SUMMARY JUDGMENT STANDARD .........................................................................12

II.     CHRYSLER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ADA
        CLAIMS ...................................................................................................................12

        A.      Plaintiff Does Not Have An ADA-Qualifying Disability......................................12

        B.      Plaintiff Has No Claim For Failure To Accommodate...........................................18

        C.      Plaintiff's Termination Does Not Constitute Disability Discrimination ...............22

CONCLUSION ....................................................................................................................30

i

# TABLE OF AUTHORITIES

CASES

**Pages**

*Albertson's, Inc. v. Kirkingburg,*
    527 U.S. 555 (1999)..................................................................................14

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................12

*Bielek v. Allegheny Ludlum Corp.,*
    2006 U.S. Dist. LEXIS 73335 (W.D. Pa. Sept. 22, 2006)....................................15, 21

*Cella v. Villanova Univ.,*
    113 Fed. Appx. 454 (3d Cir. 2004)................................................................14

*Cochrum v. Old Ben Coal Co.,*
    102 F.3d 908 (7th Cir. 1996) .....................................................................19

*Crumpton v. St. Vincent's Hosp.,*
    963 F. Supp. 1104 (N.D. Ala. 1997)..............................................................15, 20

*Ellenbogen v. Projection Video Servs.,*
    2001 WL 736774 (S.D.N.Y. June 29, 2001) .....................................................29

*Fuentes v. Perskie,*
    32 F.3d 759 (3d Cir. 1994)........................................................................24, 26

*Gaul v. Lucent Techs.,*
    134 F.3d 576 (3d Cir. 1998).......................................................................23

*Guice-Mills v. Derwinski,*
    967 F.2d 794 (2d Cir. 1992).......................................................................20

*Horth v. General Dynamics Land Sys.,*
    960 F. Supp. 873 (M.D. Pa. 1997)...............................................................13, 17

*Johnson v. Board of County Comm'rs of Shawnee County,*
    2003 U.S. Dist. LEXIS 9370 (D. Kan. May 28, 2003)..........................................27

*Kelly v. Drexel Univ.,*
    94 F.3d 102 (3d Cir. 1996)........................................................................13

*Knox v. Brundidge Shirt Corp.,*
    942 F. Supp. 522 (M.D. Ala. 1996) ..............................................................17

*Lawrence v. National Westminster Bank N.J.*,
98 F.3d 61 (3d Cir. 1996)...........................................................................................23

*Madeirense DO Brasil S/A v. Stulman-Emrick Lumber Co.*,
147 F.2d 399 (2d Cir. 1945)........................................................................................12

*Marinelli v. City of Erie*,
216 F.3d 354 (3d Cir. 2000).................................................................................13, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...................................................................................................12

*McDonnell Douglas Corp. v. Green*,
411 U.S. 793 (1973)....................................................................................................23

*Miller v. Yale-New Haven Hosp.*,
2006 U.S. Dist. LEXIS 73280 (D. Conn. Sept. 28, 2006) .....................................23, 27

*Nuzum v. Ozark Auto. Distrib., Inc.*,
2005 U.S. App. LEXIS 28736 .....................................................................................15

*Pacheo v. Black & Decker Corp.*,
2006 U.S. Dist. LEXIS 88524 (E.D. Pa. Oct. 31, 2006)....................................15, 23

*Panzullo v. Modell's PA, Inc.*,
968 F. Supp. 1022 (E.D. Pa. 1997) ...........................................................................16

*Parker v. Verizon Pennsylvania, Inc.*,
2007 U.S. Dist. LEXIS 88303 (W.D. Pa. Nov. 30, 2007) .......................................26

*Rinehimer v. Cemcolift, Inc.*,
292 F.3d 375 (3d Cir. 2002).......................................................................................24

*Sears v. E.I. DuPont de Nemours & Co.*,
1999 U.S. Dist. LEXIS 15860 (D. Del. Sept. 30, 1999).........................................23

*Singletary v. Pennsylvania Dep't of Corr.*,
266 F.3d 186 (3d Cir. 2001).......................................................................................12

*Spencer v. Verizon Connected Solutions, Inc.*,
138 Fed. Appx. 449 (3d Cir. 2005).............................................................................17

*Taylor v. Phoenixville Sch. Dist.*,
184 F.3d 296 (3d Cir. 1999).......................................................................................18

*Tice v. Centre Area Transp. Auth.*,
247 F.3d 506 (3d Cir. 2001).......................................................................................13

*Toyota Motor Mfg. Kentucky, Inc. v. Williams*,
    534 U.S. 184 (2002)................................................................................................13, 14

*Trobia v. Henderson*,
    315 F. Supp. 2d 322 (W.D.N.Y. 2004)..................................................................21

*U.S. Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002)..............................................................................................19


## STATUTES

42 U.S.C. § 12101 *et seq*.............................................................................................1, 2

42 U.S.C. § 12102(2) ......................................................................................................13

42 U.S.C. § 12111(9) ......................................................................................................18

42 U.S.C. § 12112............................................................................................................12

42 U.S.C. § 12112(b)(5)(A).............................................................................................18


## OTHER AUTHORITIES

29 C.F.R. § 1630.2(j)(3)(i)...............................................................................................16

29 C.F.R. § 1630.2(o)(1)(ii).............................................................................................18

Fed. R. Civ. P. 56(c) .......................................................................................................12

## NATURE AND STAGE OF THE PROCEEDINGS

This disability discrimination case is brought by Plaintiff David A. Smiley ("Plaintiff"), a former employee of Defendant DaimlerChrysler Company LLC, now known as Chrysler, LLC ("Chrysler" or "the Company"). On August 2, 2005, Plaintiff filed a Charge of Discrimination against Chrysler with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC"). (A284.)[1] In his Charge, Plaintiff alleged that Chrysler failed to accommodate his alleged disability and wrongfully terminated his employment in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. On May 31, 2006, the Delaware Department of Labor issued a "no cause" finding and a Right to Sue notice in Plaintiff's case. (A285-286.) The EEOC adopted the findings of the DDOL and issued a federal Right to Sue notice on October 4, 2006. (A287.)

On January 4, 2007, Plaintiff filed the instant action using the Title VII discrimination complaint form issued by the Court as his pleading. (D.I. 2.) Plaintiff, who is proceeding pro se and in forma pauperis, initially named Chrysler as the only defendant in his lawsuit. (D.I. 2; 4.) On January 17, 2007, the Court ordered Plaintiff to complete USM 285 forms so that a U.S. Marshal could serve his complaint. (D.I. 5.) Plaintiff did not return these forms until May 4, 2007. (D.I. 5.) On July 5, 2007, Chrysler timely responded to Plaintiff's complaint. (D.I. 9.) A few days after receiving Chrysler's answer, and nearly six months after filing his pleadings, Plaintiff wrote to the Court requesting that he be permitted to amend his complaint to join two former Chrysler plant physicians and Dawn Ford, an employee in Chrysler's Human Resources Department, as well as to bring various additional claims. (D.I. 11.) Plaintiff's initial

---

[1] Pertinent documentary evidence and excerpts of Plaintiff's deposition transcripts are included in Chrysler's Appendix to its Opening Brief in Support of its Motion for Summary Judgment, referred to herein as ("A___"), and filed contemporaneously herewith.

submission did not comply with the Court's rules on motion practice, and the Court granted him a second opportunity to file a proper motion to amend his complaint. (D.I. 16.)

On September 27, 2007, Plaintiff filed a motion to amend the complaint, seeking to join the above-referenced individuals and to add a claim for racially hostile work environment against Chrysler. (D.I. 17-18.) He also moved to join the United Auto Workers Local 1183 (the "union") as a defendant. Chrysler filed a brief in opposition to Plaintiff's motion. (D.I. 19.) On February 21, 2008, the Court denied Plaintiff's request to join the proposed individual defendants and to add a hostile work environment claim against Chrysler. (D.I. 26, 27.) The Court granted Plaintiff's request to join the union to this action. (*Id.*)

Plaintiff and Chrysler have exchanged written discovery requests and responses, and Plaintiff was deposed on April 9 and April 15, 2008.[2] Plaintiff took no depositions. Under the parties' Amended Case Scheduling Order, discovery closed on April 15, 2008. (D.I. 24.) Chrysler now moves for summary judgment on all of Plaintiff's claims against it. This is Chrysler's Opening Brief in support of its motion for summary judgment.

## SUMMARY OF ARGUMENT

Chrysler is entitled to summary judgment on Plaintiff's ADA claims because Plaintiff cannot show that he is disabled. Though Plaintiff sustained an injury to his right elbow, his deposition testimony reveals that this injury does not substantially limit him in any major life activities, including the major life activity of working. Instead, he can perform many manual tasks and has worked in a variety of jobs since his termination from Chrysler.

---

[2] On April 9, 2008, Plaintiff requested that his deposition be adjourned prior to its conclusion due to another commitment in his schedule. The parties mutually agreed to continue the deposition on April 15, 2008.

Further, even if Plaintiff could show that his elbow condition renders him disabled, his ADA claims fail because he cannot demonstrate that Chrysler discriminated against him in any way. Though Plaintiff asserts that he was denied a reasonable accommodation, he was permitted to modify the tools he used on the job, was granted medical leaves whenever he requested them, and was placed in an accommodated position consistent with his medical restrictions and approved by his union representatives, an OSHA nurse, and the Plant Safety Department. While Plaintiff views this accommodated position as a "demotion," he experienced no change in pay, benefits, seniority, or status. Furthermore, Plaintiff never complained that this accommodated position was insufficient, and he never identified or requested another accommodation he deemed more appropriate. Therefore, Plaintiff has no claim for failure to accommodate under the ADA.

Likewise, Plaintiff has no evidence to show that his termination from employment was motivated in any way by discriminatory animus based on his alleged disability. On the contrary, Plaintiff was discharged because he refused to comply with Chrysler's medical substantiation policies after being given two opportunities to do so. Plaintiff cannot show that the decision-maker responsible for his termination, whom he had not met until the day in question, had any reason to discriminate against him or was even aware of his medical condition. Finally, Plaintiff's claims of unlawful discrimination are undermined by Chrysler's agreement to reinstate Plaintiff to resolve his union grievance, an offer that Plaintiff failed to pursue. Accordingly, as discussed more fully below, Plaintiff's claims against Chrysler are wholly without merit and should be dismissed.

3

## STATEMENT OF FACTS

In April 1989, Chrysler hired Plaintiff to work on the assembly line at its Newark, Delaware manufacturing plant. (Pl. Dep. at A7.) Plaintiff worked primarily in the Body Shop, where he acquired various skills and moved up the ranks to perform the highest-level position in that department, that of Tech 1 installer. (Pl. Dep. at A8-9.) In his most recent position as a Tech 1 installer, Plaintiff performed the Right Side Door Fitter job. (Pl. Dep. at A9; Standard Work Instruction, Pl. Dep. Ex. 1 at 1, A252.) Among other things, this job involved ensuring that the vehicle doors on the right side opened and closed properly and conformed to specifications. (Pl. Dep. at A9-10; Standard Work Instruction, Pl. Dep. Ex. 1 at 1, A252.) The physical requirements of Plaintiff's job included lifting fifteen pounds routinely, pulling and pushing the door and frame, and using his arms, elbows, fingers, and shoulders to loosen and tighten various bolts and to fit the door into its proper place in the frame. (Pl. Dep. at A13-15.)

In September 2003, Plaintiff injured his right elbow on the job. (Pl. Dep. at A43; A53.) His physician, Dr. Bandera, diagnosed him with lateral epicondylitis, or "tennis elbow," and prescribed various treatments for his condition. (Pl. Dep. at A44-45; Nov. 1, 2004 Bandera Note, A271.) Plaintiff took several short medical leaves of absence for his elbow injury, all of which Chrysler approved. (Pl. Dep. at A51-52.) Chrysler also permitted Plaintiff to use a lighter hammer to do his work. (Pl. Dep. at A54.) Plaintiff could perform all his job duties with the lighter hammer. (Pl. Dep. at A55-56.) In February 2004, Plaintiff filed a claim for worker's compensation benefits based on his elbow injury. (Chrysler Medical Notes, A263; Pl. Dep. at A34-36.) Chrysler did not challenge Plaintiff's receipt of benefits.[3] (Pl. Dep. at A86.)

---

[3] Plaintiff continues to receive worker's compensation benefits today. He has received $361.37 in worker's compensation pay each week since 2005. (Pl. Dep. at A34.)

4

In July 2004, after continuing to work in the Right Side Door Fitter position for some time after his injury, Plaintiff's physician recommended he be placed on a leave of absence for his elbow condition. (July 12, 2004 Bandera Note, A265.) Plaintiff was placed on an approved medical leave, and he received worker's compensation payments during his leave. (Pl. Dep. at A34; A256.) In September 2004, Plaintiff was sent for an independent medical examination with Dr. Meyers to assess his ability to return to work. (Expert Medical Examination Report, A266-270.) Dr. Meyers concluded that Plaintiff could return to work with restrictions. (*Id.* at A270.) Chrysler's plant physician, Dr. Sabo, also examined Plaintiff in November 2004 and agreed with Dr. Meyer's conclusion. (Chrysler Medical Notes, A259.)

While Plaintiff was out of work, Chrysler's PQX Placement Committee considered whether he could work in an alternative position given his restrictions, or "PQXs."[4] (Pl. Dep. at A63-65; Affidavit of Steve Heitzmann, A250 ¶ 4.) The PQX Placement Committee, which consisted of management and union representatives, was responsible for determining appropriate temporary work assignments for injured workers consistent with their PQXs and their seniority rights under the Collective Bargaining Agreement. (Pl. Dep. A67; A256; Heitzmann Aff., A250 ¶¶ 3-4.) The Committee would brainstorm potential placements for such employees, then seek input from an OSHA nurse and the Plant Safety Department before approving the alternative work assignments.[5] (Pl. Dep. at A67; Heitzmann Aff., A250 ¶ 4.)

---

[4] "PQX" stands for "physically qualified with limitations." (Heitzmann Aff., A250 ¶ 3.) PQXs are the internal codes Chrysler uses to categorize the various physical limitations and restrictions of employees.

[5] Plaintiff was a member of the bargaining unit and was actively involved with union activities during his tenure at Chrysler. (Pl. Dep. at A17.) He served as a facilitator instructor, and alternate shop steward, and an alternate committeeman, all of which were appointed positions. (Pl. Dep. at A17-18.)

At the time the Committee considered Plaintiff's potential for reinstatement, he was restricted from repetitive twisting of the wrist and elbow and from lifting more than fifteen pounds with his right arm. (A256; Pl. Dep. at A66-67.) In light of these restrictions, the Committee believed that the Left Fender Install position would be an appropriate placement for Plaintiff. This position was located in Plaintiff's department, the Body Shop, and was classified as a Tech 2 job. (Pl. Dep. at A64-66; 143.) The job involved using a plunging tool called a "Yankee" to attach the fender to the frame of the vehicle. (Pl. Dep. at A69-70.) The Yankee weighed approximately five pounds, and the fender weighed approximately fifteen pounds. (Pl. Dep. at A72-73.) Chrysler's OSHA nurse and the Plant Safety Department reviewed Plaintiff's restrictions and the job duties associated with this position, and both approved this placement. (A256; see Pl. Dep. at A67.)

On February 7, 2005, Chrysler sent Plaintiff a letter instructing him to reinstate to the Left Side Fender Install position per the decision of the PQX Placement Committee. (February 7, 2005 Chrysler Letter to Plaintiff, A272.) Plaintiff reported to work without objection. (Pl. Dep. at A66.) A few days later, on February 14, 2005, Plaintiff visited the Plant Medical Department for a follow-up exam. (Chrysler Medical Notes, A259.) Chrysler's plant physician examined his elbow and re-affirmed his lifting restriction. She did not, however, impose any restrictions on repetitive movements of his elbow or wrist. (Id.)

A few days after Plaintiff began working as a Left Side Fender Installer, his right elbow began to swell. (Pl. Dep. A74.) Once the swelling began, Plaintiff used his left arm instead of his right to perform his job duties. (Pl. Dep. at A74-76.) He visited the Plant Medical Department once during that week to request ice for his elbow, which was not observed to be swollen at that time. (Chrysler Medical Notes, A260.) Plaintiff did not tell his shop steward or

anyone in Chrysler's management that he was having difficulty. (Pl. Dep. at A73; 76; 132-133.) After a week of working in this position, however, Plaintiff returned to his doctor, who recommended another medical leave of absence. (Pl. Dep. at A75.) Plaintiff was placed on medical leave from February 18, 2005, the date his doctor removed him from work, until his termination in May 2005. (Pl. Dep. at A91.)

Under Chrysler's absence policy, individuals on medical leave are required to report to the Plant Medical Department for periodic examinations with the plant physician. (Pl. Dep. at A80; Affidavit of Dawn Ford, A244, ¶ 2.) These examinations are designed to provide Chrysler with a current assessment of the individual's medical condition and updated information on the individual's restrictions. (*Id.*) On May 4, 2005, Plaintiff missed an appointment with Chrysler's plant physician. (Pl. Dep. at A93; Chrysler Medical Note, A277; Ford Aff., A245, ¶ 7.) This appointment was scheduled during Plaintiff's February 14, 2005 examination and was documented on his Medical Pass.[6] (Ford Aff., A245, ¶ 7; February 14, 2005 Medical Pass; A273.)

On May 6, 2005, Shannon West, a Human Resources Generalist in Chrysler's Personnel Department, sent Plaintiff a letter via overnight mail notifying him of the missed appointment and instructing him to report to the Personnel Department with documentation from his physician to substantiate his absence. (May 6, 2005 Chrysler Letter to Plaintiff and Delivery Information, A278-279; Pl. Dep. at A91-92; Ford Aff., A245, ¶ 7.) The letter, which was a standard form, directed Plaintiff to provide satisfactory evidence substantiating his absence by May 13, 2005 and warned that if he failed to do so, his seniority would be terminated. (Ford Aff.

---

[6] Plaintiff claims that he does not remember receiving a copy of his Medical Pass. (Pl. Dep. at A82-83.) However, it is Chrysler's practice to give employees a copy of the Medical Pass so that they know their current restrictions and the date of their next scheduled exam. (Ford Aff. A244, ¶ 3.)

A244, ¶ 4; May 6, 2005 Chrysler Letter to Plaintiff, A278.)  Enclosed with this correspondence was Chrysler's policy setting forth the documentation requirements for substantiation of absences.[7]  (Pl. Dep. at A94-95; Ford Aff., A244, ¶ 4; Chrysler Substantiation Requirements, A257.)

On the morning of May 13, 2005, Plaintiff reported to Chrysler's Personnel Department, where he encountered Ford.  (Pl. Dep. at A97; Ford Aff., A245, ¶ 8; Substantiation Denial, A280.)  He had never formally met Ford before that time, nor had he ever spoken to her.  (Pl. Dep. at A97-98; Ford Aff., A245, ¶ 8.)   Plaintiff gave Ford copies of notes written on prescription pads from Dr. Bandera's office corresponding to each of the weeks he was absent since his medical leave began in February 2005. (Copies of Bandera Notes, A274.)  Plaintiff did not provide the original notes from his physician, but instead submitted photocopies of these documents.  (Pl. Dep. at A99, 101; Copies of Bandera Notes, A274; Ford Aff., A245, ¶ 9.)  Chrysler does not accept faxed or photocopied notes as proper substantiation, however, given the risk that an employee could add or white-out information from the original note and submit a copy of the altered note in its place.  (Ford Aff., A245, ¶ 6.)  To avoid that prospect, Chrysler requires original medical documentation with the physician's signature on office letterhead.  (Id.; Chrysler Policy, A257.)

When Ford asked Plaintiff for his original documents, Plaintiff responded that they were at home.  (Pl. Dep. at A116-118; A163-163; Ford Aff., A245, ¶ 9; May 13, 2005 Ford Memo, A281.)  Plaintiff told Ford that his photocopies were identical to his originals, but Ford would not accept them. (Pl. Dep. at A161-162; Ford Aff., A246, ¶ 9.)  Ford also noticed that Plaintiff's

---

[7] Plaintiff is not absolutely sure that he received a copy of the substantiation policy with his letter. (Pl. Dep. at A94-95.)  However, he thinks the policy was "probably" enclosed with this correspondence, and it is Chrysler's practice to include a copy of the policy as a matter of course with all medical substantiation letters. (Pl. Dep. at A94; Ford Aff., A244, ¶ 4.)

notes did not include Chrysler's "DX code," the diagnostic code corresponding to Plaintiff's injury. (Pl. Dep. at A101; A103; Ford Aff., A247, ¶ 9.) As a result, Ford told Plaintiff that his notes were deficient. (Pl. Dep. at A103; Ford Aff., A246, ¶¶ 9-10.) She wrote the requirements Plaintiff needed to fulfill on a form ordinarily used for employees reinstating to work. (Pl. Dep. at A127; Substantiation Denial, A280; Ford Aff., A247, ¶ 10.) Although this particular form did not expressly apply to Plaintiff, who was on an approved medical leave, Ford used it because it was the only form readily available at the front desk at that time, and she crossed out the inapplicable information and wrote in the correct substantiation requirements for Plaintiff. (Ford Aff., A247, ¶ 10.) Ford prepared this form in Plaintiff's presence. (Pl. Dep. A97-98; Ford Aff., A277, ¶ 10.) Ford offered the form to Plaintiff so there would be no question as to the precise documentation he needed to obtain from his doctor, and she asked him to sign it as an acknowledgment of their conversation. (Pl. Dep. at A102-103; 164; Ford Aff., A246, ¶ 10.) Plaintiff, however, refused to accept the form and would not sign it. (Pl. Dep. at A103; 140-141; Ford Aff., A246, ¶ 10; May 13, 2005 Ford Memo, A281.)

Because Plaintiff already had been given several days to comply with Chrysler's substantiation requirements, Ford informed him that he needed to submit the proper documentation to the Personnel Department by 3 p.m. that afternoon. (Pl. Dep. at A108-109, A113; Ford Aff., A246, ¶ 11; May 13, 2005 Ford Memo, A281.) Plaintiff never objected to that deadline or told Ford he needed more time; instead, he told her that he would be back. (Pl. Dep. at A112, 115-118, 165-166; Ford Aff., A246, ¶ 11; May 13, 2005 Ford Memo, A281.)

Plaintiff did not retrieve his original notes from home. Instead, he visited Dr. Bandera's office and asked the receptionist to write the appropriate DX code on his photocopies of Dr. Bandera's notes. (Pl. Dep. at A106; 109-110; 112.) Then he made a copy of the photocopied

notes and returned to Chrysler, where he submitted this photocopy of a photocopy to Angenella Fleming, a Personnel Department Administrator. (Pl. Dep. at A117-118; 121; Ford Aff., A247, ¶ 12; May 13, 2005 Ford Memo, A281; Copies of Bandera Notes with DX Inserted; A275.) Plaintiff did not verify with Ford that this photocopy would be acceptable, and, though he claims that he attempted to call the Personnel Department later that afternoon, he did not leave a message on the voicemail system or follow up in any other manner that day. (Pl. Dep. at A168-169.)

Plaintiff's submission of photocopied doctor's notes did not meet Chrysler's substantiation requirements, and after the 3 p.m. deadline passed without any further word from Plaintiff, Chrysler terminated his employment as a result. (Ford Aff., A247, ¶ 13.) Ford sent Plaintiff a certified letter informing him of his termination. (Pl. Dep. at A128; Termination Letter, A282; Ford Aff., A247, ¶ 13.) Plaintiff also was made aware of his termination when he called the Personnel Department on Monday and was told to contact his union steward. (Pl. Dep. at A129.)

Plaintiff did contact his union representative, who filed a grievance on his behalf. (Pl. Dep. at A172; 176; Grievance Form, A283.) Given Plaintiff's failure to properly substantiate his injury despite Ford's instructions, Chrysler initially denied this grievance. (Grievance Form, A283; Heitzmann Aff., A250, ¶ 5.) However, after several negotiation sessions with Plaintiff's union representatives, Chrysler agreed to reinstate Plaintiff's employment. (Heitzmann Aff., A250, ¶ 5.) On April 3, 2006, Plaintiff's committeeman sent him a letter explaining that the "Union and Management had reached a comparable decision on your behalf for your reinstatement of employment." (April 3, 2006 UAW Local Letter to Plaintiff, A276; Heitzmann Aff., A250-251, ¶ 5.) The letter requested that Plaintiff contact his union representative within

five days to discuss "his continued employment at DaimlerChrysler." *(Id.)* Despite this offer, Plaintiff chose not to pursue reinstatement and focused instead on the Charge of Discrimination he had filed with the Delaware Department of Labor and the EEOC. (Pl. Dep. at A196; 201; Charge of Discrimination, A284; Heitzmann Aff., A251, ¶ 6.) Although Plaintiff has held several jobs since his termination from Chrysler, he is currently unemployed. (Pl. Dep. at A20-27.)

11

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, affidavits, depositions, and other discovery demonstrates that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, the moving party has the burden to show that no material factual issues exist for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  That burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof.  *Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (internal citations and quotations omitted).  The ruling on summary judgment "is to be made on the record the parties have actually presented, not on one potentially possible."  *Madeirense DO Brasil S/A v. Stulman-Emrick Lumber Co.*, 147 F.2d 399, 405 (2d Cir. 1945).  Because the record evidence demonstrates that Chrysler is entitled to judgment as a matter of law, as discussed below, summary judgment should be granted in its favor.

### II.    CHRYSLER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ADA CLAIMS.

#### A.    Plaintiff Does Not Have An ADA-Qualifying Disability.

To sustain both his failure to accommodate and wrongful termination claims under the ADA, Plaintiff must show that he is a qualified individual with a disability.  *See* 42 U.S.C. § 12112.  An individual is disabled within the meaning of the ADA if he has a physical or mental impairment that substantially limits one or more of his major life activities.[8]  *See* 42 U.S.C.

---

[8] The ADA provides that a plaintiff also is disabled within the meaning of the statute if he has a record of a substantially limiting impairment or is regarded as having such an impairment.  *See*

§ 12102(2); *Toyota Motor Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002).    Major

life activities are those functions that are of central importance to daily life. *Williams*, 534 U.S.

at 198.    A person is substantially limited in a major life activity if he is unable to perform that

activity "as compared to the condition, manner or duration under which the average person in the

general population can perform the same major life activity." *Kelly v. Drexel Univ.*, 94 F.3d 102,

105 (3d Cir. 1996) (internal quotations omitted).    Impairments that result in only mild limitations

on major life activities are not disabilities.    *Id.* at 107.    Instead, "only extremely limiting

disabilities . . . qualify for protected status under the ADA." *Marinelli v. City of Erie*, 216 F.3d

354, 362 (3d Cir. 2000).

Plaintiff has been diagnosed with lateral epicondylitis in his right elbow and currently

receives workers' compensation for this injury. (Nov. 1, 2004 Bandera Note, A271; Pl. Dep. at

A36.)    Neither a medical diagnosis of an impairment nor a workers' compensation award,

however, is determinative of whether Plaintiff suffers from an ADA-qualifying disability. *See*

*Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 513 n.5 (3d Cir. 2001) ("[I]t is well-established

that a particular diagnosis, no matter how severe . . . standing alone, is not sufficient to establish

'disability.'"); *Horth v. General Dynamics Land Sys.*, 960 F. Supp. 873, 880 (M.D. Pa. 1997)

("[B]ecause the criteria in determining a workers' compensation award are different from those

applied under the ADA, a workers' compensation award is not dispositive in an ADA case.").

Instead, the Court must undertake a factual analysis of the particular individual's abilities and

limitations in light of the guiding principles of the ADA. *See Albertson's, Inc. v. Kirkingburg*,

---

42 U.S.C. § 12102(2); *Toyota Motor Mfg. Kentucky Inc. v. Williams*, 534 U.S. 184, 193 (2002).
Plaintiff has never alleged, and there is no evidence to establish, that he has a record of a
disability or that Chrysler ever regarded him as disabled; therefore, the instant analysis will focus
on Plaintiff's ability to prove he is disabled under the first prong of the ADA analysis.

527 U.S. 555, 566 (1999). In this case, such an assessment demonstrates unequivocally that Plaintiff is not disabled.

For example, Plaintiff asserts that, despite his elbow injury, he can hug and pick up his children, cook and clean, drive, walk, stand, bathe, and dress himself. (Pl. Dep. at A40-41.) He acknowledges that he is "fully capable of taking care of" himself. (Pl. Dep. at A41.) He takes over-the-counter Tylenol a few times per week for pain in his elbow, but otherwise is on no medication.[9] (Pl. Dep. at A49-50.) While Plaintiff claims that his condition impedes his ability to work on his truck, he concedes that he still can perform routine maintenance on this vehicle. (Pl. Dep. at A39.) Indeed, apart from noting the financial implications of his current unemployed status, Plaintiff testified only in generalities about the impact his elbow injury has had on his daily life. He asserted that he has to use his left arm and hand more often that he used to, especially in picking up and caring for his children, and that the injury has "caused more of a readjustment . . . in the way that I do things." (Pl. Dep. at A50-51.) These facts are insufficient to show that Plaintiff's elbow condition imposes substantial limitations on his ability to perform normal, day-to-day activities. *See Cella v. Villanova Univ.*, 113 Fed. Appx. 454, 455 (3d Cir. 2004) (finding that plaintiff diagnosed with lateral epicondylitis was not disabled because he could still perform major life functions, even though he experienced some pain in doing so).

In fact, courts routinely dismiss ADA cases in which plaintiffs make similar allegations. *See, e.g., Williams*, 534 U.S. at 184 (finding that plaintiff who could "brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house" was not disabled); *Nuzum v. Ozark Auto. Distribs., Inc.*, 2005 U.S. App. LEXIS 28736, at *25-26 (8th

---

[9] Although Plaintiff alleges that he does not take any prescription mediation for his elbow because he cannot afford to do so, he also asserts that he does not like pharmaceuticals and is reluctant to take any medicine. (Pl. Dep. at A49-50.)

Cir. Dec. 27, 2005 (granting summary judgment in favor of employer on ADA claims brought by plaintiff with tendinitis in his left elbow; plaintiff's limitations on lifting more than fifteen pounds, doing certain household chores, hugging his wife, and working on his cars did not rise to the level of a disability under the ADA); *Pacheo v. Black & Decker Corp.*, 2006 U.S. Dist. LEXIS 88524, at *19 (E.D. Pa. Oct. 31, 2006) (dismissing ADA-plaintiff's claims on summary judgment; although plaintiff's carpal tunnel syndrome prevented her from carrying her grandchild, carrying heavy pots, folding certain laundry items, washing multiple dishes at a time, or lifting more than fifteen pounds, these limitations were not sufficient to demonstrate that plaintiff was disabled); *Bielek v. Allegheny Ludlum Corp.*, 2006 U.S. Dist. LEXIS 73335, at *34-38 (W.D. Pa. Sept. 22, 2006) (granting judgment as a matter of law for employer on plaintiff's ADA claim when plaintiff could care for her grandchildren, cook meals, perform chores, drive, and clean). Because Plaintiff's testimony does not demonstrate that he is substantially limited in any major life activities, he is not disabled under the ADA.

Neither can Plaintiff rely on his medical restrictions to establish his disability. During the time period at issue, Plaintiff was restricted by his physician from lifting greater than fifteen pounds and from performing repetitive twisting motions with his wrist and elbow. (PQX Placement Document A256; Pl. Dep. at A67.) However, "the presence of limitations preventing a person from performing heavy lifting or repetitive movements have been determined to be insufficient alone to establish any substantial limitation due to an impairment." *Crumpton v. St. Vincent's Hosp.*, 963 F. Supp. 1104, 1114 (N.D. Ala. 1997); *see also Marinelli*, 216 F.3d at 364 (entering judgment as a matter of law in favor of employer on ADA claim where employee was subject to 10-pound lifting restriction, as such limitation was not sufficiently different from the general population to establish disability); *Panzullo v. Modell's PA, Inc.*, 968 F. Supp. 1022,

15

1024 (E.D. Pa. 1997) (granting employer's motion for summary judgment on plaintiff's ADA claim, finding that neither a "general weightlifting or light-duty work limitation nor a restriction against performing heavy work per se constitutes a disability under the ADA"). Plaintiff's restrictions have not impeded him from doing many, if not all, of his normal day-to-day activities. Thus, the fact that Plaintiff is restricted from certain tasks does not qualify him as disabled.

Finally, should Plaintiff allege that he is substantially limited in the major life activity of working, he cannot adduce evidence sufficient to make this showing. To be substantially limited in the ability to work, a plaintiff must prove that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The relevant inquiry is "whether the particular impairment constitutes for the particular person a significant barrier to employment." *Panzullo*, 968 F. Supp. at 1024 (internal citations omitted). In this case, Plaintiff's own actions in applying for and obtaining jobs confirm that he is not substantially limited in his ability to work.

Since his termination from Chrysler in May 2006, Plaintiff has worked as an office manager for a tax preparation service, a district salesperson at a furniture store, and a loss mitigation associate in the financial department of a car company. (Pl. Dep. at A21; 25.) Although Plaintiff has since left each of these jobs, his reasons for leaving had nothing to do with his ability to meet the physical requirements of the work.[10] Plaintiff also has applied for a broad range of jobs since his termination from Chrysler, including as a document scanner, proofreader,

---

[10] For example, Plaintiff explained that he left the tax preparation service because "I don't like taxes" (Pl. Dep. at A23), that he left the furniture store to take the job at the car company (Pl. Dep. at A25), and that he left the loss mitigation job due to problems with his work schedule (Pl. Dep. at A26).

and manager. (Pl. Dep. at A28.) Plaintiff even applied for a "pick and pack" job at Mopar, Chrysler's auto parts division, which involves retrieving various auto parts out of a warehouse and preparing them for shipment to dealers. (Pl. Dep. at A30-31.) Plaintiff also has considered returning to a manufacturing job, including work on an assembly line, if the available position did not involve repetitive motion of his arm. (Pl. Dep. at A33-34.) Plaintiff never once indicated that he would be unable to meet the physical requirements of any of the positions for which he applied, or that he would have obtained these jobs but for his physical limitations. Indeed, Plaintiff admitted that his alleged disability was not an issue at any of the jobs he held post-termination from Chrysler. (Pl. Dep. at A238-239.)

Finally, it is important to note that Plaintiff obtained his college degree in paralegal studies in August 2004. (Pl. Dep. at A5-6.) Thus, not only can Plaintiff work in the various industries discussed above, but he also is qualified for employment in the legal field, which typically involves sedentary work in an office setting. Plaintiff's educational background and post-termination employment are wholly inconsistent with a finding that his elbow injury substantially limits him in the major life activity of working. *See Spencer v. Verizon Connected Solutions, Inc.*, 138 Fed. Appx. 449, 451 (3d Cir. 2005) (affirming grant of summary judgment for employer on plaintiff's ADA claim because plaintiff "asserted several times that he could work despite his back injury, and the record indicates that [plaintiff] was employed elsewhere at various times throughout this litigation"); *Horth*, 960 F. Supp. at 880 (finding that plaintiff who was restricted to light duty status was not limited in working given his ability to perform tasks of a less physical nature and his advanced degrees); *Knox v. Brundidge Shirt Corp.*, 942 F. Supp. 522, 531 (M.D. Ala. 1996) (granting summary judgment for employer on ADA claim; plaintiff with tendinitis in elbow and bursitis in shoulder failed to demonstrate that she was foreclosed

17

from a broad range of jobs as a result of her injuries and thus was not limited in the major life activity of working). In light of these facts, Plaintiff cannot show that he suffers from a disability within the meaning of the ADA, and his claims fail at the outset.

> B.    Plaintiff Has No Claim For Failure To Accommodate.

To state a claim for failure to accommodate under the ADA, Plaintiff must produce evidence demonstrating that: (1) he has a disability; (2) he can perform the essential functions of his job, with or without an accommodation; and (3) he suffered an otherwise adverse employment decision as a result of discrimination.[11] *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). An employer discriminates against a disabled employee when it does not make reasonable accommodation to the employee's known physical or mental limitations. *Id.*; 42 U.S.C. § 12112(b)(5)(A).

The EEOC has defined reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Such accommodations may include job restructuring, modified work schedules, and reassignment to a vacant position. 42 U.S.C. § 12111(9). In this case, Plaintiff's medical restrictions prevented him from performing the essential functions of his job as a Right Side Door Fitter. Accordingly, accommodations such as a modified work schedule or job restructuring were not feasible for Plaintiff. Instead, Chrysler convened its PQX Placement Committee, a joint union-management team, to consider Plaintiff's restrictions and the available jobs that Plaintiff could perform given

---

[11] As discussed above, Plaintiff's ADA claims fail at the outset because he cannot show that he is disabled. *See* Section II. A., *supra*. For completeness, however, Chrysler will discuss the third prong of Plaintiff's *prima facie* case in this section of its argument.

his skills and seniority level under the Collective Bargaining Agreement. (Heitzmann Aff., A250, ¶ 4.) Through this process, Chrysler attempted to accommodate Plaintiff by reassigning him to the Left Fender Install position, another position within the Body Shop that Plaintiff was qualified to do. (Pl. Dep. at A66; February 7, 2005 Chrysler Letter to Plaintiff, A272.) It is this accommodation that Plaintiff challenges. (Pl. Dep. at A143-148; 151-152; 230-231.)

Significantly, Plaintiff never objected to this assignment prior to or during his reinstatement, and he has never identified another accommodation that would have been more suitable given his seniority, department, and restrictions.[12] Instead, he simply complains that his transfer to the Left Fender Install position was unreasonable. (Pl. Dep. at A142-143.) Plaintiff's assertions on this point cannot sustain his failure to accommodate claim.

First, Plaintiff contends that Chrysler failed to reasonably accommodate him because the Left Fender Install position was a "Tech 2" job, while Plaintiff's regular position was classified as a higher-level "Tech 1" job. (Pl. Dep. at A142-144; 151.) Plaintiff believes that his temporary assignment to this lower-classification job constitutes a demotion. (Pl. Dep. A143-144; 151.) To demonstrate that this job placement was unreasonable or discriminatory, however, Plaintiff must proffer some evidence showing that, at the time he was reinstated, there were open Tech 1 positions for which he was qualified that were compatible with his medical restrictions. Plaintiff cannot point to any other open jobs that he could have done in the Tech 1 classification. (Pl. Dep. at A151-152 ("I don't know if they have a PQX for a tech 1. That aspect of it I'm not really sure.").) Furthermore, during his tenure in the Left Fender Install job, Plaintiff never

---

[12] *See generally U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 409 (2002) (employer is not required to assign employee to an accommodated position in violation of employer's seniority system); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912-913 (7th Cir. 1996) (employer not required to go outside terms of applicable collective bargaining agreement to accommodate an employee).

requested to transfer out of the Tech 2 position or inquired as to the availability of a Tech 1 position. (Pl. Dep. at A76.) *See Crumpton v. St. Vincent's Hosp.*, 963 F. Supp. 1104, 1115 (N.D. Ala. 1997) (rejecting plaintiff's allegations that employer did not make the necessary effort to assign her to a position that would not be a demotion when plaintiff presented no evidence that there were other open positions for which she was qualified and she never requested a transfer).

More importantly, Plaintiff also concedes that, though he was temporarily placed in a Tech 2 job, he did not experience any change in pay or seniority (Pl. Dep. at A144; 146), and he retained his status as a Tech 1 employee. (Pl. Dep. at A146-147 ("I hadn't been bumped from that position; therefore, I would still be a tech 1.")). Though Plaintiff may have viewed the Left Fender Install position as a demotion, he was never actually demoted with respect to the terms and conditions of his employment. Thus, the mere fact that Plaintiff's accommodated position was classified as a Tech 2 job is not evidence that this placement was unreasonable or discriminatory. *See Guice-Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992) (affirming summary judgment for employer on failure to accommodate claim; "[w]hen an employer offers an employee an alternative position that does not require a significant reduction in pay and benefits, that offer is a 'reasonable accommodation' virtually as a matter of law"); *Crumpton*, 963 F. Supp. at 1115 (ruling that accommodation plaintiff viewed as demotion was reasonable in part because plaintiff suffered no loss in pay).

Plaintiff further claims that his reassignment to the Left Fender Install position was unreasonable because it aggravated his elbow injury. (Pl. Dep. at A142-143.) Plaintiff concedes that the PQX Placement Committee considered an accurate list of his medical restrictions when making his placement decision, and he agrees that the Left Fender Install job conformed to his lifting restrictions. (Pl. Dep. at A67; 72-73; PQX Placement Document, A256.) Plaintiff also

acknowledges that his placement was approved by his union representatives, the OSHA nurse, and Chrysler's Safety Department. (Pl. Dep. at A65-67; PQX Placement Document, A256.) The crux of Plaintiff's argument is that his accommodated position did not comply with his restriction on repetitive twisting because the job involved using a "plunging" motion to work a mechanical tool called a Yankee. (Pl. Dep. at A71; 73; 89.)

Yet Plaintiff's testimony with regard to his work as a Left Fender Installer reveals that he operated the tool not by twisting his wrists or elbows, but by plunging the tool "in an up-and-down fashion." (Pl. Dep. at A71.) Indeed, Plaintiff testified that, "[t]hat's the only way to do it. There's no side to side. It's straight up and down." (Pl. Dep. at A71.) As such, the Left Fender Install job did not involve the type of side-to-side twisting motion from which Plaintiff was restricted, and there is no evidence that the union, the OSHA nurse, Chrysler's Safety Department, or anyone on the PQX Placement Committee knew or should have known that the Left Fender Install job would cause an aggravation of Plaintiff's elbow condition.[13]  *See Bielek*, 2006 U.S. Dist. LEXIS 73335, at *28-30 (dismissing plaintiff's failure to accommodate claim when all tasks assigned were within plaintiff's medical restrictions); *Trobia v. Henderson*, 315 F. Supp. 2d 322, 335 (W.D.N.Y. 2004) (rejecting plaintiff's argument that job placement was not a reasonable accommodation because it did not comport with his medical restrictions and made his condition worse; job fit within medical restrictions, and when plaintiff complained that job exacerbated his back, employer took steps to modify job).

Moreover, Plaintiff admits that he could perform the job with his left arm instead of his injured right arm, and that he used his left arm when he began to experience discomfort with his

---

[13] In fact, during the week that Plaintiff worked in the Left Fender Install position, he was examined by Chrysler's plant physician, who did not reinstate his twisting restriction. (Chrysler Medical Notes, A263.)

right elbow.[14]  (Pl. Dep. at A74-75.)  Plaintiff also never attempted to modify the job or to ask

his coordinator how to modify the job (Pl. Dep. at A77-78), and he never complained to any

member of management that he was having difficulty.  (Pl. Dep. at A73; 76.)   Instead, Plaintiff

simply "did [his] job."  (Pl. Dep. at A73; 76.)  Given these facts, Chrysler's management team

had no reason to believe that Plaintiff's placement was in any way problematic.  That Plaintiff

apparently re-aggravated his injury from working in this job is unfortunate, but it does not, on

this record, establish that Chrysler's attempt to accommodate Plaintiff was unreasonable or that

Chrysler discriminated against him.[15]   Thus, Plaintiff's failure to accommodate claim is without

merit and must be dismissed.

> C.    Plaintiff's Termination Does Not Constitute Disability Discrimination.

In addition to alleging that Chrysler failed to accommodate him, Plaintiff also claims that

Chrysler wrongfully terminated his employment on the basis of a disability.  To state a *prima*

*facie* case for wrongful discharge under the ADA, Plaintiff must show that: (1) he belongs to a

protected class; (2) he was qualified for the position in question; (3) he was subject to an adverse

---

[14] Plaintiff claims that this modification was problematic because he was not as efficient working
with his left arm as his right, and that continued work with his left arm would lead to problems
with his productivity. (Pl. Dep. at A132.)  However, Plaintiff concedes that his efficiency had
not become an issue during the time he performed the job with his left arm and that he never
mentioned his concerns about efficiency to his shop steward or anyone else. (Pl. Dep. at A132-
133.)

[15] Plaintiff also claims that his accommodation was inappropriate because he did not receive
adequate training to perform the Left Fender Install position. (Pl. Dep. at A142-143.)  Plaintiff
testified, however, that such job training was managed by the union, not by Chrysler. (Pl. Dep.
at A149-150).  Plaintiff further alleges that he was never consulted about whether he believed he
could do the Left Fender Install job, although he acknowledges his union's role as his
representative in the PQX process. (Pl. Dep. at 144-145, A146-147.)  While Plaintiff takes issue
with the adequacy of his training and the fact that no one from the union met with him to solicit
his feedback prior to the PQX Placement Committee meeting, Chrysler has no control over these
issues. (Pl. Dep. at A17, 64-65; 147-149.)    That Plaintiff is dissatisfied with his union's
representation in these respects does not mean that Chrysler discriminated against him or that its
decision to place him in the Left Fender Install job was unreasonable.

employment action as a result of discrimination.[16]  *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998).  Again, assuming without conceding that Plaintiff could meet the first two prongs of his *prima facie* case, his claim still fails, because he cannot point to any evidence that Chrysler acted with a discriminatory animus based on his alleged disability.  (Pl. Dep. at A234-235.) Indeed, when asked directly to identify other individuals who were treated more favorably than he with respect to the same type of adverse employment actions, Plaintiff could not point to even a single individual and instead simply replied, "I know [the discrimination] goes on, they know it goes on, it goes on, but to be able to put a finger on it, that is a whole different matter."  (Pl. Dep. at A235.)  These conclusory assertions of discrimination are wholly insufficient to defeat summary judgment.  *See Sears v. E.I. DuPont de Nemours & Co.*, 1999 U.S. Dist. LEXIS 15860, at *24 (D. Del. Sept. 30, 1999) ("Plaintiff cannot rely 'solely, upon bare assertions, conclusory allegations or suspicions,' to sustain his burden on summary judgment.") (internal citations and quotations omitted).

Even if Plaintiff could somehow make out a *prima facie* case, however, he cannot show that Chrysler's legitimate, non-discriminatory reason for his termination (*i.e.*, his failure to comply with Chrysler's substantiation policy) was a pretext for disability discrimination.[17]  To show that Chrysler's proffered reason for his termination is a pretext, Plaintiff must demonstrate

---

[16] Plaintiff has not presented any direct evidence of a discriminatory motive on Chrysler's part; therefore, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973), applies to his claim for wrongful termination.  *See Lawrence v. National Westminster Bank N.J.*, 98 F.3d 61, 68 (3d Cir. 1996) (using *McDonnell Douglas* framework to analyze ADA claims); *Pacheo*, 2006 U.S. Dist. LEXIS 88524, at *31-32 (explaining difference in analysis between mixed motive and pretext theories).

[17] Non-compliance with medical documentation requirements has been found to be a legitimate, non-discriminatory reason for terminating an employee.  *See, e.g., Miller v. Yale-New Haven Hosp.*, 2006 U.S. Dist. LEXIS 73280, at *14 (D. Conn. Sept. 28, 2006) (granting employer's motion for summary judgment on discriminatory termination claim under ADA, finding discharge for failure to comply with documentation requirement was non-discriminatory reason for termination and plaintiff could not show pretext).

such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in that reason such that a reasonable fact-finder could rationally find it unworthy of credence. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). He utterly fails to do so.

　　As an initial matter, Plaintiff's claims of pretext are untenable because he cannot show that Ford, the relevant decision-maker, was aware of his alleged disability.　To establish discrimination based on a disability, a plaintiff must demonstrate that the alleged discriminatory actor had knowledge of that disability. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002). Here, Plaintiff did not know Ford prior to his reporting to the Personnel Department on May 13, 2005, and he had never spoken to her before that day. (Pl. Dep. at A97-98.) He never discussed his elbow condition with Ford, and his doctor's notes did not reveal any information about it. (Pl. Dep. at A100-101; 171-172; Copies of Bandera Notes, A274.)　Additionally, as Plaintiff acknowledges, Chrysler's substantiation requirements pertain not just to those employees with substantially limiting or long-term impairments, but to all employees who are absent from work on account of illness, injury, or other temporary separation for five days or more. (Pl. Dep. at A96-97; Chrysler Substantiation Requirements, A257.)　Thus, when Plaintiff reported to the Personnel Department on May 13, 2005, Ford had absolutely no reason to believe that he was disabled – instead, she processed his medical documentation just as she would for any other absent employee.[18]　(Ford Aff., A245-256, ¶¶ 8-9.)　Because Plaintiff cannot establish that Ford was aware of his alleged disability, he cannot show that she discriminated against him on that ground.

---

[18] Ford likewise was not involved in any way in the PQX Placement Committee, and she does not maintain or review employee files in the Plant Medical Department. (Ford Aff., A247-248, ¶ 6.)

Neither can Plaintiff point to any other record facts demonstrating pretext. Plaintiff claims that Ford discriminated against him based on a disability by "altering" a form without authorization when she wrote out the requirements he needed to meet the substantiation policy. (Pl. Dep. at A155; 157; 173; Substantiation Denial, A280.)    Plaintiff apparently believes that these "alterations," including the request that he submit original documents, were not necessary for him to meet, and that once he obtained the proper DX codes, his submission was compliant. (Pl. Dep. at A110; 158.) Plaintiff's argument is flawed on several grounds.

First, there is nothing nefarious about Ford's supposed "alterations" – Ford was merely attempting to assist Plaintiff by giving him a list of the requirements he needed, and the reinstatement form she modified was the only one available at the front desk at the time. (Ford Aff., A246, ¶ 10.) While Plaintiff denies that Ford was being helpful, he has no evidence to show that her "alterations" to the form were motivated by any ill will, much less by a discriminatory animus based on his alleged disability. (Pl. Dep. at A128-129.)

Second, Ford did not modify Chrysler's substantiation policy in any way when she wrote the list of requirements for Plaintiff. Ford requested Plaintiff's original notes because Chrysler does not accept photocopied or faxed documentation, given the significant risk of its being altered. (Ford Aff., A245, ¶ 6.) Plaintiff contends that because Chrysler's substantiation policy does not explicitly mention original documents, he has no obligation to submit them. (Pl. Dep. at A111; *see* A159.) However, even though the policy does not use the word "original," it clearly anticipates the submission of original documents. The policy expressly prohibits two types of documents frequently submitted that would not be considered "original" – facsimiles and "rubberstamps" of physicians' signatures. (Chrysler Substantiation Requirements, A257.) Their prohibition directly reflects Chrysler's efforts to prevent fraud and alteration by requiring submission of original

documentation. (Ford Aff., A245, ¶ 6.)  Moreover, to the extent that there was any ambiguity or that Plaintiff did not understand the requirements, Ford explained them.  She specifically told Plaintiff that she wanted original documents and wrote "original notes" as a requirement on the form she offered to him, which he refused to accept. (Pl. Dep. at A158-159; 212; Ford Aff., A245-246, ¶¶ 9-10.)

Despite knowing that Ford had requested his original doctor's notes, Plaintiff chose to ignore her because he believed his documentation was good enough.[19] (Pl. Dep. at A158-159; 212.) Tellingly, Plaintiff testified that, after a point in their conversation, "[Ford] ranted about something [and] I kind of tuned her out . . . I focused on the DX code." (Pl. Dep. at A165; 212.) Plaintiff's opinions and interpretation of Chrysler's substantiation policy, however, are not controlling, and he is not entitled to substitute his views on sufficient substantiation for those of Chrysler. *See Parker v. Verizon Pennsylvania, Inc.*, 2007 U.S. Dist. LEXIS 88303, at *31 (W.D. Pa. Nov. 30, 2007) (rejecting plaintiff's ADA claim in part because "plaintiff's real argument boils down to his own disagreement with the soundness of Verizon's decision to terminate [him]").[20]

---

[19] Plaintiff disputes whether Ford explicitly told him that he "needed" to bring his original documents. (Pl. Dep. at A162.)  This contention is not sufficient to create a material issue of fact, however, because Plaintiff does not actually remember what Ford's exact words were and at some point he affirmatively "tuned her out." (Pl. Dep. at A107; 160; 165.) Plaintiff also admits that Ford "wanted" the originals (Pl. Dep. at A106; 117) and acknowledges that she wrote "original notes" as a requirement on the form she offered to him but which he declined to accept (Pl. Dep. at A106; 110).

[20] Significantly, even if Plaintiff could show that Ford was wrong or that he was justified in submitting his photocopied documents, which he cannot, these facts would not sustain his claims.  The Third Circuit has made clear that "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Here, because there is no evidence that Plaintiff's alleged disability was a factor in Ford's decision to terminate him, Plaintiff cannot meet his burden to demonstrate discrimination under the ADA.

Plaintiff also chose to ignore Ford's directives purportedly because he did not have time to go home for his notes given his schedule that day. (Pl. Dep. at A106; 112.) Plaintiff never explained his inability to retrieve his original documents to Ford or anyone else at Chrysler, and he never asked for additional time to meet the requirements. (Pl. Dep. at A111-113; 115-117.) Instead, despite being on notice that Chrysler wanted original documentation, Plaintiff returned to his doctor's office with his photocopies, asked the receptionist to write the DX code on them, and ultimately submitted *a copy of a photocopy* to Chrysler. (Pl. Dep. at A109-112; 118; 121; 129; 215.) Plaintiff refused to comply with Ford's instructions simply because he did not like them or agree with them, and his termination reflects this error in judgment, not discrimination.[21] *See Miller v. Yale-New Haven Hosp.*, 2006 U.S. Dist. LEXIS 73280, at *14-17 (D. Conn. Sept. 28, 2006) (granting summary judgment for employer on ADA claim when plaintiff was terminated for failing to comply with medical documentation policy; plaintiff had been on medical leave in the past,   knew the requirements for compliance, and had numerous opportunities to provide the documentation); *Johnson v. Board of County Comm'rs of Shawnee County*, 2003 U.S. Dist. LEXIS 9370, at *28 (D. Kan. May 28, 2003) (granting summary judgment for employer on wrongful termination claim under ADA where plaintiff submitted some medical documentation but failed to provide the precise documentation her employer requested).[22]

---

[21] Plaintiff's call to the Personnel Department that afternoon suggests that he must have been at least somewhat concerned about the sufficiency of his submissions. (Pl. Dep. at A168.) Though he had the opportunity to leave a message, however, he did not do so. (Pl. Dep. at A169.) Thus, as of 3 p.m. on May 13, 2005, Ford knew only that Plaintiff had failed, without any explanation, to comply with the substantiation policy.

[22] Interestingly, though Plaintiff emphasized that he did not provide the original doctor's notes to Chrysler because he is "programmed" to keep his original documents whenever he can (Pl. Dep. at A99-100), he has not been able to produce for Chrysler's inspection even one of his original doctor's notes from the February to May 2005 time period.

Plaintiff also claims that his termination was discriminatory because he was not given 24 hours to correct the deficiencies with his doctor's notes, but instead was given a deadline of 3 p.m. that day to comply with Chrysler's substantiation requirements. (Pl. Dep. at A154-155; Substantiation Denial, A280; May 13, 2005 Termination Letter A282.)  On May 6, 2005, however, Chrysler sent Plaintiff a letter via overnight mail asking him to substantiate his absence by May 13, 2005. (May 6, 2005 Chrysler Letter to Plaintiff, A278.)  This correspondence clearly warned that if he did not comply, his seniority would be terminated.  (*Id.*)  Thus, by the time Plaintiff reported to the plant on May 13, 2005, he already had nearly a week to fulfill Chrysler's requirements.  Plaintiff was not given an additional 24 hours to comply with the policy because he already was afforded a substantial period of time during which to do so.  (May 13, 2005 Ford Memo, A281; Ford Aff., A246, ¶ 11.)  More importantly, Plaintiff concedes that he was given a second opportunity to fulfill the requirements – Ford did not terminate him on the spot when he reported to the plant with deficient documentation, but gave him another chance to obtain the proper paperwork. (Pl. Dep. at A170; 213-214.)  At no time did Plaintiff notify Ford or anyone else at Chrysler that he would be unable to retrieve his originals or otherwise submit compliant documents by 3 p.m. that day, and he never requested additional time to meet the requirements. (Pl. Dep. at A111-113; 115-117; Ford Aff., A246, ¶ 11.)  Instead, Plaintiff told Ford that he would be back. (Pl. Dep. at 117-118; Ford Aff., A246, ¶ 11; Ford Memo, A281.)  Given these facts, there is no evidence that Ford's decision to give Plaintiff a 3 p.m. deadline was in any way unreasonable, much less discriminatory based on a disability.

Finally, Plaintiff's assertions of discriminatory animus on Chrysler's part are discredited by the Company's actions with regard to his alleged disability.  First, Plaintiff sustained the elbow injury he now claims is a disability in September 2003, more than a year prior to his

discharge. During that time, Chrysler permitted Plaintiff to take multiple medical leaves for his injury and did not contest his receipt of worker's compensation benefits. (Pl. Dep. at A34-35; 86.) Second, Chrysler was willing to reinstate Plaintiff to employment in resolution of his grievance. Plaintiff was notified by letter from his union committeeman that "the Union and Management had reached a comparable decision on your behalf for your reinstatement of employment." (April 3, 2006 UAW Local Letter to Plaintiff, A276; Pl. Dep. at A188-189.) Plaintiff, however, never took advantage of this offer, apparently because he believed that the union had made some kind of compromise with management in reaching this decision.[23] (Pl. Dep. at A193; 196-198.) Instead, he chose to take his claims to the EEOC. (Pl. Dep. at A196; 201.) Chrysler's willingness to reinstate Plaintiff is wholly inconsistent with his allegations of discriminatory motivation, and the fact that Plaintiff eschewed this offer does not negate the Company's good faith. *See generally Ellenbogen v. Projection Video Servs.*, 2001 WL 736774, at *9 (S.D.N.Y. June 29, 2001) (granting employer's motion for summary judgment on Title VII wrongful termination claim in part because employer's offer of reinstatement was inconsistent with a discriminatory motive and did not support an inference of discrimination).

Plaintiff's discharge was not discriminatory on the basis of a disability. On the contrary, the record evidence shows that Plaintiff insisted on submitting a photocopy of a photocopy as substantiation for his medical condition, even after being told that original documentation from his physician was required. Plaintiff has adduced no facts that cast doubt on this reason for his

---

[23] Indeed, though he makes this assertion, Plaintiff presently does not know exactly what decision was made with regard to his employment status or what kind of compromise, if any, was made. (Pl. Dep. at A194; 201.) In fact, Plaintiff readily acknowledged that even though his employment with Chrysler was at the heart of his grievance, he did not pursue the union to obtain an explanation of the "comparable decision" that was made in his case. Rather, he just focused his attention on his EEOC charge. (Pl. Dep. at A196-197; 201.)

termination or show that Ford or anyone else at Chrysler was motivated to discriminate against him based on his alleged disability. Therefore, his claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Chrysler respectfully requests that summary judgment be granted in its favor and that all of Plaintiff's claims against the Company be dismissed with prejudice.

POTTER ANDERSON & CORROON LLP

By: _____
Jennifer Gimler Brady (#2874)
Jennifer Wasson (#4933)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000 – Telephone
(302) 658-1192 - Facsimile
jbrady@potteranderson.com
jwasson@potteranderson.com

*Attorneys for Defendant Chrysler LLC*

Dated: May 15, 2008
861948 / 31959v2

## CERTIFICATE OF SERVICE

I hereby certify this 15th day of May, 2008, that a true and correct copy of the

foregoing **DEFENDANT CHRYSLER LLC'S OPENING BRIEF IN SUPPORT OF ITS**

**MOTION FOR SUMMARY JUDGMENT** was served in the manner indicated to the

following:

### FIRST CLASS, U.S. MAIL, POSTAGE PREPAID

David A. Smiley, *pro se*
814 Village Circle, Apt. B
Newark, DE 19713

### ELECTRONIC MAIL

Joseph J. Rhoades
Law Office of Joseph Rhoades, Esq.
1225 King Street, Suite 1200
P.O. Box 874
Wilmington, DE 19899-0874
(302) 427-9500
joe.rhoades@rhoadeslegal.com


Jennifer Wasson (No. 4933)
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6165 (Telephone)
(302) 658-1192 (Facsimile)
jwasson@potteranderson.com (Email)