**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DAVID A. SMILEY,                          )
                                          )
      Plaintiff,                        )
                                          )   C.A. No. 1:07-005-SLR
      v.                                )
                                          )   JURY TRIAL DEMANDED
DAIMLER CHRYSLER,                         )
                                          )   **PUBLIC VERSION**
      Defendant.                        )
                                          )

**APPENDIX TO DEFENDANT CHRYSLER LLC'S
<u>OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

POTTER ANDERSON & CORROON LLP
Jennifer Gimler Brady (#2874)
Jennifer Wasson (#4933)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000 – Telephone
(302) 658-1192 - Facsimile
jbrady@potteranderson.com
jwasson@potteranderson.com

*Attorneys for Defendant Chrysler LLC*

Dated: May 22, 2008
865492v1 / 31959

## TABLE OF CONTENTS

Transcript of the Deposition of David A. Smiley
Taken April 9, 2008 and April 15, 2008 ........................................................................A1

Affidavit of Dawn Ford in Support of Chrysler's Motion for Summary Judgment
Executed May 13, 2008 ..............................................................................................A243

Affidavit of Steve Heitzmann in Support of Chrysler's Motion for Summary Judgment
Executed May 13, 2008 ..............................................................................................A249

Chrysler Standard Work Instruction (Right Fender)
Plaintiff Deposition Exhibit No. 1 (Confidential) **(REDACTED)** ..........................................A252

Chrysler Standard Work Instruction (Left Fender)
Plaintiff Deposition Exhibit No. 6 (Chrysler 105) (Confidential) **(REDACTED)** .................A255

Document Related to Plaintiff's PQX Placement
Plaintiff Deposition Exhibit No. 5 (Chrysler 106) (Confidential) **(REDACTED)** .................A256

Chrysler Reinstatement / Substantiation Requirements
Plaintiff Deposition Exhibit No. 11 (Chrysler 103).................................................................A257

Chrysler Medical Notes
Period May 1, 2003 to March 15, 2005 (Chrysler 108-110) ....................................................A258

Chrysler Medical Notes
Period to November 1, 2007 (Chrysler 076-079) ....................................................................A261

Dr. Bandera Clinical Note
Dated July 12, 2004 ..................................................................................................A265

Expert Medical Examination Report
Dated September 16, 2004 (Chrysler 069-073) .......................................................................A266

Dr. Bandera Note
Dated November 1, 2004 (Chrysler 036)..................................................................................A271

Letter from Chrysler to Plaintiff Regarding PQX Placement
Dated February 7, 2005 (Plaintiff's Deposition Exhibit No. 4; Chrysler 147)........................A272

Chrysler Medical Pass
Dated February 14, 2005 (Plaintiff's Deposition Exhibit No. 8; Chrysler 149)......................A273

Copies of Dr. Bandera's Notes
Period February 2005 to May 2005 (Plaintiff's Deposition Exhibit No. 12; Chrysler 102) ....A274

Copies of Dr. Bandera's Notes with Diagnostic Code Inserted
Period February 2005 to May 2005 (Plaintiff's Deposition Exhibit No. 14; Chrysler 104) ....A275

Letter from UAW Committeeman to Plaintiff
Dated April 3, 2006 (Chrysler 096) ................................................................................A276

Chrysler Medical Missed Appointment Note
Regarding May 4, 2005 (Chrysler 125) ...........................................................................A277

Chrysler Letter to Plaintiff Regarding Missed Appointment and Substantiation
Dated May 6, 2005 (Plaintiff's Deposition Exhibit No. 10; Chrysler 101)...........................A278

UPS Delivery Confirmation Related to May 6, 2005 Chrysler Letter to Plaintiff
(Chrysler 127) ...............................................................................................................A279

Substantiation Denial
Dated May 13, 2005 (Plaintiff's Deposition Exhibit No. 13; Chrysler 100)...........................A280

Ford Memo to Labor Relations
Dated May 13, 2005 (Chrysler 099) ...............................................................................A281

Chrysler Letter Notifying Plaintiff of Termination of Employment
Dated May 13, 2005 (Plaintiff Deposition Exhibit No. 15)...................................................A282

Grievance Form Filed on Behalf of Plaintiff
Dated May 18, 2005 (Chrysler 097) ...............................................................................A283

Charge of Discrimination filed by Plaintiff against Chrysler with the Delaware
Department of Labor and the Equal Employment Opportunity Commission
Filed August 2, 2005 (Plaintiff's Deposition Exhibit No. 9)...................................................A284

Delaware Department of Labor  No Cause Finding and a Right to Sue Notice
Issued May 31, 2006 ......................................................................................................A285

Equal Employment Opportunity Commissions Right to Sue Notice
Issued October 4, 2006 ...................................................................................................A287

## CERTIFICATE OF SERVICE

I hereby certify this 22ND day of May, 2008, that a true and correct copy of the foregoing **APPENDIX TO DEFENDANT CHRYSLER LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (PUBLIC VERSION)** was electronically filed with U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) which will send notification of such filing that the document is available for viewing and downloading via CM/ECF to the following counsel of record:

> Joseph J. Rhoades , Esq.
> A. Dale Bowers, Esq.
> Stephen T. Morrow, Esq.
> Law Office of Joseph Rhoades, Esq.
> 1225 King Street, Suite 1200
> P.O. Box 874
> Wilmington, DE 19899-0874
> (302) 427-9500

And one (1) true and correct copy sent to the following in the manner indicated:

> **FIRST CLASS, U.S. MAIL, POSTAGE PREPAID**
> David A. Smiley, *pro se*
> 814 Village Circle, Apt. B
> Newark, DE 19713

> Jennifer Wasson (No. 4933)
> Hercules Plaza – Sixth Floor
> 1313 North Market Street
> Wilmington, DE 19801
> (302) 984-6165 (Telephone)
> (302) 658-1192 (Facsimile)
> jwasson@potteranderson.com (Email)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Smiley

## v.

# DaimlerChrysler

## C.A. # 1:07-005 SLR

———————————————

Transcript of:

# David A. Smiley
## Volume #
## April 9, 2008

———————————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A1

Smiley v. DaimlerChrysler

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
DAVID A. SMILEY,              )
                             ) VOLUME 1
     Plaintiff,              )
                             )
     v.                      ) C.A. No. 1:07-005 SLR
                             )
DAIMLER CHRYSLER,            )
                             )
     Defendant.             )
```

Deposition of DAVID A. SMILEY taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, LLP, 1313 North Market Street, 6th Floor,
Wilmington, Delaware, beginning at 10:15 a.m., on
Wednesday, April 9, 2008, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public. .

APPEARANCES:

        JENNIFER C. WASSON, ESQUIRE
        JENNIFER GIMLER BRADY, ESQUIRE
        POTTER ANDERSON & CORROON, LLP
          1313 North Market Street - 6th Floor
          Wilmington, Delaware 19801
          for the Defendant

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

**A2**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler

Page 2

1                    DAVID A. SMILEY,

2              the witness herein, having first been

3              duly sworn on oath, was examined and

4              testified as follows:

5    BY MS. WASSON:

6        Q.    Mr. Smiley, my name is Jennifer Wasson, and I

7    represent Chrysler in this case, and I'm going to be

8    taking your deposition this morning.  Have you ever had a

9    deposition before?

10       A.    No, ma'am.

11       Q.    There are some ground rules that we normally go

12   over at the very outset just so everybody sort of

13   understands how it's going to go and kind of how this

14   whole process works.

15             The first thing that's important to

16   remember is you're under oath just like you would be in

17   court.  Do you understand that?

18       A.    Yes, I do.

19       Q.    If you don't understand the questions that I'm

20   asking you, tell me, because otherwise I'm going to

21   assume that you understand the question.

22       A.    Yes, ma'am.

23       Q.    If you realize during the deposition that an

24   answer that you gave me at a prior point was inaccurate

**A3**

b8b447e7-e45b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 3

1    or you want to change it or it's incomplete, let me know

2    and we will go back to that.  I will give you a chance to

3    correct it.

4        A.    Yes, ma'am.

5        Q.    It's important that we give verbal responses

6    for the court reporter because she can't take down --

7        A.    Yes, I understand.

8        Q.    She can't take down nods or gestures.  We both

9    have to make sure that we give verbal answers and we

10    don't try to talk over each other.  So I'll try to

11    respect you and I'd like you to do the same for me.

12        A.    Consider it done.

13        Q.    Is there any reason why you feel that you can't

14    testify today?

15        A.    No.

16        Q.    Are you taking any kind of medication or

17    anything that would affect your ability --

18        A.    No.

19        Q.    Nothing that would impair your ability to think

20    clearly?

21        A.    No.

22        Q.    Let's start with some background information.

23    Can you give me your current address?

24        A.    814 Village Circle, Apartment B, Newark,

Smiley v. DaimlerChrysler
David A. Smiley

Page 4

1    Delaware, 19713.

2        Q.    Is this a new address for you?

3        A.    Yes.

4        Q.    How long have you been there?

5        A.    I think maybe a little over -- about maybe a

6    month.  A little over a month.

7        Q.    Is there any particular reason why you moved?

8        A.    Well, there was an issue with payment on

9    another bill.  So it basically was financial decision to

10   find somewhere else.

11       Q.    Do you live with anybody?

12       A.    My wife.

13       Q.    Anybody else?

14       A.    Two children.

15       Q.    Just as background, how old are they?

16       A.    Ten and six.

17       Q.    Tell me a little bit about your education.

18       A.    Okay.  High school graduate, college graduate,

19   Widener University.  And that's pretty much it.

20       Q.    Tell me about your college degree.

21       A.    Paralegal studies, certificate and a Bachelor's

22   degree.  Two certificates and a Bachelor's degree.

23       Q.    When you say "certificate," does that mean like

24   an Associate's?

**A5**

Smiley v. DaimlerChrysler
David A. Smiley

Page 5

1    A.    Not quite an Associate's.  They have I'd like

2  to say like an accelerated program, if you will.

3  Basically, for individuals I guess would be coming into

4  the field that just need the certification that you have

5  completed XYZ amount of classes, that type of thing.

6    Q.    When did you graduate from college?

7    A.    August 13th of 2004.

8    Q.    Were you working at the time?

9    A.    Yes.

10    Q.    Were you doing night classes?

11    A.    Yes.

12    Q.    You were working at Chrysler; is that right?

13    A.    Yes.  At Chrysler prior to this incident

14  16 years.

15    Q.    Did you get your paralegal studies

16  certification through Chrysler?

17    A.    Okay.  I utilized what they call TAP's, Tuition

18  Assistance Program, if that's the question that you're

19  asking me, yes.

20    Q.    Without going into too much detail, because I'm

21  not familiar with the TAP's program, can you tell me just

22  a little bit about that?

23    A.    Basically, as an hourly employee, you're

24  allotted I think it was $4,500 per year to utilize as far

Smiley v. DaimlerChrysler
David A. Smiley

Page 6

1    as any type classes that you want to take.

2        Q.    Your employment history, when were you hired at

3    DaimlerChrysler?

4        A.    April 6 of 1989.

5        Q.    What were you hired to do?

6        A.    I was hired as an assembler.

7        Q.    That was working on the line?

8        A.    Yes.

9        Q.    What kind of duties did you do as an assembler?

10       A.    In the beginning I was in the trim shop.  So I

11   installed the park brake.  What else did I do?  I became

12   a pool person after that.  My first real job was the park

13   brake, but I was a pool person.  So basically I do this

14   job today, tomorrow I would be doing something else.

15       Q.    When you say "pool," does that mean like a

16   floater?

17       A.    Yes, okay.

18       Q.    How long did you stay in the pool or as a

19   floater?

20       A.    I think I did that maybe a year and then I did

21   the park brake for a while and then I was bumped off of

22   that.  Various other jobs.  We had liner install.  I try

23   to forget that.  Let's see, what else?  I did that.  I

24   did carpet install.  Various.

**A7**

Smiley v. DaimlerChrysler
David A. Smiley

Page 7

1    Q.    How long did you stay in any one of these jobs?

2  Did they move you once a year or how did that kind of

3  work?  How did you progress through to start doing these

4  different positions?

5    A.    To get where I got to where I ended up at, I

6  ended up putting in a transfer.  So I was in trim for

7  nine years.  I believe it was nine years.  After that,

8  put in a transfer and ended up with body shop.  To this

9  day I cannot tell you how I got body shop, but that's

10 where they put me.

11   Q.    Was body shop a good thing?

12   A.    It's mixed blessings.  It's mixed.

13   Q.    You went from trim for nine years to body shop,

14 and then how long did you stay in body shop?

15   A.    Up until my termination date.

16   Q.    Within a position do you get additional skills

17 and move up through the ranks in a particular position?

18   A.    Basically what happens is -- as an example,

19 before it was over with, I was a tech 1.  I need to learn

20 all the jobs on your team.  Six jobs on the adjacent

21 sister team, be that and the other side of body shop.  So

22 I pretty much did it all.  Pretty much did it all.  I was

23 a door install, left that, lift gate install, left

24 that -- prior to becoming a tech 1 bidder.

**A8**

Smiley v. DaimlerChrysler
David A. Smiley

Page 8

1    Q.    Is the tech 1 the highest position you can

2    obtain?

3    A.    As far as a line worker, yes.  I mean, you have

4    inspection, but my seniority would not enable me to do

5    that job.  If I did get it, I wouldn't have had it long.

6    When I knew it would be something that I could be bumped

7    off of just because of my seniority date, I wouldn't

8    pursue that.

9    Q.    Within the context of body shop are you talking

10   about?

11   A.    Yes.  Actually, trim shop, also.  If it was

12   something -- it's sort of like to get your time in, you

13   want to take the worst job that there is.  That way, it's

14   some glimmer of hope as far as longevity.  You get your

15   time in and then you start looking for something else.

16   In my case, like I said, I ended up becoming a tech 1.

17   Q.    How long did it take you to become a tech 1?

18   A.    It was a total of -- once I got in the body

19   shop, maybe a year.

20   Q.    The most recent position that you held was door

21   fitter; is that right?

22   A.    Yes.

23   Q.    Tell me about that job.

24   A.    Okay.  The vehicle would come down the line.

Smiley v. DaimlerChrysler
David A. Smiley

Page 9

1   What we would do, you have certain measurements, I can't

2   think of the exact right now, but you would test the

3   front leading edge of the door against the rear edge of

4   the fender; ensure that there was proper space there.

5   You would also -- the door header, make sure -- make sure

6   the door closed -- opened and closed properly, that it

7   was within specifications to make sure the bolts were

8   torqued.  I forget what the specification is for that at

9   this moment, but you would do that.

10                  MS. WASSON:  Can you mark this, please, as

11  Exhibit 1?

12                  (Smiley Deposition Exhibit No. 1 was marked

13  for identification.)

14  BY MS. WASSON:

15      Q.     Mr. Smiley, I'm going to hand you what's been

16  marked as Exhibit 1.  Can you take a look at that for me?

17      A.     Okay.

18      Q.     Can you identify what this document is?

19      A.     Basically, as the vehicle comes down the line,

20  this was basically -- this was the easiest part of my

21  job.

22      Q.     Is this a job description for door fitter?

23      A.     Job description would be correct, yes.

24      Q.     You said this first page is the easiest part of

Smiley v. DaimlerChrysler
David A. Smiley

Page 10

1    your job?

2        A.    When I say that, like I say, to readjust the

3    doors is required, up, down, forward, aft.  Things like

4    that.  The bolts, retorque the strikers, checking

5    closing.  So yes.

6        Q.    The second page, is that also a list of things

7    that you would be responsible for as a door fitter?  It

8    says, "Automated Manufacturing Planning System."

9        A.    This is door install.  This is a door

10   installer.  I have had this job, but this was not the

11   last job.

12       Q.    This is not your job?  The second page does not

13   describe your job?

14       A.    Yes.  That would be correct.

15       Q.    We're looking at the first page.

16       A.    Yes.

17       Q.    Were there job duties in addition to the ones

18   that you see here that you were responsible for on your

19   job as door fitter?

20       A.    Also you do a visual inspection of the unit.

21   You're looking for dings, dents, scratches, paint

22   problems.  Let's see what else.  Again, hinges, make sure

23   everything is where it's supposed to be.  Proper torque,

24   put it into the computer.

**A11**

Smiley v. DaimlerChrysler
David A. Smiley

Page 11

1    Q.    Tell me about what you physically had to do to
2    perform these job duties.

3    A.    You generally carry -- a little carrier.  It
4    came with a hammer, a maul, maybe about five-pound maul
5    or small sledgehammer, if you will.  A maul.

6              To do the strikers, you basically had to --
7    it was two bolts.  You would break each bolt -- you want
8    it loose.  You don't want it to the point that it's going
9    to fall off, but you want it loose.  You want to close
10   the door, realign the striker.  Think in terms of a V.
11   The striker fits inside just like that.

12   Q.    The striker is which part of the door?  I'm
13   sorry, I'm not a car gal.

14   A.    That's on the V post.  You have your B post
15   which is where your glass is.  V post is where your front
16   door closes to.  The striker would be there and in the
17   case of the Durango, you have a V post, then you have the
18   C post and D post, so on and so forth.

19   Q.    Got you.  So you're fitting the door into the
20   striker part of the B post?

21   A.    What you're using -- the striker is going to
22   give you your up and down and also in and out.  So
23   basically you want to loosen the striker, take the door,
24   close the door.  This is what's called setting the

Smiley v. DaimlerChrysler
David A. Smiley

Page 12

1    striker.  You want to make sure your lines are correct.

2    You want to make sure that you have the proper dimensions

3    between the leading edge of the rear door in this case

4    and the rear edge of the front door.  Again, it would be

5    the same with the front fender.  You would take a

6    measurement off of that.  You want to make sure the lines

7    are correct.  Again, you go to the header, which is the

8    very top of your door, the part that closes onto the

9    body.  You want to make sure all that's right.

10        Q.    What do you physically do?  Is it a visual --

11   once you close the door, do you visually inspect it?

12        A.    It's visual in some cases.  It's a

13   case-by-case.  In some cases you have to I'll use the

14   expression pull it.  What I mean by "pull it," you're

15   physically moving it where it needs to be.  You may have

16   to pull a header back a little bit.  You may have to --

17   in some cases the bottom part of the door, you have your

18   beader.  You have your -- we had a little wedge of some

19   type of poly type of material.  Anyway, you would use

20   that to help move your striker ahead.  You had to do all

21   that.  It wasn't as simple as opening or closing the

22   door.  In some cases you had a good day and other days,

23   when it ran bad, you had a battle with that.

24        Q.    How much would you say that you had to lift?

Smiley v. DaimlerChrysler
David A. Smiley

Page 13

1    You had to carry the five-pound maul, right?

2        A.    Yes. Lifting, depending on what -- I'd say

3    maybe about 15 pounds with all your tools in it.

4        Q.    The carrier?

5        A.    Yes.

6        Q.    And then what about when you were physically

7    doing your job, was there lifting?

8        A.    It's not a matter of lifting.  There is

9    sometimes a matter of pulling, pushing, and that type of

10   action.

11       Q.    Did you have weight-bearing on your arms or

12   your hands when you were doing that?

13       A.    In some cases, no.  In most cases, no.  Some

14   cases you may have had to remove maybe a bottom hinge or

15   so.  So sometimes if you could get someone to help you to

16   support that, start your screws in.  But it wasn't

17   generally a bunch of lifting, per se.

18       Q.    Would it be fair to say that during an average

19   day you're responsible for lifting the 15-pound carrier

20   and maybe doing some occasional other lifting activities,

21   or no?  Correct me if I'm wrong because I want to get an

22   understanding of the physical tasks.

23       A.    The physical tasks.  As far as the lifting,

24   you're almost there.  It's not a lot of lifting.  Like I

Smiley v. DaimlerChrysler
David A. Smiley

Page 14

1    said, it's more finesse work, if you will.  Make it look

2    good, so to speak.

3        Q.    How about other manual tasks, are you on your

4    feet all day?

5        A.    Yes.  Then you have to loosen the striker,

6    tighten the striker.  You have basically what amounted to

7    a ratchet wrench, if you will.  So to do a lot of

8    repetitive type of motions as·far as using the ratchet.

9        Q.    Involving your hands and your wrists?

10       A.    Yes.

11       Q.    Any other parts of your arm or parts of your

12   body that your job would require motion and activity

13   from?

14       A.    Next spot would be elbow, shoulders.  Anything

15   that's attributable to use of the arm.

16       Q.    You need to really be able to use both arms in

17   this job?

18       A.    It helps, yes.  And fingers, too, because a lot

19   of times what your eyes can't see, a lot of times you

20   would have -- to use an example, you feel it, and your

21   hands will tell you more than your eyes will in a lot of

22   cases.  But this is after time and doing it so long, that

23   everyone finds their own little way of obtaining the same

24   thing.

**A15**

Smiley v. DaimlerChrysler
David A. Smiley

Page 15

1      Q.    You were only on the right side; is that right?

2      A.    I had primarily right side.  If necessary, I

3    would have to switch off, go to the left, I would do lift

4    gates.  I would do hoods occasionally.

5      Q.    How long would it take you to finish one door

6    fit for one vehicle?

7      A.    It's a case-by-case.  Some doors fit better

8    than others.  Some come out perfect.  Others you have to

9    make fit.  So there's no specific -- I believe you were

10   given like I think maybe 60 seconds or whatever the time

11   is allotted per vehicle.  In a lot of cases it went

12   further than that because you end up working down the

13   line.  Then you have to try to rush back.  It depends on

14   the condition of the door and how it was set to the body.

15     Q.    Ballpark, how many doors per day?

16     A.    Answering in ballpark, possibly 300.  It gets

17   old.

18     Q.    That's quite a few doors.

19           So that was the most recent position that

20   you held as a regular job with Chrysler?

21     A.    Yes.

22     Q.    Were you a member of the bargaining unit?

23     A.    No, I was not a member of the bargaining unit.

24     Q.    The local union represented you just because

Smiley v. DaimlerChrysler
David A. Smiley

Page 16

1   you were an hourly employee, but you weren't actually a

2   union member; is that correct?

3       A.    I was a union member.  Yes.  When you say

4   "bargaining unit," I'm thinking contract, you go to

5   Detroit, you're there.  I wasn't one of those.

6       Q.    I see.

7       A.    I held facility instructor, facilitator

8   instructor.  I have been an alternate shop steward.  I

9   have been an alternate committee man.  Each of those were

10  a committee more so as an election as is usually done.

11      Q.    I apologize.  Let me rephrase that.  You were a

12  member of the union?

13      A.    Yes.

14      Q.    But you weren't a member of the negotiating

15  team that did the bargaining unit contract?

16      A.    That would be correct.

17      Q.    How long were you a member of the union at

18  Chrysler?

19      A.    Sixteen years.

20      Q.    You started to tell me about this, but I want

21  to kind of hear more about how involved you were with the

22  union.

23      A.    Again, like I said, facilitator instructor.

24  There would be times that they would send me and

Smiley v. DaimlerChrysler
David A. Smiley

Page 17

1    others -- last trip I have taken was to St. Louis and

2    that was for a workplace violence type of seminar.  I had

3    to go there and soak up their information and come back

4    and give it to our union members, starting with

5    management and down to your hourly.

6         Q.    Was that an appointed assignment?

7         A.    That was an appointment, yes.  Every position I

8    have ever held with Chrysler has been an appointment.

9         Q.    You were the facilitator instructor?

10        A.    I was a facilitator.  I think at the time there

11   was about six of us.

12        Q.    It was in that context that you were sent to

13   St. Louis?

14        A.    Yes.

15        Q.    Then alternate shop steward?

16        A.    Yes.  Basically, because it was an alternate

17   position, I really had no powers as a steward or as a

18   committee person.  However, if there was an issue, I

19   would go -- I would take the necessary information and I

20   would forward it to the shop steward and the committee

21   man, whatever it was for.

22        Q.    Did you ever help facilitate grievances on

23   behalf of the union?

24        A.    No, ma'am.  As far as any administrative-type

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

**A18**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 18

1    duties, I had none.

2       Q.    Besides the grievance that was filed in

3    connection with your termination, did you ever file any

4    other grievances?

5       A.    It was years ago. I was in trim shop. I

6    believe that was the AC condenser line. I believe that

7    wasn't in my favor, but they ended up taking the job and

8    splitting it in half directly after that. So it was sort

9    of like the grievance that I put in because -- it was a

10   disciplinary thing I believe it was. But it never really

11   amounted to anything. But I put in a grievance because I

12   said it was overwork. And I could say in their actions

13   later on it was proven that it was, in fact, overwork.

14   However, as far as my grievance, it still went against

15   me.

16      Q.    So you still got disciplined or pointed?

17      A.    It's still in my jacket. I wasn't really

18   disciplined, per se, but it's still in my jacket.

19      Q.    Your most recent position, who was your

20   supervisor at Chrysler?

21      A.    Shawn -- what's his -- Hutton.

22      Q.    Tell me about your pay rate when you were last

23   working as a door fitter.

24      A.    I believe it was $26, $28.

**A19**

Smiley v. DaimlerChrysler
David A. Smiley

Page 19

1      Q.     Do you remember?

2      A.     Let's lean toward maybe perhaps $28, because I

3   knew the contract was over -- I think the contract ended

4   in 2005.  So we had I believe it was another raise or so

5   that would get us to the $30 plateau or where they're at

6   right now.

7      Q.     You were terminated in May of '05; is that

8   right?

9      A.     May 13th, yes.

10     Q.     At that time would it have been $28 or would it

11  have been --

12     A.     I believe at that time it was I want to say

13  $28.  I may be mistaken, but it may be, I believe, $28.

14     Q.     What is your current employment status?

15     A.     Unemployed.  Basically, yes.  Still receiving

16  disability.

17     Q.     When you say "disability," do you mean workers'

18  comp. or do you mean --

19     A.     Okay, workers' comp.

20     Q.     -- Social Security disability?

21     A.     I see what you're saying now.  But no, it's not

22  Social Security.  It's workmen's comp.

23     Q.     We will talk about that in just a second.

24            You're currently unemployed.  Have you had

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

**A20**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 20

1    any employment, other employment, since you were

2    terminated from Chrysler?

3        A.    At one point in '06 there was -- I was a

4    manager at Jackson Hewitt for a tax season.  I did some

5    work at a -- a salesperson, a district salesperson, for a

6    furniture company.  Let's see what else.  And there was a

7    moment that I was -- I hate to say it, but I was at Honda

8    Financial for a moment through a temporary agency, and

9    that was maybe for two months.

10       Q.    Let's talk just briefly about each of those

11   positions.

12             The first one you told me about was being a

13   manager at Jackson Hewitt, the tax service.

14       A.    Yes.

15       Q.    Where was that?

16       A.    The office that I had was 56 Carpenter Plaza.

17   I want to say up in Claymont.  It was across from the

18   Tri-State Mall.

19       Q.    I have a general idea how long a tax season is,

20   but how long did you work?

21       A.    I think it was maybe three months.

22       Q.    That was in 2005 or 2006 do you think?

23       A.    Let's go with 2006.

24       Q.    It would have been the 2005 tax season?

Smiley v. DaimlerChrysler
David A. Smiley

Page 21

1    A.    Yes.

2    Q.    How much money did you make there?

3    A.    Nothing.  I think it was $9 an hour, something

4    like that.  As a matter of fact, it was $9 an hour.

5    Q.    You were the manager of the tax preparers?

6    A.    Scary, isn't it?

7    Q.    You don't have any tax experience, do you?

8    A.    That was my first year with it.

9    Q.    Was it a supervisory --

10   A.    Yes.  Office manager/supervisor.  And slash

11   supervisor because I was basically that person, so to

12   speak.

13   Q.    Were you thinking that you were going to learn

14   how to be a tax preparer at that time?

15   A.    I needed a job and that was basically my

16   motivation for even applying for it.  And the supervisor,

17   it came -- I think it was a matter of being in the right

18   place at the right time, because it wasn't -- obviously

19   not an experience thing.

20   Q.    I don't think I'd be experienced enough to do

21   it either.

22         But did you ever think that maybe that was

23   something you would want to pursue, to be a tax preparer?

24   A.    No.

**A22**

Smiley v. DaimlerChrysler
David A. Smiley

Page 22

1    Q.    Why not?

2    A.    Well, I don't like taxes.  It's a necessary

3  evil, however, but if you're going to do taxes, why not

4  become a CPA and do it that way?

5    Q.    Did you have any physical aspect of that job?

6    A.    No.  Basically, breathe, be there.

7    Q.    Did you have to type?

8    A.    A little bit.  Very little.

9    Q.    So sitting, standing?

10   A.    Sitting.

11   Q.    No manual tasks?

12   A.    No manual, no.

13   Q.    You stayed there for the tax season.  When the

14  tax season was over, that was the end of it?

15   A.    That was the end of it.

16   Q.    Then the sales at the furniture company?

17   A.    There for about two months.

18   Q.    Which company?

19   A.    Furniture Direct I believe it was, but it was

20  right in Newark.  Hourly rate there was -- I think it

21  was -- it may have been -- I think it was another $8,

22  $9 there, also.

23   Q.    By the way, how many hours a week did you work

24  at the tax service?

**A23**

Smiley v. DaimlerChrysler
David A. Smiley

Page 23

1      A.     That varied.   There were times that I actually

2    did a 40.   There were times that, if an individual didn't

3    show, I would have to cover.   So there was no

4    specified -- no 40 hours per.   It wasn't those type of

5    deals.

6      Q.     So ballpark was it more like part-time or

7    full-time?

8      A.     Full-time or with part-time hours, if you will.

9    Not to be difficult.   There were days that I could do it

10   in less than -- it depends on what was going on.   If I

11   had other individuals coming in, did I have clients

12   coming in, who was supposed to show, who didn't show,

13   things of that nature.   A lot of it was dictated upon

14   what was going on in the office at the time.

15     Q.     I hate to keep beating you up on this, but give

16   me an average, average week, how many hours would you

17   work?

18     A.     Let's say 30.

19     Q.     Furniture Direct, how many hours would you work

20   average week?

21     A.     That was -- I think we did 40 there.

22     Q.     What kind of duties did you have there?

23     A.     Salesman.

24     Q.     What kind of physical tasks went along with

Smiley v. DaimlerChrysler
David A. Smiley

Page 24

1    that job?

2        A.    None.

3        Q.    Just kind of standing, walking?

4        A.    Be there, breathe.

5        Q.    Why did you leave that job?

6        A.    Because an opportunity -- I had gotten a call

7    that might be able to get to Honda.  I accepted it.  And

8    that's why I left.

9        Q.    So that brings us to Honda.  Tell me about

10   Honda.

11       A.    Personal feelings aside, let's see.  It was

12   basically I was in loss mitigation.  Basically my job was

13   if there was a repo, set up repos, set up -- once the car

14   was recovered, contact the individual, let them know

15   that, A, their car is, in fact, impounded.  Dealing with

16   basically the repo agents and various garages where they

17   would store these vehicles, ascertain what the amount is

18   owed on it as far as storage and vehicles such as that.

19              Let's see what else.  That was pretty much

20   it.

21       Q.    This was an office job?

22       A.    Yes.

23       Q.    How long did you work there?

24       A.    I think that was another two months.

Smiley v. DaimlerChrysler
David A. Smiley

Page 25

1    Q.    How much did you get paid there?

2    A.    That was -- I believe that was $12 an hour.

3    Q.    Full-time, part-time?

4    A.    Full-time.  I wasn't an employee, but through a

5    temporary agency.

6    Q.    We will talk a little bit more in a second, but

7    why did you decide to leave Honda?

8    A.    Actually, the decision was made for me.  I

9    had -- I think it was something to do with this.  It was

10   something.  I needed to be somewhere and they -- I guess

11   because I had just started, they had a thing about

12   absenteeism, and I understand that.  As a temp., there

13   was things that I still needed to do.  Since I'm not

14   actually a full-time employee under Honda, I still have

15   other interests that I have to take care of, if you will.

16   And it came to a point that they didn't want to continue

17   with my employment there.

18   Q.    It was more of an absence problem or a

19   scheduling --

20   A.    Scheduling would be more, yes.

21   Q.    When did you work at Honda?

22   A.    That was in '07 again.  It was there, I

23   believe, the summer, maybe the spring.  Somewhere in

24   there.  Not really exactly sure of the specific date.

A26

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 26

1     Q.     Just to backtrack for a second, when did you

2   work at the furniture company?

3     A.     That was during the late winter, early spring I

4   believe it was.

5     Q.     Of which year?

6     A.     Of '07.  Short of having my resume right here,

7   I'm not really exactly sure of the dates.

8     Q.     That's fine.

9            The temp. agency that you referred to, was

10  this the only job that you got through the temp. agency?

11    A.     That's correct.

12    Q.     The Honda job?

13    A.     Yes.

14    Q.     When did you sign on with the temp. agency?

15    A.     Again, '07.  Yeah, it was '07.  '07.  Let's go

16  with '07, because, like I said, it was only like two

17  months or so.

18    Q.     So spring maybe?

19    A.     We will go with spring because it was still

20  warm out, so yes.

21    Q.     Which temp. agency was it?

22    A.     Bernard Personnel.

23    Q.     You said this was the only job that you got

24  through them, the one with Honda?

**A27**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 27

1      A.    Yes.

2      Q.    Are you still sort of signed on with that temp.

3   agency?

4      A.    They have never called me, nor have I called

5   them, so that's pretty much where we're at.

6      Q.    How come you didn't keep pursuing jobs through

7   the temp. agency?

8      A.    Well, it had taken a few weeks before even the

9   Honda job had come up.  Since then I had heard nothing

10  else from them.  That's pretty much it.  It just wasn't

11  quite working for me, if you will.  And I'd rather have

12  something that I know is mine as opposed to, okay, you're

13  here, there's no benefits involved with the temp. agency.

14  That would be about it.

15     Q.    Let's talk about other jobs that you applied

16  for.  Did you apply for any other jobs besides the ones

17  that you obtained?

18     A.    Yes.  I saw Career Builder.  A lot of more jobs

19  than I could even probably sit here and recite to you.

20     Q.    Tell me about the ones that you remember.

21     A.    Let's see.  There was document scanner, there

22  was another one that you basically proofreading, there

23  was any type of manager.  A lot of it entry-level-type

24  management trainee.  A few paralegal jobs.  That's pretty

Smiley v. DaimlerChrysler
David A. Smiley

Page 28

1    much it.  Manufacturing, but none of that -- the job

2    descriptions on some of those -- I say "manufacturing,"

3    but I still couldn't tell you exactly what they did.  It

4    was basically on Career Builder, I'm clicking, just

5    pretty much clicking.

6        Q.    Downloading your resume to that company and

7    waiting to see --

8        A.    In most cases, I'd say 99 percent of the time,

9    you never hear anything else.  But as far as covering

10   different avenues, you could get more jobs, at least

11   apply for more jobs than physically door to door to door

12   to door.  So that was basically what it was.

13       Q.    The manufacturing jobs, do you remember which

14   companies those were for?

15       A.    I think one was -- one was with Chrysler.

16   There was a supervisory thing there.  It was a couple

17   years back.  The job description sounded somewhat

18   familiar.

19       Q.    You don't remember what it was, though?

20       A.    Yes.  It was supervisor.  I'm not sure if -- I

21   don't think it was paint department.  It would probably

22   be somewhere in trim, perhaps chassis.  I think they may

23   have had one for body.

24       Q.    When did you apply for that one, approximately?

A29

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 29

1    A.    I cannot give you an approximate date.

2    Q.    You don't remember?

3    A.    No.

4    Q.    So sometime between '05 -- or summer of '05?

5    A.    Okay.  We can say that.  That would be fine.

6    '05 to the present.  Somewhere in that area.  It was one

7    of those type of deals I never heard anything from them.

8    Q.    Was it recently?

9    A.    No.  The most recent that I had applied for was

10   at Mopar, and that was within this last -- within the

11   last month or so.  That was at Mopar.  Basically a

12   pick-and-pack position.  One time I did a slight stint

13   there.  That's basically what the job entailed.

14   Q.    When did you do your small stint there?

15   A.    That was back in '98, '99.  I think it was --

16   instead of going on change-over when the plant closed, we

17   went over there.  Basically all it is is they give you a

18   sheet of paper with numbers on it which there are

19   corresponding whatever parts there are, just small parts.

20   You get a little bin and you're picking parts for various

21   dealers around the country.

22   Q.    So you have to grab the part off the shelf?

23   A.    Anything from hoses to filters to gaskets.

24   Nothing major.  You're not lifting engine blocks or

A30

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 30

1    anything like that, no.

2        Q.    You still have to be able to lift items, but

3    they're not heavy items?

4        A.    Yes.  I think -- whatever the weight of the --

5    maybe a hose, it might be what, two pounds, something

6    like that.  In some cases.  In some cases we are

7    talking -- you could basically build a vehicle in there

8    short of an engine.  You could pretty much build a

9    vehicle in that building.

10        Q.    It's called pick and pack?

11        A.    We call it pick and pack.  What do they call

12    it?  I forget the nomenclature that they use.  But

13    basically that's what you're doing.  You're just picking

14    parts.  If a dealer wants, say, three muffler clamps,

15    it's going to be on your printout.  You have a

16    corresponding number with aisle and whatever may be a

17    column number, if you will.  You take your loader; you go

18    get that.  In some cases I had to use a stand-up loader

19    just to bring the parts down so I could get what I needed

20    and put it back.  The whole thing is like that.

21        Q.    You applied for that job within the last month,

22    but you haven't heard --

23        A.    I have heard.  That was a no.  They needed

24    someone with more experience than I.

**A31**

Smiley v. DaimlerChrysler
David A. Smiley

Page 31

1    Q.    Any other manufacturing jobs that you can

2    remember?

3    A.    No.

4    Q.    What about paralegal jobs?

5    A.    Basically, there was a lot in Philadelphia.

6    That would vary.  It was never an entry-level-type

7    paralegal.  I looked at copyright, patent, intellectual

8    property, if you will.  What else?  Basically a lot of

9    them were just general paralegal-type litigation, be it

10   personal injury or stuff like that.

11   Q.    Did you interview for any of those?

12   A.    No, ma'am.  Never heard anything from them.

13   Q.    Were those through Career Builder, too?

14   A.    Yes.

15   Q.    Ever make any other attempts to find a

16   paralegal job outside of Career Builder, like through

17   your temp. agency or anything like that?

18   A.    That was what I primarily signed on for that,

19   and since I ended up with Honda, I kind of figured that

20   that isn't the place that I needed to be looking.

21   Q.    Any other attempts at all to do door to door,

22   as you say?

23   A.    No door to door, because basically, if you

24   don't know anyone, it's kind of a hard field to get into.

Smiley v. DaimlerChrysler
David A. Smiley

Page 32

1    And then there's -- even though I have the degree, I

2    don't have the experience.  So it's a catch 22.  You

3    can't if you don't have the experience, or if I had the

4    experience, you don't have the degree.  It flip-flops.

5        Q.    Are you continuing to apply for jobs --

6        A.    Yes.

7        Q.    -- at this point?

8        A.    Yes.

9        Q.    What kind of jobs are you still looking for?

10   What kind of industries do you want to get in?

11       A.    I'm still looking at legal since I figure I

12   have a little bit of paperwork for that.  So I figured if

13   anything, it's a leg up.  I still like the automotive

14   industry, but that's a dying horse, if you will.  Short

15   of being a vehicle salesman, and that's nothing that I

16   would be interested in.  There's certain aspects in

17   Chrysler or pretty much any type of manufacturing, that's

18   sort of where my heart is.  I still like that type of

19   thing.

20       Q.    Any specific position within manufacturing that

21   you would prefer?

22       A.    At this venue, because of my arm, I would be

23   looking for some type of management.  Manager position or

24   something like that.

**A33**

Smiley v. DaimlerChrysler
David A. Smiley

Page 33

1    Q.    Would you consider ever going back to a
2    line-level job?
3    A.    Depending on what that would do.  What's the
4    repetitive type of actions involved in it because of the
5    arm.  I know that's what got me into it.  If I can avoid
6    it, that's what I will do.
7    Q.    You had told me before that you were receiving
8    some workers' compensation benefits?
9    A.    Yes.
10   Q.    Tell me how much you receive per week.
11   A.    $361.37.
12   Q.    How long have you received that amount?
13   A.    From 2005.
14   Q.    Did you receive any amounts before that time?
15   A.    I believe with those times that I was -- the
16   times I was off, yes.  Probably about the same amount
17   because there's never really been anything higher than
18   the amount that I have just quoted you.
19   Q.    The times that you have been off, do you mean
20   times that you were out of work on leave at Chrysler?
21   A.    Well, the times I was on -- my doctor would
22   pull me out and then just on those times and those times
23   alone.
24   Q.    Let me just make sure I'm clear on this.  You

A34

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 34

1   would get workers' compensation benefits when your doctor

2   would pull you out of work?

3       A.    When I was off.  That would be the only time I

4   would receive it.  Other than that, it would be your

5   regular pay, which is considerably more than $361.

6       Q.    You would be approved for workers' comp. -- can

7   I use "on leave"?  Is that an appropriate term for you?

8       A.    No.   When I was on sick leave.  If we worded it

9   that way.  Because leave could be vacation or whatever or

10  Family Medical Leave Act.  Something like that.  That's

11  why I choose not to use "leave."  But when I was

12  diagnosed and my doctor had pulled me out, those were the

13  times that I received workers' compensation.

14      Q.    Then you went back to work for your regular

15  pay?

16      A.    Yes.

17      Q.    Then you were out of work for a period before

18  your termination; is that correct?

19      A.    Yes.  In fact, on the day of my termination, I

20  was out then.  I had come back because I had received

21  information from Chrysler stating that I had missed an

22  appointment.  I didn't know about it.  My workmen's comp.

23  attorney at the time didn't know about it.  I responded

24  to the letter.  I brought everything in and that day I

Smiley v. DaimlerChrysler
David A. Smiley

Page 35

1    was terminated.

2        Q.    We will talk about that.

3        A.    I don't doubt that.

4        Q.    Just so I'm 100 percent perfectly clear, when

5    you were out of work at that time prior to when you were

6    terminated, you were receiving the workers' comp.

7    benefits?

8        A.    It was workmen's comp., one of the two.  At

9    that time David Cline was my attorney.

10       Q.    Then after you were terminated, did you

11   continue to receive the workers' comp.?

12       A.    Yes.

13       Q.    You continued right through to today?

14       A.    Yes.  I am receiving workmen's comp. at this

15   point.

16       Q.    Do you know what your status is as far as have

17   you been deemed to have a permanent injury?  Are you on a

18   temporary status?

19       A.    Right now I'm waiting.  I have another

20   appointment, I think it is next month, for another -- I

21   just had a surgical consult.  I believe we're going to go

22   through with the surgery.  But right now they have -- on

23   my checks -- they have "temporary" on my check stubs.  So

24   that's what I will have to go with at this point.

Smiley v. DaimlerChrysler
David A. Smiley

Page 36

1      Q.     Do you have any idea how long your benefits
2    will continue?
3      A.     No, I don't.  That aspect of it I have no idea.
4      Q.     I think I already know the answer to this, but
5    are you receiving any workers' comp. benefits from any
6    other employers?
7      A.     No, ma'am.
8      Q.     How about unemployment benefits?
9      A.     Never.
10     Q.     One quick question again about workers' comp.
11   Do you know the status of your injury?  Has it been
12   characterized as partial or total?
13     A.     I think my workmen's comp. attorney would be
14   better suited to answer that than I because I'm not
15   exactly sure what wording and I'm sure there's aspects he
16   knows that I'm not aware of.
17     Q.     So you're not quite sure at this time?
18     A.     I'm not quite sure.
19     Q.     What about Social Security disability benefits?
20     A.     No.  Don't receive that.
21     Q.     Did you ever apply?
22     A.     No.  I didn't know I was able.  I have never
23   even -- like I said, I never tried it.  I never thought
24   you could do it.  Never really thought of it.

Smiley v. DaimlerChrysler
David A. Smiley

Page 37

1      Q.     Any further education or degrees since leaving
2   Chrysler?
3      A.     Not yet, but that's in the future.  Go back and
4   get my Master's or if I can knock this LSAT out.
5      Q.     So you'd either like to get your Master's
6   degree or go further in law?
7      A.     Yeah.  It will still be in law even with my
8   Master's.  It will probably be criminal justice, only
9   because there's a familiarity with that area.
10     Q.     Do you have any concrete plans as for when you
11  would like to do that?
12     A.     Like to get it done -- gosh.  As soon as I get
13  this -- the sooner I can get this all out of the way,
14  then I can focus because that was another reason I was
15  doing the LSAT.  I was focusing on trying to get the job,
16  and, as you already know, you need 110 percent
17  concentration and I was not able to afford it that.
18     Q.     You think this year maybe?
19     A.     As soon as the smoke clears.  That's when I'm
20  going to try.  That's where it is right now.
21     Q.     Tell me about your hobbies.
22     A.     Well, can't really perform it like I used to.
23  I used to be in working on my vehicles.  Now it's
24  basically if I have to, I will do it now, because of the

Smiley v. DaimlerChrysler
David A. Smiley

Page 38

1    torquing actions and stuff because I have a 1985 Dodge

2    Ram truck, modified.  Once upon a time.  But like I said,

3    right now it's basically transportation.

4        Q.    When you say you were working on your cars,

5    what kind of work did you do?

6        A.    Basically engine stuff.  I would do tune-ups,

7    different type of component changes, intake, stuff like

8    that, for cams, carbs, stuff like that.

9        Q.    Was it more like routine maintenance or were

10   you kind of tricking it out?

11       A.    Now it would be routine maintenance.  Back when

12   it was truly a hobby, tricking it out, as you say.  It's

13   a sleeper.  On paper it's a 13-second truck.

14       Q.    That means what, speed?  I'm not a car gal.

15       A.    Yes.

16       Q.    Routine maintenance.  Prior to that when were

17   you doing the mods?

18       A.    Prior to 2005.  Actually, before the injury I

19   would be out doing -- basically doing little stuff to it.

20   It's been a project.  I have been working on it for years

21   now a little bit at a time.

22       Q.    When you say "before the injury," what time

23   period would you characterize that as?

24       A.    It could go -- actually anytime prior to that.

Smiley v. DaimlerChrysler
David A. Smiley

Page 39

1   Usually during the summer.  So that happened in May of

2   2005.  We could go back to, let's say, maybe 2003 in the

3   summer.  About the summer.  Since I don't have a garage

4   and a lot of the things that I was doing, I was doing

5   outside.  Once you're exposed like that...

6       Q.    Let me make sure I understand you.  You said

7   that you were doing the mods prior to 2005, but at one

8   point you said prior to your injury.

9       A.    Yes, prior to my injury.  My injury occurred

10  somewhere in September/October of '04.  So that's why I

11  said back in 2003 when I first really got the truck and

12  started doing different things to it.

13      Q.    Any other hobbies?

14      A.    No, ma'am.  Not now.

15      Q.    Do you take care of your kids?

16      A.    In which aspect?  Am I raising them?  Yes,

17  they're with me.

18      Q.    Do you play with them?  Do you --

19      A.    Since they're girls, I can't toss them.  If

20  they were my nephew, roughhouse with them.  I'm sort of

21  limited on that.  My arm -- they're my children.  You

22  take whatever.  You hug them, you pick them up at times.

23  The left arm still works fine.

24      Q.    How about household chores?

**A40**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 40

1    A.    Cook, clean.  I do it all.

2    Q.    Your wife must love you.

3    A.    She's kind of tired of me at this point, but we

4    won't go into that.

5    Q.    How about driving, can you drive okay?

6    A.    Yes, I can drive.

7    Q.    Walking?

8    A.    Yes.

9    Q.    Standing?

10   A.    Yes.

11   Q.    Bathing?

12   A.    Yes.

13   Q.    Dress yourself?  Can you dress yourself?

14   A.    Yeah, I can still do that.

15   Q.    Twisting?

16   A.    Like Twister?  Yes, I can twist.  My hips are

17   fine.

18   Q.    Any problems caring for yourself?

19   A.    No.  No.  I'm fully capable of taking care of

20   myself.

21   Q.    Your case is about a disability.

22   A.    Yes.

23   Q.    Can you tell me about your understanding of

24   your disability?

**A41**

Smiley v. DaimlerChrysler
David A. Smiley

Page 41

1    A.    All I know is my right elbow, I hurt it on the

2  job and it was swollen for a number of years.  Swelling

3  has finally gone down.  I'm still going to therapy for

4  that.  Pretty much it.

5    Q.    You told me that you sustained that injury in

6  September '04.  Is that right?

7    A.    Somewhere in '04, yes.  September/October '04.

8    Q.    Would you say that that was when you first

9  became disabled?

10   A.    Well, in the beginning I was doing therapy and

11 doing the job.  So I was doing them both.  And my doctor

12 was, you need to leave it alone, but at the same time my

13 family has to eat, so I had to do what I had to do.

14   Q.    When would you say you first became disabled?

15   A.    Well, the day that that happened, I think from

16 there, because that was the first incident of ever having

17 a problem with my right elbow.  So we could use that day.

18   Q.    It's your right elbow?

19   A.    Yes.

20   Q.    And it was hurt on the job?

21   A.    Yes.

22   Q.    What happened?

23   A.    In the hole -- and when I say "the hole," if

24 you remember, we were speaking about you have -- let's

Smiley v. DaimlerChrysler
David A. Smiley

Page 42

1    say you have 30 seconds on the vehicle.  Sometimes that

2    vehicle might take considerably longer than 30 seconds.

3    Meanwhile, the line is still coming.  So after you finish

4    that, you have to type in the vehicle number, were there

5    any other defects, what you did to the vehicle, and then

6    go back and try and make this car.

7              Now, what had happened in my case, it was

8    an incident.  I was probably coming out of the hole.

9    There are times that the line stops.  There's nothing --

10   it stops.  Someone up so many feet ahead of you may stop

11   it.  Someone behind you may stop it.  Someone on the

12   other side of you could stop it.  There's no red light.

13   It stops.  Going in to do a vehicle, rear door, I hit my

14   elbow on the can.  The can is in the rear door where the

15   door handle is.  It sticks out, and that's where your

16   lamp mechanism is.

17       Q.    In the inside of the door?

18       A.    In the inside the structure of the door itself

19   on the inside of the door.  Going in and that's when I

20   hit it.

21             I went to medical.  We got it documented.

22   That's why we're here.

23       Q.    Was the line moving or the line stopped?

24       A.    The line moving and it stopped.  It stopped as

Smiley v. DaimlerChrysler
David A. Smiley

Page 43

1    I was going in.  So we sort of -- the door and I sort of

2    met.

3        Q.    Were you given a diagnosis for the elbow

4    injury?

5        A.    My doctor -- it's in his notes.  I can't verse

6    the technical terms that he put out.  They're inside

7    Dr. Bandera's notes.

8        Q.    Dr. Bandera's records would have that?

9        A.    Yes.  He's the only doctor that I have treated

10   with with this situation since it has occurred.

11       Q.    Is he a family doctor?  Is he a specialist?

12       A.    I don't know what you would consider him.  I'm

13   not really sure.  I guess you could say specialist

14   because I know he does -- he has like a rehab type of

15   center there.  He does -- you have people in there with

16   ankles, arms, legs, what have you, type of therapy.

17       Q.    Do you remember when he diagnosed you?

18       A.    I couldn't give you an exact date, no.

19       Q.    Are you still being treated?

20       A.    Yes.

21       Q.    Tell me about your treatments.

22       A.    Basically, heat, ice, stim, and we do

23   manipulative-type exercises with it.  I have this one

24   thing that I have to squeeze and whirlpool for it, heated

Smiley v. DaimlerChrysler
David A. Smiley

Page 44

1    whirlpool for it.  Like I say, stim is basically put your

2    electrodes on it and he wraps it in an icepack and then

3    turns the current on.

4        Q.    Electric current?

5        A.    Yes.  The rack.

6        Q.    Does that help?  I have never heard of that.

7        A.    A lot of times, if an individual, say, were in

8    an auto accident, a lot of times, for muscle-type

9    injuries and things like that, they will use electrical

10   stimulus.  Basically it agitates the muscle, if you will.

11       Q.    How often do you go to treatment?

12       A.    When I can -- I was going -- he had me going

13   three times a week.

14       Q.    Do you still do that?

15       A.    Now we pretty much held back on that because

16   we're waiting to see what's going on with this other

17   doctor's evaluation of my arm.

18       Q.    Dr. Bandera had you going three times a week to

19   do the exercises and the whirlpool and the electrode

20   procedure?

21       A.    Uh-huh.

22       Q.    How long were you doing the three-times-a-week

23   course of treatment?

24       A.    That was for a few months.  A few months.

Smiley v. DaimlerChrysler
David A. Smiley

Page 45

1    Q.    When you were still working?  Give me some

2    context for time.

3    A.    At the time when I was going, it was two times

4    a week when I was still working.  This is in the

5    beginning, in '04.  In fact, I would have to leave

6    Chrysler to go to his facility because he closes like --

7    I think it was like at 4 o'clock.  He's usually out of

8    the office around 4 o'clock.  So there were times they

9    were saying that I get paid, I never seen it, but I would

10   go like maybe two times a week there.  The swelling

11   hadn't went down, there was no real change, so we

12   intensified the visits, if you will.

13   Q.    Do you remember when you started three times a

14   week?

15   A.    Couldn't give you a concrete date, but it would

16   be -- it would even for -- we did it sometimes in '05.

17   We did it in '04.  We did it in '06.  Intermittently to

18   the current date.

19   Q.    When you say "intermittently," do you mean it

20   started in '04 and you did it sometimes in '04 and then

21   you ratcheted it up or down?

22   A.    Not so much my call.  Not so much my call.

23   There would be times he would say, give it a few months

24   and give me a call back and you come in and we will do an

Smiley v. DaimlerChrysler
David A. Smiley

Page 46

1    evaluation and we will do it that way.  Again, those

2    things would be in his notes.

3        Q.    Throughout 2004, 2005, 2006, all the way to the

4    present, it was kind of a course where sometimes it was

5    two times a week if you were doing okay.  If it started

6    to kind of decline, it would be more like three times a

7    week?

8        A.    Well, we would go from three down to two

9    because basically we didn't see the true improvement that

10   we both felt should have been there.

11       Q.    Now are you doing two times a week?

12       A.    Right now I'm waiting on -- I'm supposed to be

13   doing three.  Can't afford to do three.  From Newark

14   coming back and forth here, I really can't afford to make

15   those trips.  If I could, I would.

16       Q.    Are you doing any --

17       A.    I do like basically like a home thing.  I do a

18   lot of stretching and I put a little ice on it.

19       Q.    How is that going?

20       A.    The situation is still the same.  The only

21   difference now is it isn't swollen.

22       Q.    You said you were waiting for an evaluation by

23   another doctor?

24       A.    Yes.

**A47**

Smiley v. DaimlerChrysler
David A. Smiley

Page 47

1    Q.    Tell me about that.

2    A.    That's Surgical Consultants.  His name is

3    David Sowa.

4    Q.    S-o-a?

5    A.    S-o-w-a.

6    Q.    He's the surgeon?

7    A.    Yes.  We're going to wait and see what his

8    evaluation is.  He gave me another shot in my elbow.

9    It's still the same.  Pretty much the same.

10    Q.    Have you been treating with Dr. Sowa?

11    A.    I had one visit with him.  Like I say, we're

12    awaiting the next visit next month.

13    Q.    You had one visit.  You got the shot?

14    A.    Yes.

15    Q.    The shot didn't help very much?

16    A.    No.  Maybe a couple days and then you get the

17    same burning.  The same thing.

18    Q.    Now you're looking at surgery?

19    A.    Yes.  Because the idea was years ago I had one

20    incident that I think I might have jumped into it too

21    soon.  I opted to treat it conservatively this time.

22    Aggressive, but still conservative at the same time, no

23    surgery.  Three years after the fact the problem is still

24    there.  So I caught myself giving it enough time this

**A48**

Smiley v. DaimlerChrysler
David A. Smiley

Page 48

1    time to make a better evaluation of it.  So now I'm at

2    the point now if surgery will correct it, that's what I

3    will do.

4        Q.    The prior surgery that you had, was that an arm

5    surgery?

6        A.    No.  That was my foot.  Totally unrelated to

7    Chrysler.

8        Q.    Do you take any medication?

9        A.    I get prescriptions, but what I do, like I

10   said, again, it's an affordability issue, since I don't

11   have insurance.  Basically over-the-counter Tylenol.

12       Q.    But you've been prescribed some medication?

13       A.    Yes.  I think it was a Percocet thing and I was

14   doing the Lidoderm patches and things like that.

15       Q.    But you're not taking that now?

16       A.    Can't afford it right now.  No.

17       Q.    How often do you take the over-the-counter

18   Tylenol?

19       A.    When it gets -- because I'm not a fan of

20   pharmaceuticals.  When it gets to the point it's really

21   being a pain, then I will take it.  Say three, four times

22   a day, I can't sit here and tell you that, no.  There are

23   some days is better than others.  Some days, this is

24   enough to aggravate it.  And other days I could do other

Smiley v. DaimlerChrysler
David A. Smiley

Page 49

1    things.

2        Q.    What do you think, a couple times a week?  Give

3    me a ballpark again.

4        A.    I could say a couple.  I'd have to say a few.

5    A few times a week.

6        Q.    Can you give me a number of times, let's say a

7    seven-day period?

8        A.    It depends because some days, some weeks it

9    feels better than others.  I could say the whole thing --

10   I don't like pharmaceuticals from the go.  If I don't

11   have to take an aspirin, I'm not going to take an

12   aspirin.  When it gets to the point that it's really

13   paining me, if you will, then I will take one.  Goes to,

14   oh, I take five, six, seven, I can't do that for you.

15       Q.    We're going to leave it at a few.

16       A.    A few.

17       Q.    Tell me about how your injury has affected your

18   life.

19       A.    Well, from going from being gainfully employed

20   to the opposite, from there.  Financially, obviously.

21   Again, it's taken away -- I can't do what -- like I said,

22   again, with the girls, I'm learning to use the left arm

23   and the hand a lot more so.  I'm becoming more

24   ambidextrous because I have to.  That would be another

Smiley v. DaimlerChrysler
David A. Smiley

Page 50

1    way that is -- that's it.  Because I basically had some

2    type of manual-type labor I have done.  Prior to Chrysler

3    I was an ironworker.  I have always worked with my hands.

4    When I was in the Navy, I worked with my hands.  It's

5    caused more of a readjustment, if you will, in the way

6    that I do things and even down to the things that I

7    pursue.

8        Q.    We may have tread this ground before, but when

9    did your injury begin to affect these activities?

10       A.    That would go back to September/October of '04

11   when it occurred.

12       Q.    Has it gotten worse since you stopped working

13   for Chrysler?

14       A.    I wouldn't say -- I wouldn't say it's gotten

15   worse, but I can't say -- like I said, the swelling,

16   that's the only aspect that's gotten better.

17       Q.    Let's go back to September/October of '04 when

18   you sustained the injury on the job.

19       A.    Okay.

20       Q.    What happened after you sustained your injury?

21       A.    I went to medical; had it documented.  Medical

22   iced it, put me back in the game.

23       Q.    How long did you keep working with the elbow

24   injury?

**A51**

Smiley v. DaimlerChrysler
David A. Smiley

Page 51

1    A.    I worked up until -- intermittent times that my

2    physician has pulled me out on workmen's comp., I worked

3    till my termination.  Back and forth up until my

4    termination.

5    Q.    Let's talk about the first time that your

6    physician pulled you out, if you can remember.  So the

7    injury occurred and then when was the first time that you

8    were out of work for this injury?

9    A.    I still tried to work through it, because I

10   remember like it -- I was working and doing therapy.  So

11   again, I'd have to refer you to his notes as a more

12   accurate portrayal of that time frame.

13   Q.    Do you remember going out in March of -- March

14   of '04, that was before your injury.  So you didn't take

15   any time off work for --

16   A.    Perhaps it was '03, then, that the injury

17   occurred.  It may have been '03, then.

18   Q.    Let's see.  I have a note here that you were

19   out for a small period in March of '04, but that could be

20   mistaken.

21   A.    That might have been -- let's see, what was

22   that for?  I don't know.  I don't remember exactly what

23   it's for.  If I was out, I'm sure there's documentation

24   somewhere to substantiate whatever that is.

**A52**

Smiley v. DaimlerChrysler
David A. Smiley

Page 52

1    Q.    Let me show you a document, then.

2         MS. WASSON:  Can I have this marked as

3    Exhibit 2, please?

4         (Smiley Deposition Exhibit No. 2 was marked

5    for identification.)

6    BY MS. WASSON:

7    Q.    Mr. Smiley, could you just take a look at this

8    document for me, please?

9    A.    Uh-huh.  Okay.

10   Q.    Do you recognize this?

11   A.    Let's see.  For '04, couldn't exactly tell you

12   what it looks like.  They wanted to do an evaluation from

13   the medical department.

14   Q.    Do you think that you sustained your injury

15   before this time?

16   A.    It very well could have occurred.  Very well

17   could have.  Again, I could say that September/October

18   could, in fact, be '03.

19   Q.    '03?

20   A.    Yes.  Like I said, short of having everything

21   here right in front of me and having to admit to it, I

22   can't do that.

23   Q.    Let's assume just for now, and I'll go back and

24   check in the file and see if we can firm up the date, but

Smiley v. DaimlerChrysler
David A. Smiley

Page 53

1    let's assume for now it's '03, September or October of

2    '03.  Do you remember taking any brief leaves in the

3    spring of '04 or any time that your doctor put you out of

4    work in the spring of '04?

5        A.    If he did, there is a note somewhere stating

6    that's what he did.  Let's see.  There was one time, and

7    again, this was unrelated, again with my foot, that could

8    have been around that same time because I was out for

9    that.  Obviously I walk all day.  That's the only other

10   thing I can think of sitting right here.

11              So I can't rightfully say if this was

12   attributed to my foot or if this is attributed to my arm.

13       Q.    Do you remember early on when you sustained the

14   injury, did you do anything to sort of modify your job

15   duties or make it easier for you to do your job?

16       A.    I got a lighter hammer.

17       Q.    You did?

18       A.    Yes, I did.  That's all I did.  I didn't use

19   the regulation hammer that they issued, but we did have

20   another one and I tried using that.

21       Q.    Do you remember anybody at Chrysler objecting

22   to you using the lighter hammer?

23       A.    As long as the job was being done, there was no

24   objections that I can think of at this point.  I guess it

Smiley v. DaimlerChrysler
David A. Smiley

Page 54

1    was a little more time-consuming because you have to

2    loosen it.  You're going from something five pounds,

3    you're using the weight of the hammer as opposed to now

4    you have a lighter hammer.  So it's more strikes.  You

5    have to loosen whatever object it is up a little bit more

6    because it's not going to have the same power as a

7    regular hammer would.  But other than that, none that I

8    can think of at this point.

9        Q.    Besides maybe loosening it up a little bit more

10   and maybe taking just a little bit longer to do each car,

11   was there anything else?  Or did that modification,

12   getting the lighter hammer, did that enable you to do

13   everything you needed to do on your job?

14       A.    As far as that aspect, yes.  As far as hitting

15   whatever, the striker or whatever I had, driving a hinge

16   forward, I could still do that.  Like I said, I just have

17   to do it a little harder and a little more often, but

18   other than that...

19       Q.    Did you use that lighter hammer for the

20   duration of your time as the right door fitter?

21       A.    No, because at the time of the injury I was

22   using a regular hammer.  A little ways after that and,

23   like I said, at the time it was still swollen.  So that's

24   when I was like, okay, let me see if I can do something.

Smiley v. DaimlerChrysler
David A. Smiley

Page 55

1   Let me try something else.  That was basically -- it was

2   a shot in the dark.  It seemed like it worked.  That's

3   what I did.

4       Q.    After you started using that lighter hammer,

5   did you continue using that for the rest of the time you

6   spent as door fitter?

7       A.    Yes.

8       Q.    Do you remember approximately when you decided

9   to switch to the lighter hammer?

10      A.    That I cannot tell you.

11      Q.    Do you think it was a couple months after the

12  injury?

13      A.    I don't know.

14      Q.    Couple days?

15      A.    I don't know.  I know it wasn't a couple days.

16  That I do remember.  It wasn't a couple days.

17      Q.    It looks like, and I will get some

18  documentation if I can find some in the file, but it

19  looks like you took a leave or you went out of work in

20  July of 2004.

21      A.    Okay.

22      Q.    You were on leave for a period of time and then

23  received this letter while you were on leave.  Do you

24  remember that at all?

**A56**

Smiley v. DaimlerChrysler
David A. Smiley

Page 56

1      A.    Again, like I said, just looking at it, there's

2  nothing on here to indicate exactly what I was out for.

3  So I can't truthfully answer that because I don't know

4  what it was for.

5      Q.    That's fair.

6            This letter talks about coming in for an

7  evaluation by plant medical?

8      A.    Uh-huh.

9      Q.    What would you do in response to a letter like

10 this?

11     A.    Come in.

12     Q.    Under the normal Chrysler procedure, was there

13 anything that you had to do besides come in to plant

14 medical?

15     A.    Okay.  In this particular instance, like

16 they're saying submit such evidence as directed, okay.

17 So it would be whatever medical documentation you had.

18 Just going by what this says right there.

19     Q.    Do you remember bringing in any medical

20 documentation prior to this last incident regarding your

21 termination?

22     A.    I brought that in, too, also.  Yes, I probably

23 submitted either a copy or -- depends on what I did with

24 the original note.  But they would have -- if this

Smiley v. DaimlerChrysler
David A. Smiley

Page 57

1   happened in 11/04, it's safe to assume that I gave them

2   whatever it was that they wanted.

3       Q.    Do you know under Chrysler's procedures how

4   employees are typically notified about their visits to

5   plant medical?

6       A.    Well, it's been my experience that it's through

7   mail.

8       Q.    Through a letter?

9       A.    Through a letter.

10      Q.    Do you see the signature at the bottom of this

11  letter here?

12      A.    Uh-huh.

13      Q.    This is Dawn Ford?

14      A.    Uh-huh.

15      Q.    Did you know her at the time that this letter

16  was written?

17      A.    Not personally.  I knew of her, as I'm sure

18  she's known of me.

19      Q.    Do you remember ever talking to her in

20  connection with this visit?

21      A.    I can't remember, but, again, they have never

22  had -- in fact, Dawn was the one individual that had a

23  problem with my note.  Prior to this I never had any

24  problem with any notes, any copy of notes that I brought.

Smiley v. DaimlerChrysler
David A. Smiley

Page 58

1   Never had problems.

2       Q.    So at this time period, whenever you had to

3   come in, which it looks like November 3rd, 2004, you

4   don't remember any kind of conversations with Dawn or any

5   kind of interactions with this particular Dawn Ford, this

6   person?

7       A.    No.  This is the only Dawn Ford in there.

8       Q.    You don't remember anything with regard to this

9   visit with her?

10      A.    I don't remember right offhand, no, ma'am.

11  Again, because it doesn't exactly say what I was there

12  for short of bringing documentation and evaluation by the

13  plant physician.

14              MS. WASSON:  I'd like to mark this as

15  Exhibit 3, please.

16              (Smiley Deposition Exhibit No. 3 was marked

17  for identification.)

18  BY MS. WASSON:

19      Q.    Mr. Smiley, have a look at Exhibit 3.

20      A.    Okay.  From my doctor saying I'm having therapy

21  three times.  The DX code still the same.  Diagnosis

22  code, 726.32.  Okay.  So that would be, I guess, this.

23      Q.    So it looks like this would be your

24  substantiation that you brought in in response to this

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 59

1    letter?

2        A.    May have actually been one of them, yes.

3        Q.    Do you remember bringing this one?  I know it's

4    been a long time ago.

5        A.    I don't know if I brought it in or perhaps

6    maybe they got it from him.  Obviously they have it.  I'm

7    not exactly sure how, but they have it.  It's around the

8    same time.  Seems like it fits in with everything that

9    they would like to have.

10       Q.    Do you remember coming in in November of '04

11   when you were previously out of work and you were

12   summoned to come in to plant medical?  You came in;

13   apparently you brought your documentation.

14       A.    Okay.

15       Q.    Do you remember seeing the doctor at that point

16   in time?

17       A.    I guess if I came in that day, I saw the doctor

18   that day.  The only day that I hadn't seen the doctor

19   would be the May 13th incident.  That was the only time

20   that I did not see a doctor when I was at the plant.

21       Q.    Do you remember being out of work for this

22   period of time at all?

23       A.    I have to go with this if this is -- that

24   covers that period of time.

**A60**

Smiley v. DaimlerChrysler
David A. Smiley

1    Q.    So you don't remember what happened as a result

2    of this evaluation by plant medical?  Do you remember if

3    you were returned to work with restrictions or you went

4    back out of work?

5    A.    They may have done the restrictive.  They may

6    not have.  I'm not exactly sure, short of seeing what

7    medical would put out in response to that.  I don't

8    really know.

9    Q.    So you can't remember?

10   A.    Well, okay, let's go with can't remember.

11   Q.    At some point in time you were out of work and

12   you were summoned back to return to work.

13   A.    Okay.

14   Q.    Right?

15   A.    Well, actually -- somewhere in there, yes.

16   Basically, that's sort of what this things looks like.

17   One of those you need to have an evaluation or something

18   like that.  That would fall under that same type of

19   heading, I guess.

20   Q.    Did you ever return to work but in a different

21   position?

22   A.    They brought me back -- let's see.  What did I

23   do?  I did the left side fender installer.  That was the

24   last thing I did.

**A61**

Wilcox and Fetzer, Ltd.  Registered Professional Reporters          302-655-0477

Smiley v. DaimlerChrysler
David A. Smiley

Page 61

1    Q.    Do you have any recollection of when that

2    occurred, when you were reinstated to left side fender?

3    A.    Let's see.  Terminated in May.  Somewhere

4    probably, let's say, February/March, somewhere in there.

5    And maybe even January, perhaps.  I'm not sure.

6    Q.    Before you were doing left side fender, before

7    you were reinstated, were you out of work?

8    A.    Yes.

9    Q.    Do you remember the longest time period that

10   you were out of work, generally?

11   A.    No.  They were generally around the same time.

12   I'm assuming they were around the same length of time.

13   So to -- no, I can't say in any particularity which time

14   I was out longer.

15   Q.    Let me rephrase that.

16         Do you remember or do you recall how long a

17   time period at any one time you were out of work?  Say

18   were you out of work for more than two months?  Were you

19   out of work for six months?  Do you remember --

20   A.    I don't remember six months.  It may have been,

21   but short of having everything right there, I'm not

22   really sure.  I have been occupied with a lot of other

23   things.

24         I don't remember it being -- this being the

Smiley v. DaimlerChrysler
David A. Smiley

Page 62

1    longest since the termination, this would have to be the

2    longest that I have ever gone with it.  I think before it

3    may have been a couple of months, maybe two, three

4    months.  Again, short of having it in front of me...

5        Q.    Sure.  So are we agreed that before you got

6    placed back in left side fender install, that you had

7    been out of work for some kind of extended period of

8    time, maybe a couple months?

9        A.    Okay, we could say a couple months, perhaps.

10       Q.    Is that fair?  Do you remember that?

11       A.    That would be a fair one.  That would be a fair

12   one.

13       Q.    You were out -- I may end up saying "on leave."

14   What I mean by "on leave" --

15       A.    Now I understand the context that you're using.

16       Q.    You're on a medical leave, you're out for your

17   elbow.  You're out on leave and then how did you come to

18   work in the left side fender install position?

19       A.    They brought me back.  They gave me a PQX and

20   someone decided I could do left-sided fender.

21       Q.    You said PQX.  What do you mean by that?

22       A.    A PQX is basically they're going to put you on

23   another job, have you doing something else other than

24   what you're normally doing.

**A63**

Smiley v. DaimlerChrysler
David A. Smiley

Page 63

1    Q.    When you say "they," who are we talking about?

2    A.    When I say "they," I mean the corporation.

3         MS. WASSON:  Can we mark this as Exhibit 4,

4    please?

5         (Smiley Deposition Exhibit No. 4 was marked

6    for identification.)

7    BY MS. WASSON:

8    Q.    Mr. Smiley, do you recognize this letter?

9    A.    This is letting me know that there was a PQX

10   for left side fender installer.

11   Q.    Do you remember receiving this?  Did you get

12   this letter?

13   A.    I can't say that I remember it.  That would be

14   what, probably by column number I'm thinking.  DNR, no.

15   But I'm sure I received it because I did do left side

16   fender install.

17   Q.    It says on that first line, "A PQX placement

18   search has been conducted"...

19   A.    Uh-huh.

20   Q.    Do you know what that means?

21   A.    What that basically means, my understanding of

22   it is that they will look at whatever it is that is

23   bothering you and they will try and find something else

24   that they say would cause you not to aggravate that

Smiley v. DaimlerChrysler
David A. Smiley

Page 64

1    injury or whatever area.

2        Q.    Do you know who decides?

3        A.    That's somewhere up in the medical and Human

4    Resources.

5        Q.    Have you ever heard of the PQX Placement

6    Committee?

7        A.    I have heard of them, yes.

8        Q.    Do you know who makes up the PQX Placement

9    Committee?

10       A.    The individuals, no, I don't.  I don't know

11   exactly what it is.

12       Q.    Is the union involved with that?

13       A.    Supposedly.

14       Q.    Have you ever sat in on one?

15       A.    No, I have not.

16       Q.    Supposedly it's supposed to be a joint

17   committee with the management and the union folks.

18       A.    Somewhere in there, yes.

19       Q.    You were telling me that the committee looks at

20   what's wrong with you and tries to place you somewhere

21   else in another job?

22       A.    Yes.

23       Q.    In this instance, it looks like the PQX

24   Placement Committee identified left side fender install

**A65**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 65

1    as your new job?

2        A.    That's what's there.  I have to go with what's

3    on this letter.

4        Q.    When you got this letter and you were told to

5    go to left side fender install, did you know what that

6    position entailed?  Were you familiar with that one?

7        A.    Still in body shop, I know that much, because

8    of the B.  So you already knew it was in body shop.

9    Fender install, just kind of take it as the name implies,

10   putting on fenders.  Not being sarcastic.

11       Q.    No.  That's fine.

12             Did you ever object to being placed in that

13   particular job?

14       A.    I pretty much do whatever they put in front of

15   me.

16             MS. WASSON:  Can we mark this as Exhibit 5,

17   please?

18             (Smiley Deposition Exhibit No. 5 was marked

19   for identification.)

20   BY MS. WASSON:

21       Q.    This is a document that we produced to you

22   during discovery --

23       A.    Okay.

24       Q.    -- in your case.

**A66**

Smiley v. DaimlerChrysler
David A. Smiley

Page 66

1      A.      Uh-huh.

2      Q.      It has the PQX codes for you.

3      A.      Okay.   DO6 and BO9.   Okay.

4      Q.      Looks like these PQX codes.   Are these PQX

5   codes an accurate summary of your restrictions?

6      A.      Pretty much.   Pretty much.

7      Q.      That pound sign here where it says on the

8   document "No lifting over 15" pounds?

9      A.      Fifteen pounds.

10      Q.      It's a 15-pound lifting requirement or lifting

11   restriction?

12      A.      Yes.

13      Q.      You can see here that it was the left side

14   fender install?

15      A.      Uh-huh.

16      Q.      I guess that B38, does that mean like where --

17      A.      Column number B38.   That's where it's located

18   inside the facility.   9110 is the area, and 303 is the

19   locale.

20      Q.      It says down at the bottom that this job is

21   approved by the OSHA nurse and safety?

22      A.      That's what it says.

23              MS. WASSON:   Can I have this marked as

24   Exhibit 6, please?

**A67**

Smiley v. DaimlerChrysler
David A. Smiley

Page 67

1            (Smiley Deposition Exhibit No. 6 was marked

2    for identification.)

3.   BY MS. WASSON:

4        Q.    If you will take a look at this document for

5    me, Mr. Smiley.

6        A.    Uh-huh.

7        Q.    This one looks sort of like the one I showed

8    you earlier.  It's a job description.  It looks like this

9    one is for the left side fender, right?  Can you take a

10   glance through that and see if that's an accurate job

11   description for the duties of that job description.

12       A.    I don't remember that.

13       Q.    Which one?

14       A.    No. 16, it says, "If the operator drops a hinge

15   bolt in the car," it looks like something "dropped bolt

16   into C.R.T."  okay.  Inner drop bolt in the C.R.T.

17   computer.  There are no hinges on the fender.

18       Q.    So you would say 16 isn't really something that

19   you would do in that job?

20       A.    I'm trying to remember, because -- something

21   with the lift gate, but I'm thinking it was already

22   there, already on the lift gate.  Trying to remember how

23   the operation went.

24       Q.    Take your time.

**A68**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 68

1    A.    Okay.   Okay.   I have to go with what they say.

2    Fender to body.   Still trying to figure out which peg

3    that is.   Okay.   I'm still thinking the hinge bolt in the

4    car.   I'm thinking -- we had to do something in the back.

5    I think it was just unloosen one bolt back there and that

6    was with the gun.

7              On No. 11 where it says open the doors and

8    post -- front and rear -- right rear door -- front and

9    rear door opening, and I'm trying to remember -- I don't

10   remember -- I think we had those little door clamps up

11   there.   I'm trying to remember the job.   But okay.

12   Q.    What do you think about No. 16?   Do you think

13   that's fair, or do you not remember doing that?

14   A.    I don't remember doing that.

15   Q.    Everything else?

16   A.    Decent assessment.

17   Q.    I know we spent a lot of time previously

18   talking about the right side door fender job and exactly

19   what you did.   You used the carrier and all.   Can you

20   tell me about the left side fender install job in sort of

21   the same way that you were telling me about what you did

22   previously?

23   A.    What I remember with the left side fender, the

24   actual fender would come down the carousel.   As the

A69
b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 69

1   vehicle is approaching, it was basically as almost like

2   an intersect.  I would be over here.  I would lift the

3   fender up, trying to use my left for that.  We would have

4   to use tools called a Yankee.  It may be 13 inches long.

5   Basically what you're doing with the Yankee, think

6   inverted -- or even mechanical screwdriver, if you will.

7   You use a plunging-type motion and in turn right turn,

8   left loose.  You would do that.  Start to screw in a

9   couple of turns.  One in the front part of the fender,

10  one near the rear.  So it was like maybe two, possible

11  three, bolts with that.

12      Q.    Hold on.  Are you doing front and back fender?

13      A.    No.  The fender itself.  The fender usually

14  takes I think six screws in it.  It takes six screws.  If

15  you were to go -- I think it's called catwalk there.

16  Inside the fender where the plate steel is thin, there's

17  like six different holes in there.  Attach it to the

18  frame on the vehicle.

19      Q.    So did you say that you would sort of manually

20  screw it in first and then use the tool?

21      A.    Yes.  You have to try and twist it or actually

22  after a while, when you're halfway decent at it, if you

23  have a magnetic head on it, a lot of times you can get it

24  in there.  Like I said, you're yanking.  It's called a

**A70**

Smiley v. DaimlerChrysler
David A. Smiley

Page 70

1    Yankee.   It's a plunging type of motion.

2        Q.    It's almost like an air screwdriver thing?

3        A.    No.

4        Q.    Help me out here.

5        A.    I'm trying to think of the best descriptive

6    terms for this thing.

7              Like I say, it's about 13 inches long, 12,

8    13 inches long, possibly 14.  Mechanical type of a

9    twisting mechanism in it.  It plunges.  So it goes up --

10   you have to do it in an up-and-down fashion.  That's the

11   only way to do it.  There's no side to side.  It's

12   straight up and down.

13       Q.    It would put the bolts --

14       A.    Yes, it would screw the bolt in.

15       Q.    Tell me about what you physically had to do.

16       A.    Physically had to take the fender from the

17   carousel, walk to the vehicle, I had my tools -- had my

18   screws, had a little pouch.  Usually carried my Yankee

19   with me to save time.  Started a couple turns on the

20   first screw, couple turns on the back screw.  I believe

21   go to the rear of the car and that's where I think this

22   lift gate issue with the hinge comes in because I think

23   it was one bolt up in there that you had to take out.

24       Q.    There was a bolt you had to take out?

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 71

1      A.      Uh-huh.  After you put the lift gate on, when
2   it's coming to where we're at is right before they paint
3   the vehicle.  So it's coming down.  Lift gate is on, but
4   it's not in its -- it's not really set.  It's just there,
5   so to speak.  And I believe, I'm trying to remember, that
6   you had to -- I think it was that back screw we had to
7   take out.  We had to take the back one out.

8      Q.      You told me that you're taking the fender to
9   the vehicle?

10     A.      Uh-huh.  Take the fender off of the carousel.
11  It was coming this way, so I would take it off the
12  carousel, walk to the vehicle, use my Yankee couple turns
13  here, couple back here, grab my gun, go around to the
14  rear of the vehicle.  I think it had the door clip things
15  on it, too.  You had to make sure the door was set
16  because after it left us it went to paint.

17     Q.      How much did the fender weigh?

18     A.      Fender is relatively light.  It could be within
19  that PQX range.  Possibly 15, 16 pounds.  Something like
20  that.

21     Q.      Any other lifting that you had to do besides
22  holding your Yankee?

23     A.      The Yankee and that's pretty much it.  Using
24  the gun.  And like I said, because of my height, I had to

Smiley v. DaimlerChrysler
David A. Smiley

Page 72

1    reach up.  But other than that, no.

2        Q.    And the Yankee was how many pounds do you

3    think?

4        A.    Guesstimation, maybe five.

5        Q.    So the left side fender install job was within

6    these restrictions, right?

7        A.    Well, it was, but see, the thing about it is,

8    you're using the Yankee and it says no twisting,

9    repetitive type of actions like that.  A Yankee, there's

10   no way to do it other than that.  I'm right-handed.

11   Automatically it's going to go into my right hand.  So

12   there's been an issue there.

13       Q.    Did you let anybody know about an issue that

14   you were having with that?

15       A.    I did my job.

16       Q.    So you didn't tell them, hey, I'm having a hard

17   time with this?

18       A.    I'm not a whiner.  I did my job.

19       Q.    How long were you supposed to work on left side

20   fender install?

21       A.    They don't give you a specified time limit.

22       Q.    So as long as it fits within your restrictions,

23   you can just keep on doing that?

24       A.    Basically I'd have to say yeah.  I'm not

Smiley v. DaimlerChrysler
David A. Smiley

Page 73

1   exactly versed on PQX protocol, but there was not, to my

2   knowledge, a start-stop date.

3       Q.    Was it as long as you had those restrictions,

4   you could have that job?  Is that how it sort of worked?

5       A.    Basically I guess you could look at it like

6   that.  That would be a decent assessment.

7       Q.    How long did you actually work on the left side

8   fender install?

9       A.    Before the swelling, I got about a week out of

10  it.  I did it for about a week and it was just to the

11  point like, okay, this is not -- seeing my doctor and

12  that's when he pulled me out for the last time and then

13  that led up to where we are right now.

14      Q.    So you experienced some swelling?

15      A.    Swelling came back, yes.  Like I said, I was

16  still using my arm.  I'm right-handed.  So even though it

17  says left fender install, I'm a left-handed person.  So

18  you're automatically going to use your comfortable --

19  your natural hand.

20      Q.    Could you have used your left hand if you

21  wanted to?

22      A.    Not with the efficiency of my right hand.

23      Q.    Did you ever try it with your left hand?

24      A.    Yes.  I had to.  That's how I made a week out

A74

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 74

1    of it.

2        Q.    You actually started doing the job with the

3    left hand because the swelling was in your right?

4        A.    Then when you fall behind and it's causing

5    another set of unseen headaches and you do what you have

6    to do to do the job.

7        Q.    You worked at the job for a week and then you

8    went to see your doctor?

9        A.    I went back to my doctor.

10       Q.    He took you out of work again?

11       A.    Yes.

12       Q.    Did anybody at Chrysler object to you going out

13   of work at that point?

14       A.    Not that I have known of.  No one had came to

15   me with it, no.

16       Q.    At that time when your doctor was going to take

17   you out of work, did you ever ask to be placed in a

18   different position since this one wasn't working out?

19       A.    No.  He had taken me out that day.  Well, I

20   seen him, I believe, probably maybe a Monday since I

21   worked that week and I think maybe that Monday I went to

22   see him.  And to answer it, did I ask anyone, there

23   wasn't anyone to ask at the time.  My doctor made a

24   decision and that was about the end of it.

**A75**

Smiley v. DaimlerChrysler
David A. Smiley

Page 75

1    Q.    When you started this job and you were working

2    on this job, this left fender job, during that week and

3    you were starting to experience the swelling, you

4    switched hands?

5    A.    I also went to plant medical.  There ought to

6    be a document in there with plant medical, also.

7    Q.    At that point in time, during that week before

8    your doctor affirmatively took you out of work, did you

9    tell anybody, hey, this is not working out?

10   A.    I did my job.  Basically did my job.

11   Q.    So you didn't ask to be placed in a different

12   position, not this left side fender job?

13   A.    I guess it could also be viewed as I wasn't

14   known that I had a choice that I could go anywhere else.

15   So I wouldn't, you know...

16   Q.    So you didn't actually ask anybody, yes or no,

17   to be placed in a different job?

18   A.    To that question -- okay, I hadn't spoken with

19   anyone about another position, no, because, like I said,

20   again, I didn't know you could do that.

21   Q.    Did you ever approach the union about this?

22   A.    No.  This was -- apparently they were behind it

23   also with them.  So I'd have to say no.  They put me

24   there and that was pretty much the end of it.

**A76**

Smiley v. DaimlerChrysler
David A. Smiley

Page 76

1    Q.    Do you think at that point you should have been
2  given another job?
3    A.    Should have, would have, could have.  At this
4  point it's kind of I -- because it hurt, yes, I probably
5  should have had another one, probably, but, then again,
6  like I said, after I went to my doctor, I wanted to tough
7  it out, spent a week on it, seen me and pulled me out.
8  That was it.
9    Q.    Basically, your doctor decided no, no more
10 jobs, we're taking you out?
11   A.    Yes.
12   Q.    One more time, back to that week when you were
13 doing the left side fender job.  Remember how you were
14 telling me that there were ways that you could modify
15 your right side door fitter job to make it a little bit
16 easier on your arms?
17   A.    Uh-huh.
18   Q.    Were there any ways that you could modify this
19 job?
20   A.    Well, let's see.  I'd say hard to say because I
21 hadn't done it that long.  Right side door fitting,
22 because I had done it so long.  First you have to learn
23 the job.  You have to learn the mechanics, what to do,
24 what steps to take.  Then if you're going to try any

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

1    modifications, shortcuts whatever, then you can develop

2    them from there.  But if you don't know how to do the

3    job -- and sometimes falls on inadequate training in a

4    lot of cases.  That's what it is.  Being in there 16

5    years, it is what it is.  If you don't know how to do the

6    job, you're generally not going to know how to modify the

7    job.

8         Q.    Just so I'm clear, are you claiming that you

9    didn't get enough training to do the job right?

10        A.    That's quite possible -- basically will show

11   you and they're gone.  That's the team coordinator's job.

12   Team coordinator is basically the individual if a new

13   person comes on board, this is the job you're going to

14   do, I'll stay with you for a few seconds.  And it depends

15   on the coordinator because, again, that is a case by

16   case.  I know what I have taught them, but it's a case by

17   case and personality by personality.  Some people will

18   sit there and work with you.  Some people, okay, you're

19   holding it, you're still standing here, you haven't left,

20   see you later.  It's kind of subjective.

21        Q.    At that point you were able to do the job,

22   albeit with swelling, but you were able to do these

23   functions, right?

24        A.    Yeah.  I performed those functions.

**A78**

Smiley v. DaimlerChrysler
David A. Smiley

Page 78

1    Q.    But by the end of that week or on that Monday,

2    after you had worked in the left side fender job for the

3    week, your doctor said you need to go back out on leave?

4    A.    Yes.

5    Q.    By the way, do you need to take a break?

6    A.    Let's do this because I do have another

7    appointment that I would have to go to.

8    Q.    That works for me.  I wanted to make sure.

9         At that point in time when you were working

10   the left fender side install, do you remember going to

11   see plant medical for a status update, kind of a status

12   appointment?

13   A.    No.  I went to plant medical because my arm was

14   hurting.  That's why I went to plant medical.

15   Q.    Let me see if this refreshes your recollection

16   here.

17        MS. WASSON:  Can we have this marked as

18   Exhibit 7, please?

19        (Smiley Deposition Exhibit No. 7 was marked

20   for identification.)

21        THE WITNESS:  This is a medical

22   appointment.  I'm reading aloud.  I'm saying basically

23   it's a change of appointment type of thing.

24

**A79**

Smiley v. DaimlerChrysler
David A. Smiley

Page 79

1   BY MS. WASSON:

2       Q.      Do you recognize this one?

3       A.      Yes.  It has my name on it.  Around the same,

4   2/10.  Somewhere in area.  Somewhere in there.  But okay.

5       Q.      Do you remember receiving this?

6       A.      I probably -- I don't know.  Is this the one

7   that I didn't receive?  Because there was one that I

8   didn't receive.  I'm not exactly sure which one it was.

9   But just looking at this, this looks like there's been a

10  rescheduling.

11      Q.      This was in February.

12      A.      Okay.

13      Q.      Around the time I think that you were working

14  in the left fender job.

15      A.      Okay.

16      Q.      Any dispute about receiving this or the

17  authenticity of this?

18      A.      None at this point, because basically all I see

19  is it's been a rescheduling of an appointment.

20      Q.      It was under Chrysler's policies that, if you

21  were out of work or even if you weren't out of work and

22  you had restrictions, periodically you had to come in and

23  see plant medical, right?

24      A.      Okay.  Yes.

**A80**

Smiley v. DaimlerChrysler
David A. Smiley

Page 80

1    Q.    Is that fair?

2    A.    That's somewhere in there, yes.  Because

3  basically that's the letter -- from the one appointment

4  that I did miss, that was basically what they were

5  saying, substantially whatever absences you had, and

6  that's why I brought what I brought.

7    Q.    So you saw plant medical apparently on 2/14/05.

8    A.    Okay.

9    Q.    We think.

10   A.    Somewhere around there.  Had to have on 2/14.

11  So 10 o'clock.  10:00 a.m.

12   Q.    Do you remember anything about that

13  appointment?

14   A.    No.  Basically they set you down, take your

15  temperature.  The doctors change so often, so it's sort

16  of like there's nothing personal involved in it.  It's

17  just pretty much you're here, we're here, and we do what

18  we do.

19   Q.    So would they give you a full examination?

20   A.    No.  They would just basically look at whatever

21  the affected area is and that's about the size of it.

22   Q.    Would they issue restrictions?

23   A.    That I can't answer.  I don't know if they were

24  the ones, because I know PQX placement does.  So as far

Smiley v. DaimlerChrysler
David A. Smiley

Page 81

1    as what Chrysler's doctors, what their full capacity is,

2    I don't know.

3        Q.    If they had a problem with your current

4    restrictions, would that be something that would change

5.   up your job?

6        A.    If Chrysler --

7        Q.    The plant medical doctor.

8        A.    I'd have to assume that, if there was ever a

9    problem with it, they would have to deal with the --

10   which one is this back here that you have given me

11   earlier?  PQX individuals.  If there were any type of

12   discrepancy, I think that's where they would take it up

13   at.  I'm not sure exactly how that works.

14                    MS. WASSON:  Exhibit 8, please.

15                    (Smiley Deposition Exhibit No. 8 was marked

16   for identification.)

17                    THE WITNESS:  This is a recheck, okay.

18   BY MS. WASSON:

19       Q.    Does this refresh any recollection?

20       A.    Looking at it -- I mean, there's no

21   recollection on my part, but looking at the date, I know

22   Dr. Tinklepaugh was in medical.  So this would probably

23   be the results of that last appointment change.

24       Q.    It says at the top "Medical Pass."  Do you

Smiley v. DaimlerChrysler
David A. Smiley

Page 82

1    recognize this type of document?

2        A.    No, because the medical passes -- actually, it

3    got to the point they were generating them through the

4    computer, through the supervisor's computer.  So I

5    wouldn't -- medical passes that I'm familiar with are not

6    laid out pretty much that way.

7        Q.    Are you telling me that you didn't get a copy

8    of this?

9        A.    Okay.  I'd say that, yes.  I don't remember

10   getting a copy of that, no.

11       Q.    Do you know if these were issued when you went

12   to see plant medical or when an employee goes to see

13   plant medical?

14       A.    One should be generated when -- all right.  I

15   know a pass would generate something.  But if this is the

16   result of a rescheduled doctor's appointment, I'm not

17   exactly familiar how they handle things in medical

18   either.  It's medical.  I'm assembly.  I don't know how

19   they do their things over there.

20       Q.    Basically you're telling me that you never got

21   this medical pass as a result of this doctor's

22   appointment?

23       A.    I'm telling you if -- this looks like it's a

24   possibility.  It was Shannon West.  This is a

Smiley v. DaimlerChrysler
David A. Smiley

Page 83

1    computer-generated one.  This isn't the normal -- this

2    isn't the normal pass.  The normal pass was smaller than

3    this.  I don't know what they're using nowadays.  But

4    this looks like a computer-generated one.  Basically,

5    your supervisor would input the information into the

6    computer.  So no, I would not receive a copy of that.

7        Q.    Did you ever receive a copy of a medical pass

8    like that little one that you were just talking about?

9        A.    Last time I seen one of those -- I can't

10   remember.  If he gave me one, they usually kept it.  You

11   don't walk around with the medical pass in your pocket.

12   You take it in the medical, you present it, and then you

13   do whatever it is that you have to do there.

14       Q.    You're not given one of these documents when

15   you leave?

16       A.    Not just like this, no.  Not that, no.

17       Q.    If you look down in the second box, see where

18   it says "Medical Treatment/Information"?

19       A.    Uh-huh.

20       Q.    Then in the middle there it says, "No lifting

21   over 15 pounds right hand"?

22       A.    Uh-huh.

23       Q.    Is that an accurate statement of your

24   restrictions at that time?

**A84**

Smiley v. DaimlerChrysler
David A. Smiley

Page 84

1    A.    No, because it was my right elbow.  That would

2    be inaccurate.

3    Q.    It was really your right elbow?

4    A.    Should have been elbow.

5    Q.    What about the 15-pound lifting?

6    A.    That would be within the weight limits that I

7    remember.

8    Q.    So you went to this appointment and apparently

9    the no-lifting restriction, the 15-pound restriction, was

10   affirmed because you had already had that one.  Right?

11   A.    Okay.  Yes.

12   Q.    Around this time your doctor took you out of

13   work again, right?

14   A.    Let's see.  Whenever I was doing -- when was I

15   doing the right fender thing?  That's the last time he

16   had taken me out, physically taken me while I was doing

17   the left side.

18   Q.    Looks like you were supposed to report --

19   A.    On the 9th.

20   Q.    -- on the 9th.

21   A.    So this would be within that time frame.

22   Q.    You were placed out of work around the time

23   that you had this medical appointment.

24   A.    Uh-huh.

**A85**

Smiley v. DaimlerChrysler
David A. Smiley

Page 85

1    Q.    Did anybody at Chrysler ever object to you

2    going out of work again?

3    A.    I hadn't discussed it with anyone.  So I'd have

4    to say no.  I didn't discuss it with anyone.  I don't

5    know if they objected or not.

6    Q.    You never received a letter or anything?

7    A.    Saying you shouldn't go on?

8    Q.    You better be reinstated, you better report?

9    A.    No.

10    Q.    This is February of '05, right?

11    A.    Okay.

12    Q.    You were receiving workers' comp. again at this

13    time?

14    A.    It doesn't start right that same week.  It

15    might be a week, two weeks, three, whatever.  Somewhere

16    in there I'm sure I received it.

17    Q.    Workers' comp. started back up when you were

18    out of work.

19    A.    Okay.

20    Q.    Did Chrysler ever fight you on that or

21    challenge your ability to obtain the workers' comp.?

22    A.    No.

23    Q.    You were receiving your workers' comp. when you

24    were out on this leave?

**A86**

Smiley v. DaimlerChrysler
David A. Smiley

Page 86

1      A.    Uh-huh.

2      Q.    Were you continuing to accrue seniority time?

3      A.    Yes, my time was still going because it was a

4   plant-related incident.

5      Q.    Healthcare benefits, you were still getting

6   them?

7      A.    At the time, yes, I was still getting them.

8   All that stopped upon my termination.

9      Q.    What about vacation and sick time?

10     A.    They still accrued as well.  Everything would

11  accrue up and until my termination date.

12     Q.    You have a failure-to-accommodate claim; is

13  that right?  Are you making a claim that Chrysler didn't

14  accommodate you?

15     A.    Well, how's the best way to put that?  Short of

16  having it worded exactly -- and I don't have my notes

17  with me.  Don't have the information right there in front

18  of me.  The way that I had it worded --

19     Q.    Are you talking about your charge?

20     A.    Yes.  You said it was a failure of

21  accommodation.

22     Q.    Do you want to see your charge of

23  discrimination?

24     A.    Yes.

**A87**

Smiley v. DaimlerChrysler
David A. Smiley

Page 87

1    Q.    Okay.  Let's take a look at that.

2    A.    Because if there was an accommodation --

3    Q.    Let's take a look.

4              MS. WASSON:  Can you mark this as

5    Exhibit 9, please?

6              (Smiley Deposition Exhibit No. 9 was marked

7    for identification.)

8              THE WITNESS:  Okay.

9    BY MS. WASSON:

10   Q.    That is your signature down at the bottom?

11   A.    Uh-huh.

12   Q.    This is your charge of discrimination that you

13   filed?

14   A.    Yes.

15   Q.    Your two causes of action here where it says,

16   "Adverse employment action:  Denied Reasonable

17   Accommodation, Terminated."  Is that correct?

18   A.    Okay.  Yes.

19   Q.    You're claiming that you were denied a

20   reasonable accommodation?

21   A.    Well, okay, yes.  That would -- at the time,

22   yes.

23   Q.    Tell me about the basis for that claim.

24   A.    Okay.  Terminated kind of speaks for itself.

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 88

1      Q.      We will talk about that in a second.

2      A.      Reasonable accommodation, if I have an injury

3   to my right arm and the job you put me on causes me to

4   aggravate said right arm again, I think this is an issue

5   of -- I think is an accommodation issue at this point

6   because you look at my height, my stature, I'm 5 foot 8.

7   Put me on a job that I basically have to -- I'm not going

8   to say I sat here and reinjured it, but I reaggravated

9   the same problem that existed which gave me the PQX in

10  the first place.

11     Q.      That's the basis for your accommodation claim?

12     A.      Yes.

13     Q.      Did you object to being out of work?  When your

14  doctor took you out of work and you didn't have to do the

15  left side fender install anymore, did you object to that,

16  to being placed out of work?

17     A.      I don't understand.

18     Q.      Did you want to go back and get another job?

19     A.      He pulled me out and he's my doctor, so I went

20  with -- since he's the only treating physician I had on

21  the issue, it's getting to the point it was going on far

22  enough, pain is still there, I went with what my doctor

23  said.

24     Q.      The failure to accommodate, you were saying

Smiley v. DaimlerChrysler
David A. Smiley

Page 89

1    that this left fender install position is the basis for

2    your reasonable accommodation claim.

3        A.    Okay.

4        Q.    How is that discriminatory?

5        A.    Okay.  Let me put it this way:  Again, same

6    argument I just gave you.  You know my right arm is bad,

7    why would you put -- why in accommodating me, as you say.

8    One, we already know it was already worded incorrectly.

9    Two, you have an issue that I'm using a Yankee that

10   causes me to aggravate the injury all over again.  Is

11   that a true accommodation?

12                MS. WASSON:  It's 12:15.  Can we go off the

13   record?

14                (Discussion off the record.)

15                (A recess was taken.)

16   BY MS. WASSON:

17       Q.    We were talking about the left fender install

18   job and we were talking about in connection with your

19   accommodation claim.

20       A.    Uh-huh.

21       Q.    Did you ever ask your doctor whether the

22   accommodations that the PQX team gave you would be okay?

23       A.    I don't recall having that conversation with

24   him, no.  We didn't discuss that.  I told him what I was

Smiley v. DaimlerChrysler
David A. Smiley

1   using.  Told him how -- gave him specifics on the

2   mechanics, how it worked.  Like I said, he pulled me out.

3       Q.    But prior to that, when you were just being

4   installed at that left fender job, did you ever talk to

5   your doctor about whether that would be a suitable job

6   for you?

7       A.    No.  He and I had not discussed it.

8       Q.    Let's move on to your termination.

9       A.    Okay.

10      Q.    You were on leave starting sometime after that

11  week that you worked in the left fender install job, and

12  we think that that was mid-February '05.

13      A.    Somewhere in there, yes.

14      Q.    You were on leave and then presumably you

15  received this letter.  We will mark this as Exhibit 10.

16            (Smiley Deposition Exhibit No. 10 was

17  marked for identification.)

18  BY MS. WASSON:

19      Q.    Did you, in fact, receive that letter?

20      A.    Yes, I remember this one because it gave me the

21  dates that I had to return by, and that was May 13th, the

22  day I was terminated.

23      Q.    It says in the first paragraph on the third

24  line, you are to return to the plant employment office on

Smiley v. DaimlerChrysler
David A. Smiley

Page 91

1    or before May 13th to provide satisfactory evidence to

2    substantiate your failure to report.  Correct?

3        A.    According to our records, substantiate -- okay,

4    yes.  We did that.

5        Q.    It says in the second paragraph that the

6    absences between February 18th, 2005, and the date you

7    report have to be substantiated, right?

8        A.    That is correct.

9        Q.    Then the third paragraph talks about if you

10   don't report by May 13th and you don't submit your

11   evidence, then your seniority will be terminated?

12       A.    That's what it says.

13       Q.    Then it gives you the office hours that you can

14   come in?

15       A.    Uh-huh.

16       Q.    As of this point, when you received this

17   letter, you understood that you needed to bring in

18   satisfactory evidence to substantiate your injury, right?

19       A.    I did what it asked me to do, yes.

20       Q.    Did you ever tell anybody prior to May 13th

21   that you'd have a problem supplying the information that

22   it asked for, this letter asked for?

23       A.    Did I ever tell anyone?  Who would I tell?

24       Q.    Anybody at Chrysler.

**A92**

Smiley v. DaimlerChrysler
David A. Smiley

Page 92

1    A.    No. I hadn't spoken with anyone from Chrysler.

2 Prior to that, like I said, when I found out that I

3 missed the May 4th appointment and then that was by

4 notification and letter, I said, okay, you want me there

5 by the 13th. I was there on the 13th.

6    Q.    You never received anything telling you that

7 you had an appointment on May 4th?

8    A.    Not that I remember, because that's the only

9 appointment that I missed. I don't remember anything on

10 that one. That's the only doctor's appointment that I

11 had missed.

12    Q.    The medical pass, this one right here, that we

13 looked at, that's Exhibit 8; is that right?

14    A.    Yes.

15    Q.    This exhibit has your reexam date on it,

16 correct?

17    A.    Okay. But as we also said, that I don't

18 know -- I wasn't given one of these. But this paper does

19 have a reexam date on it.

20    Q.    Right. So this one has the reexam date as

21 May 4th, but you never got this one, as far as you can

22 tell?

23    A.    Yeah, I don't remember receiving it. I don't.

24    Q.    So you get this letter. It says you missed

Smiley v. DaimlerChrysler
David A. Smiley

Page 93

1    your appointment on May 4th and you have until May 13th.

2        A.    Okay.

3        Q.    What did you do in response to this letter?

4        A.    That's when I showed up.  I came in on the

5    13th.

6        Q.    Did you receive with this letter any kind of

7    information about what you needed to do to substantiate

8    your injury?

9        A.    They probably had one of those in there.

10        Q.    Let's take a look at this .

11              MS. WASSON:  Can we have this marked as

12    Exhibit 11, please?

13              (Smiley Deposition Exhibit No. 11 was

14    marked for identification.)

15    BY MS. WASSON:

16        Q.    Mr. Smiley, I'm going to ask you to take a few

17    minutes and read through this information notice.

18        A.    Okay.

19        Q.    Thanks.

20        A.    Okay.

21        Q.    Have you ever seen this before?

22        A.    Yes.

23        Q.    Where have you seen it?

24        A.    Usually at the plant.  They give you those --

Smiley v. DaimlerChrysler
David A. Smiley

Page 94

1    they give you these things.

2         Q.    Is it part of a policy notebook that you got or

3    is it something that would be handed out to you?

4         A.    No.  Generally, you receive one of these at the

5    front desk or sometimes you could -- the spots that I

6    have seen it was at the front desk.  Every time I

7    received one was at the front desk.

8         Q.    The front desk of medical?

9         A.    No.  No.  Personnel.

10        Q.    Personnel.

11        A.    Human Resources.

12        Q.    Did you receive one of these along with this

13   letter?

14        A.    I'm not sure, but I may have.

15        Q.    So you were familiar with this at the time of

16   May 13th, right?

17        A.    Okay, yes.

18        Q.    This lists the documentation requirements in

19   the center here?

20        A.    Uh-huh.

21        Q.    It says in the middle, "Reinstatement/

22   Substantiation From Temporary Separation, Illness or

23   Injury (Five days or more)."  Right?

24        A.    Uh-huh.

**A95**

Smiley v. DaimlerChrysler
David A. Smiley

Page 95

1    Q.    Anybody that's been out for five days for

2    whatever reason, sick?

3    A.    This is the criteria.

4    Q.    This is the criteria that pertains to them?

5    A.    Uh-huh.

6    Q.    Down here in this box, it's the third paragraph

7    down in the -- see how it's sort of a box?  It says

8    management has the right to further investigate and

9    verify the authenticity of the statement as presented by

10   the employee?

11   A.    Yes.  That's what it says.

12   Q.    Management has the right to take disciplinary

13   action when the statements are altered or falsified or

14   otherwise unsatisfactory.

15   A.    That's what it says.

16   Q.    That's what it says, okay.

17         It also says here in the reinstatement

18   section that no faxes are allowed?

19   A.    That's correct, that's what it says.

20   Q.    Do you know why that would be?

21   A.    I'm not going to speculate on that.  That's

22   their call.

23   Q.    You knew you had to report by May 13th, and you

24   knew what the documentation requirements were, right?

Smiley v. DaimlerChrysler
David A. Smiley

Page 96

1    A.    Uh-huh.  Okay.

2    Q.    We talked about this.  What did you do in

3    response to the letter?  You told me --

4    A.    I came in.

5    Q.    You came in.  On May 13th, right?

6    A.    Yes.

7    Q.    Where did you go?

8    A.    Plant personnel is the only place you can go

9    because my badge no longer works, so I would have to go

10   straight to personnel.

11   Q.    Who did you talk to there?

12   A.    That's where I met Ms. Ford.

13   Q.    Who is she?

14   A.    Open-ended question.  Personnel, I think Human

15   Resources.  Something like that.  Personnel.

16   Q.    So she works in the personnel office?

17   A.    Yes.

18   Q.    Did you know her?

19   A.    Not know her, no.  I mean, know of, she knows

20   of me, one those type of things.  We don't know each

21   other.  In fact, it had been brought to my attention, it

22   was the same question, "Do I know you?"

23              And I was like "No."

24              "Have we met?"

**A97**

Wilcox and Fetzer, Ltd.  Registered Professional Reporters    302-655-0477

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 97

1          "No, we have not."

2          We have never been formally introduced.   We

3    haven't.

4    Q.    It's safe to say you were not friends?

5    A.    You could still say that.

6    Q.    You never worked together?

7    A.    No.

8    Q.    You didn't know her outside of work?

9    A.    No.

10    Q.    Any other time that you talked to her --

11    A.    No.

12    Q.    -- before this time on May 13th?

13    A.    No.

14    Q.    Any issues or problems with her prior to this

15    time on May 13th?

16    A.    No.  Not that I know of.

17    Q.    You see Ms. Ford at the personnel desk, right?

18    A.    Uh-huh.

19    Q.    What happens then?

20    A.    Okay.  Goes on, well, what happened.  I gave

21    her the note stating why I was there.  It came back with

22    the reinstatement thing, altered that.  It was a

23    reinstatement on the paper changed up to substantiation

24    to top of it.

**A98**

Smiley v. DaimlerChrysler
David A. Smiley

Page 98

1      Q.     Let's take a look at some documents.

2             MS. WASSON:  Exhibit 12, please.

3             (Smiley Deposition Exhibit No. 12 was

4      marked for identification.)

5      BY MS. WASSON:

6      Q.     Do these look familiar?

7      A.     Those are my doctor's notes.  Copies of the

8      originals.

9      Q.     Are these the notes that you brought in?

10     A.     These are a copy of the notes that I obtained

11     to bring in, yes.  These are the original copies -- these

12     are the original notes and this is a copy of the notes.

13     Q.     This is a copy of the original notes?

14     A.     Correct.

15     Q.     Did you bring a copy of the original notes or

16     did you bring the original --

17     A.     Individual, no.

18     Q.     -- individual notes?

19     A.     I brought what you see in front of you.

20     Q.     You brought this document?

21     A.     Yes.

22     Q.     Why didn't you bring the original notes?

23     A.     Well, one, you kind of keep those because if

24     you give up your originals, if something happens, there's

Smiley v. DaimlerChrysler
David A. Smiley

Page 99

1    never any proof that you did whatever you say you did.

2    Also, each one of these notes that shows a call-in number

3    from a specific date that it was called in.  So really

4    didn't see an issue there.

5        Q.    Couldn't you ask for a copy from Chrysler,

6    though?  Couldn't you ask them to copy them for your

7    records?

8        A.    Just my originals.  It's kind of the way you're

9    programmed, to keep your originals when you can.

10        Q.    Where were these original notes at the time?

11        A.    They were probably home.

12        Q.    They were home?

13        A.    Uh-huh.

14        Q.    These notes don't say what kind of injury you

15    had, right?

16        A.    They all say "resume no work" or "continue no

17    work," "continue no work," "continue no work."

18        Q.    But they don't describe your injury in any way.

19    They don't say what it was?

20        A.    Well, considering it's dealing with the same

21    injury, could be said that it applies to all the same

22    injury, to the same incident.

23        Q.    But what I'm asking you is:  Is there anything

24    on these notes that specifically says what your injury

Smiley v. DaimlerChrysler
David A. Smiley

Page 100

1   was, yes or no?

2       A.    There is no DX code on this particular one, no.

3       Q.    Any other written statement describing your

4   injury or saying what it was?

5       A.    No.  Just "continue no work."

6       Q.    Just "continue no work"?

7       A.    Uh-huh.

8       Q.    So you bring these notes to the personnel

9   office and you see Ms. Ford.

10      A.    Uh-huh.

11      Q.    What happens then?

12      A.    Informed me that I didn't have the DX code,

13  which is why I went back out and received -- went back to

14  Dr. Bandera's office.  His secretary wrote the proper DX

15  code on whichever one it was, but she wrote it on a copy

16  of the notes -- the copy of the original notes that I

17  had.

18      Q.    Before that time did Dawn or anyone else in the

19  personnel office give you anything?

20      A.    As a matter of fact -- well, I'll wait until

21  she puts that --

22            MS. WASSON:  I'd like to mark another

23  document, please.

24            (Smiley Deposition Exhibit No. 13 was

Smiley v. DaimlerChrysler
David A. Smiley

Page 101

1    marked for identification.)

2                    THE WITNESS:  This is the one she wrote

3    "Substantiation."

4    BY MS. WASSON:

5        Q.    Do you remember receiving this document?

6        A.    Actually, I didn't receive it.  Was this the

7    one that I received?  There was one that there was

8    something that I had to sign for.  I'm thinking this is.

9    And I didn't sign for it because, like I said, it had the

10   scratched-out word "substantiation" and put that in

11   there.  Then you're asking for -- just because of the way

12   that it's altered, this is not the original form that

13   was -- that is normally presented.

14       Q.    What you're telling me is that this is not the

15   original substantiation form?

16       A.    What I'm telling you is if you look to the top,

17   you see "reinstatement" crossed out, "substantiation" put

18   in.  You look down here and in their handwriting.  This

19   is not the proper form.

20       Q.    Did you get a copy of this form?

21       A.    I have a copy of it, yes.

22       Q.    Did you get one at the time?

23       A.    This was the one that she was trying to give

24   me, but I have had one since then.

                                                      **A102**

Smiley v. DaimlerChrysler
David A. Smiley

Page 102

1    Q.    She tried to give this to you?

2    A.    Yes.

3    Q.    You didn't take it?

4    A.    I didn't sign it.

5    Q.    Did you take a copy of it?

6    A.    Probably not if I didn't sign it.  But I

7    already knew what -- the sheet says this is the

8    diagnostic code and that's what I went out and got.

9    Q.    She also has a few other boxes checked, right?

10   A.    Uh-huh.

11   Q.    Did she explain to you what you needed?

12   A.    Explain, I wouldn't say explained, no.

13   Basically said, you know, you need this, that, and the

14   other and it has to have this.  And each one of these

15   notes have everything that they wanted, continued, resume

16   no work.  The only thing it didn't have was the

17   reinstatement -- not reinstatement, forgive me -- the DX

18   code on it.

19   Q.    Did she explain to you that it needed the

20   diagnostic code?

21   A.    Yes.  That's when I went to get the DX code.

22   Q.    Did she explain to you that you needed the

23   statement of total disability?

24   A.    Continued no work, kind of covered it.

Smiley v. DaimlerChrysler
David A. Smiley

Page 103

1    Q.    Did she talk to you about that, though?

2    A.    Not really.  What's the best word?  Trying to

3    figure out the best way -- do you know Dawn?

4    Q.    I have met her.

5    A.    Let's put it this way, then:  It wasn't -- no,

6    we didn't really discuss it.  It was basically I need my

7    DX code to pass this off.  Like I say, I told them these

8    are copies of the originals.  I never had a problem with

9    that prior.  I haven't -- obviously, this is the only

10   instance that there's a problem with anything that I have

11   done.

12   Q.    Hang on.  We're going to explore that just a

13   little bit more in a second.  What I want to know is she

14   never mentioned to you that you needed a statement of

15   total disability on your notes?

16   A.    No.  Well, obviously she said something about

17   it because she has it marked off here, but what I'm

18   saying is, like I said, this was already altered.  So I

19   don't know exactly what more -- all right.  Give you a

20   good example.  Return-to-work date, then you have

21   penciled in "estimated return to work date."  That's

22   there.  What you're asking is already there.

23   Q.    Where?

24   A.    Okay.  Let's go with No. 1 dated 2/23/05.  2/23

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

A104

7

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 104

1   and you got the through sign, 3/9/05.

2       Q.    That would be your estimated return-to-work

3   date?

4       A.    Yes.   This is the same physician that I have

5   dealt with the whole time since this injury.

6       Q.    Did she tell you, though, that you needed a

7   better or a clearer return-to-work date?

8       A.    She didn't say -- basically I guess -- I don't

9   remember exactly.

10      Q.    Tell me what she told you.

11      A.    It was kind of going back and forth and, like I

12  said, I seen that it was getting to the point that it was

13  getting ridiculous.   So basically I went out to get the

14  DX code.   I have never had a problem with my notes,

15  These are the same style notes that I have always had and

16  I have never had a problem with them.

17      Q.    So when you were having these conversations,

18  you came to the window, you gave her the notes.

19      A.    Uh-huh.

20      Q.    She said, no, notes aren't good enough.

21      A.    First it was -- what was it?   First it was the

22  issue of why didn't I show up for the appointment.   We

23  got through that.   Then we got to the notes.   It was no

24  DX code.   Here, wait a minute, let me give you this right

Smiley v. DaimlerChrysler
David A. Smiley

Page 105

1    here.  This is all marked up.  Well, I need you to sign

2    it.  I'm like, I can't sign that.  It's changed.  I see

3    "reinstatement."  You put "substantiation."  To me it

4    tells me it's a different form.

5        Q.    Did she give any explanation of why she was

6    using this form?

7        A.    No.

8        Q.    Did she at least mention to you all four of the

9    things that she had checked?

10       A.    No, because she was kind of stuck on the DX

11   code because this is the first one because it doesn't

12   have the DX code there.  I left and went to Bandera's

13   office and his secretary put the proper DX code on it.

14       Q.    She has down here "original notes."

15       A.    Uh-huh.

16       Q.    Did she tell you you needed an original note?

17       A.    Well, she says she wanted the original notes.

18   There was really no time to do it.  It was barely enough

19   time to get to Bandera's.  And these are copies of the

20   original notes.

21       Q.    But she told you at that time when you were at

22   the window --

23       A.    She wrote that on here.

24       Q.    She wrote it on here.  Did she tell you?

Smiley v. DaimlerChrysler
David A. Smiley

Page 106

1    A.    No, not that I can remember, no.  Like I said,

2    it was back and forth.  It was back and forth.  There was

3    probably some things that I don't remember.  But I

4    distinctively know that she was stuck on the DX which is

5    why that's what I focused on, getting the DX code.

6    Q.    But you saw this document before you went to

7    the doctor's office --

8    A.    Uh-huh.

9    Q.    -- to get the DX code?

10   A.    Uh-huh.

11   Q.    You saw this document.  You saw that it had

12   four things checked?

13   A.    Yes.  And also had two things scratched out.

14   Q.    Right.  Okay.  So you knew this is what she

15   wanted you to get, these things?

16   A.    Again, that was the DX because I knew that's

17   what she was focusing on.  I don't want to use the word

18   "harping," but that is what she was focusing on, the DX

19   code.  I have used the same physician.  He has written

20   the same notes for me as long as I have had him.  There

21   has never ever been any problem.

22   Q.    So you submitted notes that looked like this

23   before?

24   A.    Yes.

**A107**

Smiley v. DaimlerChrysler
David A. Smiley

Page 107

1    Q.    Notwithstanding the note that didn't look like

2    this, this other one that you submitted from

3    Dr. Bandera's office?

4    A.    I submitted these one or two.  I'm not sure

5    how -- obviously they have it.

6    Q.    He didn't always submit notes like this.

7    Sometimes he would submit the other kind that we looked

8    at as a prior exhibit?

9    A.    These are the notes that he gives you when you

10   have an appointment with him to take back to Chrysler.

11   That's why I'm saying he may have sent that to them.  I

12   don't know.  But these are the notes that I received from

13   him.

14   Q.    This one?

15   A.    Again, I'm not sure if he sent it or what.  I'm

16   not sure.  But this is what was handed to me.

17   Q.    At the time --

18   A.    Yes.

19   Q.    -- that you were supposed to come in and

20   substantiate back in May of '05?

21   A.    These are what I was handed.

22   Q.    This form indicates that if you don't come back

23   to plant personnel by 3:00 p.m. on May 13th with the note

24   that meets all the substantiation requirements, then your

Smiley v. DaimlerChrysler
David A. Smiley

Page 108

1    seniority will be terminated.  Is that correct?

2        A.    That's what it says.

3        Q.    What did you do next?  You had this discussion

4    or conversation with Dawn?

5        A.    I went to Dr. Bandera's office.  I submitted

6    basically this.  And what she did, she wrote the DX code

7    in one of these corners.  And I went back to personnel.

8    It was a little after 11:30 -- after 11:30.  Maybe 11:35

9    or 11:40, but I seen -- what is her name?  I knew Dawn

10   would get it.  I knew Dawn would get it.  So I gave her

11   that.

12       Q.    Was Dawn the person you were supposed to give

13   the notes to?

14       A.    Yes, but there was nobody -- because my

15   daughters were at school at 1 o'clock.  There was no way

16   I could have did that.  But I'm sure she didn't mention

17   that either.

18       Q.    Hang on for that.  I'm going to mark this

19   exhibit as Exhibit 14, please.

20            (Smiley Deposition Exhibit No. 14 was

21   marked for identification.)

22            THE WITNESS:  This is the one.  It has the

23   DX code written on it which covered all of them.

24

**A109**

Smiley v. DaimlerChrysler
David A. Smiley

Page 109

1    BY MS. WASSON:

2        Q.    You went to your doctor, Dr. Bandera?

3        A.    Uh-huh.

4        Q.    What did you do when you got there?

5        A.    Dr. Bandera wasn't in.  His secretary, I asked

6    her for the DX code.  They were having a problem with my

7    notes saying they didn't have the DX code on it.  She

8    wrote 726.32.  I returned to Chrysler.

9        Q.    Whether you agreed with her or not, you knew

10   that one of Dawn's -- not Dawn's requirements -- the

11   requirements on this letter was to bring an original

12   note?

13       A.    That would be Dawn's requirement because the

14   original note is not on that letter.

15       Q.    The original note is not on this letter?

16       A.    That is handwritten.

17       Q.    Okay.  That's fine.  But that is within this

18   document now.  She wrote it in, correct?

19       A.    She did that, yes.

20       Q.    You knew that Dawn was expecting that you were

21   going to bring in an original note?

22       A.    These are the original notes.  You can look at

23   the call-out numbers and tell these are the original

24   notes.  These are all different notes on different days.

Wilcox and Fetzer, Ltd.  Registered Professional Reporters       **A110**     77

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 110

1    Q.    But these are photocopies.  They are not the
2    original.
3    A.    They are photocopies of the original.
4    Q.    They're photocopies of original notes?
5    A.    There's nothing in here that says anything
6    regarding a photostatic copy of an original document.
7    Q.    If you knew that Dawn had entered this entry,
8    "original notes," why didn't you just ask the doctor's
9    office to reissue original notes?
10   A.    Then she can put -- I'm sure she can do DX
11   codes.  Now you're asking her to establish different
12   notes.  Now I would have a different signature.  No, I
13   cannot do that.
14   Q.    You can't do it because it would have a
15   different signature?
16   A.    This is Dr. Bandera's signature.  If she was to
17   reissue these notes again, then it would be an issue,
18   well, wait a minute, the signature is different.  The
19   only thing that I had her do -- I asked her to do was
20   give me the DX code which she placed right here.
21   Q.    Then you came back to Chrysler?
22   A.    Then I came back to Chrysler.
23   Q.    Did you ever tell anybody at Chrysler that the
24   doctor wasn't in, you couldn't get original notes?

Wilcox and Fetzer, Ltd. Registered Professional Reporters    **A111**    77

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 111

1      A.    I told -- who was the individual that I gave

2    this to?  You mean original notes.  I had the original

3    notes at the house at the time.  I came back with the DX

4    codes.  What is her name?  Anyway, she was letting me

5    know she didn't work in personnel anymore, but I knew

6    that Dawn would receive it.  I knew that she would get

7    them.

8      Q.    You gave this copy to somebody in personnel?

9      A.    I can't think of her name right offhand.  She

10   was close enough to personnel that I know it would be

11   received by personnel.

12     Q.    One more thing.  Again, you know that written

13   on this page says "original notes."  You know you have

14   your original notes at home.  Why didn't you come on back

15   home to get your original notes?

16     A.    Trying to reach Bandera.  There was no way that

17   I would have been able to go home, get those notes, make

18   it to Bandera's office to get the DX code put on, and

19   return to Chrysler.  There was no way.

20     Q.    Did you tell anybody that at Chrysler?

21     A.    I told -- well, I told what's her name?  What

22   is that lady's name?

23     Q.    Is it Ms. Flemming?

24     A.    Angeline.

**A112**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 112

1    Q.    Angeline?

2    A.    Angelina.  Angeline.  Her.  Yes.  Because she

3    was like, "I don't work there anymore."

4             I was like, "Look, I know you don't work

5    there anymore.  Can you give this to Dawn, please?"

6             I'm thinking, okay, if there's any problem,

7    they will contact me, whatever, whatever.  That same day

8    apparently I was terminated.  I was there before 3:00.

9    Granted, it wasn't at the whatever time, 1:30, but again,

10   my daughter was out.  I already had one with me at the

11   time.  I couldn't have done it.

12   Q.    But you didn't tell anybody that?

13   A.    I told Angela to make sure that she got this; I

14   had to go out to get my daughter.  Plus, does she have a

15   copy of the note from my daughter's school?

16   Q.    A copy of the note from your daughter's school.

17   A.    She doesn't have that.

18   Q.    Hold on a second.  I think we have it.  I think

19   you may have submitted it.

20   A.    I submitted all that stuff at the same time,

21   because my daughter got out of school early that

22   afternoon.

23   Q.    Help me understand why that's important.

24   A.    Well, that deals with the 1 o'clock thing.

Wilcox and Fetzer, Ltd. Registered Professional Reporters

**A113**

77

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 113

1    Like I said, 1 o'clock I had to pick my daughter up.  She

2    gets out of school.  Now we're dealing with this.  This

3    is what I focused on, DX code, brought back to Chrysler,

4    I submitted it.

5        Q.    You went to the doctor.  Tell me again, what

6    does that have to do with picking your daughter up at

7    1:00?  You went to your doctor, you got what you thought

8    was your DX code on your notes.  What does picking up

9    your daughter at 1:00 have to do with anything?

10       A.    Chrysler opens up at 1:30.  I have to pick up

11   my daughter at 1 o'clock.  Two places at the same time.

12   Can't hardly be there.

13       Q.    I thought you gave the note in the morning?

14       A.    That's precisely it.  They already knew this.

15   This is why I was -- Angelina to make sure that she got

16   this.  I figured that everything was satisfied at that

17   point.

18       Q.    At 11:30 when you gave it to Angela --

19       A.    11:40, 11:35, yes.

20       Q.    -- if you thought it was satisfied at that

21   point, what does that have to do with picking your

22   daughter up at 1:00?  I'm sorry.  I'm missing it.  Tell

23   me.

24       A.    Okay.  Again, I have to pick my daughter up at

Smiley v. DaimlerChrysler
David A. Smiley

Page 114

1   1:00.  Still on that same Friday.  I'm going to pick her

2   up.  I got to pick her up.  Now, in the interim, because

3   this was going on, I think it was 10 something, I was

4   trying to make it back to Bandera's office because I know

5   he leaves early on a Friday.  I got his secretary to

6   install the proper DX code.  I brought that back to

7   Chrysler.  At the time I have never had a problem with

8   submitting notes of this fashion before.  Ever.  Ever.

9   This was not my first time being out at Chrysler.

10      Q.    Right.  You had done the substantiation

11  requirements before?

12      A.    Right.  Maybe not quite with this, but I have

13  done it before.

14      Q.    You submitted that stuff at 11:30.  Gave it to

15  Angelina; told her give it to Dawn?

16      A.    Uh-huh.

17      Q.    You went on your way.

18      A.    I hadn't heard anything.  Called in, never

19  nothing on my answering machine.  Next thing I know I was

20  terminated for not returning.

21      Q.    Let me just make this clear in my mind.  I know

22  we're going over it again and again, but I want to make

23  sure I understand it.

24            Did you tell anybody at Chrysler that you

Smiley v. DaimlerChrysler
David A. Smiley

Page 115

1    couldn't go home and get the original notes by 3 o'clock

2    that day for any reason?

3        A.    Okay, now you're asking me did I do it that

4    way.  She didn't ask me could I.  She said I needed the

5    DX code.  That's what I went back to get, the DX code.

6    That's why I went to Dr. Bandera's office.

7        Q.    Right.  You thought she was focused on the DX

8    code.  You were focused on the DX code.

9        A.    She knew I went to Bandera's office.  The note

10   kind of speaks for itself.

11       Q.    I'm going to ask you one more time.

12       A.    Okay.

13       Q.    You knew that she wrote down "original notes"

14   here, right?  You knew that.  You had seen this document.

15   You had seen the changes that she made to it?

16       A.    Uh-huh.

17       Q.    You knew that.  You never told anybody, hey, I

18   have got the notes at home, but I'm not going to have

19   time to get them to you?

20       A.    She asked for the original.  I'm like, these

21   are the original notes.  She knew these are the original

22   notes.  You can look at the dates and tell these were the

23   original notes.  They satisfied all the requirements in

24   the reinstatement.  Now, like I said, you handed me

**A116**

77

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 116

1  substantiation. Then you have altered it and you change

2  it in what, here, here, here. And no.

3      Q.    You say, yes, they are the original notes and

4  she says, I want the original notes. Is that how it

5  ended?

6      A.    Pretty much. I'll go get the DX code and I'll

7  be back and hopefully I can get back before 11:30. I got

8  back. It was 11:35, 11:40 by the time I got back. I

9  rush in, I see Ms. Flemming, I give her this one sheet

10  here. "Can you give this to Dawn?" And that was the end

11  of it.

12      Q.    In response to this original note back and

13  forth, did you ever mention that your original notes were

14  at home?

15      A.    Dawn knew my notes were at home. At least

16  that's where I told her my notes were at home. I don't

17  carry my notes. I have my little bag with me.

18      Q.    When she said, no, no, we need the original

19  notes, did you ever tell her, hey, I can't get back home

20  in time to get you those originals?

21      A.    The original notes was placed there after the

22  DX. She was focusing on DX which is why I focused on DX.

23      Q.    The answer is no, you didn't tell her, hey, I

24  don't have time to get the original notes?

**A117**

Smiley v. DaimlerChrysler
David A. Smiley

Page 117

1      A.      Didn't word it that way, no.  Okay.

2      Q.      She knew you had the originals at home.  She

3   still put down the original notes as a requirement.  You

4   went to the doctor's and got the DX and the secretary to

5   copy them?

6      A.      Actually, what she did is she wrote it on and I

7   made a copy from there.

8      Q.      She wrote it on and then you kept that original

9   with her pen writing the DX code?

10     A.      Yes.

11     Q.      Then you submitted a copy?

12     A.      She gave me a copy of the DX code that she did.

13  Yes.

14     Q.      You gave it to Angelina.  Did you mention that

15  you had to pick your daughter up that day?

16     A.      Yes, I did.  Because I also told her, "Can you

17  give this to Dawn for me?  I need you to do this for me."

18  I went to Angelique.  I seen her.  She was the only

19  person that came to the door.  I knew that Dawn would get

20  it.  I knew Dawn would get it.  But their offices are

21  like right there.

22     Q.      Why would you have to tell Angelina that you

23  had to pick your daughter up later?  Because you thought

24  you fulfilled the requirements.

**A118**

Smiley v. DaimlerChrysler
David A. Smiley

Page 118

1    A.    I'm missing your question.

2    Q.    I still don't see why it's important that you

3    had to pick your daughter up early.

4    A.    My daughter's school was letting out early.

5    Q.    But didn't you already fulfill the requirement?

6    Didn't you already hand this note in thinking you did

7    everything you were supposed to do?

8    A.    The way you just asked that question is not the

9    way that I'm interpreting it. Now, like I said, this was

10   given to Angelina. "I have to go. I have to pick my

11   daughter up." And that's the last I heard of it. Then,

12   like I said, that following week I received -- I think

13   that's the only time I received one of the things that

14   was certified stating that I was terminated on the 13th.

15   Q.    Did you ever follow up with anybody to make

16   sure that you had the correct documentation?

17   A.    I knew I had the correct documentation. Follow

18   up with whom?

19   Q.    With Dawn or with anybody else in personnel.

20   A.    I called -- what day was it? How did she word

21   it? "You might want to contact your shop steward because

22   your seniority was terminated." And that was on a

23   Monday.

24   Q.    Hang on. Tell me about that --

**A119**

Smiley v. DaimlerChrysler
David A. Smiley

Page 119

1    A.    That was the call.  When I called in.  I can't

2  think of her name either.  But that's how I found out I

3  was terminated before I got the certified letter.

4    Q.    You made a call to Chrysler at some point

5  between May 13th and the time you got your term letter?

6    A.    Yes.  It was Monday, because I never heard

7  anything on a Friday.  I called Monday morning.

8    Q.    You called Monday morning, and why were you

9  calling?

10    A.    Is there any other -- is there anything else?

11    Q.    You did follow up?

12    A.    Not so much follow up, but where would I go,

13  what did I do at this venue.  I hadn't heard anything.  I

14  passed this off.  Wanted to make sure she had it,

15  checking, making sure everything was in.

16    Q.    Did you call personnel?

17    A.    Yes.

18    Q.    Who did you talk to, do you remember?

19    A.    I don't remember the girl's name.  It was her

20  and -- don't even know her because she was kind of new.

21  She didn't have as much time.  Or Angela.  I knew Angela

22  because it was -- again, that's a know of, but I have

23  known her longer, seen her around, stuff like that.

24    Q.    What did she tell you?  You're calling in to

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

**A120**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

1   check up on the status?

2       A.    Check in, everything okay, what am I supposed

3   to do at this point.

4       Q.    What did she tell you?

5       A.    I was informed that I need to contact my

6   steward because my seniority was terminated on the 13th.

7       Q.    Do you remember when the 13th was relative to

8   that call?

9       A.    Friday, the 13th.

10      Q.    It was Friday, the 13th?

11      A.    Yes.

12      Q.    Before we move on to your term letter and what

13  happened after that, one more time.  When you came back

14  to talk to Angelina or Angela, you gave her this?

15      A.    I gave her the one with the proper DX code.

16      Q.    Exhibit 14 with the proper DX code?

17      A.    Correct.

18      Q.    But this Exhibit 14 was a photocopy?

19      A.    Of a photocopy.

20      Q.    Of a photocopy.

21      A.    All right.  A photocopy of a photocopy that had

22  her original DX code put on it that I photocopied to give

23  to her.

24      Q.    Because you were keeping the original?

Smiley v. DaimlerChrysler
David A. Smiley

Page 121

1    A.    Keep the original, yes.

2    Q.    Even though you knew that Dawn was expecting

3    you to bring in the originals?

4    A.    No.  Again, this is something Dawn put in

5    there.  It does not ask for my original.  This is what

6    Dawn had wrote in there.

7    Q.    But Dawn was the HR representative in charge of

8    administering the substantiation process, wasn't she?

9    A.    But then again, again, I would have to say --

10   she was up front.  I don't know what her title was, what

11   she was supposed to do.  She was up front.  Like I said,

12   this one wasn't signed because from here, like I said,

13   you already have it all marked up and everything.  It's

14   like you're putting this, that, and the other in here.

15   Wait a minute.  You asked me for the DX code.  I'm going

16   to get the DX code.  This, I have to say I never received

17   this because I know I didn't sign and there's no

18   signature right there.  This would have to be that one.

19   Q.    You didn't receive it, but you have seen it?

20   A.    I seen enough of it to know that I couldn't

21   sign it.  You're sitting here, you're changing the

22   program right in front of me.

23   Q.    Yes or no --

24   A.    If able.

**A122**

Smiley v. DaimlerChrysler
David A. Smiley

Page 122

1    Q.    Yes or no, okay?  Did you know that Dawn

2  required you to bring in original notes?  Whether or not

3  you agreed with that, whether or not you thought it was

4  consistent with anything else, did you know that she told

5  you that day you need originals?

6    A.    She did not tell me that day.  Like I said, I

7  didn't sign it.  So I can't sit here and say I received

8  this.

9    Q.    You didn't receive it, but you knew that this

10  was one of the requirements, original notes?

11    A.    I knew she wanted the DX code.  That I knew.

12  There was never ever a problem.  She touched on it and

13  there's never been a problem with it.  That's why I'm

14  thinking she switched over to DX code because it was like

15  she was looking for any discrepancy possible on this

16  thing.

17    Q.    As you're sitting here today, you are telling

18  me right now that during that entire conversation that

19  you had with Dawn she never mentioned that you had to

20  bring in original notes?

21    A.    She did not say I needed to bring in my

22  original notes.

23    Q.    She did not say that once?

24    A.    She did not say I needed to bring them in.  I

Smiley v. DaimlerChrysler
David A. Smiley

Page 123

1    never had a problem with these before.

2        Q.    She may not have said it, but you saw this

3    document before you left that day to go to your doctor?

4        A.    I seen enough of that document to know that I

5    was not signing that document because it had been

6    altered.

7        Q.    Right, but you saw that this was the entry on

8    this document that said "original notes"?  You saw that

9    because you saw the document?

10       A.    I seen enough of that document that I was not

11   signing it.

12       Q.    You saw enough of the document.  Yes or no, did

13   you see this document before you left for your doctor's

14   office?  Yes or no?

15       A.    Did I see it?  No, I did not read it.

16       Q.    Did you see it?

17       A.    I seen enough of it.  What I'm telling you is

18   it was marked here and I was pretty much done by the time

19   you got here.

20       Q.    Now you're telling me you had no idea that you

21   needed to bring in original notes.  Is that what you're

22   telling me?

23       A.    She's telling me that there's no -- let's see,

24   there was a problem with the DX code.  The DX code was

Smiley v. DaimlerChrysler
David A. Smiley

Page 124

1    the only thing that was shy on the notes I presented.

2        Q.    One more time.  Yes or no, did you know that

3    day about this entry on this sheet before you left to see

4    Dr. Bandera?  Did you know about it?

5        A.    No.

6        Q.    You had no idea that this was one of the

7    requirements that Dawn wanted you to bring to

8    substantiate your injury on that day, no idea?

9        A.    Again, we had crossed that bridge already.

10       Q.    Who had crossed that bridge?

11       A.    Dawn and I had crossed that bridge already.

12       Q.    When?

13       A.    She focused on the 13th.  That's why she

14   focused on the DX code.  The DX code is the only thing

15   that was shy which is why I focused on the DX code.

16       Q.    When did you focus --

17       A.    On the 13th.

18       Q.    How did you cross that bridge before?  What do

19   you mean by that?

20       A.    It's personnel.  I gave her what I have.  She's

21   like, well -- what was it?  First it was why I did not

22   show up on the doctor's appointment.  Obviously I have

23   another doctor's appointment.  I'm here.  So I got that

24   one.  Then the notes.  These are the notes.  "Where are

Smiley v. DaimlerChrysler
David A. Smiley

Page 125

1    your originals?"

2              "My originals are home, but I have always

3    submitted these."

4        Q.    She did say where are your originals?

5        A.    She left it at that because these are copies of

6    the originals.

7        Q.    So she asked you, "Where are your originals?"

8    You said, they're at home.

9        A.    Yep.

10       Q.    And then she made this entry on here and she

11   never told you --

12       A.    I don't know when she made the entry.  Like I

13   said, I was done with it pretty much up here.

14       Q.    She never told you that you needed originals?

15       A.    Never said I need my originals, bring the

16   original in, no.

17       Q.    But you had an opportunity to look at this

18   document?

19       A.    I had enough of an opportunity to know that I

20   wasn't signing it, and I didn't look it over fully, no.

21       Q.    But you could have?

22       A.    Could have accepted it as how she did, but she

23   didn't.

24       Q.    We're talking about you.  Tell me again why you

Smiley v. DaimlerChrysler
David A. Smiley

Page 126

1    wouldn't sign this document.

2        A.    Because it's been altered.

3        Q.    Because she made these changes?

4        A.    Uh-huh.  Says "Reinstatement Denial."  Now it

5    turns to "Substantiation Denial."

6        Q.    You were saying that she was harping or

7    focusing on the DX code?

8        A.    Yes.

9        Q.    If all that was at issue here was getting the

10   DX code, what was the big problem with this document?

11   Why didn't you take it, and why didn't you sign it?

12       A.    Kind of the way I was trained.  If an

13   individual alters something like that, I can't sign it

14   because it's not -- I'm signing -- this says

15   "reinstatement."  This says "substantiation."  This is

16   proper form.  This is her form.  That's why I did not

17   sign it.

18       Q.    Do you know if there's a substantiation form?

19       A.    Do you know she has the legal authority to

20   change forms?

21       Q.    I'm asking the question, okay?

22       A.    Excuse me.  If we're going to do this.

23       Q.    Let's just focus on this for one second.  Do

24   you know if there's a substantiation denial form?  Do you

Smiley v. DaimlerChrysler
David A. Smiley

Page 127

1    know if that form exists at Chrysler?

2       A.    I know there is not a substantiation/

3    reinstatement form.

4       Q.    But had you ever gotten one that said

5    "Substantiation Denial" at the top?  Do they have an

6    official form like that?

7       A.    That I don't know.  If that is truly the case,

8    it would have "substantiation" there and not crossed out.

9    This is something that someone did.  This is not

10   generated by the Chrysler Corporation.

11      Q.    Is it possible that she just didn't have a copy

12   of the correct form and just modified this one to help

13   you out?

14      A.    Perhaps -- obviously she wasn't trying to help

15   me out.

16      Q.    Why not?

17      A.    Why?  She wanted DX and obviously wasn't trying

18   to help or wasn't granted even a 24-hour thing.  If you

19   had a problem with anything I had, I could have brought

20   it in there.  You chose to terminate me on the 13th the

21   exact same day.

22      Q.    What reason would she have --

23      A.    What reason would she have to help me?  There

24   you go.

**A128**

Smiley v. DaimlerChrysler
David A. Smiley

Page 128

1    Q.    What reason would she have to try to be out to

2  get you either?  You didn't know her, right?  You guys

3  were strangers?

4    A.    For the most part, yes, we are.  I know her

5  probably as she knows me.  That's the extent of it.

6    Q.    She didn't give or try to give this to you as a

7  way to help you figure out what you needed?

8    A.    She was telling me what she needed.  She told

9  me DX.  That's what I did.

10    Q.    You submitted a photocopy of a photocopy with

11  the DX codes on it to Angelina?

12    A.    That would be correct, yes.

13    Q.    Let's see.  And then you called personnel on

14  Monday to check if they had everything.

15    A.    To make sure she had everything, because I

16  tried calling Friday and never got an answer.  With these

17  crazy hours, you can't barely get through to them anyway.

18  And then that's when I was informed contact my shop

19  steward guy, so on and so forth.

20    Q.    Did you do that?

21    A.    Yeah.

22         MS. WASSON:  Can you mark this as 15,

23  please?

24         (Smiley Deposition Exhibit No. 15 was

Smiley v. DaimlerChrysler
David A. Smiley

Page 129

1    marked for identification.)

2    BY MS. WASSON:

3        Q.    Do you recognize this document?

4        A.    This is the one that's dated the 13th.

5        Q.    Did you receive this?

6        A.    Yes, I have that.  Yes.  Certified.  Just like

7    I said, it was the only one I have ever received that was

8    certified.

9        Q.    Do you know who made the final decision to

10   terminate your employment?

11       A.    That I can't tell you.  I don't know.  I'd have

12   to say it started and ended there.

13       Q.    But you don't know for sure?

14       A.    No, I don't.  I don't know what the hierarchy

15   is there as far as HR.  I have no experience in HR.

16       Q.    You believe your termination was discriminatory

17   on the basis of a disability?

18       A.    Okay.  Well, let's see.  Again, we have already

19   gone over the Yankee thing.  He put me on something that

20   causes me to aggravate the injury again.  Even with this

21   letter here, you were issued a substantiation denial

22   form.

23       Q.    When you say that --

24       A.    This is what's written here.

**A130**

Smiley v. DaimlerChrysler
David A. Smiley

Page 130

1    Q.    Okay.  We're looking at the letter.

2    A.    At the letter.  No. 15.  It says that I was

3 issued a substantiation denial form.  No.  I was

4 presented with a reinstatement denial form that had been

5 modified to include "substantiation."  Totally two

6 different forms.

7    Q.    Okay.  You think -- tell me how that is

8 discriminatory on the basis of your disability.

9    A.    Well, like I said, as far as this, that would

10 be closer to a retaliatory, but we're not even going to

11 address that at this time.  This, as far as -- again,

12 this right here, we already know, right hand, it's my

13 right elbow.  You have me doing a job that is aggravating

14 and occurred on your premises to my right elbow.  There's

15 nothing in this PQX that states anything regarding my

16 right elbow.  I'm sorry.  Right hand.  There's nothing in

17 there for my right hand.

18    Q.    There's nothing in this PQX that states

19 anything about your hand?

20    A.    No lifting over.  If I'm doing no repetitive

21 twisting of wrist, does repetitive include an up-and-down

22 movement to utilize a Yankee?

23    Q.    You're asking me to answer that?

24    A.    You said you asked the question.  This

Smiley v. DaimlerChrysler
David A. Smiley

Page 131

1    statement is in the form of a question.  For this reason

2    and these reasons right here, repetitive twisting of

3    wrist.  I'm using a plunger motion with an arm that has

4    been injured by doing repetitive operation.  All they

5    succeeded in doing was aggravating the situation that was

6    already there that was caused by them.

7        Q.    You do admit and you told me before that you

8    could have used your other arm.  You weren't as fast with

9    the other arm, but you could have done it?

10       A.    That brings about other things.  Then there's a

11   work product issue.  There's a time issue.  Along that

12   particular line, it's not like right side door fitting

13   where I can go maybe as far as that wall there to

14   complete that task.  I may be changed to about right

15   here.  Now I have to stop doing everything, plunge it in.

16   Either which way, it would become a work issue.  It would

17   become a work product issue.  I'm trying to keep hassle

18   off of me.

19       Q.    Had it become a work product issue when you

20   were doing it with your left hand?

21       A.    No.  It would become one.  I'm telling you, it

22   would become one, because I'm not as efficient with my

23   left as I am with my right.

24       Q.    But you never told your shop steward or anybody

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

A132

·7

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler
David A. Smiley

Page 132

1   about that concern, that you were worried about your work

2   productivity because you were on this new job and you

3   were trying to do it with your other hand?

4       A.    Yeah, I'm going to try.  I hate to use the

5   term, that's the nature of the beast.  If this is what

6   I'm to do, this is what I'm going to do.  I'm going to

7   try to do it the best I can.

8       Q.    Can we go back to your termination?

9       A.    Sure.

10      Q.    I understand what you're saying about the left

11  fender install.

12              MS. BRADY:  Can we can off the record?

13              (Discussion off the record.)

14              (The deposition was adjourned at 1:15 p.m.)

15              (Deposition to be continued.)

16                    - - - - -

17

18

19

20

21

22

23

24                                            **A133**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f

Smiley v. DaimlerChrysler

```
                                                    Page 133
1              T E S T I M O N Y

2

3   DEPONENT:  DAVID A. SMILEY                       PAGE

4

5   BY MS. WASSON................................. 2

6

7              E X H I B I T S

8

9   SMILEY DEPOSITION EXHIBIT NO.              MARKED

10  1 - Three-page job description................. 9

11  2 - Letter dated October 26, 2004............. 52

12  3 - Letter dated 11/1/04 from Dr. Bandera..... 58

13  4 - Letter dated February 7, 2005............. 63

14  5 - Document Bates stamped Chrysler 106....... 65

15  6 - Job description........................... 67

16  7 - Memo dated February 2, 2005............... 78

17  8 - Medical pass............................. 81

18  9 - Charge of Discrimination.................. 87

19  10 - Letter dated May 6, 2005................. 90

20  11 - Information Notice...................... 93

21  12 - Substantiation Denial................... 98

22  13 - Photocopy of four prescription slips.... 100

23  14 - Photocopy of four prescription slips.... 108

24  15 - Letter dated May 13, 2005............... 128
```

Smiley v. DaimlerChrysler

Page 134

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

**A135**

Smiley v. DaimlerChrysler

Page 135

CERTIFICATE OF REPORTER

STATE OF DELAWARE)

)

NEW CASTLE COUNTY)

       I, Kimberly A. Hurley, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 9th day of April, 2008, the deponent herein, DAVID A. SMILEY, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

*Kimberly A. Hurley*

Kimberly A. Hurley

Certification No. 126-RPR
(Expires January 31, 2011)

DATED:  April 10, 2008

**A136**

b8b447e7-e46b-4c6a-9f8c-6e16ff28250f



**WILCOX & FETZER LTD.**

In the Matter Of:

# Smiley

## v.

## DaimlerChrysler

C.A. # 1:07-005 SLR

Transcript of:

# David A. Smiley
### Volume # 2
### April 15, 2008

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A137

Smiley v. DaimlerChrysler

Page 136

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DAVID A. SMILEY,                    )
                                    ) VOLUME 2
        Plaintiff,                  )
                                    )
        v.                          ) C.A. No. 1:07-005 SLR
                                    )
DAIMLER CHRYSLER,                   )
                                    )
        Defendant.                  )

            Continued deposition of DAVID A. SMILEY
taken pursuant to notice at the law offices of Potter
Anderson & Corroon, LLP, 1313 North Market Street,
6th Floor, Wilmington, Delaware, beginning at 9:15 a.m.,
on Tuesday, April 15, 2008, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            JENNIFER C. WASSON, ESQUIRE
            POTTER ANDERSON & CORROON, LLP
                1313 North Market Street - 6th Floor
                Wilmington, Delaware 19801
                for the Defendant


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com


**A138**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler

Page 137

1                       DAVID A. SMILEY,

2          the witness herein, having first been

3          duly sworn on oath, was examined and

4          testified as follows:

5    BY MS. WASSON:

6       Q.    Good morning, Mr. Smiley.

7       A.    Good morning.

8       Q.    We are back again for the continuation of your

9    deposition.

10      A.    Yes.

11      Q.    You were just sworn in, so you know that you

12   are under oath.

13      A.    Yes.

14      Q.    And the same ground rules are still going to

15   apply that we talked about when we first started on

16   Thursday or Friday of last week.

17            Also, have you had any medications or

18   anything today that would influence your ability to

19   testify?

20      A.    No, ma'am.

21            MS. WASSON:  Can we go off the record?

22            (Discussion off the record.)

23   BY MS. WASSON:

24      Q.    Mr. Smiley, I think we last stopped by talking

Smiley v. DaimlerChrysler
David A. Smiley

Page 138

1  about your termination and the reasons why you thought it

2  was discriminatory.  We will go back to that in just a

3  second, but I wanted to make sure the record was clear

4  with regard to one of our exhibits.  I believe last time

5  we were talking about Exhibit 13, which it says

6  "Substantiation Denial" and part of this is handwritten

7  at the top.

8      A.    Yes.

9      Q.    I just want to make sure the record is clear,

10  because I think by the end of our time last time we were

11  sort of saying "this document" and "that document" and we

12  want to make sure that for the record the paper

13  transcripts reflects which documents we were talking

14  about.

15     A.    Okay.

16     Q.    Exhibit 13 that says "Substantiation Denial" at

17  the top, this was a document that Dawn filled out --

18     A.    Yes.

19     Q.    -- when you reported to the plant on May 13th?

20     A.    Yes.

21     Q.    Were you offered a copy of this document?

22     A.    I was shown a copy -- I guess I could say I was

23  offered a copy, but because of the alterations that were

24  done to it, that's why I didn't sign it and I didn't

A140

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 139

1    accept it.

2        Q.    I just wanted to make sure the record was clear

3    about this particular document.

4        A.    No problem.

5        Q.    Going back to your termination, you started to

6    explain to me when we took the break why you thought your

7    termination was discriminatory on the basis of your

8    disability.  Can we talk about that some more?

9        A.    Well, basically, from what I remember, what she

10   had shown me, it was -- I was basically -- what was it,

11   the left side fender install and that's where -- that's

12   where we were and I was saying it was discrimination --

13   discriminatory because I still had to use my right arm to

14   perform the job.

15       Q.    How did that relate to your termination?

16       A.    How did that -- actually, it doesn't I would

17   assume because one is a different avenue than the other.

18   The other was I guess Chrysler's attempt at a -- what's

19   the word we're looking for?  An accommodation, versus

20   this.

21       Q.    So that left fender install position you're

22   saying has to do with the evidence for your

23   failure-to-accommodate claim?

24       A.    That would be correct.

A141

Smiley v. DaimlerChrysler
David A. Smiley

Page 140

1       Q.     Let's talk about that for one second.  You

2   think the left fender install job was not an appropriate

3   accommodation?

4       A.     Well, considering that my PQX did state the

5   movement of the right arm, and I was mistaken about the

6   hand part, but the right elbow, but the hand, elbow is

7   right there.  If you're going to make an accommodation

8   and the job that I am to perform still involves using the

9   same limb that's in question, it's not really an

10  accommodation.

11      Q.     After that left fender install job, your doctor

12  put you out on leave?

13      A.     That's correct.

14      Q.     What should Chrysler have done after you

15  couldn't do the left fender install?  What could they

16  have done to make it better or make it nondiscriminatory,

17  in your view?

18      A.     In my view, if they were to consult me as far

19  as, you know, how the job is set up.  Again, I wasn't

20  consulted.  I was just placed there.  I had no input

21  whatsoever as far as what job I was going to be on, how I

22  was to perform it, like that.

23             Like I said, it also could have a

24  combination of inadequate training because, like I said,

Smiley v. DaimlerChrysler
David A. Smiley

Page 141

1    in a lot of cases when you're put on a job, you will do

2    it -- and this is shop talk -- do about three jobs and

3    you're on your own.  In that aspect, also.

4            But more so I'm still using the affected

5    limb that got me on the PQX list in the first place.  I'm

6    still using that, so it's kind of -- it just doesn't

7    quite mesh to me.

8        Q.    Is there a position at Chrysler that you feel

9    that you should have gotten instead of left fender

10   install?

11       A.    I'm not going to say I should have gotten

12   because like I said again, you look at seniority, you

13   look at availability, shift availability, first, second,

14   as qualified for driving, I wasn't made a driver.  I'm

15   qualified for other things.  That was not put there to

16   basically put me -- I hate to use "demote," but it is

17   what it is.  Put me back on the line in a situation -- on

18   a line situation under the guise of an accommodation.

19   Like I said, all it succeeded in doing was aggravating

20   the situation that was there.

21       Q.    You feel like that was a demotion?

22       A.    "Demotion" may be too strong of a word.  I use

23   "demotion" to say coming from a tech 1 going back to a

24   tech 2 job, it could be construed as a demotion, if you

A143

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 142

1    will.

2        Q.    Did you keep your same pay rate?

3        A.    Yes, I still had the same pay rate.  I don't

4    even think they gave me the shift differential when I

5    went back because originally I'm on first shift, so going

6    back to that and though it did last a week, I'm not even

7    sure if I got the shift differential, also.  So there's

8    been that time.  And like I said, early on when I was

9    going to therapy, it was like three times a week, two,

10   three times a week, and leaving Chrysler early, and I was

11   never compensated for that either.  You kind of like take

12   it and just go on.

13       Q.    Let me break that down a little bit.  So you're

14   talking about the shift differential.

15       A.    Yes.  I mean, it's a few dollars, but still, I

16   mean, if you're there, that's what you're supposed to

17   receive.

18       Q.    The shift differential, I want to make sure I

19   understand Chrysler's procedures because I'm not too

20   familiar with the shift differential.

21       A.    Let's say -- these are not accurate figures,

22   but let's say first shift would pay you $5.  Shift

23   differential on second shift would be just a guesstimate

24   maybe $5.75, something like that.  It's a little bit, but

Smiley v. DaimlerChrysler
David A. Smiley

Page 143

1    it's more or less the principle of it, if it's supposed

2    to be there, it's supposed to be there.  That's just an

3    example.  It's not an accurate portrayal.

4        Q.    I understand that.

5              You'd essentially get a little bit more --

6        A.    Yes.

7        Q.    -- for working the second shift?

8        A.    Yes, ma'am.

9        Q.    For doing that.

10       A.    Yes, ma'am.

11       Q.    Do you know for sure whether you were paid that

12   shift differential?

13       A.    That I cannot tell you -- I cannot -- I don't

14   remember at this point.  I'm not really sure.  I'm just

15   saying for the question that you asked, this all falls

16   into that answer.

17       Q.    If, in fact, you didn't get it, that would be

18   something that you would say would be evidence --

19       A.    We could look at that, too.  I wouldn't say

20   maybe perhaps evidence, not as strong as the fact that

21   I'm doing left side fender.  Shift differential, that's

22   more of an administrative type of thing, payroll type of

23   situation.

24       Q.    Do you know whether Chrysler has a policy of

Smiley v. DaimlerChrysler
David A. Smiley

Page 144

1   paying the shift differential if you're doing the job

2   based on the PQX process, if you're placed there for a

3   PQX accommodation?

4       A.    That I do not know.  I do not know.

5       Q.    We talked about the pay differential, and then

6   was there something else that we talked about that had to

7   do with you going from tech 1 to a tech 2 job?

8       A.    Well, I used the word "demote."  I did use the

9   word "demote."  Like I said, maybe perhaps a little bit

10  strong, but I am a tech 1.  I was moved to a tech 2

11  position.

12           Let's see, what else?  Like I say, I was

13  never queried as to even if I could do the job.  You had

14  asked did I speak to anyone.  No one had spoken to me.  I

15  wasn't made a part of the process to put me there.  It

16  was basically, this is what you're going to do, see you

17  later.

18      Q.    You continued to accrue seniority in the tech 2

19  job, right?

20      A.    Yes, I was still accruing my seniority.

21      Q.    For purposes of personnel matters, were you

22  still classified as a tech 1?

23      A.    Yes, ma'am.  That's the job that I got hurt on

24  when I went on disability in the first place.  I hadn't

Smiley v. DaimlerChrysler
David A. Smiley

Page 145

1   been bumped from that position; therefore, I would still

2   be a tech 1.

3       Q.    The PQX process, the union representation was

4   available at the PQX process.  The union weighed in on

5   the PQX committee?

6       A.    I would have to assume that they did.  I was

7   not there.  I was not a party to that conversation or any

8   conversation, for that matter, pertaining to a PQX.

9       Q.    As a general rule, is the union involved in the

10  PQX process?

11      A.    Supposedly.

12      Q.    Did anyone from your union ever talk to you

13  before they had the PQX meeting about you?

14      A.    No.

15      Q.    Do you know if that would be a normal thing

16  that the union would do?

17      A.    That was not exactly my area of expertise, so

18  again, if you're going to place an individual, it would

19  seem that you would speak with this individual and get

20  some type of feedback, at least some type of

21  back-and-forth so everyone knows where everyone is.

22      Q.    Any other reason why you think that the left

23  side fender install position was discriminatory or a

24  failure to accommodate?

**A147**

Smiley v. DaimlerChrysler
David A. Smiley

Page 146

1      A.     Outside of the training, the job itself, at

2  this moment or as we sit, that's all I can think of at

3  this moment.

4      Q.     Do you know how much training someone in a PQX

5  placement would normally get for their accommodated

6  position?

7      A.     It's not as much as, to my knowledge, that they

8  differentiate in the training.  Like I said, it depends

9  on the coordinator.  You have some coordinators that will

10  stay there and help you out.  You have other

11  coordinators, okay, you have done the operation two

12  times, that's enough.  It's sort of a case-by-case.

13  Actually is up to the coordinator.  That's not the way

14  that we taught them to do it, but they sort of take a

15  free rein in doing it whichever way they want to.

16      Q.     You were the facilitator instructor?

17      A.     I was one of them.

18      Q.     Were you responsible for helping the trainers?

19      A.     No.  I trained coordinators myself.

20      Q.     You trained the coordinators.

21      A.     I trained coordinators, disseminating

22  information, and, like I say, I gave you an example, I

23  believe.  I flew out to St. Louis, I got the workplace

24  violence information, we brought it back, regurgitate it

**A148**

502 655 0477

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 147

1    to the plant.

2        Q.    Do you remember who your coordinator was?

3        A.    No.  No, because he was a second-shift guy.  I

4    don't know him.  I can't think of him right now anyway.

5        Q.    If you were trained and you decided that you

6    didn't have enough training to enable you to do your left

7    fender job, could you contact the coordinator or could

8    you approach the coordinator and say, hey, you know, I'm

9    having a hard time with this or I can't figure out how to

10   do this specific thing that you told me, I'm not getting

11   it?  Is it an open-door policy where you could come back

12   to that coordinator if you had questions?

13       A.    Yes, you can.  In the real-world scenario, you

14   have to catch him first because he has up to 20 other

15   individuals that he has responsibility for and other

16   functions that he has to fulfill.

17       Q.    Do you remember how much training that you

18   actually did have to do the left fender job?

19       A.    It wasn't long.  Maybe an hour or two hours.

20   Few operations.

21       Q.    Is the coordination done through the union or

22   is that a Chrysler function?

23       A.    That's done through the union.  It's through

24   the union.  It's also part -- falls under the MOA, modern

A149

77

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 148

1    operating agreement, which basically coordinators are

2    elected by each respective team.  At that point they are

3    trained and we pretty much turn them loose; let them

4    fulfill their job.

5        Q.    Under the modern operating agreement, between

6    the management and the union?

7        A.    Yes.

8        Q.    The training of someone for a new position,

9    that's a union function?

10       A.    Yes, that would fall under a union function.

11       Q.    If you wanted to complain about the training

12   you received, would you go to the union, would you go to

13   your shop steward or your committee man?

14       A.    What you would do first, you would -- you could

15   go to your shop steward.  I guess you could go to your

16   shop steward.  Steward, committee man is last-ditch

17   effort, if you will.

18       Q.    Is committee man higher than shop steward?

19       A.    Yes.

20       Q.    Does shop steward represent all of the

21   employees at that particular facility or is it broken

22   down into you have a shop steward for trim, one for body?

23       A.    That's correct, yes.

24       Q.    The latter one?

**A150**

Smiley v. DaimlerChrysler
David A. Smiley

Page 149

1    A.    The latter.  The latter, not the former.

2    Q.    Got you.  We talked about training.  We talked

3    about the job itself.  Have we covered all the ground you

4    can think of for failure to accommodate at this point?

5    A.    Training, we can go with the inadequate

6    training, we could go with the job itself, we could go

7    with -- something else I said.

8    Q.    Demotion?

9    A.    Like I said, it's a strong word.  That's the

10   only word I could think of at the time, but you're going

11   from a 1 to a 2.  You start out as a 2.  If you're good

12   enough and lucky enough, you get to be a 1.  To go back

13   when you're qualified to drive vehicles, when you're

14   qualified like finish where I am, body shop, the argument

15   could be made that we couldn't find him anything, but at

16   the same time the argument can also be made that, yes,

17   you could if you decided to.

18   Q.    Basically, if I understand you correctly,

19   you're telling me that really the accommodation should

20   have stayed in a tech 1 level job?

21   A.    And that's the other side of it.  I say that it

22   could have.  I don't know if they have a PQX for a

23   tech 1.  That aspect of it I'm not really sure.  I didn't

24   delve in that area.  What I had learned and what I was

A151

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 150

1    teaching is a totally different monster.

2        Q.    It may be possible, may be, that they looked at

3    the tech 1 positions and because of the seniority and the

4    bumping and the way that they do the process across the

5    board, that there wasn't a tech 1?  Is that possible?

6        A.    I wasn't party to that conversation, so I

7    cannot answer that affirmatively.

8        Q.    Did you know of any tech 1 positions that were

9    open or that would have fit the bill under the PQX

10   process?  I know you said you don't know exactly how they

11   do it.

12       A.    Now, as far as PQX and a tech 1, again, there

13   have been incidents where you had individuals with less

14   seniority that were on day shift and remained on day

15   shift.  So it's -- I say you probably could if you chose

16   to do so, you may have been able to find me something.

17   Again, I was not privy to that information, nor

18   conversation; therefore, I can't affirmatively answer

19   your question.

20       Q.    Okay.  That's fair.

21             Should we move on to termination?  We can

22   talk about failure to accommodate more if you feel like

23   there's more you want to tell me.

24       A.    At this point I believe we pretty much covered

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 151

1    it.  We can go on to termination.

2        Q.    By the way, I just wanted to see if we could

3    clarify your dates of injury and dates of leave.

4    Remember how we were thinking about that?

5        A.    I'm not really sure how that --

6        Q.    That's okay.

7        A.    You found something?

8        Q.    I think so.  I actually found it in an exhibit

9    that we have already introduced, Exhibit 3, which I'm

10   just going to put in front of you again.  I know we

11   already looked at this, but I think this might help us

12   figure out when your injury occurred, because see how it

13   says --

14       A.    March '04.

15       Q.    -- he's been disabled since March of '04 and

16   continues current disability, and down at the bottom it

17   says it's the elbow, DCX code.

18       A.    Uh-huh.  I understand where you're at with

19   that.  DCX code 726.32.

20       Q.    That probably means that it was September of

21   '03 or October of '03, right?

22       A.    Yes, quite possibly.  I mean, this is my

23   physician, this is his signature, this is his letterhead;

24   therefore, I'd have to say he's been in it as long as I

Smiley v. DaimlerChrysler
David A. Smiley

Page 152

1    have been in it.

2         Q.    I guess it's safe for us to conclude that it

3    would be October of '03?

4         A.    Yes.

5         Q.    And not of '04?

6         A.    Yes.  Because it was nearly the end of the

7    year, and that has always been a source of we're all

8    scratching our head on that.  It's not just you.

9         Q.    It was a long time ago at this point.  I just

10   wanted to see if that helped any because I know we were

11   kind of fumbling back and forth last time.

12        A.    I admit I am not exactly sure of the correct

13   date; however, after viewing that, it is highly likely --

14   like I said, he's my physician, so he would know.

15        Q.    Right.  If I can find anything else conclusive

16   that we have in the exhibits, I will certainly draw it to

17   your attention, but I think that really helps shed light

18   on it.

19        A.    Yes.

20        Q.    Moving on to termination, right?

21        A.    Okay.

22        Q.    If we're talking about the mechanics of the

23   termination and the things that led up to the

24   termination, tell me about why you think that you were

Smiley v. DaimlerChrysler
David A. Smiley

Page 153

1   wronged with regard to your termination.

2       A.    Okay.  Again, I was given a form that had been

3   altered.  I was not afforded 24 hours if there were any

4   type of discrepancies to clarify that.  I was terminated

5   on the 13th, that same day.  I did show up, again, twice

6   on the 13th.  The copies that I have are copies of the

7   original notes.  Again, I would look to the call-out

8   numbers.  They would be the numbers on each individual --

9   if you have one in front of you.  But I think it's like

10  maybe a nine-digit train of numbers at the bottom.  It's

11  called a call-out number.  What happens there is you call

12  and they assign you a number.  There you go.

13      Q.    Do you want to look at -- I think this was

14  Exhibit 14.

15      A.    These are the call-in numbers.  See right here?

16  That's in my hand.  You have a call-in number there, you

17  have a call-in number there, you have a call number

18  there, and you have a call-in number there.

19      Q.    Tell me again the call-in number, why that's

20  important.

21      A.    What happens is the absentee program, if you're

22  going to be out, you know you're going to be out, the

23  last policy change that I can remember, they requested

24  that you call in, you were to receive this number.  I

Smiley v. DaimlerChrysler
David A. Smiley

Page 154

1    have never been questioned on the number or what have

2    you.

3        Q.    Is it like your ID number for your absence or

4    something?

5        A.    For that particular absence.  It would be like

6    you call in and you give your reasoning for whatever,

7    they assign a number.  I don't know how that number is

8    generated, the mechanics of that, but that is the way it

9    works.

10       Q.    When you call in, you're supposed to provide

11   them with that number?

12       A.    No, they provide you.  They provide you with

13   the number.  What you do -- well, what I like to do on my

14   notes, I would write the call-in number on it, on each

15   corresponding note; therefore, I knew which one applied

16   to where.

17       Q.    I see.  So these are all different numbers --

18       A.    Yes, ma'am.

19       Q.    -- for each of the notes?

20       A.    Yes, ma'am.

21       Q.    The reason why the call-in number is important

22   is because --

23       A.    The purpose of it is to call in before your

24   shift.  It would notify your supervisor, okay, he's going

Smiley v. DaimlerChrysler
David A. Smiley

Page 155

1    to be a man short, so he can make whatever accommodations

2    he needs to make, whatever switches he needs to make,

3    between he and his coordinator, find someone.  If not,

4    the coordinator himself could perform the job until

5    either someone comes in late, the individual comes in, or

6    we can find someone in a pool and have -- forgive me on

7    that.  Force of habit.  I have been doing it too long.

8        Q.    Not a problem.

9        A.    Till another individual can be found.

10       Q.    Right.  I understand.  I guess we can talk

11   about each of those reasons that you gave, because you

12   kind of ticked off a few here.

13             You think that the termination was

14   discriminatory.  Do you think one of the reasons why is

15   because Dawn altered the form?

16       A.    That would be the major reason.  Again, I was

17   not afforded 24 hours if there were any discrepancies to

18   correct said discrepancies.  That's pretty much it.

19   That's pretty much it, because everything else according

20   to their guidelines were there.

21             I would have to also say if Chrysler does

22   reserve the right if they feel as though something was

23   altered and what have you, if an investigation was not

24   performed to get to the truth of the matter and you just

Smiley v. DaimlerChrysler
David A. Smiley

Page 156

1    sort of slide it under the table, yes, because you did

2    not afford me that right to respond.  Maybe this is the

3    wrong context to use "right to respond"; however, if

4    there was a discrepancy that you truly had a problem

5    with, allow me the opportunity to correct it.

6        Q.    Some of this that we're talking about now has

7    to do with our discussion before about what was required

8    and what Dawn wrote on the form and that sort of thing.

9        A.    Yes.  Because it's part of the requirements,

10   basically.  There's no rubber stamp.  You see the

11   physician's signature, it's on his letterhead, address,

12   telephone number.  The only thing was shy would be

13   perhaps DX code, which I retrieved.

14       Q.    Can you look at Exhibit 13 again, the

15   substantiation denial?

16       A.    Sure.

17       Q.    I know we talked about that a lot the last

18   time, and we spent a lot of time talking about original

19   notes.  I want to clarify the situation, because I think

20   we started talking about that and we kind of kept going

21   over and over it and I want to make sure that I

22   understand exactly what happened from your perspective

23   under oath, what happened with regard to who said what

24   about original notes.  Okay?  I know we have already

Smiley v. DaimlerChrysler
David A. Smiley

Page 157

1    tread that ground, but I just want to make sure the

2    record is clear, because you know how we kept going back

3    and forth and we were talking a lot about it.

4              When you came in that morning, you reported

5    pursuant to that letter that you received that was

6    already entered into the record and you encountered

7    Dawn Ford?

8         A.    Correct.

9         Q.    You gave her your photocopy notes?

10        A.    Yes.

11        Q.    They had --

12        A.    They had the requirement -- the physician's

13   name, address, letterhead, written in his signature, no

14   facsimile copies, no rubber stamps for his signature, the

15   dates that you're going to be absent from and to.  Again,

16   the only thing my copies had not shown was a DX code.

17        Q.    You hand them to Dawn?

18        A.    Yes.

19        Q.    Did Dawn want original notes at that point when

20   you first made contact with her and you first started

21   talking about this?

22        A.    Notes kind of came up a little later, the

23   original, because again, you can see that these were

24   originals.  You can look at the dates, the call-in

Smiley v. DaimlerChrysler
David A. Smiley

Page 158

1    numbers and see these are originals. You can't pull

2    these out of the air like that. Again, if you truly

3    wanted to investigate the dates in question, you would

4    look at the corresponding call-in number, there's a

5    record right there.

6        Q.    I think when we previously met, you were

7    telling me that the first thing that you all talked about

8    was you missed your appointment. She said, oh, you

9    missed your appointment. You said, hey, I didn't know

10   about that.

11       A.    I didn't know about that, and I figured that

12   was a done deal because when it was mailed to me, I did

13   receive it, I did show up. I have only missed one

14   appointment since this whole ordeal begun.

15       Q.    That was the first thing?

16       A.    Yes.

17       Q.    How did the conversation turn from there?

18       A.    She was looking at these. She was like, your

19   original -- I don't have my originals with me, I have the

20   copies right here. Well, you don't have the DX code.

21   And that's where we focused on the DX code.

22       Q.    Did she say, these are not originals, I need

23   the originals? What did she tell you?

24       A.    What the exact words are, they elude me.

Smiley v. DaimlerChrysler
David A. Smiley

Page 159

1    However, again, you can see that these were original

2    notes which is basically I believe, I could be wrong, why

3    she decided to go to the DX code.  You can see that these

4    are originals.

5        Q.    I'm just trying to understand, because she's

6    not in the room.  I'm trying to understand sort of

7    secondhand what she said to you about the originals.  Do

8    you remember?  I don't need exact words.  What I want to

9    know is she brought that up as an issue, right?

10       A.    She asked did I have the original.  I said I

11   had the copies, these are the copies here.  She harped

12   more on the DX than anything else.  The note, I guess,

13   would be you could say sideshow.  Then it came back with

14   the original notes.  It's like, you're altering this

15   thing here and you expect me to sign this.  I mean, no.

16       Q.    She first --

17       A.    This was right before I left to get the DX

18   code.  This was right before I left.

19       Q.    First part of the conversation was about missed

20   appointment.  You guys got over that.

21       A.    Yes.

22       Q.    Then she says, where are your original notes?

23       A.    Okay.  After she looked these over.  Again, I

24   said, right here, basically, here you go, because these

Smiley v. DaimlerChrysler
David A. Smiley

Page 160

1  are copies of the originals. I mean, you can look at

2  them and tell they're the copies. Again, I figured that

3  was done. She didn't say anything else about it. She

4  focused upon the DX code, and, understandably, that was

5  the only information that was shy. Initially.

6      Q.    Got you. You start out talking about the

7  original notes. She asked you where they are. You say,

8  hey, these are copies of the originals. And then does

9  the conversation move on to DX code?

10     A.    That's correct.

11     Q.    At that point in time before the conversation

12 moves on to DX code, did she ever say, I need the

13 originals?

14     A.    She did not say she -- her exact words I do not

15 believe were "I need the originals." I do not believe

16 she said that.

17     Q.    Did she say anything, well, you have to bring

18 the originals?

19     A.    Nothing like that that I can remember, no.

20     Q.    You ended up telling her that the originals

21 were at home?

22     A.    Yeah. I don't carry my originals with me.

23 That was part of that conversation, do you have the

24 originals, no, this is what I have, I don't carry my

Smiley v. DaimlerChrysler
David A. Smiley

Page 161

1   originals with me, all the information that you would

2   need is right there.  Then it was, okay, well, I need the

3   DX code.  You have me there because I did not know the DX

4   code.  I left the plant, I went to Bandera's office, his

5   secretary wrote the proper DX code on one of my copies, I

6   brought it back, I submitted it to Angelina, Angeline,

7   her, I gave it to Angelina, and I knew it would get

8   forwarded to Dawn, knew it was going there.  Obviously it

9   didn't.

10      Q.    You guys started talking about the DX code?

11      A.    Uh-huh.

12      Q.    Does she talk about any other substantiation

13   requirement that you need to get after you talk about DX

14   code?

15      A.    I told her I would go get the DX.

16      Q.    She takes a piece of paper out?

17      A.    She started with this and, again, you cross

18   out --

19      Q.    Hold on one second.  When you say "this," you

20   mean Exhibit 13, the substantiation --

21      A.    The substantiation and reinstatement form which

22   has been altered to include substantiation.  She had

23   struck "reinstatement," substituted it with

24   "substantiation."  Again, on the third paragraph, again,

Smiley v. DaimlerChrysler
David A. Smiley

Page 162

1    other than that, return-to-work date or estimate of

2    return-to-work date.  Again, handwritten items.

3        Q.    So she starts using a form that wasn't

4    particularly suited to the one that you would need,

5    right?

6        A.    You could say that, yes.

7        Q.    She's crossing things out and she's writing in

8    in handwriting some additional requirements that are not

9    appearing on this typewritten form?

10       A.    Yes.

11       Q.    You saw her writing in these requirements,

12   right?

13       A.    Uh-huh.

14       Q.    What did she do, hand this over the counter and

15   try to give this to you?

16       A.    She's like, I need you to sign this.  I'm like,

17   I'm not signing it, you altered it.  I mean, if you're

18   going to get picky about it, she didn't even initial it.

19   She just altered it.

20               Again, I have never had a problem with this

21   procedure prior.  So somewhere in there lies the point of

22   contention that perhaps maybe we just -- I don't know the

23   woman.  I know of her.  But like I said, you can just see

24   I'm not going to sign anything like that.  It's been

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

A164

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 163

1  altered.  It was like basically why don't you give me a

2  blank sheet of paper, I'll sign my name to it, and you

3  fill it in as you feel.  Basically it's the same thing.

4  You do not agree to it, you do not sign it.

5      Q.    She basically handed it to you.  You said, I'm

6  not signing this because it's been altered.  What did she

7  do after that?

8      A.    She ranted about something.  I kind of tuned

9  her out at that point.  I focused on the DX code.  I told

10  her I will be back, which I did.  At the time this was

11  about 10:12 a.m., so minutes after this when I proceeded

12  to go to Dr. Bandera's office to get the DX code.

13      Q.    Did she try to kind of shove this at you and

14  make you take a copy of this?

15      A.    I didn't even get a copy of it.  Didn't even

16  get a copy of it.  There was no other copies involved

17  here.  She wanted me sign, I refused to sign it, and I

18  left it at the window and I proceeded to focus on my DX

19  code that I knew I needed and I proceeded to go retrieve

20  it.

21      Q.    At that point the conversation is kind of

22  getting a little agitated between the two of you?

23      A.    Do you know Ms. Ford?

24      Q.    I met her, but I can't speak to how she would

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

**A165**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 164

1   be in this situation.

2        A.    Then we will leave it there, then.

3        Q.    Okay.

4        A.    That was the end of the conversation.

5        Q.    Are both of you getting frustrated at this

6   point?

7        A.    I'm not frustrated because I didn't do anything

8   wrong.  There was no need for me to get upset.  I have

9   given you what I have.  It matches everything that you

10  need.  Sure, granted, I would have to say the DX code was

11  shy.  If you look at both exhibits, one has a DX code on

12  it, 3905, and the other one doesn't.  So as far as me

13  getting frustrated, there's no need to.

14       Q.    Was she getting frustrated?

15       A.    Yes.  Yes.

16       Q.    Do you know why?

17       A.    I don't know why.  I have no idea why.

18       Q.    Basically it's fair to say that she offered

19  this to you, you refused to sign it, because we talked

20  about that before?

21       A.    We could say that, yes.

22       Q.    And then that's where you sort of left off, you

23  said, hey, I'll be back?

24       A.    Yes.

**A166**

Smiley v. DaimlerChrysler
David A. Smiley

Page 165

1      Q.     Right?

2      A.     Yes.

3      Q.     In this whole situation, do you think that Dawn

4    was the discriminator?  Because you're saying your

5    termination was discriminatory, right?

6      A.     Yes.

7      Q.     Were her actions the ones that you think are

8    discriminatory?  Or tell me about how this altered form

9    and this process was discriminatory against you on the

10   basis of your disability.

11     A.     Well, going to the theory, again, there was a

12   memo, which will be part of that packet that you will

13   receive, that she admits that I was not given 24 hours to

14   substantiate my information.  It was a memo to

15   Mr. Dan Michaelenko.  Like I said, she admits that I was

16   not given -- her words were I was not afforded 24 hours

17   because "I felt as though he was taken advantage of" --

18   basically taking advantage of the program.  What do you

19   base that upon?  What evidence can you produce that would

20   substantiate you even coming out of your mouth with

21   something like that?  There's nothing.

22             Again, if you felt that strongly about it,

23   they could have called the doctor's office.  His number

24   is in plain view here.  I have no knowledge of any

Smiley v. DaimlerChrysler
David A. Smiley

Page 166

1   inquiries into my doctor's notes through my doctor, if

2   there was an investigation or not.  It was basically --

3   from what I gleaned from the information that I have,

4   this was her call.

5        Q.    She says you weren't given 24 hours to

6   substantiate, and, in fact, you weren't given 24 hours?

7        A.    If I were given 24 hours, it would have been --

8   it happened on Friday, the 13th.  That would have been

9   Monday, the 16th, would have been the correct date, which

10  is the date that, as I told you before, I called in.  I

11  called Friday; didn't get anything.  Wasn't really

12  expecting to really catch anyone in.  Like I said, I had

13  to pick my daughter up.

14       Q.    So you did call Friday?

15       A.    Yes, I did call.  I never got a response, never

16  got an answer, I didn't speak to anyone.  I got the

17  usual -- not so much a busy signal.  You go into the

18  loop, if you will.  If the phone isn't answered, it will

19  just -- once you get in the loop, you're pretty much

20  there until someone decides -- inside the building

21  decides they want to pick up.

22       Q.    Like a voice mail kind of machine?

23       A.    You will get a voice mail.  Again, needed to

24  speak to an individual and not a voice mail.

Smiley v. DaimlerChrysler
David A. Smiley

Page 167

1    Q.    Did you have an opportunity to leave a message?

2    A.    I never got a chance to speak with an

3    individual because we're dealing with this -- all right.

4    I don't know when they retrieve their messages.  So it's

5    better if I speak to an individual, that way we both get

6    a response, an instance response.  To leave a message, I

7    don't know when they would get it.  Then it could also be

8    construed we never got it.  This way, if I'm speaking

9    body to body, at least you know what I said, I know what

10   you said.

11   Q.    You didn't leave a message because you wanted

12   to just verify by speaking to a person?

13   A.    Yes.  That my information was, in fact, there.

14   I knew Angela would give it to her.  Angela, again, her

15   and I aren't friends either, but she works in the office

16   adjacent.  They're in the same office.  So I knew that it

17   was just a matter of here you go.  For simplicity sake,

18   that's where we were with this thing.

19   Q.    You called on Friday and got into sort of the

20   phone message loop system because no one was picking up?

21   A.    Uh-huh.  I got called Monday and that's when I

22   was informed, you need to contact your steward, you have

23   been terminated, yadda, yadda, so on and so forth.  My

24   response to that was okay, because again, there's no need

A169

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 168

1    to jump up and down, holler and scream.  What is it going
2    to prove?  Again, I will handle it.

3        Q.    We can talk about when you contacted your
4    steward and the grievance and that process.  We will get
5    to that.  That's something else we have on tap for this
6    morning.

7        A.    Okay.

8        Q.    The 24-hour requirement, you weren't given
9    24 hours.  You were given a second opportunity to go back
10   to your doctor's office and get the proper paperwork,
11   right?

12       A.    The DX code.

13       Q.    Right.  Dawn just didn't deny it outright and
14   terminate you on the spot.  You did get a second chance
15   to go back and you told her you were going to go back to
16   your doctor?

17       A.    To get the DX code, that is right.

18       Q.    You said that Dawn at some point wrote a memo
19   that said that you were taking advantage of the program.

20       A.    Yes.  That was dated the 13th.

21       Q.    Do you know why she would have said that?

22       A.    No idea.  No idea.  To be honest with you, no
23   idea.

24       Q.    To recap, because I just want to make sure I

Smiley v. DaimlerChrysler
David A. Smiley

Page 169

1    get all the evidence, because this is your chance to tell

2    me your evidence about discrimination on the basis of

3    your disability --

4        A.    Yes.

5        Q.    -- you're saying that the form was altered?

6        A.    Yes.

7        Q.    And that was discriminatory based on your

8    disability?

9        A.    You're giving me -- yes, I would have to say

10   that, because that's what the purpose of that -- that's

11   why I was out, I was brought back -- not brought back,

12   but told to report because of my -- because of my

13   disability, the doctor's appointment.  My notes would

14   substantiate my absence again because of my disability.

15   Yeah, that's pretty much it.

16       Q.    When you were talking to Dawn that morning, did

17   you mention to her anything about your medical condition?

18       A.    No.  No.  It's really not -- that's not her

19   call.  What she needs to know is basically this is the

20   information that is requested, here you go.  There's no

21   need to delve into your personal aspect of whatever your

22   case is.  There's no need for that.

23       Q.    You all didn't talk about your elbow or

24   anything about what your doctor was saying, none of the

Smiley v. DaimlerChrysler
David A. Smiley

Page 170

1  medical information?

2      A.    No.  I would not discuss that with her.  Again,

3  she's not a physician, there's no need to do that.

4      Q.    She's one of the administrators or the HR

5  person?

6      A.    Yes.  Okay.

7      Q.    The altered form and then not being afforded

8  the 24 hours?

9      A.    Yes.  We didn't discuss that.  That was

10  something that I had learned later through discovery that

11  a memo was written to Dan Michaelenko on the 13th which

12  addresses I guess her substantiation of my termination

13  and then like I said, some other things.  But until I can

14  get an opportunity to speak with her or at least give her

15  some interrogatories between her and Mr. Michaelenko,

16  right now I can't really put too much into it because I

17  need to speak with these individuals, at least corner

18  them on events of that day.

19      Q.    Again, you would say that Dawn was the

20  discriminatory actor when she didn't give you the

21  24 hours?  You think she discriminated against you on the

22  basis of your disability by not doing that?

23      A.    By not doing that when they could do that.  You

24  didn't -- again, if there was any discrepancies, no

Smiley v. DaimlerChrysler
David A. Smiley

Page 171

1    investigation as to the whos, the whats, the whys of my

2    notes, no conversation that I know of, that I'm aware of

3    with my position, not being afforded the 24 hours, the

4    altered forms and stuff.  Yes, that would be

5    discriminatory.

6                And again, short of knowing what her

7    true -- what her limitations of power are, like I said, I

8    wasn't being sarcastic when I was saying it before, if

9    you do not have the legal authority to change a form --

10   just things like that.  That's why I say discriminatory.

11       Q.    Any other reason why you think your termination

12   was discriminatory based on your disability or your

13   alleged disability?

14       A.    No.  It's a disability.  It's no alleging.  I

15   have documentation to prove that the condition does

16   exist.

17                Not right now.  Short of going truly into

18   the theory of it, no, this will be fine.

19       Q.    So those two points are your basis for that

20   claim, right?  Anything else you can give me?  I want to

21   make sure --

22       A.    When you say "those two points" --

23       Q.    The altered form and not being afforded the

24   24 hours.

**A173**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 172

1    A.    That would be correct.  Let's see what else.

2    Okay.  Those are it for right now.

3    Q.    Let's talk about what happened after your

4    termination.  That was not the last communication that

5    you had with anybody at DaimlerChrysler, right?

6    A.    No.  I had spoken with John Mehalshick and we

7    were going to -- I asked him to put in a grievance.  At

8    that point, short of what I found in discovery, I heard

9    nothing else until like a year later.

10            Do you want these back?

11   Q.    No, that's okay.  Hang on to them for a second

12   because we may have to go back to them.

13            Tell me about who John Mehalshick is.

14   A.    John Mehalshick.

15   Q.    Who is he?

16   A.    He was the -- he was my shop steward when they

17   had moved me to second shift.

18   Q.    Are there different shop stewards for each

19   shift?

20   A.    Correct.

21   Q.    Did you know John before you contacted him?

22   A.    Yes.

23   Q.    How well did you know him?

24   A.    From the plant.  I mean, he seemed like a nice

Smiley v. DaimlerChrysler
David A. Smiley

Page 173

1    guy.  We have conversated, we get along fine, things like

2    that.

3        Q.    Did you know him outside of work?

4        A.    Prior to working at Chrysler, no.

5        Q.    What about when you were working at Chrysler?

6        A.    We seen each other.  Like I said, we're

7    cordial, how you doing, so on and so forth.  We're not

8    drinking buddies, if that's what you're asking.

9        Q.    No.  Just wanted to know what kind of

10   relationship you had.  Was it more like a friend

11   relationship or was it more acquaintance?

12       A.    I would go with acquaintance, coworkers, type

13   of thing like that, yes.

14       Q.    Do you remember when you contacted John?

15       A.    That would be the 16th.

16       Q.    Did you call him?

17       A.    Yes.  I never stepped foot on Chrysler's

18   property from the date that I knew I was terminated.  I

19   never went back to that plant.

20       Q.    What did you talk about?

21       A.    I was terminated.

22       Q.    What was his response?

23       A.    Basically, what happened.  I told him what had

24   occurred, asked can I get a grievance put in, and that

Wilcox and Fetzer, Ltd. Registered Professional Reporters

**A175**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 174

1   was pretty much the end of it.

2       Q.    Is he the one that would be responsible for

3   filing the grievance?

4       A.    Yes, it would be him.

5       Q.    Did he do that?

6       A.    From discovery I seen that, yes, he did.

7       Q.    Did you know that he did it at the time?

8       A.    He said he would do it.  I had no reason to

9   believe that he would not.

10      Q.    Tell me about the process for filing a

11  grievance.

12      A.    I have never filed one.  I filed one -- well, I

13  have had a shop steward file one before and, like I said,

14  that was back when I was in trim shop and the job was

15  overwork.  We went through that and found out it was

16  overwork, but it stayed in my jacket.  Sort of left a bad

17  taste because it's like how can you be wrong when you're

18  right?  Your actions tell me I was right, but because of

19  the process -- we go past that.

20            So when I discussed a grievance with him, I

21  left it alone because, like I said, you can win a battle

22  and still lose the war with this thing.

23      Q.    When you say you left it alone, what do you

24  mean by that?

**A176**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 175

1      A.     I requested a grievance be filed and that was

2    pretty much the end of it.  He told me some other things,

3    but then that would fall under hearsay, but told me some

4    other things and stuff, general conversation.  But that's

5    it.  The process -- it sometimes can take a minute.

6      Q.     By the way, it's okay to tell me hearsay.  It

7    wouldn't be okay in court.  You're right, though, you put

8    your finger on something very important, it would not be

9    okay in court.

10     A.     That's when it was brought to my attention that

11   Dawn had said that I forged my signature.

12     Q.     She said you forged your signature?

13     A.     Not my signature, forged this document.  Told

14   me I did that.  Totally out of character.  No basis

15   whatsoever.  Plus, I'm a paralegal.  Why would I do that?

16   That's the stupidest thing in the world.  Why would you

17   do something like that that can instantly be traced back?

18   It's dumb.  In fact, it's an insult.  Let me stop.

19     Q.     It was during that first phone conversation

20   with John -- I'm going to call him John M.

21     A.     We're there.

22     Q.     You called John and he told you that Dawn had

23   said you forged something?

24     A.     The thing what got his attention, it was

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

A177

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 176

1  brought to Dan's attention that they thought that I had

2  forged it.  Dan and I go back, we trained together.  Dan

3  was also a facilitator, Mr. Dan Michaelenko.  Dan knows I

4  wouldn't do anything like that.  What I got back out of

5  it, even he said, that's totally not David, David

6  wouldn't do anything like that, which again, I wouldn't.

7  Just the stupidest thing in the world.

8      Q.    John is telling you that Dawn said, hey, I

9  think he altered -- David altered the form.

10     A.    Uh-huh.

11     Q.    Do you know how John came to get that

12  information?

13     A.    John would have to speak with Dan because Dan

14  is over Dawn.  He may have spoken with Dawn.  I'm sure he

15  did.  But at the same time I know he spoke with Dan.  He

16  had to.

17     Q.    Did he speak to Dan before you even called him

18  to tell him you were terminated?

19     A.    That chain of events I'm not sure of.  I would

20  have to assume he did.  Like I say, I hate to use the

21  word "assumption" but because it was the information was

22  brought to me.

23     Q.    During that first phone call?

24     A.    Yeah, through that, that wait a minute, what's

Smiley v. DaimlerChrysler
David A. Smiley

Page 177

1    going on here.

2        Q.    So John contacted Dan?

3        A.    Uh-huh.

4        Q.    And Dan told John that Dawn thought that you

5    had altered the form?

6        A.    Yes.  Okay, going back to that, what we were

7    saying before, you were saying the two points of

8    contention with Dawn and discrimination, again, I would

9    have to also add to that you did not properly investigate

10    whatever claim was there.  Again, like I said, I have no

11    knowledge that a call was made.  My doctor never said

12    anything to me about it, so I have to say I don't know if

13    any investigation was, in fact, conducted.

14        Q.    You're telling me that, if someone at Chrysler

15    thought that you altered the form, then they could have

16    conducted an investigation?

17        A.    On their form themselves.  Not this one, but

18    there's another reinstatement form that at the bottom

19    clearly states if they feel as though there was any --

20    that's the form we're looking for, right there.  I think

21    you have it highlighted.

22        Q.    This is Exhibit 11.

23        A.    I believe you have it highlighted.  They

24    reserve the right to investigate and so on and so forth.

Smiley v. DaimlerChrysler
David A. Smiley

Page 178

1    Does not -- "nor does it preclude management's right to

2    take disciplinary action where such statements may be

3    altered, falsified, or otherwise unsatisfactory

4    substantiation of the disability for the period in

5    question." Again, if no investigation is conducted and

6    you just go with that alone with no proof, yes, that is

7    discriminatory.

8         Q.    You were just reading from Exhibit 11, right?

9         A.    Yes.

10        Q.    Continue what you were saying. Go on.

11        A.    I'm saying if they did -- they do have the

12   right to investigate and verify the authenticity of a

13   statement. Had that been done, I would not be sitting

14   here now. Bottom paragraph, presentation of such a

15   statement.

16        Q.    I see. That would have been the case if they

17   thought that you altered the form.

18        A.    Correct.

19        Q.    There's also a note on the letter that you

20   received to come in and substantiate your injury.

21   Remember you received that one on May 6?

22        A.    Somewhere in there, yes. Obviously I came in.

23   I responded to it.

24        Q.    The text of that letter indicated that, if you

A180
28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 179

1    didn't substantiate your injury or your medical

2    condition, then your seniority would be terminated?

3        A.    That's a possibility that that could occur;

4    however, here we go, I brought that in with me, the

5    doctor's notes.

6        Q.    I want to go back to John and Dan, their

7    conversation that they had about this.

8        A.    Okay.

9        Q.    I know this is all coming secondhand, that you

10   heard it all from John.

11       A.    Yes.

12       Q.    John talked to Dan about this whole issue.

13       A.    Yes.

14       Q.    What did Dan say?

15       A.    Basically, from what I remember, basically that

16   it's out of character, David wouldn't have done that.

17   They probably said some more, but I sort of was focused

18   on that because that's a serious allegation.

19       Q.    Was Dan involved in the grievance process?

20       A.    I'd have to say he initiated.  Now, after that,

21   again, like I said, because I have been an alternate

22   steward, I have been an alternate committee man,

23   basically that aspect of the job I am not familiar with

24   what is the steps, what is the true procedure, what path

Smiley v. DaimlerChrysler
David A. Smiley

Page 180

1   it would take.  That I cannot answer.

2       Q.     From your understanding of this conversation,

3   sounds like Dan said, hey, that's out of character with

4   what David would do?

5       A.     Yes.

6       Q.     But your termination was still upheld?

7       A.     Somewhere in there, yes.

8       Q.     Is it possible that they could have looked at

9   the termination as an administrative termination?

10      A.     That I cannot answer.  I don't have enough

11  information to make that call.

12      Q.     The grievance process, your understanding is

13  that you contact your shop steward if you're the employee

14  that's been harmed or suffered some kind of adverse

15  action.  You contact your shop steward, they file your

16  grievance for you, and then you have to trust your shop

17  steward to see that grievance through?

18      A.     That would be a correct assessment.

19      Q.     So you're not really involved as the employee?

20      A.     All I do is make the request.  After then I'm

21  off over here somewhere.

22      Q.     They're supposed to advocate on your behalf?

23      A.     Supposedly.

24      Q.     Let's take a look at your grievance form.

A182

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 181

1              Can I have this marked as Exhibit 16?

2              (Smiley Deposition Exhibit No. 16 was

3    marked for identification.)

4    BY MS. WASSON:

5        Q.    Have you ever seen this document?

6        A.    Just after what I received at -- received

7    through discovery.

8        Q.    It looks like the grievant's name is

9    David Smiley or Smiley, comma D, right?

10       A.    Yes.

11       Q.    The department number would be yours, right?

12       A.    9110, yes.

13       Q.    Whatever the clock number is?

14       A.    1681, my badge number.

15       Q.    At the time you were working second shift

16   because the last position you held was the left fender

17   install?

18       A.    Correct.

19       Q.    The nature of the grievance says, "Unjust

20   Discharge," right?

21       A.    Yes.

22       Q.    It looks like it's signed down at the bottom.

23   Do you think this is John?

24       A.    John Mehalshick, IV, yes.

**A183**

Smiley v. DaimlerChrysler
David A. Smiley

Page 182

1    Q.    Have you seen his signature before?

2    A.    One other time.  One other time.  The IV is

3  what stands out.

4    Q.    We feel pretty confident that this was his

5  signature at the bottom?

6    A.    Yes.

7    Q.    It looks like at the top, the first big box

8  here that starts out with "Plant," do you see that at the

9  top?

10    A.    Okay.

11    Q.    And then if you go down a couple lines, it

12  says, "Discussion 1, Date Held."

13    A.    Yes, I see -- it looks like --

14    Q.    To me it looks like "numerous."  Then it looks

15  like the management rep was J. Asquith?

16    A.    I don't know him.  But then there's John, the

17  union rep man.

18    Q.    The union rep was John.

19    A.    Then we see discussion 2, again, "numerous,"

20  S. Heitzman.  I'd have to say that's Steve Heitzman.  I

21  have heard of him.  I don't personally know him.  And

22  again John Mehalshick.

23    Q.    Do you know how the process is supposed to

24  work?  Do they have a first discussion and second

A184

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 183

1    discussion?  Can you tell me anything about that?

2        A.    That I don't know.  That I never had to deal

3    with.  I have never -- that aspect I have never had to

4    deal with.

5        Q.    It looks like the union writes down a statement

6    of what the grievance is?

7        A.    Basically it was just unjustly discharged,

8    without going into any specifics.

9        Q.    When you had that conversation with John or any

10   conversation with John during this grievance process, did

11   he ask you what you wanted as relief for your

12   termination?  Did you talk about that?

13       A.    No.  Basically it was more or less -- because I

14   was still a little upset -- okay, that's when you got a

15   little anger out of me on that one.  It was basically

16   needed the grievance filed.  It was basically, in your

17   hands, do what you do.

18       Q.    You didn't talk at that point about what kind

19   of relief you wanted or anything like that?

20       A.    I'd have to assume -- I don't remember it, nor

21   do I remember it being, you know, offered to me as far as

22   what do I want.  Look at this, "the union demand that

23   this violation stop immediately and bring employee

24   D. Smiley back with a clear record and full pay."

Smiley v. DaimlerChrysler
David A. Smiley

Page 184

1    Q.    You just read from Exhibit 11, right?

2    A.    Yes.

3    Q.    You have never seen a copy of this grievance,

4    correct?

5    A.    No.

6    Q.    Then the management on this form has an

7    opportunity to give its answer?

8    A.    Uh-huh.  And they said that they found no

9    violation in this instance.  "Employee Smiley reported to

10   plant personnel in response to a letter," so I did show,

11   from personnel to substantiate his absence.  Employee

12   Smiley responded but did not follow the proper procedures

13   for substantiation," which I did.  The only thing I

14   didn't have is a DX code, which I retrieved.  "Employee

15   Smiley was issued a substantiation denial form," which I

16   was not.  I was issued a reinstatement form.  "And

17   awarded the opportunity to provide the necessary

18   documentation."  There we go back to the DX.  "Employee

19   Smiley failed to follow established procedures and was

20   therefore separated by employment."  So I was fired by,

21   like you said, an administrative type of thing.  "This

22   grievance and this demand are denied."

23   Q.    Can you tell who signed on behalf of the

24   management down at the bottom?

A186

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 185

1    A.    I have no idea whose signature that -- I don't

2    know what that is.  I have a different signature.  I

3    don't know who that is.

4    Q.    It looks like this was May 20th, May 18th,

5    around that time period?

6    A.    Yes.  Both dates, yes.

7    Q.    From what we can tell from this document, I

8    know you didn't see it contemporaneously, from what we

9    can tell from just looking at it, it looks like the union

10   brought your grievance and the management denied it, at

11   least at phase 1?

12   A.    We can say that, yes.  That would be a correct

13   assumption.

14   Q.    What happened at this point?  I mean,

15   management denies your grievance.  Did you have a

16   conversation with your union rep at this point?

17   A.    No.  I can only assume that maybe they took it

18   to the next -- this is assuming.  I wasn't there.  We had

19   no conversations to this, but perhaps they pushed it

20   on -- I don't want to say reinstated.  Sometimes when you

21   don't get the answer, there's a step 2 or I think it's

22   three steps.  Again, that's not exactly my area of

23   expertise as far as the grievance procedure is.  But I

24   believe there are other steps that can be taken.

A187

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 186

1     Q.    Around May 20th when this initial denial was

2  made you were out of the loop?

3     A.    Yes.

4     Q.    When did you hear again from the union about

5  your grievance?

6     A.    A letter that I received I think it was

7  April 16th of '06.

8     Q.    Did you have communications with John or

9  anybody else on behalf of the union before that time, any

10  telephone calls, any other informal communications?

11     A.    Left a message.  We spoke.  He said something

12  about that they were working on it.

13     Q.    Did you call him?

14     A.    Yeah, I had called him on that one.  I can't

15  think of the exact day it was, but it was prior to

16  receiving that information.

17     Q.    Do you think it was a couple months later?  Do

18  you think it was a couple weeks?

19     A.    That I received the letter from John?

20     Q.    No, that you had --

21     A.    That I spoke with John?

22     Q.    Right.

23     A.    I would say maybe a couple weeks before I had

24  received it.

**A188**

Smiley v. DaimlerChrysler
David A. Smiley

Page 187

1    Q.    Received the letter from the union?

2    A.    Yes.  Maybe a week or so.

3    Q.    You called John?

4    A.    Yes.

5    Q.    What did you all talk about?

6    A.    Basically where we're at with this thing, how

7    is it going.  That was pretty much it.  The full gist of

8    the conversation I don't remember, but basically touching

9    base.

10   Q.    Did he give you any information about how the

11   grievance process was proceeding?

12   A.    Well, basically he's like, we're working on it,

13   we might be able to get you back.  But then that's a

14   generic answer and you're supposed to say something like

15   that.

16   Q.    Did he say where the process was as far as the

17   different phases or procedures?

18   A.    No, no recollection of that.  No.

19   Q.    Did you have any discussions with management

20   about your grievance?

21   A.    No.  No.

22   Q.    You didn't call Dan or anybody at Chrysler?

23   A.    No, I didn't call Dan.  I didn't call anyone

24   there.  Like I said, the day I was terminated or the day

Smiley v. DaimlerChrysler
David A. Smiley

Page 188

1   I discovered I was terminated, I have had no

2   conversations with anyone inside that facility, nor have

3   I stepped foot on their property.

4       Q.    Any conversations with anybody else in the

5   union during this period where your grievance is sort of

6   in process?

7       A.    No call-backs, no.  I even tried to speak with

8   the union's president and no response there.  I'm

9   basically just out there by yourself.

10      Q.    You tried to call the president?

11      A.    Yes.  And that got me nowhere.

12      Q.    Anybody else you tried to contact?

13      A.    Oh, gosh.  There's someone in Detroit.  I

14  forget who it is in Detroit.  But they're over the

15  unions.  I tried to get with the international,

16  Don Cordell.  Never received any response there.  Like I

17  said, you're basically out there on your own.

18      Q.    You called the president in Detroit from

19  international during the grievance process before this

20  letter from John?

21      A.    Yes.

22      Q.    No responses?

23      A.    No.

24      Q.    Anybody else at Chrysler that you could talk to

Smiley v. DaimlerChrysler
David A. Smiley

Page 189

1    besides the president and John or that you did talk to,

2    let me rephrase that?

3        A.    No one else I did speak to outside of John

4    because it came from -- I'd have to say because it's

5    administrative, because Dawn fired me.  Basically who in

6    there is there to speak to?  They have the union side and

7    then they have the management side.  I spoke with the

8    union side because I'm not a member of management.  There

9    you go.

10       Q.    So during this time period you make what, one

11   contact with John between the time your grievance is

12   filed and you received the letter from him?

13       A.    There may have been others, but there was one

14   that we had a conversation on, because I mean, at the

15   same time John has -- how many people were there?  He has

16   over 100 people that he has to look out for.  So just

17   little old me and I'm no longer in there, I get to you

18   when I can.  I'm not mad about that, I have no problem

19   with that, I know sort of what your job entails, I know

20   what you have to deal with, so I can't get upset about

21   that.  All I know I did what I felt I had to do.

22       Q.    The grievance process, if the union and the

23   management reach a decision, is that decision binding on

24   you?

A191

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 190

1    A.    Don't know.  Never been in that situation

2    before.  I'd have to say the last time that a decision

3    was made on my behalf, it was somewhat binding, it's

4    still in my jacket.

5    Q.    If the union and the management agree on a

6    resolution and let's say you don't agree with the

7    resolution that they came to, do you have any way of

8    changing that, or is it binding on you in that sense?

9    A.    I guess it would have to be binding on me

10   perhaps -- I don't know.  I don't know.  I'm not really

11   sure.  But I'd have to say maybe yes, maybe yes.

12   Q.    Because is there any other avenue that you can

13   use to appeal that resolution?

14   A.    I went to EEOC.  That didn't work out.  Again,

15   that's pretty much how I ended up here.

16   Q.    The EEOC, let's not talk about them for a

17   second.  We can get to them later.  I'm talking about

18   within the union and Chrysler, within the sort of

19   disciplinary process.  If you'd keep it within the

20   company and the union.

21   A.    No one else that I can think of right offhand.

22   Q.    There's not an appeal procedure if you don't

23   like the decision that the union and the management made

24   on your behalf?  You can't take that anywhere?

Smiley v. DaimlerChrysler
David A. Smiley

Page 191

1    A.    Not that I know of.  If it were, you probably

2    still be out in the street anyway until they decided to

3    come to a resolution.

4    Q.    Basically is the process at Chrysler and with

5    your union that the union represents you and the union is

6    supposed to advocate on your behalf and if they reach a

7    decision, it's supposed to be the decision for you?

8    A.    In an ideal scenario, yes.

9    Q.    Do you know if they reached a resolution of

10   your grievance?

11   A.    The letter from the 6th stated a comparable

12   decision was made.  Compromise to me is compromise.

13   Q.    Let's take a look at that letter here.

14                Exhibit 17, please.

15                (Smiley Deposition Exhibit No. 17 was

16   marked for identification.)

17                MS. WASSON:  Can we go off the record?

18                (Discussion off the record.)

19   BY MS. WASSON:

20   Q.    We're looking at Exhibit 17, right?

21   A.    Uh-huh.

22   Q.    Is this the letter that you were referring to?

23   A.    That would be correct.

24   Q.    You did actually receive this letter sometime

A193

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 192

1    in April of '06?

2        A.    That is correct.  Okay, I said April 16th.

3    April 3rd.  But 2006.  I knew it was 2006.

4        Q.    You were saying that this second paragraph

5    talks about reaching a comparable decision on your behalf

6    for your reinstatement?

7        A.    Uh-huh.

8        Q.    You got this letter and you saw that it said

9    that.

10       A.    Uh-huh.

11       Q.    What did you do at that point?

12       A.    Tried to contact John.  Didn't get in contact

13   with him because I wanted to find out what's a comparable

14   decision.  Still to this day I do not know what a

15   comparable decision is.

16       Q.    It says that you're supposed to contact them

17   within five days, right?

18       A.    For your "continued employment."  It's not

19   continued employment if you're terminated.

20       Q.    Did you contact John within the five-day

21   period?

22       A.    I never got through to him, but I did call,

23   yes.

24       Q.    At any point after you got this letter, did you

Smiley v. DaimlerChrysler
David A. Smiley

Page 193

1    end up talking to him?

2        A.    We did not -- we have not spoken actually since

3    then, since the last time when he told me he was still

4    working on it.  It was shortly before this and he's like,

5    we're working on it.  And that was the last conversation

6    that we really had had.

7        Q.    You contacted him.  Did you leave a message for

8    him?

9        A.    Yes.

10       Q.    After you got this letter?

11       A.    Yes.

12       Q.    He never called you back?

13       A.    I didn't receive the call.  So if he did, he

14   didn't leave a message that he had called, because at the

15   same time, I mean -- I'm trying to think of what I was

16   doing back then.  To the best of my knowledge, we hadn't

17   had a discussion.

18       Q.    From the time you received the letter to the

19   present day, you haven't talked to him about the contents

20   of this letter?

21       A.    No.

22       Q.    Did you talk to anybody at the union about it?

23       A.    No, because after you're ignored so many times,

24   you just kind of I'll leave it alone and I pursued this

Smiley v. DaimlerChrysler
David A. Smiley

Page 194

1    another way.

2        Q.    So this says that they have reached a

3    comparable decision on your behalf for your reinstatement

4    of employment. Did you want to come back and be

5    reinstated?

6        A.    Well, I was still -- we had some issues that

7    needed to be cleared up. Again, it shouldn't have

8    happened in the first place. And then, like I said -- by

9    then I was speaking with the EEOC on this and that was

10   prior to my filing with the courts for why we're here

11   today.

12       Q.    Right. You don't really know what the

13   comparable decision turned out to be, right?

14       A.    Well, basically it did not say David Smiley,

15   you are reinstated. It says a compromise had been

16   reached. What compromise? There's nothing to compromise

17   if you have everything that you need.

18       Q.    After you left the message for John within the

19   five-day period, did you keep trying?

20       A.    No, because like I said, I have called before

21   and I never got any response. Like I said, every now and

22   then you can catch him, but other times you can't.

23       Q.    But weren't you interested in hearing what the

24   decision would have been, because it does say "for your

Smiley v. DaimlerChrysler
David A. Smiley

Page 195

1    reinstatement"?

2        A.     A comparable decision.   It did not say I was

3    reinstated.   It says a comparable -- "comparable decision

4    on your behalf for your reinstatement."  So it didn't say

5    I was reinstated.  Basically you're somehow -- somewhere

6    there was a compromise made and that's basically it.  It

7    did not specify, you are reinstated.  Like I said, you're

8    continued.  Again, it doesn't say "reinstated."

9    "Continued."  How can I continue if I have been

10   terminated?

11       Q.     You weren't even curious about what the

12   decision was?

13       A.     They had pretty much did what they were going

14   to do to me and whatever I say really wasn't going to

15   make a whole heck of a lot of difference.

16       Q.     But you didn't know, though, what they were

17   going to do?

18       A.     I do know that they didn't reinstate me.

19       Q.     But could that have been because you never

20   called them back and got in touch with them?  I'm trying

21   to understand.

22       A.     No.  Going by this letter, again, "continued

23   employment" versus "reinstatement," two different terms.

24   Compromise, what's the compromise?  What did I do wrong?

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 196

1    I did everything by the book how they asked me to do it.

2        Q.    Are you basically telling me that you just

3    decided once you read this letter that it wasn't worth

4    pursuing?

5        A.    I called.  I didn't hear anything else.  And

6    no, I did not pursue it.  Once I called and I didn't

7    receive my response, I figured, hey, they're doing what

8    they want to do.  Obviously it's not in my best interest.

9        Q.    You knew it wasn't in your best interest how,

10   because there was some kind of a compromise made?

11       A.    A compromise, continued.  Like I say, looking

12   at the letter, it does not state, you are reinstated.  It

13   does not say that on here.  Had it said that, then we

14   probably would not be sitting here, but it did not say

15   that.

16       Q.    The paragraph also says, "Per our conversation

17   dated Monday February 13, I had informed you that the

18   Union and Management had reached a comparable decision on

19   your behalf for your reinstatement of employment."

20       A.    What they should have read is we're working on

21   it.

22       Q.    On February 13th, 2006, do you think that was

23   the day that you had the call with John or can you

24   remember what he's talking about here when he says, "Per

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 197

1    our conversation"?

2        A.    Let's see.  He did not tell me that I was

3    reinstated.  That I can tell you.  John did not tell me

4    that.

5        Q.    Do you think that was the call that you

6    remember about how he said, oh, we're working on it?

7        A.    I'd have to say that's the one that I can

8    remember speaking with him.

9        Q.    So you don't have a specific recollection of a

10   conversation on February 13th, 2006, where he's talking

11   about a decision that had been reached?

12       A.    No.

13       Q.    Because this letter doesn't say particularly

14   that you had been reinstated.  It said we "reached a

15   comparable decision on your behalf for your

16   reinstatement," but it didn't say you're going to be

17   reinstated and that's the reason why you decided not to

18   continue to follow up?

19       A.    No, like I said, I called and didn't get a

20   response.  Again, compromise, whichever way you want to

21   do it is not saying you are reinstated.  You fired me

22   with no -- not saying you, but you fired me with no ifs,

23   ands, and buts and you're going to bring me back.  What

24   are we talking about?  What are we compromising?

Smiley v. DaimlerChrysler
David A. Smiley

Page 198

1    Q.    Would you have agreed to be reinstated with

2  some kind of compromise attached to it?  Like let's say

3  you did call, let's say you called and John said, hey,

4  they're going to reinstate you, but you're going to have

5  to stay on shift 2, or something like that, would that

6  have been something you would have agreed with?

7    A.    Going with answering your hypothetical, if John

8  were to say, you're reinstated, the thing is you have to

9  stay on second shift, that's different.  That's a whole

10 different scenario.

11   Q.    At the end of the day you don't know what the

12 decision was, right?

13   A.    I'd have to say --

14   Q.    What the compromise was.

15   A.    Again, because he did not exactly tell me what

16 it was or, like I said, again, compromise, what kind of

17 compromise?  You put in a grievance, you're compromising.

18 If I remember, compromise, well, I give something, you

19 get something.  We're kind of trying to meet in the

20 middle here wherein I did everything that I was supposed

21 to do.  You received no new information from me, not to

22 my knowledge, I was not made a party to any

23 investigations that were held.  So compromise what?

24 Again, a comparable decision, you did not specify that I

Wilcox and Fetzer, Ltd. Registered Professional Reporters

**A200**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 199

1   was reinstated.  Again, continued employment versus

2   termination, reinstatement versus continuing.

3        Q.   To this day you don't know what the actual

4   decision was that they reached, the union and the

5   management?

6        A.   I'd have to say no, I don't.

7        Q.   Did you have any more conversations with

8   anybody affiliated with the union after you received this

9   letter?

10       A.   No.  I was pretty much in the middle of

11   pursuing of where we're at now.  Like I said, I still had

12   to tie up ends with the EEOC and then there was an appeal

13   made to Philadelphia district.  You have all this stuff.

14       Q.   So at that point you just figured, I'm just

15   going to pursue this through the EEOC process?

16       A.   Yes.  Figured at least if anything I might get

17   at least a straight answer out of something, at least a

18   call back, which they didn't.

19       Q.   We're wrapping up soon.  We have a couple

20   housekeeping things to just take care of.  I want to make

21   crystal clear, are there any other reasons that you think

22   that Chrysler discriminated against you based on your

23   disability?

24       A.   At this moment, as I sit, there's nothing I can

Smiley v. DaimlerChrysler
David A. Smiley

Page 200

1    think of at this time.  Granted, I'm digesting everything

2    that we're doing here.  Give me a few minutes.  If

3    something else comes to mind, I will gladly give you a

4    call.

5        Q.    Because this is kind of your show.

6        A.    I understand.  My case-in-chief and all that

7    good stuff.

8        Q.    It's a good opportunity for you to tell me

9    everything that you think is a part of your case.

10       A.    I understand.

11       Q.    Because both of us have to know what is at

12   issue here.

13       A.    Right.  I understand.

14       Q.    We have run the gamut through all the facts?

15       A.    Okay.

16       Q.    Right?

17       A.    Pretty much.

18       Q.    Can you think of any other facts that are

19   important that you want to talk about?

20       A.    Nothing that you brought up.  We went over --

21   yeah, we're pretty much there.

22       Q.    There's one more thing I think you produced to

23   us either through your complaint or something --

24       A.    That was the note from my physician for the DX

Smiley v. DaimlerChrysler
David A. Smiley

Page 201

1    code that was written on 3/9 of '04, '05. And in regards

2    to that -- what I was telling you about it was brought to

3    my attention that it may have been forged, that was the

4    purpose of that, even though if you look at the date that

5    he wrote it, it wasn't that same day, but that's about

6    the same time that I gained knowledge that I could

7    contact him and he responded to it.

8        Q.    Let's put it into the record because I want to

9    talk about it for just a second because I want to make

10   sure where he wrote it and that sort of thing.

11               Can we mark this as 18, please?

12               (Smiley Deposition Exhibit No. 18 was

13   marked for identification.)

14   BY MS. WASSON:

15       Q.    This is a note from Dr. Bandera, correct?

16       A.    Correct, yes.

17       Q.    And he says that "The medical note of 3/9/05

18   written on a prescription pad was exclusively written and

19   authorized by me, inclusive of the added DX of 726.32."

20       A.    Right.

21       Q.    It's dated 11/10/05; is that right?

22       A.    Uh-huh.

23       Q.    I assume at some point that you came to him and

24   asked him to write this note for you?

**A203**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 202

1    A.    What had happened, like I said, because it had

2  come back to me that there was talk of forgery and such,

3  what he did, because if you look at this note here, you

4  look at this, the date on this note, that just happened

5  to be the position where she put the DX code.

6    Q.    When you say "she," you mean the receptionist?

7    A.    Receptionist.  What he was doing is because

8  it's that note there and it's all of these because it

9  encompasses the whole thing, but because that's why he

10  initialed -- I mean, he put down 39 because the note

11  itself says 39, but we're addressing the DX that the

12  receptionist had put on mine -- we're just addressing

13  that.

14    Q.    Dr. Bandera did this in November of '05?

15    A.    Uh-huh.

16    Q.    At that point was your termination in the

17  grievance process?

18    A.    11/10, I'd have to say it had probably if we're

19  looking at a letter from the union in '06.  Yes, I'd have

20  to assume that it was still in that process.

21    Q.    Who did you give this to?

22    A.    EEOC.

23    Q.    The EEOC, okay.  Did you ever give it to

24  anybody at Chrysler?

**A204**

Smiley v. DaimlerChrysler
David A. Smiley

Page 203

1      A.    Never stepped foot on their property after the

2   13th.

3      Q.    Never sent it to anybody at Chrysler?

4      A.    No.

5      Q.    This note would be news to them, right?  They

6   don't have this in their possession?

7      A.    Had they did an investigation, they would have.

8      Q.    But given the facts as they are, no, right,

9   this is not something that you ever submitted?

10     A.    To Chrysler?  In my complaint I believe it's

11  part of my complaint, also.  So yes, Chrysler does have

12  it.

13     Q.    Chrysler has it through the complaint and maybe

14  the EEOC process, but not contemporaneously with your --

15     A.    I did not physically hand-deliver it, no.

16     Q.    Or send it or anything?

17     A.    Or mail it, no, pony express.

18     Q.    Did you give it to your shop steward or anybody

19  else at the union?

20     A.    No.

21     Q.    This note was not used to help your grievance

22  process or to substantiate your case with Chrysler.  This

23  was used to help the EEOC adjudicate your case?

24     A.    Yes.  That would be a proper assessment.

Smiley v. DaimlerChrysler
David A. Smiley

Page 204

1        Q.    Anything else that you can think of as far as

2    facts, one more time, just so we're clear?  That's all

3    the exhibits I have?

4        A.    That would be the same thing that I have.

5                MS. WASSON:  Can I have this marked as

6    Exhibit 19, please?

7                (Smiley Deposition Exhibit No. 19 was

8    marked for identification.)

9                MS. WASSON:  And also this one as

10   Exhibit 20.

11               (Smiley Deposition Exhibit No. 20 was

12   marked for identification.)

13   BY MS. WASSON:

14       Q.    Mr. Smiley, what you have just been handed is

15   the request for admission that Chrysler sent to you and

16   then also your answers.

17       A.    My answers.  I did these interrogatories, sorry

18   about that, but yes.

19       Q.    That's not a problem.

20               I want to quickly walk through these with

21   you because you did answer them and that's fine.  But

22   usually what happens when you respond is that you give

23   the basis for the response that you give.

24       A.    Correct.

**A206**

Smiley v. DaimlerChrysler
David A. Smiley

Page 205

1  Q. You're a pro se litigant, so that's fine.  I

2 think what I'd like to do is kind of go through each one

3 so that I understand when you say "admits in part" or

4 "denies in part," which parts we're talking about just so

5 it's clear.

6  A. No problem.

7  Q. No. 1 about working in the left fender install

8 job --

9  A. Admitted.

10  Q. No. 2 --

11  A. Shall we just go to the portions that they're

12 admitted in part, denied in part?

13  Q. Sure.

14  A. That would be No. 4.

15  Q. Right.

16  A. Could not perform the job associated with the

17 left fender install job, admits in part, denies in part.

18 Admits in part, I was taken off of that job by my

19 physician.  Denies in part, I did perform the job for a

20 year, but yes, in answer to that, in answer to that, like

21 I said, the denying part would be that I did perform the

22 job.

23  Q. Correct me if I'm wrong.  Did you say, I

24 performed it for a year?  You didn't mean a year?

Smiley v. DaimlerChrysler
David A. Smiley

Page 206

1    A.    Did I say a year? I said a week, I believe. I

2    said a year? I did perform it for a week.

3    Q.    We want a week, right?

4    A.    Yes.

5    Q.    Admits because you were taken off the job. In

6    that respect you could not perform the duties because

7    your doctor said no?

8    A.    Yes.

9    Q.    You deny in part because you did perform them

10   for a week's worth of time?

11   A.    Correct.

12   Q.    How about No. 5?

13   A.    "Admit that you did not request an

14   accommodation after you were unable to perform the left

15   fender install job"... I have to deny that because I was

16   no longer there.

17   Q.    You're telling me that you denied it because

18   your doctor took you out and you were on leave at that

19   time?

20   A.    Yes.

21   Q.    And because you were on leave, you weren't

22   going to try to request a different job because he took

23   you out of work?

24   A.    Well, okay, you could say that, but -- I'd have

Smiley v. DaimlerChrysler
David A. Smiley

Page 207

1   to say it was -- in answer to your question as you have

2   it posed in front of me, the fact of the matter is my

3   physician had taken me out, so therefore, I was unable to

4   actually --

5       Q.    So on with the rest of it, you're unable to

6   request an accommodation because --

7       A.    Because I was no longer there.

8       Q.    How about No. 6?

9       A.    Denies in part, admits in part.  No. 6.  "Admit

10  that you were placed on medical leave February 18."  I'm

11  not exactly sure when in February, so I guess I should

12  say insufficient information to adequately answer that

13  question.  I do know that year, yes, that month, yes.

14  Somewhere in there.  I don't know the specific date.

15      Q.    What about No. 7, "Admit that you received

16  Sickness and Accident benefits while on medical leave

17  from February 2005 to your termination."

18      A.    Okay.  Well, I could not -- I have to deny that

19  because in order to have S & A, you can't be working, and

20  if I was terminated on the 13th of May, I could not have

21  received S & A.

22      Q.    You were receiving workers' comp. benefits

23  during that medical leave, right?

24      A.    I believe it was workmen's comp.

**A209**

Wilcox and Fetzer, Ltd.  Registered Professional Reporters        302-655-0477

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 208

1    Q.    8 looks like it's okay, right?

2    A.    Uh-huh.

3    Q.    9, how about 9?

4    A.    Okay.  Denied because they were photocopies of

5    the originals.

6    Q.    But do you admit that they were, in fact,

7    photocopies?

8    A.    Of the originals.

9    Q.    Yes.  Photocopies of the originals?

10   A.    Yes.

11   Q.    Photostatic copies?

12   A.    Yes.  But you did not -- you didn't pose the

13   question that way, so I had to answer it that way.

14   Q.    How about 10?

15   A.    Denies in part.  "Admit on May 13 an employee

16   in the personnel office informed you of the

17   substantiation requirements for your medical condition."

18   Let's see.  No. 10.  Okay.  Where is this thing?  This

19   thing here.

20   Q.    Exhibit, which one is that, 13 maybe, the

21   substantiation denial?

22   A.    The substantiation, yes.  That was No. 10,

23   correct?

24   Q.    Yes.

A210

Smiley v. DaimlerChrysler
David A. Smiley

Page 209

1      A.      Denied in part.  Again, I did not sign again

2    because of this.  So this, I did not physically receive

3    it.  I was informed that I did need a DX code.  Denied in

4    part.  I didn't know I needed the DX code which is what I

5    went to retrieve.

6      Q.      Are you denying in part because you didn't know

7    of the other requirements that you needed, you only knew

8    of the DX code?

9      A.      I knew I needed the DX code.  Like I said, this

10   had been like one of the last things we talked about

11   before I went out of there.  Like I said, I pretty much

12   by here I was done.  I have no idea when she put that in

13   here.  I know she did looking at it.  That's her

14   handwriting.  That's why I'd have to say I knew I needed

15   a DX code which is what I focused on which is what I went

16   to retrieve.

17     Q.      I just want to make sure I'm clear.

18     A.      No problem.

19     Q.      You're denying it in part because you would

20   admit that you knew you needed the DX code, correct?

21     A.      Yes.

22     Q.      You're denying in part because you didn't know

23   that you needed that information on Exhibit 13?

24     A.      All this information is already on the notes.

Smiley v. DaimlerChrysler
David A. Smiley

Page 210

1    This is kind of I hate to use the word moot, but that's

2    moot.  I already had all that.

3        Q.    The reason why you think you fulfilled the

4    original note's requirement is because you submitted

5    photocopies of the original notes?

6        A.    They are not facsimiles, they are not

7    rubber-stamped copies.  So yes.

8        Q.    That's why you figured you fulfilled this

9    requirement here where it says "original notes"?

10        A.    That right there, like I said, that I'm not

11    really sure when she put it there and, like I said, it

12    really doesn't matter because I was stuck right up here.

13    You're giving me a form to say one thing, but it says

14    something else.  If you didn't do what is supposed to be

15    done whenever you strike a paragraph.  I mean, I'm not

16    saying that I know her job better than her.  I don't.

17    However, at the same time, that's why I made an analogy

18    why don't you give me a blank sheet of paper and I'll put

19    my name to it.

20        Q.    I understand that you did not want to accept

21    this because it had some strike-outs and handwritten

22    insertions?

23        A.    That's why we have to say in part because I

24    knew I needed the DX.  I went to his office to get said

Smiley v. DaimlerChrysler
David A. Smiley

Page 211

1   DX.  That's why I have to answer it that way.

2        Q.    How about No. 11?

3        A.    I deny that, because they did not give me a

4   second opportunity.  The second opportunity in my mind

5   would have been the 16th, the date of the 16th, the

6   24 hours.  What transpired on the 13th is not a second

7   opportunity.  Again, she wanted the DX.  I brought back

8   DX.

9        Q.    So she did give you a second chance to get the

10  DX?

11       A.    I brought DX.  I brought it back.  I did bring

12  it back.  Obviously I brought it back.

13       Q.    You knew that at the point you came to see

14  Dawn, that there was at least one problem with your

15  substantiation requirements; you didn't have the DX?

16       A.    She brought that to my attention.  I will

17  admit, she brought that to my attention.  I retrieved DX.

18       Q.    Right.  So at that point weren't you given a

19  second opportunity to go back and get the things that you

20  thought you needed?

21       A.    I'd have to say no, considering that I was

22  terminated that same day.  If there was an issue, there

23  are 24 hours that I would have -- I was supposed to have

24  to take care of that.  I was not afforded those 24 hours.

A213
28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 212

1    It goes right back to that. So for me to say I had a

2    second chance on the 13th when I came in in response to a

3    letter, I submitted what I had, that's not really the

4    first chance. I gave you what you wanted, now you asked

5    me for a DX code. I go back. So that would be a chance

6    there. Second chance, if there was any type of

7    discrepancy with what I had given you, you would not have

8    done it that same day.

9        Q.    Would not have done what?

10       A.    Terminated me on the same day, on the 13th. I

11   was terminated on the 13th, which, again, is why I

12   answered that in the fashion that I answered it.

13       Q.    How about No. 12? The question is "Admit that

14   you returned to the Plant" -- I'm going to say it for the

15   record.

16       A.    For photocopies of doctor's notes with DX code

17   written on them. One DX code and I did return that day

18   with the DX code.

19       Q.    You denied in part because it was only one DX

20   code?

21       A.    Yes.

22       Q.    It really should have been DX instead of DCX;

23   is that correct?

24       A.    DCX. DCX, I believe that's their ticker

Smiley v. DaimlerChrysler
David A. Smiley

Page 213

1    number.  I believe that's the ticker number.  But DX
2    would be the proper code for that again.  That's why I
3    answered in the fashion that I answered because it was
4    one code.
5         Q.    You admit that you came to the plant a second
6    time on May 13th, 2005?  You admit that part, right?
7         A.    Yes, I did, because that's when Angela is
8    involved at this point.  That really is even more of a
9    sideshow.  "Would you please do me a favor?  I don't work
10   in that area anymore.  I need you to make sure Dawn gets
11   this."  Obviously she did it.
12        Q.    You also admit that you returned with the
13   photocopies of the doctor's notes with the DX code, and
14   really, honestly, at that point it was a photocopy of a
15   photocopy, right, that you handed in?  You didn't hand in
16   the original with the pen writing of the DX code on it?
17        A.    No.  I think it was a copy of a copy on that
18   one.  Because I believe she made that --
19        Q.    You admit that part of it?
20        A.    Yes, I admit that part.  That's why it was
21   answered in the fashion that it was answered.
22        Q.    How about 13?
23        A.    "Admit that a grievance was filed with regard
24   to your termination."  At that time I know a request had

Wilcox and Fetzer, Ltd.  Registered Professional Reporters

**A215**

302 655-0477

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 214

1   been made.  I did not know until after I received the

2   materials from discovery that it was made.  So with the

3   information that I had available to me, I had to say no

4   at the time, to the best of my knowledge, because I did

5   not know.

6       Q.    How about 14?

7       A.    "Admit that Chrysler and the UAW Local 1183

8   reached a resolution of your grievance."  On that one I

9   said I denied because basically I don't know what they

10  had done.  I don't know.

11      Q.    So that was another one that you just didn't

12  have any basis?

13      A.    I didn't have the basis.  I didn't know how far

14  or what exactly they had done at that moment.

15      Q.    15, not a problem, right?

16      A.    No.  16, "Admit that the letter referenced in

17  Request No. 15 offered to reinstate your employment with

18  Chrysler."  To that I did deny because, again, as we

19  discussed prior, it did not say, you are reinstated.  It

20  addresses continued after termination, which would be a

21  reinstatement.  The answer to the question has been

22  answered based on that information.

23      Q.    When you just said continued, it addresses

24  continued versus termination --

**A216**

Smiley v. DaimlerChrysler
David A. Smiley

Page 215

1     A.    I was terminated, so continued means I never

2    went anywhere, I was terminated.  In order to bring me

3    back, you have to reinstate me.  It never said I was

4    reinstated.

5     Q.    You have a problem with them saying "continued

6    employment."  This letter is about your continued

7    employment at Chrysler?

8     A.    Can't be continued if it's been severed.  It

9    can be reinstated, it can be restarted, but continued

10    means there was no gap in it.

11     Q.    The reason why you're taking issue with that is

12    just because it was a misstatement?  Tell me why that's

13    bothering you so much that they said "continued

14    employment" instead of referencing your termination.

15     A.    Okay.  It does not adequately -- to me -- like

16    specifically of your question, you asked me a question,

17    I'll answer it.  To anything else, this is basically --

18    it's not saying that I have a problem with your wording.

19    I'm stating that the wording does not properly reflect

20    the conditions that were prevalent at the time.  Terms

21    such as "terminated," "continued," "reinstatement,"

22    they're all three different terms.

23     Q.    But the reason why you have a problem with them

24    using "continued employment," is the reason you have a

**A217**

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 216

1    problem with that is just because that is a misstatement,

2    that it's not continued employment, this is really about

3    your termination and they got it wrong?  I'm trying to

4    understand why that's a big deal.

5        A.    If they got that much of a problem, how much

6    else did they get wrong?  How can you adequately

7    represent me if you can't -- if what you're presenting to

8    me, a compromise, where there should be no compromise.

9    Continued, again, I was terminated.  Let's address it for

10   what it is.  Let's be more factual about it.

11       Q.    Okay.  I see where you're coming from now.

12   That makes sense.

13       A.    Thank you.  No. 17?

14       Q.    Yes.

15       A.    "Admit that you did not accept the offer of

16   reinstatement referenced in Request No. 15."  I deny that

17   because it was not adequately posed.  How did I not

18   accept because you didn't offer it?  They did not offer

19   it.  Nowhere in that letter does it state that I was

20   reinstated.

21       Q.    It just says, "a comparable decision was

22   reached on your behalf with regard to reinstatement."

23       A.    Right.  It did not say, you are reinstated.

24   They told me I was terminated.  Crystal clear, no

Wilcox and Fetzer, Ltd.  Registered Professional Reporters    302-655-0477

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 217

1    ambiguity whatsoever.

2         Q.    That's the end.

3         A.    I'm not trying to give you a hard time.

4         Q.    I know you're not.  I want to make sure I

5    understand where you're coming from.  I think I see what

6    you have to say.

7         A.    Okay.  Like I said, not trying to be difficult.

8         Q.    No, no.  I know that.

9                Anything else with regard to these

10   responses that you have to say or that you want to

11   clarify in any way?

12        A.    No, ma'am.  We pretty much covered it.

13        Q.    We are in the homestretch here.

14               Let's talk about why you've brought the

15   case and what you're seeking as a result of bringing this

16   litigation.  Not talking about the grievance anymore.

17   We're not talking about the EEOC.

18        A.    What do I want for resolution?

19        Q.    Here and now.  What you're seeking in this

20   case, what you want to get out of filing this case.

21        A.    Finally got something that you got me on.

22   Again, my name.  If I'm going to be accused -- I have had

23   a position in Chrysler wherein which every position I

24   have had in Chrysler has been an appointment.  That's a

A219

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 218

1    reflection of the way that I do what I do.  I'm good at

2    what I do.  I'm not bragging to you.  I'm good at what I

3    do.  I take what I do seriously.  I wouldn't have been

4    chosen if they didn't think I was capable of performing.

5                 I have received numerous awards.  The vice

6    president's award.  Well, that and 75 cents might get you

7    a cup of coffee, but, nonetheless, I received it.  Team

8    of the month on a couple of occasions.  At one time I had

9    aspirations to law.  But basically you caught me -- not

10   you.  I have been called a liar, a cheat.  My

11   intelligence has been played with.  I didn't do anything

12   wrong here.  And I'm going to fight -- if something is

13   done, you're supposed to stand up for yourself because

14   obviously no one else was going to do it for me.  But I

15   say it to say what do I want?  What would it take at this

16   point?  I don't know, because we had spoken about the

17   line.  The injury still exists on my arm.

18        Q.    Can you say that one more time?

19        A.    We had spoken last week about possible line,

20   doing something with the line, if I would ever go back to

21   the line.  I'd have to say the line is what caused this.

22   That's what caused this problem.  It depends on what

23   capacity.  Even if I were to entertain that idea, what

24   capacity, a line worker, a tech 2?  For what?  Because I

Smiley v. DaimlerChrysler
David A. Smiley

Page 219

1    got hurt doing your job?  I still have to suffer the

2    indignities of being fired, losing my livelihood, about

3    to lose my family, my wife is ready to leave me.  Now the

4    emotions are starting to come out.  I have been through a

5    lot, my family has been through a lot.  So to just say,

6    oh, well, I'll take a line job, it doesn't quite work

7    that way.

8               The only thing in their favor is I got

9    10 years to go until I retired if this were to resolve

10   and I go back and reinstate all my time and everything

11   else.  I'd only have 10 years to go.

12              The other side is after working for Honda,

13   which I did not like, my family had to eat, after doing

14   things like that, where else really am I going to find a

15   livelihood that my family's accustomed to?  So we have

16   that issue.

17              It's not as simple as what do I want.  I

18   mean, okay, granted, it's greater than an apology.  But

19   you know, and it's a shame, and I'm not trying to take

20   the easy way out.  I focused more trying to get to where

21   we are right now than what I really want out of this.

22   Give me a minute on that and I can get back to you

23   adequately.

24              This is what has consumed me from the day

Smiley v. DaimlerChrysler
David A. Smiley

Page 220

1   this thing started.  To just say, well, I want this,

2   this, this, and that and we can make this go away, I

3   can't give you that right now.  Give me a second on that

4   and I can get back to you.

5       Q.    I hate to do this to you because I know that

6   you want time to sort of think about these questions.

7       A.    Top of my head, we will do it that way.  I

8   understand you have your job to do that, and I understand

9   that.  You're going to get to that.

10          What do I want?  Quarter of a million

11  dollars, we will call it a day.  No.

12      Q.    I want to hear what you want, I do.  That's

13  important.

14      A.    What I want basically is my name, my good name.

15  Monetarily?  I mean, they owe me already.  I can't put a

16  dollar figure on it to do those type of calculations in

17  my head.  I lost my benefits, all my benefits, medical.

18  Even if this had not occurred and I was out on

19  disability, I still would have received my vacation, I

20  still would have received my PAA time.

21      Q.    What's PAA time?

22      A.    Paid absence something or other.  Basically

23  what it is, you have seven days that you're free to do

24  whatever you think you feel like doing and you can get

Wilcox and Fetzer, Ltd.  Registered Professional Reporters    **A222**   ../7

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 221

1   paid for it.

2       Q.      Like floating holidays?

3       A.      Floating holidays, personal days, if you will.

4   If you have adequate time in -- and that's another thing.

5   I always make sure I have enough time that some days you

6   just don't feel like it.  You keep those days.  I have

7   lost that.  Opportunities missed as far as even school.

8   Granted, I had considered going to law school.  I'm still

9   going to go after my Master's.  That I'm still going to

10  do.  Maybe not law school.  I'm still getting my Master's

11  because Bachelor's isn't enough to me.  This is a

12  personal thing.  That was taken away from me.  We would

13  receive from -- each year through our contract you

14  receive I think it was $4,500 a year to pursue whatever

15  educational endeavor you could come up with.  I had that

16  taken away from me.  I'm not getting any younger.  I'm

17  46 years old.  The opportunities are not going to be

18  there for a 46-year-old man as opposed to when I was that

19  20-some-odd-year-old kid when I walked in that building.

20              That's why, like I said, I'm not trying to

21  be difficult, but the question that you posed, it's no

22  real easy answer at this point.  But we will try to get

23  through it.

24      Q.      I know.  I can appreciate that.  I can.

Smiley v. DaimlerChrysler
David A. Smiley

Page 222

1          You can't even give me a ballpark about

2    dollar figure?

3      A.    Okay.

4      Q.    Lost wages, things like that?

5      A.    Lost wages, let's see, if I were in there I

6    would think I was making -- I forget what I was making a

7    year.  Let's say $300,000.

8      Q.    Can you tell me how you came up with that?

9      A.    Per year, if I still work on the line, any

10   overtime that may have been involved and all the perks

11   that came with it, be that the education, be that the

12   PAA, be that if I was on the second-shift differential,

13   throw that in there, again, any opportunity if this

14   hadn't probably never happened, I'd have my Master's by

15   now.  There were opportunities at Chrysler because I

16   remember one specific one, I had inquired about a

17   paralegal job.  Granted, I would have had to move to

18   Detroit, but opportunities within the corporation.  I

19   have never had any intention of working the line for

20   30 years.  That has never been my intention.  Any time I

21   do something, I'm going to try to do it to the best of my

22   ability.  Whatever levels you have are the levels I'm

23   going to attain.  I'm going to try and do that.

24   Opportunities intracorporation are no longer available

Smiley v. DaimlerChrysler
David A. Smiley

Page 223

1   because of this termination.

2       Q.    So you would put maybe a $300,000 figure for

3   the lost wages, your overtime, your benefits, medical,

4   vacation, PAA?

5       A.    Uh-huh.  We haven't even gotten to the pain in

6   the butt this has been to me and what it has cost me and

7   what it's about to cost me.  My wife wants to separate

8   with me.  Shall we go into loss of consortium as well?

9       Q.    Well --

10      A.    Yes.  I'm about to be single.  I hate to raise

11  my voice, but... Consortium.

12      Q.    That's fine.  I understand where you're going.

13  Pain and suffering, let's talk about your basis for that.

14      A.    As far as the pain and suffering, mental

15  anguish would fall under pain and suffering.  Like I

16  said, I have aged since this whole thing.  I mean, you're

17  going to age every day, but I'm just saying the stress

18  that an individual has to go through and still try and

19  maintain -- I'm daddy, I have two little girls that

20  depend on me, and irregardless of what I'm going through

21  with this, I still have to be dad to them, and I'm going

22  to be dad to them.  Daddy does what he has to do.  There

23  are times that they don't quite understand it.  They

24  don't understand the stress that this has taken my wife

Smiley v. DaimlerChrysler
David A. Smiley

Page 224

1    through.  Trying to keep a face for them, it's...

2                The pain aspect, I can't even afford -- I

3    have to take over-the-counter Tylenol because I can't

4    afford the medications that I have.  Again, no insurance.

5    That's why I say I guess I've never really quite delved

6    on it because it's deep.  I had to put it deep to deal

7    with everything else.  Sort of like we will get to that

8    in a minute, right now I have to deal with these issues.

9        Q.    Have you ever consulted anybody, any kind of

10   medical provider, about your pain and suffering or

11   your -- any of those --

12       A.    No, I haven't gone to that yet.  It is

13   documented on a number of occasions that I do, in fact,

14   experience pain with my arm.  But to have a dollar figure

15   computated for it, no, ma'am, I have not.

16       Q.    Are you seeing anybody for the stress in your

17   life or anything like that?

18       A.    I can't.  Right now I don't have the luxury of

19   a breakdown.  I just can't do that.  I have too much

20   other stuff I have to do.  When this is all over with, I

21   will probably bounce off of every wall you can think of,

22   but until then, I have to see this thing through.

23       Q.    Can you give me a dollar figure for your pain

24   and suffering?  And then tell me the basis for that.

Smiley v. DaimlerChrysler
David A. Smiley

Page 225

1    Tell me how you're going to come up with that number.

2        A.    At this point I cannot.  Excuse me, because I

3    kind of lost composure there for a second, but it's

4    just -- I've been under a lot here.

5        Q.    Anything else that you're seeking in the case?

6        A.    No, ma'am.

7        Q.    Let's go to something a little more plain

8    vanilla here.  We're going to mark this as Exhibit 21.

9                (Smiley Deposition Exhibit No. 21 was

10   marked for identification.)

11   BY MS. WASSON:

12       Q.    Do you recognize this?

13       A.    Uh-huh.  This is the original complaint.

14       Q.    The most important thing I want to talk about

15   is the attachments to your complaint because I see that

16   you have used the form complaint that you got in the

17   District Court.  Is that right?

18       A.    Yes.

19       Q.    When you came to District Court and you wanted

20   to file your case against Chrysler, did the clerk of the

21   court give you this form?

22       A.    Yes.  I had applied pro se -- no, I'm sorry.

23   This form is public and this is the paperwork I had

24   received.  There were some issues which is why there

Smiley v. DaimlerChrysler
David A. Smiley

Page 226

1    would be attempts later to amend because there were

2    certain things that were shy on this, that.

3        Q.    Right.  You came to the District Court and told

4    them that you wanted to file a civil rights complaint, or

5    tell me how you came about using this form.

6        A.    Okay.  Received a right to sue letter from the

7    EEOC from Delaware and then from the Eastern District of

8    Pennsylvania.  Again, both were no-cause findings;

9    however, the right to sue letter was issued; therefore, I

10    pursued.

11        Q.    You came into the District Court of Delaware.

12    Did you physically go there?

13        A.    Physically.

14        Q.    With the right to sue letter?

15        A.    Yes.

16        Q.    What happened then, did they give you this

17    form?

18        A.    Basically I got this form and the rest of it is

19    pretty much history, yes.

20        Q.    You just filled this form out.

21        A.    Uh-huh.

22        Q.    You attached a copy of your right to sue,

23    right?

24        A.    Yes, ma'am.

**A228**

Smiley v. DaimlerChrysler
David A. Smiley

Page 227

1    Q.    Then you also attached some other documents

2    here?

3    A.    Yes.  This was the documents that were also

4    filed with the EEOC, and the purpose of that was to

5    encompass anything that I may have missed on one aspect.

6    And like I said, in this one case, particularly item 10,

7    attach notice of right to sue, so on and so forth.  What

8    wasn't covered would be covered because I had just filed

9    the entire complaint, the EEOC complaint and in addition

10   to this.  Like I said, it's not my best work.  A little

11   too close to me.

12   Q.    Well, this is a form and so you're pretty

13   limited in what you can do and what you can't do on this

14   form.

15   A.    Yes.

16   Q.    What I want to make sure of is this complaint,

17   the copy of this complaint that we're using as

18   Exhibit 21, I took from the docket in our case, but what

19   I want to make sure of is that all of these documents

20   that are attached are documents that you are fine with

21   the authenticity of, they're the ones that you did attach

22   to your complaint.  I don't want any kind of weird

23   discrepancy coming up where if one of us wants to use one

24   of these documents later on in the case, that there's

Smiley v. DaimlerChrysler
David A. Smiley

Page 228

1    some issue about that this wasn't really attached or that

2    this isn't something you have seen.

3        A.    No, there's no problem with that. Everything

4    that I have seen thus far -- let me look through it a

5    little more thoroughly.

6        Q.    Take a minute if you would.

7        A.    To the best of my knowledge, as I sit in front

8    of you, this is the complete complaint, the original

9    complaint that was filed with the District Court.

10            Okay.

11       Q.    You feel pretty comfortable with the

12   attachments?

13       A.    Yes, ma'am.

14       Q.    One other thing about the complaint. The

15   complaint, because it's a form, you can look at page 3,

16   No. 11, it doesn't have a box for the ADA, for the

17   Americans With Disabilities Act.

18       A.    That is correct.

19       Q.    Is that why you didn't check any boxes here?

20       A.    Yes. At the time we were looking at the

21   accommodation type of thing and ADA, and again, they were

22   dealing -- it deals with race, color, sex, religion,

23   national origin, things of that nature, which, like I

24   said, later on and through the amended complaint we

Smiley v. DaimlerChrysler
David A. Smiley

Page 229

1    covered.  But at the same time it was enough to encompass

2    the ADA material as well.

3        Q.    Right.  Basically the claims in the case right

4    now, given what's happened before the procedure that's

5    happened before in the case, the claims in the case right

6    now against Chrysler are your two ADA claims, they're the

7    failure to accommodate and they're the wrongful term.

8        A.    Yes.

9        Q.    That's what this complaint is getting at?

10       A.    Yes.

11       Q.    Even though we don't have those on the form,

12   because we have your right to sue and we have your

13   charge, that's how we know.

14       A.    Also we would go into -- going back to the same

15   form like you say on No. 3 from 11, like I said --

16       Q.    What page are you on?

17       A.    That's okay.  No. 3.

18       Q.    Page 3?

19       A.    Page 3, yes, ma'am.  On 11, like I said, it

20   goes with the race, the color, the sex, and so on and so

21   forth.  The amended complaint deals with my

22   discrimination based upon being an American of African

23   descent.

24       Q.    Those claims are directed at the union?

Smiley v. DaimlerChrysler
David A. Smiley

Page 230

1     A.     Actually both of them.

2     Q.     Right.  Your new amended complaint after the

3  judge made her ruling?

4     A.     Yes.  It would be their baby now.

5     Q.     It's their baby now.  For purposes of Chrysler,

6  we're dealing with the ADA?

7     A.     Yes, ma'am.

8     Q.     Then your charge of discrimination, did you

9  identify anybody as a witness to the DOL?

10     A.     The Department of Labor.

11     Q.     Yes, the Department of Labor.

12     A.     The only individual as far as witnesses,

13  individuals that witnessed what had occurred that morning

14  at the window?

15     Q.     Whatever.  Anybody that you thought would be a

16  good witness to help your case.

17     A.     I have no witnesses.  Basically I was there by

18  myself.  I couldn't produce any witnesses.  I do know

19  that they had spoke to a John Rutherford, which would be

20  my former first-shift -- I'm getting tongue-tied.  My

21  first -- about to say coordinator.  I told you that was

22  going to happen.  Give me a second here.

23     Q.     Take your time.

24     A.     My first shop steward from first shift, that

Smiley v. DaimlerChrysler
David A. Smiley

Page 231

1  would be John Rutherford, they did speak with him.

2  Again, through information that I had received, there is

3  a redact form that they redact their questions that they

4  asked him. I can pretty much ascertain what they asked

5  him based upon his responses. So I do know they spoke

6  with one individual and that's it.

7      Q.    They spoke with John Rutherford, who was the

8  first-shift shop steward?

9      A.    Yes.

10      Q.    Do you know why they chose him?

11      A.    I have no idea. I have no idea. Even in his

12  response, his written response, is basically he didn't

13  know what was going on.

14      Q.    He probably didn't, right?

15      A.    That's a safe assumption. He probably doesn't

16  because I did not discuss it with him.

17      Q.    You went to the other John, the second shift --

18      A.    Because I was put on second shift, I have to

19  speak with the second shift -- the shop steward.

20      Q.    Anybody else that has knowledge of your

21  discrimination claims?

22      A.    No one that I had planned on thus far bringing

23  forward, no. I mean, of course my wife, other

24  individuals that worked there that are going through

Smiley v. DaimlerChrysler
David A. Smiley

Page 232

1    their own little battle and stuff like that, but no.

2        Q.    Anybody that you think would be a comparator

3    that was treated better than you were in the same sort of

4    circumstances?

5        A.    It's a case-by-case.  You can't quite say.

6    There are times that I have seen it.  I can't quote all

7    the particulars to you, but they do what they do.  It's

8    not the best answer I can give you, but you know what I'm

9    saying, they do what they do.

10       Q.    You can't tell me the name of somebody that you

11   think was in your situation and was treated better?

12       A.    Well, in my situation I can't say that --

13   because then to say that would encompass did they have

14   the same injury.  If you don't have the same injury,

15   there's going to be certain -- you can't get the same --

16   to adequately answer your question, it would have to be

17   someone that has the same condition as I.  I mean, I know

18   of incidents that there were first-shift individuals with

19   far less time than me that have remained on the first

20   shift.  I don't know the extent of their injury or even

21   the cause of their injury.  So for me to sit here and say

22   that, well, they did such and such like that, without

23   having all the information in front of me, it's almost

24   baseless, it's almost baseless, because where is the

Smiley v. DaimlerChrysler
David A. Smiley

Page 233

1   benchmark?  What do we have to compare it to?  I know it

2   goes on, they know it goes on, it goes on, but to be able

3   to put a finger on it, that is a whole different matter.

4       Q.    You can't do that at this point?

5       A.    At this point, no, I can't.

6       Q.    Do you intend to call any expert witnesses?  I

7   have to ask you.

8       A.    No.

9       Q.    You told me that you will be giving me the

10  documents that you have that support your claims or that

11  you have collected?

12      A.    Yes.

13      Q.    The original documents, that sort of thing.

14  You have the subpoena, right?

15      A.    I have the subpoena, yes.

16      Q.    Do you have any documents that are going to be

17  sort of news to me that I haven't seen before?

18      A.    No.  Everything is pretty much out there.

19  Everything is pretty much out there.  It's been going on

20  long enough.  Everything is out there.

21      Q.    Besides the originals of these types of

22  documents, and I say "these," I'm looking at exhibit --

23      A.    I know what you're talking about.

24      Q.    -- the exhibit that contains the medical notes.

Smiley v. DaimlerChrysler
David A. Smiley

Page 234

1      A.    Yes.

2      Q.    There's nothing else that is sort of new to the

3   case?

4      A.    No surprises.

5      Q.    No surprises, okay.

6            Have you ever filed another lawsuit before?

7      A.    No, ma'am.

8      Q.    Even a car wreck or anything like that?

9      A.    No.  Safe driver.

10     Q.    Ever file another charge of discrimination?

11     A.    No, ma'am.

12     Q.    Any activity in another case where you served

13  as a witness?

14     A.    No, ma'am.

15     Q.    Ever think you were the victim of

16  discrimination at another employer?

17     A.    All my life, but again didn't pursue it.

18     Q.    Even if you thought you had been discriminated

19  against somewhere else other than Chrysler, you never

20  went far enough to take affirmative action as far as

21  filing a charge or making complaints?

22     A.    I went elsewhere, I gained other employment.

23  It's a part of life.  You accept it.  I'm 40 some odd

24  years old.  If it's a situation that you can change and

A236

28ddf947-a16a-4272-8d90-bba85d3e648a

Smiley v. DaimlerChrysler
David A. Smiley

Page 235

1    better, make your situation better, you leave.  Why put

2    up with it?  Why put up with it?

3        Q.    Do you remember what kind of discrimination you

4    were feeling at that point?

5        A.    Outside of being the only black man in the

6    room, I mean, if you got to go that way, there's always

7    that.  And you have individuals -- the worst type are the

8    ones that make their little jokes because we're friends

9    and you have no idea nor clue nor concept of what you're

10   really saying.  You're telling me things without opening

11   your mouth.

12       Q.    Like an ignorance type of thing?

13       A.    There you go, an ignorance.  An ignorance can

14   be veiled as it be intentional or just you didn't mean

15   it, but if it were turned around, you would understand

16   exactly what I'm saying to you.

17       Q.    Like the implications of what was said?

18       A.    Yes.

19       Q.    The unsaid implications?

20       A.    There you go.  It's not so much what a person

21   says, it's what they don't say.

22       Q.    You experienced that kind of discrimination at

23   another place of employment?

24       A.    Other places.  I mean, just life, period.  It

Smiley v. DaimlerChrysler
David A. Smiley

Page 236

1    doesn't -- just because you go on a job for eight or nine

2    hours a day, it doesn't turn off, it's there, it follows

3    you.  Every day I wake up I am reminded outside of my own

4    reflection, I am a black man.  That's why I answered it

5    earlier, all my life.

6         Q.    What about disability discrimination?

7         A.    Well, the thing about disability discrimination

8    is I'd have to say my opportunities again considering my

9    manual dexterity is one of my strongest points is no

10   longer available to me.  That has been taken away from

11   me.

12        Q.    Right, but I'm not talking about that part of

13   it.  I'm talking about feeling like the victim of

14   disability discrimination at another employment.

15        A.    No, I have never been hurt at another

16   employer's before.  Nothing like this, no.

17        Q.    What about after your employment with Chrysler,

18   have you felt like the victim of disability

19   discrimination?

20        A.    No, because the other jobs I have had did not

21   encompass doing what I did at Chrysler, the same

22   utilization of my arm that I did at Chrysler.  So we're

23   talking apples and oranges with anything after I left

24   Chrysler.

**A238**

Smiley v. DaimlerChrysler
David A. Smiley

1      Q.    These other places of employment, it wasn't an

2    issue because you could work without having that come up?

3      A.    Yes.

4            MS. WASSON:  Well, I think that that's all

5    the questions that I have for you.  Thank you for being

6    willing to come in today and work with me on the

7    scheduling.  I appreciate that.

8            THE WITNESS:  I want to get to the bottom

9    of this just as much as you do.

10            MS. WASSON:  Let's go off the record.

11            (Deposition concluded at 11:35 a.m.)

12                —  —  —  —  —

13

14

15

16

17

18

19

20

21

22

23

24

**A239**

Smiley v. DaimlerChrysler

Page 238

1          T E S T I M O N Y

2

3    DEPONENT:  DAVID A. SMILEY                    PAGE

4

5    BY MS. WASSON............................ 137

6

7              E X H I B I T S

8

9    SMILEY DEPOSITION EXHIBIT NO.              MARKED

10

11   16 - Grievance
     Form.................................. 181
12
     17 - Letter dated April 3, 2006.............. 191
13
     18 - Copy of doctor's note................... 201
14
     19 - Requests for Admission................. 204
15
     20 - Interrogatory Answers.................. 204
16
     21 - Complaint.............................. 225
17

18

19

20

21

22

23

24
                                              **A240**

Smiley v. DaimlerChrysler

Page 239

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

A241

Smiley v. DaimlerChrysler

Page 240

CERTIFICATE OF REPORTER

STATE OF DELAWARE)

)

NEW CASTLE COUNTY)

       I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 15th day of
April, 2008, the deponent herein, DAVID A. SMILEY, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

       I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

       I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

       Kimberly A. Hurley

       Certification No. 126-RPR
       (Expires January 31, 2011)

DATED:  April 27, 2008

**A242**

28ddf947-a16a-4272-8d90-bba85d3e648a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DAVID A. SMILEY,                    )
                                    )
        Plaintiff,                  )
                                    )        C.A. No. 1:07-005-SLR
    v.                              )
                                    )
DAIMLER CHRYSLER,                   )
                                    )
        Defendant.                  )
                                    )

### AFFIDAVIT OF DAWN FORD

STATE OF DELAWARE            )
                             ) ss.
COUNTY OF NEW CASTLE         )

I, Dawn Ford, being duly sworn this 13ᵀᴴ day of May, 2008, do depose and say:

1.      My name is Dawn Ford.  I am employed by Chrysler LLC ("Chrysler") as a Human Resources Generalist in the Newark Assembly Plant.  I have been employed with Chrysler for 14 years and have worked as a Human Resources professional since 2002.  I have a bachelor's degree in general studies, with a minor in Human Resources.  I am currently working on a dual master's degree in Health Care Administration and Human Resources Management.  I have training in various human resources fields, including employee interviewing, safety, discrimination and harassment.

2.      As a Human Resources Generalist, I am responsible for handling, among other things, employee inquiries at the front desk, telephone inquiries to the Personnel Department, pay adjustments, employee orientation, and certain disciplinary processes.  I also

am responsible for administering various Chrysler policies, including the reinstatement and medical substantiation policies.

3.    Under Chrysler's absence policy, individuals on medical leave are required to report to the Plant Medical Department for periodic examinations with the plant physician. These examinations are designed to provide Chrysler with updated information on the individual's medical restrictions and a current assessment of the individual's condition. When an employee reports to the Plant Medical Department, he or she receives a copy of a Medical Pass listing, among other things, the date of his or her next exam.

4.    Employees who skip or miss their appointments with the Plant Medical Department are sent a letter instructing them to report to the Personnel Department to substantiate their absences with documentation from their physicians. The letter consists of a standard form which contains the hours that an employee may report and includes a warning that failure to submit proper substantiation will result in termination of seniority. As a matter of course, we enclose a copy of Chrysler's substantiation policy with these letters so that the employees know what is required.

5.    I am familiar with the requirements of the substantiation policy, and it is my job to administer the policy when employees report to the Personnel Department. The policy applies to any employee who is out of work for five days or more from a temporary separation, illness, or injury. These employees must provide documentation meeting certain criteria, including: the date of treatment; a proposed return to work date; a confirmation that the employee was unable to work during his or her absence; the diagnosis code (or "DX code") corresponding to the injury, and the physician's address and phone number. The doctor must sign the statement, and it must be on his or her office letterhead.

2

6.      Chrysler also requires that employees' documentation be original. We do not accept photocopied or faxed documents as evidence of medical status. The reason Chrysler does not permit photocopies or faxes is because employees could easily commit fraud and/or alter their doctor's notes by adding or whiting out information from an original note and submitting a copy of the modified note in its place. To avoid that prospect, we require that employees submit original documentation. In fact, we do not even permit physician's offices to "rubberstamp" a doctor's signature – we want to see an original signature on original letterhead so that we can verify that the information submitted by the employees is true and accurate.

7.      David A. Smiley, the plaintiff in this case, missed an appointment with the Plant Medical Department that was scheduled for May 4, 2005. This appointment was documented on Mr. Smiley's February 14, 2005 Medical Pass. On May 6, 2005, my colleague, Shannon West, sent a substantiation letter to Mr. Smiley. Pursuant to this letter, Mr. Smiley was given a deadline of May 13, 2005 to report to the Personnel Department with the proper documentation. We normally give employees five days to substantiate their absences, and Mr. Smiley's deadline was consistent with that timeframe. Ms. West sent Mr. Smiley this letter via overnight mail, so he would receive it the next day.

8.      At this time, I did not know Mr. Smiley. I had never spoken to him, and I never worked in the same area of the plant as he did. I did not recognize him when he reported to the Personnel Department on the morning of May 13, 2005 to substantiate his absence.

9.      Mr. Smiley brought documentation corresponding to each of the weeks he had been absent from work on medical leave. Upon reviewing each of the doctor's notes he submitted, I noticed that the documents were photocopies of the originals. I asked Mr. Smiley for his original documents, and he told me that they were at home. I told him that I needed to see

3

A245

his original doctor's notes. In response, he told me that the photocopies were identical to the originals, but I could not accept them. He seemed somewhat agitated at my refusal. I also saw that his documents did not contain a DX code, and I told him that this was another requirement that the notes were missing.

10.     To ensure that Mr. Smiley understood what he needed from his doctor, I wrote out a list of requirements for him. At that particular moment, when Mr. Smiley was standing at the front desk, the only forms within easy access were reinstatement denial forms. The reinstatement denial form is normally used when employees fail to submit proper documentation with regard to reinstatement. As such, this form was not applicable to Mr. Smiley, who was on a medical leave. Because I did not have any other forms handy, though, I wrote the requirements applicable to Mr. Smiley's substantiation on the reinstatement denial form and crossed out the reinstatement requirements that did not apply to him. I did so in Mr. Smiley's presence. I tried to give this form to Mr. Smiley and asked him to sign it to acknowledge our conversation. Mr. Smiley refused to sign the form and pushed it back across the counter at me.

11.     Given that Mr. Smiley received his substantiation letter on May 7, he already had had ample time to visit his doctor and obtain medical notes that complied with Chrysler's requirements. However, consistent with the terms of his substantiation letter, I gave him until 3 pm that afternoon to return with proper documentation. Mr. Smiley never told me that he could not meet that deadline or that he would not have time to retrieve his original documents from home due to his schedule that day. Instead, he told me that he would be back that afternoon.

4

**A246**

12.    Later that morning, while I was away from the front desk, Mr. Smiley returned to the Personnel Department. He submitted documentation to one of the Personnel Administrators, Angenella Fleming, and left. When I reviewed Mr. Smiley's documentation later that day, I realized almost immediately that he had re-submitted photocopies of his doctor's notes, now bearing photocopied DX codes, despite the fact that I had asked for his originals. I did not understand why he would submit documents that he knew would be deficient based on our conversation that morning. I waited until 3 p.m. to see if Mr. Smiley would return to the Personnel Department with his original documentation, but he did not come in.

13.    As a Human Resources Generalist, I am authorized to discharge employees who fail to properly substantiate their absences, and I do so routinely. Given the fact that Mr. Smiley already had been given two opportunities to comply with the substantiation policy and refused to do so without any explanation, I determined that he should be terminated from employment. That afternoon, I prepared a letter informing Mr. Smiley that he was being discharged for his failure to submit proper documentation substantiating his absences. I modified a form letter the Personnel Department uses for administrative terminations and filled in Mr. Smiley's name. I then sent this letter to Mr. Smiley via certified mail and wrote up a quick memo to the labor relations file documenting the reasons for Mr. Smiley's termination, in case he decided to file a grievance.

14.    I was not involved in Mr. Smiley's grievance process.

15.    Mr. Smiley is now claiming that I discriminated against him based on some kind of disability. This allegation is completely baseless. When I terminated Mr. Smiley's employment, I did not know what kind of injury or illness he had, or why he was absent from work on medical leave. I am not responsible for maintaining employee medical files, I do not

5

**A247**

review such files, and I do not sit on the PQX Placement Committee or make any decisions concerning placements.  Even to this day, I do not know what kind of disability Mr. Smiley is claiming to have.

16.    I did not discriminate against Mr. Smiley in any way, including on the basis of a disability.


_Dawn Wford_ _____          _5/13/08_ _____
Dawn Ford, Human Resources Generalist          Date

SWORN TO AND SUBSCRIBED before me the day and year above written.

_Carey M Shee_ _____
Notary Public

CAREY M. SHEA
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires May 24, 2011

6

A248

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID A. SMILEY,                    )
                                    )
      Plaintiff,                )
                                    )    C.A. No. 1:07-005-SLR
    v.                            )
                                    )
DAIMLER CHRYSLER,                   )
                                    )
      Defendant.                )
                                    )

## AFFIDAVIT OF STEVE HEITZMANN

STATE OF DELAWARE            )
                             )  ss.
COUNTY OF NEW CASTLE         )

I, Steve Heitzmann, being duly sworn this 13th day of May, 2008, do depose and

say:

      1.     My name is Steve Heitzmann. I am currently employed by Chrysler LLC

("Chrysler") as the Human Resources Manager for the Newark Assembly Plant. During the

2004-06 time period, I worked as the Labor Relations Supervisor. I have been employed with

Chrysler for 22 years.

      2.     As the Labor Relations Supervisor, I was responsible for working with

United Auto Workers Local 1183 ("union") officials in the development of joint policies,

resolving employee grievances, administering the terms of the Collective Bargaining Agreement

and other negotiated agreements, and handling various other issues with respect to union-

management relations.

3.    I have knowledge about the PQX placement process. "PQX" stands for "physically qualified with limitations," and PQXs are Chrysler's codes corresponding to various medical restrictions. The PQX Placement Committee is a joint team of union and management officials responsible for determining appropriate placements for individuals whose medical restrictions prevent them from performing their regular jobs. Through this process, Chrysler seeks to return physically qualified employees to work consistent with their seniority per the terms of the Collective Bargaining Agreement.

4.    In considering an individual's ability to reinstate to work, the PQX Placement Committee analyzes whether any of the positions then available at the plant would be appropriate for the individual to perform given his or her seniority, department, and medical restrictions. The Committee recommends a work assignment, then a medical professional such as the plant physician or the OSHA nurse verifies that the proposed position would be compatible with the individual's medical restrictions. In 2005, Mr. Smiley was placed in an alternative position through the PQX Placement process. The documentation from the PQX Placement Committee regarding Mr. Smiley, which shows his seniority date, last day worked, restrictions, and alternative placement, was located in his personnel file.

5.    After Mr. Smiley was terminated from employment, he filed a grievance. I was involved in the initial phases of Mr. Smiley's grievance, although I do not recall many specifics about it. The grievance documentation in Mr. Smiley's file makes clear, however, that Chrysler's management team decided to deny the grievance because Mr. Smiley clearly failed to follow the proper procedures for substantiating his absence, even after being given a second chance to do so. After discussions with Mr. Smiley's union representatives, the management team at Chrysler agreed to reinstate Mr. Smiley's employment. Mr. Smiley's union

2

representative sent him a letter informing him of the joint decision and requesting that he contact the union within five days to discuss his reinstatement. This letter also was located in Mr. Smiley's file. Despite Chrysler's agreement to reinstate him, Mr. Smiley did not return to work at Chrysler.

6.    On August 2, 2005, Mr. Smiley filed a Charge of Discrimination with the Delaware Department of Labor and has now filed this lawsuit, claiming that Chrysler discriminated against him based on a disability. These allegations are false.. I do not believe Mr. Smiley was the victim of discrimination based on any alleged disability or any other protected characteristic.

_____
Steve Heitzmann

5/13/08
Date

SWORN TO AND SUBSCRIBED before me the day and year above written.

_____
Notary Public

CAREY M. SHEA
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires May 24, 2011

3

A251

# A252 - 254

# REDACTED IN ITS ENTIRETY

# A255

# REDACTED IN ITS ENTIRETY

**A256**

**REDACTED IN ITS ENTIRETY**

# NEWARK ASSEMBLY PLANT
## *INFORMATION NOTICE*

DEPOSITION
EXHIBIT
Shirley H
KQH 4/9/08
FBIG00 800-631-698

### RETURN TO WORK FROM CASUAL ABSENCE(S) (Less than five days):

For absences of less than five (5) days, a medical statement containing the above criteria, with the exception of the following provisions, must be submitted to your immediate supervisor the first day you return to work or the absence will be unexcused.

- An employee absent for medical reasons for (1) day is no longer required to submit a diagnosis on the doctor's letter substantiating the absence if treated by a physician.
- An employee absent for medical reasons for two (2) to four (4) days must treat no later than the second day of absence. If treated on the first day of absence, no diagnosis is required. If treated on the second day, the employee must provide a diagnosis, and the substantiation must cover the employee's first day of absence. All other information as noted in the Corporation's policy regarding medical substantiation remains required.

#### DOCUMENTATION REQUIREMENTS

All employees must have the following seven criteria when substantiating their absence(s) on doctor's letterhead:
1. The date the statement was written.
2. Date of treatment to include start and end dates of medical coverage (dates prior to initial treatment may be unexcused).
3. A return to work date.
4. Confirmation that the employee was *totally disabled, totally incapacitated, or unable to work.*
5. The diagnosis code for the absence.
6. The attending physician must sign the statement. *(NO RUBBER STAMPS)*
7. The statement must contain the physician's address and phone number. *(NO FAXES)*

### REINSTATEMENT/SUBSTANTIATION FROM TEMPORARY SEPARATION, ILLNESS OR INJURY (Five days or more):

Emp... s must treat no later than the third day absence. The plant policy remains that an employee released by his/her physician to return to work from sick leave or other temporary separation of five (5) days or more due to illness or injury must report to the Employment Office for reinstatement. Employees will not be permitted to enter the plant through Security for reinstatement purposes.

Employees must report to the Employment Office the day prior to reinstatement. All employees are required to report to the Employment Office and complete the reinstatement process prior to start of shift within the hours of operation:

#### DOCUMENTATION REQUIREMENTS

All employees must have the following seven criteria when substantiating their absence(s) on doctor's letterhead:
1. The date the statement was written.
2. Date of treatment to include start and end dates of medical coverage (dates prior to initial treatment may be unexcused).
3. A return to work date.
4. Confirmation that the employee was *totally disabled, totally incapacitated, or unable to work.*
5. The diagnosis code for the absence.
6. The attending physician must sign the statement. *(NO RUBBER STAMPS)*
7. The statement must contain the physician's address and phone number. *(NO FAXES)*

Presentation of such a statement does not preclude Management's right to further investigate and verify the authenticity of the statement as presented by the employee. Nor does it preclude Management's right to take disciplinary action where such statements may be altered, falsified, or are otherwise unsatisfactory substantiation of the disability for the period in question.

When reporting to the Plant Personnel Office, enter the building through the outside door at the south end of the administration building. The hours for inactive employees are as follows:

**Monday through Friday**
9:00 a.m. – 11:30 a.m.
and
1:30 p.m. – 3:00 p.m.

**CHRYSLER 103**

V. Stout    3/1/05

*Encounters For An Individual Employee*

04/26/2006
Page: 1

Name          **SMILEY, DAVID A.**
EIN           **241681**
Department    **B.I.W.**
Period  **05/01/2003**  to  **03/15/2005**

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 05/02/2003 | 09:51a | NONOCC | Non-Occ Visit - Lt Wrist-ganglion Cyst | Noel, Evis |

5/5/03. EE revisit for left wrist pain. States went to CCER this am and DX: Ganglionic cyst. States cyst was drained. States wrist is very painful. Has dc instructions from CCER and referal to see an Ortho specialist.
Mod amt swelling noted left wrist. Band aid noted, sm punctured wound noted with removal of band aid.   PQX B09 issued for BOS only.
Evis Noel-Samuel, RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 09/26/2003 | 10:20a | OCCINC | Occupational - R Elbow | Shrewsbury, Jennifer |

Job: Door fitter x 3 years. C/O R elbow pain started about a month ago. Increased pain this past week. Since the new vehicle started he has had increased hammering and chiseling Also has to shut doors and pull on a metal hook to adjust the fender. Ice x 20 min. Tennis strap and IB given. RTO PRN. J Dubbs RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 10/08/2003 | 08:45a | OCCINC | Occ--Revisit Right Elbow | Rennings, Heidi |

10-08-03  EE reports with c/o continuing right lateral elbow pain.  States feels pain with lateral movements and when extending and gripping (like when shaking someone's hand.) IB taken without help.  Using Pronator strap, but not on correctly when presents to medical.  Ice to arm.  New pronator strap.  Mediproxen given.  Biofreeze to go.  Advised on stretches for arm.  Advised same at home.  RTO next week if still painful.  H Rennings RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 10/23/2003 | 09:14a | OCCINC | Occ Visit- Pain Rt Elbow/contusion. | Noel, Evis |

10/23/03.  EE revisit for rt elbow pain.  States pain continues since previous visits.  Also states on 10/22/03 hit rt elbow on iridide of the truck door while working on strikers.  EE states applied ice at home and took pain meds on occassion, but pain continues.
EE noted with elbow strap on rt elbow.
Ice pack applied x 20 min, IB 2 tabs po given.  Appt issued for 13:15 pm today for eval b y Dr Serra.  Evis Noel-Samuel, RN.
10/23/2003

S: Hx as above.  Door fitting has caused right elbow pain over last 6 weeks.  Only temporary and partial relief with elbow strap and ASA.

No significant PMH.  Surgical history includes right toe reconstruction.

No allergies.

O: Pain with palpation over the right lateral epicondyle, which is eacerbated with resisted extension of the right wrist.  There is no pain with palpation over the right olecranon bursa and no pain withpalpation over the medial epocondle.

A: 1) Right lateral epicondylitis

P: Discuss the risks and benefits of injection, iontophoresis, and po therapy.  David would like to discuss it with his girlfriend first.  RTC prn.

Serra, MD, MPH

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 12/15/2003 | 08:45a | OCCINC | *Occ Incident- Revisit Rt Elbow. | Noel, Evis |

12/15/03.  EE revisit for right elbow.  States saw Sakalof ? in late October - early November and is treated with Bextra which is helping pain in elbow, but today rt elbow pain is increased.  Request ice.  Ice pack x 20 min applied.  Evis Noel-Samuel, RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 12/15/2003 | 08:45a | OCCINC | *Occ Incident- Contusion Left Wrist. | Noel, Evis |

12/15/03.  EE states job is door fitter x 3 years.  Today approx: 8:15 - 8:30 am while fitting door, door sprung forward and came back and hit left wrist.  States HX: Ganglion cyst left wrist.
Cyst palpated radial aspect left wrist.  Ice pack applied x 20 min, ES APAP 1000 mg po given, wrist support given.  Instructed to rto prn.
Evis Noel-Samuel, RN.

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 12/22/2003 | 09:56a | OCCINC | *Occupational Incident Pain R Elbow | Rennings, Heidi |

I2-22-03 EE c/o Pain in Right Elbow. Wears support. Type one door fitter. Uses rachet to allpy door. Ice applied to right elbow. EE takes Benacor for pain 2 x a day. returned to work. D. Kondzielawa,RN/HRenningRN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 01/30/2004 | 11:43a | OCCINC | *Occupational Inc- R Elbow. | Shrewsbury, Jennifer |

EE revisits for R elbow pain. States has been treating with Dr. Bandera. Rec'd a cortisone injection the week of 1/6/03-(not sure of date.) Ice x 15 min. Apap given. Has a f/u appt. with Dr. Bandera on 2/12/04. Advised to RTO PRN. J Dubbs RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 01/30/2004 | 11:43a | OCCINC | *Occupational Inc- L Wrist | Shrewsbury, Jennifer |

Revisit for Lump L wrist. States lump has not decreased any in size since last visit. Has intermittent pain. PMH of ganglion which was drained. Requests wrist support. Given. J Dubbs RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 02/16/2004 | 08:40a | OCCINC | ERROR In Chart | Rennings, Heidi |

02-16-04  EE reports with metal slag in arm.  States on tightening exhaust muffler today at Col C-6, was tightening muffler and scraped right FA against metal, breaking off piece of slag which penetrated FA.  Small area noted ulnar aspect of volar wrist.  Explored with needle.  Small piece of metal removed.  Cleansed with NSS.  Polysporin/DSD.  RTO if Swelling/Redness/Drainage occurs.  H Rennings RN
PLEASE DISREGARD ABOVE ENTRY, WRONG EE.  H RENNINGS RN

**A258**

CHRYSLER 108

*Encounters For An Individual Employee*

04/26/2006
Page: 2

Name          SMILEY, DAVID A.
EIN           241681
Department     B.I.W.
Period  05/01/2003  to  03/15/2005

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 02/16/2004 | 08:50a | OCCINC | *Occu--Right Elbow | Rennings, Heidi |

02-16-04 EE reports for right elbow pain. States saw Dr Bandera on Thursday, will start PT 2-3 times per week. Just wanted on record. Has not filed WC claim at this time. Referred to Disabilities Manager. H Rennings RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 02/17/2004 | 01:30p | OCCINC | *Occ Incident- Revisit Rt Elbow. | Noel, Evis |

2/17/03. EE revisit for rt elbow pain. States filed WC claim on 2/16/04 and has claim # for P.T., but cancelled P.T. on 2/16/04 due to misinformation received from numerous people related to WC process to be treated with P.T.
Ice pack applied x 20 min and process explained to EE - WC is for bill payment and not necessarily for P.T. now and untill WC claim is approved, bills will be paid by BC/BS . EE understood instructions. States will call to reschedule P.T.. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 04/22/2004 | 01:20p | OCCINC | *Occupational Incident- R Elbow | Shrewsbury, Jennifer |

Job: Door fitter- R side. Supervisor- Sean Hutton. Revisit for R elbow. Was out for PT- came back on 4/5/04. Is doing good. Has some mild pain today in R elbow. Requests ice and IB. Ice x 20 min. IB given. J Fowler RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 04/29/2004 | 10:00a | OCCINC | *Occupational Incident- R Elbow | Shrewsbury, Jennifer |

Revisit for R elbow. Was seen by Dr. Bandera yesterday. Is going to continue PT. Taking own Tylenol. Is currently working. To discuss with Dr. Horowitz. J Fowler RN
4/29/04
S: EE presents for f/u of R elbow tendonitis/lateral epicondylitis. EE is followed by his PMD, Dr. Bandera, who has EE going to PT 2x/week.. EE notes some improvement in sx. EE reports he can do his job without restrictions because he was able to "modify" his tools which takes stress off his elbow. EE reports steroid injections by Dr. Bandera without relief.
O: No distress. Pos tenderness over lateral epicondyle which is exacerbated with pronation/supination of arm
A: Lateral epicondylitis
P: Continue tx with Dr. Bandera and his PT. RTC prn.

Jack Horowitz, M.D.

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 06/24/2004 | 09:35a | OCCINC | *Occ Incident- Revisit Rt Elbow Pain. | Noel, Evis |

6/24/04. EE revisit for rt elbow pain. Has f/u with Dr Bandera on 6/30/04. Attends P.T. 3 x/week.
Mod amt swelling noted. Ice pack applied x 20 min, IB 2 tabs po given, Tennis elbow strap,Biofreeze to go. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 07/06/2004 | 11:40a | OCCINC | *Occ Incident- Revisit Rt Elbow/lt Wris | Noel, Evis |

7/6/04. EE revisit for rt elbow and left wrist pain. States had a Cortisone injection in rt elbow on 6/30/04.
Sm amt swelling noted lateral aspect rt elbow.
Ice pack applied x 20 min, IB 2 tabs po,biofreeze to go. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 11/03/2004 | 01:52p | OCCINC | *Occ: R Elbow | Figueroa, Suzanne |

11/3/04 EE to medical per employment's request. Presents documentation on elbow. EE scheduled to be seen 11/10/04 @ 1:00PM. S. Figueroa RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 11/10/2004 | 01:08p | OCCINC | *Occupational Incident: RIGHT ELBOW | Sabo, Susan |

DR. SJ SABO

S--EE RTC FOR F/U FOR RIGHT ELBOW EPICONDYLITIS; HE HAS 16 YEARS OF SERVICE. HE LAST WORKED IN JULY OF 2004. HE HAS HAD TWO INJECTIONS INTO RIGHT ELBOW; LAST ONE WAS A FEW MONTHS AGO. HE HAS INTMT PARESTHESIAS IN FINGERS. HE HAD MRI OF RIGHT ELBOW ALSO; RESULTS ???.
O--PE: SLIGHT FULLNESS AT RIGHT EXTENSOR SIDE OF ELBOW WITH FULL ROM IN ALL DIRECTIONS. THERE WAS NO MAGNIFIED PAIN BEHAVIOR. TINEL'S SIGN IS NEGATIVE AT ELBOW. THERE IS NO MUSCLE ATROPHY OR CLICKING. NO GROSS TENDERNESS WAS NOTED.
DME WAS DONE IN 9/04. RESULTS RECOMMENDED RTWR. EE HAS FULL USE OF BOTH EXTREMITIES ON OBSERVATION.
A--CHRONIC RIGHT LATERAL EPICONDYLITIS.
P--RTWR AS PER DME; I AGREE WITH IT. EE IS PLANNING ON ATTENDING LAW SCHOOL IN THE NEAR FUTURE. DR. BANDERA DOES KEEP HIM TOTALLY DISABLED.

DR. SJ SABO

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 02/14/2005 | 10:16a | OCCINC | *Occupational Incident - R Lateral Epic | Tinklepaugh, Carole |

EE is seen for follow up of a right lateral epicondylitis and left wrist pain attributed to a ganglion cyst. He states that his physician, Dr. Bandera, has injected the right elbow three times, last time was in 11/04; and two or three times he has had the left wrist injected. Currently, he is taking Ibuprofen and a medicated patch on his right elbow.
PMH. Borderline blood pressure and cholesterol. He has, to date, been unable to get into law school. He was not accepted at either Widner or Temple. He is considering going back to school for a masters' degree - perhaps in IT.
O. NAD Alert and oriented x 3. FROM right elbow. Some prominence of the lateral epicondyle. Non tender. Left wrist. Nontender. No appreciable swelling. Strength UEs: 5/5. Reflexes UEs: 1+ and symmetric.
A. Right lateral Epicondylitis - advised to wear forearm splint.
P. May return to work with a 15 pound lifting restriction on the right. Carole N. Tinklepaugh, M.D.

**CHRYSLER 109**

**A259**

*Encounters For An Individual Employee*

Name        SMILEY, DAVID A.
EIN         241681
Department  B.I.W.
Period  05/01/2003   to  03/15/2005

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 02/15/2005 | 07:31p | OCCINC | *Occupational Incident- R ELBOW | Knight, Mary |

2-15-05

S. EE TO MEDICAL REQUESTING ICE TO KNOWN INJURY OF RT. ELBOW. PAIN TODAY IS 5/10. TOOK IBUPROFEN EARLIER TODAY.
O NO SWELLING NOTED
A. PAIN RT. ELBOW
P ICE APPLIED X 20 MIN RTW WITH PQX  MARY kNIGHT, RN

CHRYSLER 110

A260

## *Encounters For An Individual Employee*

Name    **SMILEY, DAVID A.**
EIN      **241681**
Department  **B.I.W.**
Period    to  **11/01/2007**

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 03/29/1986 | 09:21a | PHYSEX | PHYSICAL EXAM | |
| 03/23/1989 | 09:12a | PHYSEX | PHYSICAL EXAM | |
| 10/29/1990 | 04:45p | PHYSEX | PHYSICAL EXAM | |
| 05/31/1991 | 05:40p | PHYSEX | PHYSICAL EXAM | |
| 10/23/1991 | 07:20p | PHYSEX | PHYSICAL EXAM | |
| 02/18/1999 | 11:23a | OCCINJ | FIRST AID | |
| 03/05/1999 | 05:30a | OCCINJ | FIRST AID | |
| 03/05/1999 | 07:55a | OCCILL | | |
| 03/29/1999 | 10:05a | OCCILL | | |
| 04/01/1999 | 09:07a | OCCILL | | |
| 04/30/1999 | 12:50p | OCCILL | | |
| 06/12/1999 | 08:40a | NONOCC | NON OCCUPATIONAL INJURY | |
| 08/25/1999 | 09:17a | OCCILL | | |
| 08/28/1999 | 06:05a | OCCILL | | |
| 10/06/1999 | 09:10a | NONOCC | NON OCCUPATIONAL INJURY | |
| 10/08/1999 | 05:31a | OCCINJ | FIRST AID | |
| 01/13/2000 | 05:33a | NONOCC | NON OCCUPATIONAL INJURY | |
| 01/13/2000 | 12:15p | OCCINJ | FIRST AID | |
| 01/19/2000 | 06:30a | NONOCC | NON OCCUPATIONAL INJURY | |
| 02/11/2000 | 09:00a | OCCINJ | FIRST AID | |
| 03/04/2000 | 09:05a | NONOCC | NON OCCUPATIONAL INJURY | |
| 05/18/2000 | 10:47a | NONOCC | NON OCCUPATIONAL INJURY | |
| 05/30/2000 | 12:10p | NONOCC | NON OCCUPATIONAL INJURY | |
| 06/07/2000 | 08:45a | PHYSEX | PHYSICAL EXAM | |
| 06/12/2000 | 10:17a | NONOCC | NON OCCUPATIONAL INJURY | |
| 08/08/2000 | 06:08a | NONOCC | NON OCCUPATIONAL INJURY | |
| 10/03/2000 | 12:37p | NONOCC | NON OCCUPATIONAL INJURY | |
| 10/06/2000 | 09:28a | NONOCC | NON OCCUPATIONAL INJURY | |
| 02/22/2001 | 10:00p | NONOCC | NON OCCUPATIONAL INJURY | |
| 02/23/2001 | 03:17p | PHYSEX | PHYSICAL EXAM | |
| 04/12/2001 | 06:18p | NONOCC | NON OCCUPATIONAL INJURY | |
| 06/15/2001 | 03:25p | OCCINJ | Occ Inj - cont. l. elbow | Wallace, Annetta |

S: i was writing track #'s down and co-worker closed hood door and hit my l. elbow.   O: pain on palpation of elbow and r.o.m. exam. A: contusion of l. elbow. P: ice to area, apap x 3 doses. r.t.w..  a. wallace, r.n.

| 05/14/2002 | 11:40a | NONOCC | Non-Occ Visit -allergic reaction. | |

States ate Chinese food last night, and today noted eyes red and puffy and some rashes on face, states daughter had same reaction last night.
Lg amt redness noted bil eyes, sm amt swelling noted lower eye lids, raised rash on left side of face.
Benadryl 25 mg po, Hydrocortisone cream 1% applied to rash, eyes flushed with NSS. Evis Noel, RN.

| 04/28/2003 | 01:25p | NONOCC | Non-Occu--knot left wrist | Rennings, Heidi |

04-28-03  EE reports with c/o knot-like swelling on left wrist.  States started just today.  No recent job changes.  No trauma to area.  No c/o soreness or numbness.  Knot noted volar wrist, radial aspect.  3" wristlet given.  Advised IB if pain presents.  Biofreeze to area.  Advise f/u with FMD if necessary. H Rennings RN

| 04/30/2003 | 06:00a | NONOCC | Non-Occu--revisit Knot Left Wrist | Rennings, Heidi |

04-30-03  EE revisits for left wrist knot.  States wore wristlet and took ASA without help.  ES APAP given.  Supprt given.  Advised to F/U with FMD. H Rennings RN

| 05/02/2003 | 09:51a | NONOCC | Non-Occ Visit - Lt Wrist.-ganglion Cyst | Noel, Evis |

5/5/03.  EE revisit for left wrist pain.  States went to CCER this am and DX: Ganglionic cyst.  States cyst was drained.  States wrist is very painful.  Has dc instructions from CCER and referal to see an Ortho specialist.
Mod amt swelling noted left wrist.  Band aid noted, sm punctured wound noted with removal of band aid.   PQX B09 issued for BOS only.
Evis Noel-Samuel, RN

CHRYSLER 076

*Encounters For An Individual Employee*

11/01/2007
Page: 2

| | |
|---|---|
| Name | **SMILEY, DAVID A.** |
| EIN | **241681** |
| Department | **B.I.W.** |
| Period | to **11/01/2007** |

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 09/26/2003 | 10:20a | OCCINC | Occupational - R Elbow | Shrewsbury, Jennifer |

Job: Door fitter x 3 years. C/O R elbow pain started about a month ago. Increased pain this past week. Since the new vehicle started he has had increased hammering and chiseling Also has to shut doors and pull on a metal hook to adjust the fender. Ice x 20 min. Tennis strap and IB given. RTO PRN. J Dubbs RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 10/08/2003 | 08:45a | OCCINC | Occ--Revisit Right Elbow | Rennings, Heidi |

10-08-03 EE reports with c/o continuing right lateral elbow pain and when extending and gripping (like when shaking someone's hand.) IB taken without help. Using Pronator strap, but not on correctly when presents to medical. Ice to arm. New pronator strap. Mediproxen given. Biofreeze to go. Advised on stretches for arm. Advised same at home. RTO next week if still painful. H Rennings RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 10/23/2003 | 09:14a | OCCINC | Occ Visit- Pain Rt Elbow/contusion. | Noel, Evis |

10/23/03. EE revisit for rt elbow pain. States pain continues since previous visits. Also states on 10/22/03 hit rt elbow on indide of the truck door while working on strikers. EE states applied ice at home and took pain meds on occassion, but pain continues.
EE noted with elbow strap on rt elbow.
Ice pack applied x 20 min, IB 2 tabs po given. Appt issued for 13:15 pm today for eval b y Dr Serra. Evis Noel-Samuel,RN.
10/23/2003

S: Hx as above. Door fitting has caused right elbow pain over last 6 weeks. Only temporary and partial relief with elbow strap and ASA.

No significant PMH. Surgical history includes right toe reconstruction.

No allergies.

O: Pain with palpation over the right lateral epicondyle, which is eacerbated with resisted extension of the right wrist. There is no pain with palpation over the right olecranon bursa and no pain withpalpation over the medial epocondle.

A: 1) Right lateral epicondylitis

P: Discuss the risks and benefits of injection, iontophoresis, and po therapy. David would like to discuss it with his girlfriend first. RTC prn.

Serra, MD, MPH

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 12/15/2003 | 08:45a | OCCINC | *Occ Incident- Revisit Rt Elbow. | Noel, Evis |

12/15/03. EE revisit for right elbow. States saw Sakalof ? in late October - early November and is treated with Bextra which is helping pain in elbow, but today rt elbow pain is increased. Request ice. Ice pack x 20 min applied. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 12/15/2003 | 08:45a | OCCINC | *Occ Incident- Contusion Left Wrist. | Noel, Evis |

12/15/03. EE states job is door fitter x 3 years. Today approx: 8:15 - 8:30 am while fitting door, door sprung forward and came back and hit left wrist. States HX: Ganglion cyst left wrist.
Cyst palpated radial aspect left wrist. Ice pack applied x 20 min, ES APAP 1000 mg po given, wrist support given. Instructed to rto prn. Evis Noel-Samuel,RN.

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 12/22/2003 | 09:56a | OCCINC | *Occupational Incident Pain R Elbow | Rennings, Heidi |

!2-22-03 EE c/o Pain in Right Elbow. Wears support. Type one door fitter. Uses rachet to alipy door. Ice applied to right elbow. EE takes Benacor for pain 2 x a day. returned to work. D. Kondzielawa,RN/HRenningRN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 01/30/2004 | 11:43a | OCCINC | *Occupational Inc- R Elbow. | Shrewsbury, Jennifer |

EE revisits for R elbow pain. States has been treating with Dr. Bandera. Rec'd a cortisone injection the week of 1/6/03-(not sure of date.) Ice x 15 min. Apap given. Has a f/u appt. with Dr. Bandera on 2/12/04. Advised to RTO PRN. J Dubbs RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 01/30/2004 | 11:43a | OCCINC | *Occupational Inc- L Wrist | Shrewsbury, Jennifer |

Revisit for Lump L wrist. States lump has not decreased any in size since last visit. Has intermittent pain. PMH of ganglion which was drained. Requests wrist support. Given. J Dubbs RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 02/16/2004 | 08:40a | OCCINC | ERROR In Chart | Rennings, Heidi |

02-16-04 EE reports with metal slag in arm. States on tightening exhaust muffler today at Col C-6, was tightening muffler and scraped right FA against metal, breaking off piece of slag which penetrated FA. Small area noted ulnar aspect of volar wrist. Explored with needle. Small piece of metal removed. Cleansed with NSS. Polysporin/DSD. RTO if Swelling/Redness/Drainage occurs. H Rennings RN
PLEASE DISREGARD ABOVE ENTRY, WRONG EE. H RENNINGS RN

| Date | Time | Type | Description | Examiner |
|---|---|---|---|---|
| 02/16/2004 | 08:50a | OCCINC | *Occu--Right Elbow | Rennings, Heidi |

02-16-04 EE reports for right elbow pain. States saw Dr Bandera on Thursday, will start PT 2-3 times per week. Just wanted on record. Has not filed WC claim at this time. Referred to Disabilities Manager. H Rennings RN

CHRYSLER 077

A262

## *Encounters For An Individual Employee*

Name          **SMILEY, DAVID A.**
EIN           **241681**
Department     **B.I.W.**
Period          to  **11/01/2007**

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 02/17/2004 | 01:30p | OCCINC | *Occ Incident- Revisit Rt Elbow. | Noel, Evis |

2/17/03. EE revisit rt elbow pain. States filed WC claim on 2/16/04 and has claim # for P.T., but cancelled P.T. on 2/16/04 due to misinformation received from numerous people related to WC process to be treated with P.T.
Ice pack applied x 20 min and process explained to EE - WC is for bill payment and not necessarily to be cow and untill WC claim is approved, bills will be paid by BC/BS . EE understood instructions.  States will call to reschedule P.T. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 04/22/2004 | 01:20p | OCCINC | *Occupational Incident- R Elbow | Shrewsbury, Jennifer |

Job: Door fitter- R side. Supervisor- Sean Hutton. Revisit for R elbow. Was out for PT- came back on 4/5/04. Is doing good. Has some mild pain today in R elbow. Requests Ice and IB. Ice x 20 min. IB given. J Fowler RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 04/29/2004 | 10:00a | OCCINC | *Occupational Incident- R Elbow | Shrewsbury, Jennifer |

Revisit for R elbow. Was seen by Dr. Bandera yesterday. Is going to continue PT. Taking own Tylenol. Is currently working. To discuss with Dr. Horowitz. J Fowler RN
4/29/04
S: EE presents for f/u of R elbow tendonitis/lateral epicondylitis. EE is followed by his PMD, Dr. Bandera, who has EE going to PT 2x/week.. EE notes some improvement in sx. EE reports he can do his job without restrictions because he was able to "modify" his tools which takes stress off his elbow. EE reports steroid injections by Dr. Bandera without relief.
O: No distress. Pos tenderness over lateral epicondyle which is exacerbated with pronation/supination of arm
A: Lateral epicondylitis
P: Continue tx with Dr. Bandera and his PT. RTC prn.

Jack Horowitz, M.D.

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 06/24/2004 | 09:35a | OCCINC | *Occ Incident- Revisit Rt Elbow Pain. | Noel, Evis |

6/24/04. EE revisit for rt elbow pain. Has f/u with Dr Bandera on 6/30/04.  Attends P.T. 3 x/week.
Mod amt swelling noted. Ice pack applied x 20 min, IB 2 tabs po given, Tennis elbow strap,Biofreeze to go. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 07/06/2004 | 11:40a | OCCINC | *Occ Incident- Revisit Rt Elbow/lt Wris | Noel, Evis |

7/6/04. EE revisit for rt elbow and left wrist pain. States had a Cortisone injection in rt elbow on 6/30/04.
Sm amt swelling noted lateral aspect rt elbow.
Ice pack applied x 20 min, IB 2 tabs po,biofreeze to go. Evis Noel-Samuel,RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 11/03/2004 | 01:52p | OCCINC | *Occ: R Elbow | Figueroa, Suzanne |

11/3/04 EE to medical per employment's request.  Presents documentation on elbow.  EE scheduled to be seen 11/10/04 @ 1:00PM. S. Figueroa RN

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 11/10/2004 | 01:08p | OCCINC | *Occupational Incident: RIGHT ELBOW | Sabo, Susan |

DR. SJ SABO

S--EE RTC FOR F/U FOR RIGHT ELBOW EPICONDYLITIS; HE HAS 16 YEARS OF SERVICE.  HE LAST WORKED IN JULY OF 2004. HE HAS HAD TWO INJECTIONS INTO RIGHT ELBOW; LAST ONE WAS A FEW MONTHS AGO.  HE HAS INTMT PARESTHESIAS IN FINGERS.  HE HAD MRI OF RIGHT ELBOW ALSO; RESULTS ???.
O--PE:  SLIGHT FULLNESS AT RIGHT EXTENSOR SIDE OF ELBOW WITH FULL ROM IN ALL DIRECTIONS.  THERE WAS NO MAGNIFIED PAIN BEHAVIOR.  TINEL'S SIGN IS NEGATIVE AT ELBOW.  THERE IS NO MUSCLE ATROPHY OR CLICKING.  NO GROSS TENDERNESS WAS NOTED.
   DME WAS DONE IN 9/04.  RESULTS RECOMMENDED RTWR.  EE HAS FULL USE OF BOTH EXTREMITIES ON OBSERVATION.
A--CHRONIC RIGHT LATERAL EPICONDYLITIS.
P--RTWR AS PER DME; I AGREE WITH IT.  EE IS PLANNING ON ATTENDING LAW SCHOOL IN THE NEAR FUTURE.  DR. BANDERA DOES KEEP HIM TOTALLY DISABLED.

DR. SJ SABO

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 02/14/2005 | 10:16a | OCCINC | *Occupational Incident - R Lateral Epic | Tinklepaugh, Carole |

EE is seen for follow up of a right lateral epicondylitis and left wrist pain attributed to a ganglion cyst.  He states that his physician, Dr. Bandera, has injected the right elbow three times, last time was in 11/04, and two or three times he has had the left wrist injected.  Currently, he is taking Ibuprofen and a medicated patch on his right elbow.
PMH.  Borderline blood pressure and cholesterol.  He has, to date, been unable to get into law school.  He was not accepted at either Widner or Temple.  He is considering going back to school for a masters' degree - perhaps in IT.
O. NAD  Alert and oriented x 3.  FROM right elbow.  Some prominence of the lateral epicondyle.  Non tender.  Left wrist. Nontender.  No appreciable swelling.  Strength UEs: 5/5.  Reflexes UEs: 1+ and symmetric.
A. Right lateral Epicondylitis - advised to wear forearm splint.
P. May return to work with a 15 pound lifting restriction on the right.  Carole N. Tinklepaugh, M.D.

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|
| 02/15/2005 | 07:31p | OCCINC | *Occupational Incident- R ELBOW | Knight, Mary |

2-15-05

S. EE TO MEDICAL REQUESTING ICE TO KNOWN INJURY OF RT. ELBOW. PAIN TODAY IS 5/10. TOOK IBUPROFEN EARLIER

CHRYSLER 078

## *Encounters For An Individual Employee*

Name          **SMILEY, DAVID A.**
EIN           **241681**
Department     **B.I.W.**
Period         to  **11/01/2007**

| Date | Time | Type | Description | Examiner |
|------|------|------|-------------|----------|

TODAY.
O NO SWELLING NOTED
A. PAIN RT. ELBOW
P ICE APPLIED X 20 MIN RTW WITH PQX  MARY kNIGHT, RN

| 04/26/2006 | 02:23p | ADMIN | Administrative Encounter | Mcelroy, Catherine |
|------------|--------|-------|--------------------------|--------------------|

4/26/06 Requested by Dan Mykelenko to review job placemnt  made by  previous OSHA nurse B-38 left side fender install. Advised that this job is an appropriate placement for EE's restrictions no repetitive twisting of wrist,elbow & No lifting over 15 lb w/ right hand.  Note part weighs under 15 lb.
Cathy McElroy,RN

**A264**

CHRYSLER 079

B-11 Trolley Square
Wilmington, DE  19806

CLINICAL NOTE

Patient's Name:        David Smiley
Date of re-eval:       July 12, 2004

He had to go to Occupational Health Service to have his arm iced down due to increased swelling.

He has increased pain/swelling at the extensor/flexor elbow with associated tenderness and Grade I reduction of strength.

As such, we are taking him out of work currently and getting him into more intense therapy with medication support.  RTC approximately 3-4 weeks.

Peter B. Bandera, M.D.

**A265**

10/05 Case 1:07-cv-00005-SLR   efe43   Documents 50-6   ☑002/008

JEFF MEYERS MD & ASSOC

DOC, YWSA copy
Moving ос called in

Lily

SMILEY, David
9/16/04

*(handwritten side note, partly illegible)*

# Jeffrey S. Meyers, M.D. & Associates, P.A.

Board Certified in Physical Medicine & Rehabilitation
1600 Washington Street
Wilmington, DE 19802
Tel. (302) 428-5954
Fax (302) 656-1210
e-mail jeffreysmeyersmd@aol.com

LDW 7/1/04

### EXPERT MEDICAL EXAMINATION

September 16, 2004

Ms. Barbara Eichelberger
ESIS
Integrated Health
P.O. Box 5001
Southfield, MI 48086

RE: David Smiley  9/16/81
Date of Birth: 08/12/61
Date of Incident: 09/26/2003

**SSN REDACTED**

---

Dear Ms. Eichelberger:

At your request, I performed an expert medical examination on David Smiley in my office today. We held a discussion at the beginning of his appointment and Mr. Smiley understands that he was referred to me by ESIS in reference to the alleged incident at work on approximately September 26, 2003; that no patient/physician treatment relationship exists; that I would be obtaining a history, performing an examination, and reviewing medical records; and that a written report would be submitted to ESIS. Mr. Smiley presented for his evaluation alone today. The client provided records including physician evaluation and treatment notes, reports of diagnostic studies, therapy notes and administrative correspondence.

HISTORY (as reported by the examinee): David Smiley is a pleasant 43-year-old right-handed African-American man who states that he was in his usual state of health until approximately the end of September 2003 when he was at work for Daimler Chrysler performing "right side door fit" and began to notice pain over his right elbow area. He reported the symptoms to the on-site medical unit where he presented with complaints of significant right lateral elbow pain with swelling. He was treated conservatively including use of medications and ice and returned to work. He continued to work at his job but his symptoms persisted with the onset of swelling that was unremitting, and he was subsequently seen by Peter Bandera, M.D. Dr. Bandera treated him with "cortisone injections" without relief of his symptoms and placed him in occupational therapy and gave him medications. Over time, his right elbow swelling decreased somewhat but due to continued symptoms he was placed on total temporary disability in March 2004 for a few weeks. He then returned to work but was again placed on total temporary disability on approximately July 9, 2004 due to worsening symptoms. He has remained out of work since that time. He reports his swelling has decreased since he has been off work. He continues to undergo therapy in Dr. Bandera's office three times per week with mild relief of his symptoms but "no major change." He also reports some symptoms in his left wrist that developed around the same time as the elbow problem when he got his hand caught in a door. He was diagnosed with a "left thumb and wrist cyst" and was recently seen by Errol Ger, M.D. who drained the cyst in January 2004 without recurrence. He reports persistent symptoms in his right elbow and left wrist. He reports no bowel or bladder dysfunction, no progressive weakness, no progressive sensory loss. For exercise, he is in occupational therapy three times per week.

CONTRIBUTING PAST MEDICAL HISTORY: Notable for a broken great toe that required surgery.

**A266**                    CHRYSLER 069

JEFF MEYERS MD & ASSOC

09/30/2004 07:18 FAX

SMILEY, David
9/16/04

PAIN LOCATION:  His pain is focused over the right lateral elbow over the lateral epicondyle.  His left wrist discomfort is over the base of the first metacarpal.
PAIN QUALITY/INTENSITY:  His pains are of a burning quality and range from 2-5/10 on the VAS scale.  The pains are constant and are worse with activity.
EXACERBATING FACTORS:  Include supination and pronation of the forearm and forward flexing the right shoulder.  He reports when his elbows are straight and he flexes his shoulders forward with pressure, he has to "shake (his) hands" to make the elbow pain go away.
RELIEVING FACTORS:  Include avoiding activities that make his symptoms worse.

ALLERGIES:  No known drug allergies.
CURRENT MEDICATIONS:  Ibuprofen p.r.n.

PAST MEDICAL/SURGICAL HISTORY:  Negative.
ROS:  (N = Negative  P = Positive)
CONSTITUTIONAL:
        Weight change__N__  Chills__N__  Loss of Appetite__N__
        Fatigue__N__  Fever or night sweats__N__  Night Pain__N__  Sleep disturbance__N__
INTEGUMENT:  __N__
LYMPHATIC:
        Malignancy__N__  Infection__N__  Swollen Glands__N__
HEMATOPOIETIC SX:
        Anemia__N__  Bleeding__N__
ENDOCRINE SX:
        Diabetes__N__  Thyroid dysfunction__N__
EYES:
        Visual loss__N__  Inflammation__N__  Diplopia__N__
        Myopia__N__  Hyperopia__N__  Astigmatism__N__
MOUTH:
        Pain__N__  Ulcerations__N__
BONES, JOINTS, MUSCLES:
        Pathologic fractures__N__
        Peripheral or cervicothoracic joint symptoms__N__
        Muscle pain__P__.  Right lateral elbow and left radial wrist.
BREASTS:
        Pain·N__  Lumps__N__  Discharge__N__
RESPIRATORY:
        Pain__N__  SOB__N__  Cough__N__
CV:
        Chest pain__N__  intermittent claudication__N__
        Palpitations__N__  Distal skin lesions__N__  varicose veins__N__
        Orthopnea__N__  Edema__N__  Dyspnea on exertion__N__
GI:
        Dysphagia__N__  Jaundice__N__  Nausea__N__  Reflux__N__
        Change in bowel habits__N__  Vomiting__N__  Incontinence__N__
        Constipation__N__  Diarrhea__N__  Ulcer/GERD__N__
GU:
        Nocturia__N__  Urinary frequency__N__  Dysuria__N__
        Retention__N__  Hematuria__N__  Incontinence__N__  Pyuria__N__
GYN/SEXUAL HX:
        Sexually active.  Reports increased pain with sexual activity.
NERVOUS SX:
        Cranial nerves__N__  Convulsions__N__
        Movement disorders__N__  Coordination__N__
        Anxiety/Depression__N__  Headaches__N__

**A267**

CHRYSLER 070

10/05/04  11:47 FAX 888 244 6243          ERIS                                          ☒005
                                                                                        ☒004/008
                                    JEFF MEYERS MD & ASSOC
09/30/2004 07:18 FAX

SMILEY, David
9/16/04

**FAMILY HISTORY:**
The medical history of his biological father and mother are unknown.
**PERSONAL/SOCIAL HISTORY:** Mr. Smiley has been married for three years. He has two daughters ages 3 and 6 and in good health. Highest level of education is Bachelor's degree in paralegal studies.
   Alcohol use: Two to three drinks per week.
   Illicit drugs: None.
   Smoking: Approximately twenty pack-years at two thirds a pack per day.
   Caffeine: Occasional.

**FUNCTIONAL HISTORY:** He is independent in ambulation and basic ADLs. He reports that since the incident at work, he does less work on his own vehicle and uses his left upper extremity more in order to protect the right. He has difficulty pulling the start cord on his lawn mower. He has difficulty opening bottles. He reports decreased grip strength on the right. He lives in a two-story townhouse with bedroom on the second floor.
**WORK HISTORY:** Mr. Smiley has been employed by Daimler Chrysler for over 15 years. For the last four years he has performed "right-side door fit." He works greater than 50 hours per week, all of which is standing or walking activities. All lifting is less than 10 pounds. His job involves frequent forward bending, pushing, and pulling as well as occasional kneeling, squatting and overhead reaching. His job involves getting the doors to fit securely on the Durango vehicle.

**REVIEW OF RECORDS:** I received the records, which you forwarded to me. These records included but were not necessarily limited to the following:

1.  Treatment notes from the Daimler Chrysler on-site medical unit from approximately April 12, 2001 through August 2004 (mostly illegible). Documents treatment received at the onsite medical unit. Notes from approximately March 28, 2003 documents non-occupational injury involving the left wrist that is noted to be a ganglion cyst in approximately May 2003. On note of approximately September 25, 2003, it documents occupation related right elbow complaints that started about a month previously while performing his job. He continued treatment for right elbow symptoms through October 2003 and notes of that date noted pain with palpation over the lateral epicondyle, which was exacerbated with resisted extension of the right wrist. There was no pain over the right olecranon bursa. An assessment was right lateral epicondylitis. He continued treatment for his right elbow through December of 2003 and in January 2004 it was noted he was undergoing treatment with Dr. Bandera. He continued to have treatment for what was deemed an occupation-related complaint in his right elbow and notes from approximately June 2004 documented lateral epicondylitis as his diagnosis. Note of July 6, 2004 documents he presents for right elbow and left wrist pain and noted that he had a cortisone shot in the right elbow on June 30, 2004. It was noted there was small amount of swelling over the lateral aspect of the right elbow.

2.  Treatment notes from the office of Peter Bandera including February 12, 2004, March 8, 2004, March 10, 2004, March 24, 2004, April 28, 2004, June 9, 2004, June 30, 2004, July 12, 2004, and August 16, 2004. Note from February 12, 2004 documents slight improvement of his right elbow with injection and he was continuing working, which was "obviously an ongoing stress." There was pain on stressing of the forearm flexors and extensors with ulnar notch tenderness and he was to participate in outpatient therapy with anti-inflammatories and defer impact forces to area. Note of March 8, 2004 documents he had complaints in the right elbow region for approximately six months, which he correlated with his work activities including using a torquing action with doors. He had been seen by the plant physician, and Dr. Sokoloff and was treated conservatively. It was noted that he had an overuse syndrome/medial – lateral tendonitis of the right elbow. It was noted subsequently that his treatment helped but when he returned to work he had exacerbation of his overuse syndrome/tendonitis relative to the right forearm. Note of March 24, 2004 documented he was taken out of work. Note of June 9, 2004 documented gross swelling over right elbow area and note of June 30, 2004 documented he was working 10 hours per day and continued to have considerable right elbow discomfort as his work was a persistent source of irritation. He again had a cortisone shot and note of July 12, 2004 documented that he would be on total disability again. Final note of August 16, 2004 noted swelling of the right elbow/forearm with associated tenderness. It noted a positive Tinel's sign over the right ulnar notch and some distal ulnar weakness by 1 grade and he continued to be diagnosed with an over-use syndrome with associated strain/sprain pattern and tendonitis.

10/05/04  11:47 FAX 888 244 6243          ERIS                                              ☒006
                                                                                           ☒005/008
                              JEFF MEYERS MD & ASSOC

09/30/2004 07:18 FAX

SMILEY, David
9/16/04

3. Report of EMG/nerve conduction study of the upper extremities by Dr. Bandera dated April 28, 2004. Documented Mr. Smiley went back to work on April 5, 2004 and he had positive Tinel's sign over the right ulnar notch and pain on stressing the forearm flexors and extensors with grade 1 weakness at the elbow. EMG/nerve conduction study noted mild to moderate ulnar nerve entrapment at the right elbow with a normal EMG component. There was a drop in conduction velocity over the elbow from above to below the right elbow. He was to continue outpatient therapy with medications and defer impact forces to his right elbow and wear an elbow pressure support.

**PHYSICAL EXAMINATION:**     Pulse: 72     Respiration:     16     Height: 5 feet 8 inches     Weight:
      BP: 125/88
173 pounds.
Constitutional: He is a well-developed, well-nourished African-American man in no acute distress.
HEENT EXAM: PERRL, EOMI, oro-pharynx clear, face symmetric, tongue midline.
      LUNGS: Clear to auscultation. No rales, wheezes or rhonchi.
      HEART: Regular rate and rhythm with murmur present.

MUSCULOSKELETAL EXAM:
      INTEGUMENTARY: No abnormalities.
      INSPECTION: There was a well-healed scar over the right dorsum of great toe. There was a 1-cm raised area over the left radial wrist on the palmer side that appeared to be cystic. There was no swelling over the right elbow.
PALPATION EXAMINATION: Noted some tenderness to palpation over the right lateral epicondyle.
      GIRTH: Upper arm girths were equal and symmetric bilaterally. Lower arm girths were 11 inches on the right and 10 inches on the left, circumferentially over the extended right elbow over the olecranon. Lower extremity girths were equal and symmetric bilaterally.
PULSES: 2 + bilateral radial and posterior tibial pulses. Skin pallor is normal, capillary refill is less than one second.

| SPECIAL MANEUVERS: | Left | Right |
|---|---|---|
| CERVICAL | | |
| Spurling | Negative | Negative |
| Root Tension | Negative | Negative |
| Percussion of neurovascular complex | Negative | Negative |
|    In supraclavicular fossa | Negative | Negative |
|    In medial upper arm | Negative | Negative |
| Tinel's at elbow | Negative | Negative |
| Tinel's at carpal tunnel | Negative | Negative |
| Tinel's at Guyon's canal | Negative | Negative |
| Phalen Test | | Negative |
| Compression | | Negative |
| Distraction | | Negative |
| Finkelstein | Negative | Negative |
| | | |
| SHOULDER/UPPER EXTREMITY | | |
| Neer's Impingement Test | Negative | Negative |
| Hawkin's Test | Negative | Negative |
| Yergason's Test | Negative | Negative |
| Speed's Test | Negative | Negative |
| "Load & Shift Test" | Negative | Negative |
| Apprehension Test | Negative | Negative |
| Sulcus Test | Negative | Negative |
| Winging | Negative | Negative |
| Finkelstein | | |

GAIT EXAMINATION: He performed heel walk, toe walk, and tandem walk without difficulty. He performed full squat and 10 ankle pumps without difficulty. Static and dynamic balances are intact. Romberg is negative.

CHRYSLER 072

SMILEY, David
9/16/04

NEUROLOGICAL EXAMINATION: Cranial nerves III-XII are intact. Sensory Examination: Light touch, pinprick, proprioception, and vibration were intact in the bilateral upper and lower extremities throughout. DTR/UMN: 2+ bilateral biceps, triceps, brachioradialis, Achilles and patellar reflexes. Babinski and Hoffman signs were absent. There was no clonus present. Coordination exam: Finger-to-nose, rapid-alternating movements, and heel-shin tests were normal.

NEUROPHYSIOLOGICAL REVIEW: There are new neurophysiological studies for review.
IMAGING REVIEW: There are no imaging studies for review.

IMPRESSION:

1.  Right elbow pain. This condition appears to be related to the incident at work on approximately September 26, 2003. There is no evidence of neurologic deficit or radicular signs present. There was no evidence of structural damage attached to this condition and at today's visit there was no swelling over the right elbow. No imaging studies were available. EMG/nerve conduction performed in April 2004 noted mild ulnar nerve conduction deficits across the right elbow but neurological exam today was normal. Mr. Smiley continues to have complaints of discomfort of his right elbow and forearm that appear to be soft tissue in nature. He has undergone an aggressive treatment program including occupational therapy and further formal treatment is not warranted. At this time, I believe that his right lateral epicondylitis has stabilized and reached maximum medical improvement. No further workup is indicated. Treatment should be strictly conservative and home based. I suggest the use of over-the-counter anti-inflammatory and analgesic medications with training in a home-based exercise and stretching program that includes bilateral upper extremity stabilization. He should remain as active as possible and may return to work at a sedentary-light activity level for the right upper extremity with a 15 pound lifting restriction and avoiding repetitive flexion-extension with his right upper extremity at the elbow.

ANSWERS TO SPECIFIC QUESTIONS: I have attempted to answer the questions you have raised in your consultation request in the body of this report. In addition, I would like to state that Mr. Smiley's condition appears to be work related and has been documented as such since approximately September 2003. He is partially temporarily disabled and should have restrictions on repetitive flexion and extension of his right elbow and a 15 pound lifting restriction at this time. He has undergone an extensive treatment program including occupational therapy in Dr. Bandera's office and has maximized his benefit from that treatment.

The above analysis is based upon the history as provided by Mr. Smiley, findings on his examination, and the medical records reviewed. It is assumed that the material provided is correct. If more information becomes available at a later date, an additional report may be requested. Such information may or may not change the opinions rendered in this evaluation. The opinions I have expressed are based upon a reasonable medical probability and are totally independent of the requesting agent. Please do not hesitate to contact me, if you have further questions regarding this report.

Very truly yours,

Jeffrey S. Meyers, M.D.

CHRYSLER 073

A270

PHYSICAL MEDICINE &
REHABILITATION

BOARD CERTIFIED

PETER B. BANDERA, M.D.

Trauma and Rehabilitation Associates

Telephone: (302) 777-7723

Fax: (302) 777-3454

TROLLEY SQUARE
SUITE B-10
WILMINGTON, DE 19806

11-01-04

RE:  David Smiley

DOI:  2-2-4

Claim #:  82701263652671

To Whom It May Concern:

David Smiley has been treating with our office since 3-8-04.
He has been disabled since 3-10-04 and continues current
disability.  He is also still currently treating at our office.
He is getting therapy three times a week and follow-ups with the
doctor every four weeks.  His diagnosis directly related to this
injury includes:  Elbow Lat. Epic (tennis elbow) The DX code is
726.32.  Any further questions please feel free to contact our
office.

Peter B. Bandera, M.D.

**A271**

**CHRYSLER 036**

*LDW - 2/6/04*

# DAIMLERCHRYSLER



DEPOSITION
EXHIBIT 4
Smiley
KAH 4/9/08

DaimlerChrysler Corporation
Newark Assembly Plant

February 7, 2005

David Smiley
1956 Seneca Road
Wilmington, DE 19805

*302 426-4081*
*0395*

DCid #241681

Dear David Smiley,

A PQX placement search has been conducted and a job (Left Side Fender Install @ B38 9110/303) has been identified for you. Therefore, you are instructed to report to the Plant Employment Office on or before, **Wednesday, February 9, 2005** for reinstatement.

If you do not report to the Plant Employment Office by Friday, February 11, 2005 or if you do not promptly notify the Plant Employment Office that for a reason beyond your control, which must be satisfactorily substantiated, you were unable to comply with these instructions, your seniority will be terminated.

When reporting to the Plant Employment Office, enter the building through the outside door at the south end of the administration building. The hours for inactive employees are as follows:

**Monday through Friday**

9:00 a.m. – 11:30 a.m.
and
1:30 p.m. – 3:00 p.m.

*2/10/05*
*B 09*
*D 06*

Respectfully,

*Jennifer Asquith*

Jennifer Asquith
Labor Relations
302-453-5018

**A272**

**CHRYSLER 147**

Medical Pass

**EMPLOYEE INFORMATION**                                    DATE: 02/14/2005   TIME: 10:05am

...e: SMILEY, DAVID A.      SS#: REDACTED      Dept: 9110        Zone/Group# NA

Shift: 1          Job Station / OPN No: NA

Seniority Date: 04/06/1989      How long on job? G. +10 Years In Dept      Job Location: 4070

| INJURY/ILLNESS TYPE | REASON FOR REQUEST | AFFECTED BODY PART |
|---|---|---|
| Occupational [X] | *Re-Check | Elbow |
| Non-Occupational [ ] | | |
| Personal Protective | | |
| Equipment worn at time of incident | | |

DEPOSITION
EXHIBIT
Smiley 8
Kau 4/4/08

Employee Signature: _____      Supervisor Signature: WEST, SHANNON
                                         Supervisor Pager: _____

F...oyment Signature: _____      Phone#: 8585347      Radio Channel: _____

Completed By: _____            Title: _____

**MEDICAL TREATMENT / INFORMATION.........   (COMPLETED BY MEDICAL STAFF)**
                                                               Time in: 10:16am
NATURE OF INJURY / ILLNESS: Lateral Epicondylitis Of Elbow Region           Time out: 10:44am
       Tem  Perm                        Yes  No   Undetermined
PQ [ ]  PQX [X]  [ ]      OSHA Recordable  [X]  [ ]  [ ]

Detail of PQX                                   Expiration Date   Re-Exam Date
No Lifting Over 15# Right Hand                   05/04/2005        05/04/2005
Physician / Nurse Signature: Dr. Tinklepaugh /Em      Date: 2/14/05

**PLACEMENT STATUS.........   (COMPLETED BY PLACEMENT COORDINATOR / SUPERVISOR)**
1. Did employee return to regular job?          YES [ ]   NO [ ]
2. Alternative work found?                      YES [ ]   NO [ ]
3. Was employee sent to Area Manager?           YES [ ]   NO [ ]
4. Was employee sent to Center Manager?         YES [ ]   NO [ ]
5. Was employee sent to Plant Champion?         YES [ ]   NO [ ]
6. Was employee sent home/no work? (HR)         YES [ ]   NO [ ]

New Job Title: _____   Department: _____   Operation: _____   Shift: _____

Placement Coordinator Signature: _____   Approved By: _____

COPIES TO:      MEDICAL        DISABILITY        SAFETY        SUPERVISOR

**A273**

CHRYSLER 149

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

PHONE (302) 777-7723
(302) 777-3454
Dea Reg No. BB3216113

NAME _D Smiley_ AGE _____ DATE 2/25/05

ADDRESS _____

Rx Resume No Work

→ 3/9/05

REFILL _____ TIMES _____

Substitution Permitted

In order for a brand name product to be dispensed, the prescriber must hand write 'Brand Necessary' or Brand Medically Necessary' in the space below.

---

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

TELEPHONE (302) 777-7723
FAX (302) 777-3454
Dea Reg No. BB3216113

NAME _Smiley David_ AGE _____
ADDRESS _____ DATE 3/9/05

Rx Continue No Work

3/9 → 4/1/05 —

Call in # 2005-1105

3/9/05   H Mar 05

_____ TIMES _____ mitted

brand name product to be dispensed, the prescriber must hand necessary' or Brand Medically Necessary' in the space below.

---

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

TELEPHONE (302) 777-7723
FAX (302) 777-3454
Dea Reg No. BB3216113

NAME _David Smiley_ AGE _____
ADDRESS _____ DATE 4/6/05

Rx Cont No Work

4/6 → 5/11/25

2005 752 828

FILL _____ TIMES _____

stitution Permitted

order for a brand name... 'Brand Necessary'...

DEPOSITION
EXHIBIT 12
Smiley
KAH 4/9/08

---

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

TELEPHONE (302) 777-7723
FAX (302) 777-3454
Dea Reg No. BB3216113

NAME _David Smiley_ AGE _____
ADDRESS _____ DATE 5/9/05

Rx Cont No Work

5/9 → 6/15/05

on joy

REFILL _____ TIMES _____

Substitution Permitted

Call in Number
2005 198 978

**A274**
CHRYSLER 102

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

PHONE (302) 777-7723
(302) 777-3454
FAX
DEA Reg No. BB3216113

NAME _____
ADDRESS _____ AGE ___
DATE 2/22/05

Rx   Resume No work

3/9/05

REFILL ____ TIMES ____
Substitution Permitted

In order for a brand name product to be dispensed, the prescriber must hand
write "Brand Necessary" or Brand Medically Necessary" in the space below.

---

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

TELEPHONE (302) 777-7723
FAX       (302) 777-3454
DEA Reg No. BB3216113

NAME  Smiley David
ADDRESS _____ AGE ___
DATE 3/9/05

Continue No work

3/9 → 4/1/05

Call in #  2005 1105

MC  11 Mar 05

TIMES ____
limited

DX 126.32

brand name product to be dispensed; the prescriber must hand
necessary" or Brand Medically Necessary" in the space below.

---

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

TELEPHONE (302) 777-7723
(302) 777-3454
DEA Reg No. BB3216113

NAME  David Smiley
ADDRESS _____ AGE ___
DATE 4/6/05

Cont No work

2005 15 2828

FILL ____ TIMES ____
Substitution Permitted

order for a brand name

**DEPOSITION EXHIBIT**
Smiley 14
KAH 4/9/08

---

Peter B. Bandera, M.D.
TROLLEY SQUARE, SUITE B-10
WILMINGTON, DE 19806

TELEPHONE (302) 777-7723
FAX       (302) 777-3454
DEA Reg No. BB3216113

NAME  David Smiley
ADDRESS _____ AGE ___
DATE 5/19/05

Cont No work

5/1 → 6/15/05

ongoing

**A275**

CHRYSLER 104

Call in Number
2005 198 978

REFILL ____ TIMES ____
Substitution Permitted



# UNITED AUTOMOBILE • AEROSPACE • AGRICULTURAL IMPLEMENT WORKERS of AMERICA (UAW)

**LOCAL UNION 1183**
698 OLD BALTIMORE PIKE • NEWARK, DELAWARE 19702
PHONE: (302) 738-4500 • FAX: (302) 738-9564

| | |
|---|---|
| JAMES J. FISHER<br>PRESIDENT | RICHARD "MACK" McDONAUGH, JR.<br>VICE PRESIDENT |
| WANDA SALVATELLI<br>RECORDING SECRETARY | D. MICHAEL GUSEMAN<br>FINANCIAL SECRETARY-<br>TREASURER |

April 3, 2006

Mr. David Smiley
1956 Seneca Road
Wilmington, Delaware 19805

Dear Brother Smiley,

It is critical that you contact me within five (5) days on receipt of this letter in reference to your continued employment at the Daimler Chrysler Assembly Plant in Newark, Delaware.

Per our conversation dated Monday February 13, 2006, I had informed you that the Union and Management had reached a comparable decision on your behalf for your reinstatement of employment.

Please contact me to address this issue @ 302-453-5596 or the Union Hall @ 302-738-4500 within the time period stated above.

In Solidarity,

*John Mehalshick IV*

John Mehalshick IV
Committeeman District 1
UAW Local 1183

**A276**

**CHRYSLER 096**

*Appointments*

04/26/2006
Page: 1

Name        SMILEY, DAVID A.
EIN         241681
Department   B.I.W.

| Date | Time | Examiner | Description | |
|------|------|----------|-------------|---|
| 11/10/2004 | 01:00pm | Figueroa, Suzanne | Elbow | |
| 02/14/2005 | 10:00am | McEwen, Elana | Elbow | |
| 05/04/2005 | 10:00am | McEwen, Elana | Elbow | MISSED |

A277

CHRYSLER 125

# DAIMLERCHRYSLER



DEPOSITION
EXHIBIT
Smiley 10
KOH 4/9/08

DaimlerChrysler Corporation
Newark Assembly Plant

May 6, 2005

David Smiley
1956 Seneca Road
Wilmington, DE  19805

DC id #:241681

Dear David Smiley,

According to our records, you were scheduled to report to the Plant Medical Department for a medical examination on May 4, 2005. You failed to report for this appointment. Accordingly, you are to report to the Plant Employment Office on or before May 13, 2005 to provide satisfactory evidence to substantiate your failure to report.

All absences between February 18, 2005 and the date you report to the Plant Employment Office must be substantiated.

If you do not report to the Plant Employment Office by May 13, 2005 and submit such evidence as directed above or if you do not promptly notify the Plant Employment Office that for a reason beyond your control, which must be satisfactorily substantiated, you were unable to comply with these instructions, your seniority will be terminated.

When reporting to the Plant Employment Office, enter the building through the outside door at the south end of the administration building. The hours for inactive employees are as follows:

### Monday through Friday

9:00 a.m. – 11:30 a.m.
and
1:30 p.m. – 3:00 p.m.

Sincerely,

Shannon West
Human Resources Generalist

**SENT VIA OVERNIGHT MAIL**

**A278**

**CHRYSLER 101**

**UPS**

## UPS Next Day Air®
## UPS Worldwide Express℠

### Shipping Document

See instructions on back. Visit UPS.com® or call 1-800-PICK-UPS® (800-742-5877) for additional information and Terms and Conditions.

**TRACKING NUMBER** 1Z F55 V82 22 1780 1126

**1 SHIPMENT FROM**

SHIPPER'S UPS ACCOUNT NO. **F55V82**

REFERENCE NUMBER

NAME Shannon West    TELEPHONE 302-453-5347

COMPANY **DAIMLER CHRYSLER NEWARK ASSY PLANT**

STREET ADDRESS **550 SOUTH COLLEGE AVENUE**

CITY AND STATE **NEWARK**    ZIP CODE **DE 19713**

**2 EXTREMELY URGENT DELIVERY TO**

NAME David Smiley    TELEPHONE

COMPANY

STREET ADDRESS 1956 Seneca Dr    DEPT./FLR.

CITY AND STATE (INCLUDE COUNTRY IF INTERNATIONAL) Wilmington DE 19805    ZIP CODE

**3 WEIGHT** Enter "LTR"If Letter  LTR    DIMENSIONAL WEIGHT If Applicable    LARGE AIR PACKAGE    **4 SHIPPER RELEASE** 1

**5 TYPE OF SERVICE**
- ☑ NEXT DAY AIR
- ☐ EXPRESS (INT'L)

FOR WORLDWIDE EXPRESS SHIPMENTS
Mark an "X" in this box if shipment only contains documents of no commercial value.
- ☐ DOCUMENTS ONLY

**6**
- ☑ SATURDAY PICKUP See instructions.
- ☐ SATURDAY DELIVERY See instructions.

OPTIONAL SERVICES
- ☐ DECLARED VALUE FOR CARRIAGE Cartons are automatically protected up to $100, for declared value over $100, see instructions.  AMOUNT $
- ☐ C.O.D. C.O.D. enter amount to be collected and attach completed UPS C.O.D. tag to package.  AMOUNT $

**7 ADDITIONAL HANDLING CHARGE**
An Additional Handling Charge applies for certain items. See instructions.

**8 TOTAL CHARGES**

**CHARGES**
$
$
$
$
$

**METHOD OF PAYMENT**
- ☐ BILL SHIPPER'S ACCOUNT NUMBER IN SECTION 1
- ☐ BILL RECEIVER DOMESTIC ONLY
- ☐ BILL THIRD PARTY DOMESTIC ONLY RECORD ACCOUNT NO. IN SECTION 9
- ☐ CREDIT CARD
  - American Express
  - Diner's Club
  - MasterCard
  - Visa
- ☐ CHECK

**9 RECEIVER'S/THIRD PARTY'S UPS ACCT. NO. OR MAJOR CREDIT CARD NO.**    EXPIRATION DATE

THIRD PARTY'S COMPANY NAME

STREET ADDRESS

CITY AND STATE    ZIP CODE

The shipper authorizes UPS to act as forwarding agent for export and customs purposes. The shipper certifies that these commodities, technology or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited.

**10 SHIPPER'S SIGNATURE**

All shipments are subject to the terms contained in the UPS Tariff and Terms and Conditions of Service, which are available at ups.com and local UPS offices.

DATE OF SHIPMENT 5/6/05

0101911202609 1/05 S

UPS COPY

This form not needed with UPS Internet Shipping at UPS.com

**A279**

**CHRYSLER 127**

Substantiation
~~REINSTATEMENT~~ DENIAL

DEPOSITION
EXHIBIT
Smiley 13
KAN 4/9/08

Date _May 13, 2005_    Time _10:12 a.m._

Name _David Smiley_    DCid# _241681_

You are being denied ~~reinstatement~~ substantiation from sick leave due to insufficient medical documentation. You have been told what information your documentation is missing (see below) and given a copy of the reinstatement requirements. Accordingly, you are to report to the plant personnel office by 3:00pm on _5/13/05_ with a **NEW** doctor's note that meets **ALL** of the reinstatement requirements.

You were released to return to work by your treating physician on _n/A_
You will be reinstated effective _n/A_, and will accumulate an excused tardy/absence for _n/A_. Extended coverage from your treating physician for _n/A_ will not be accepted.

However, if you do not provide the required ~~reinstatement~~ substantiated documentation as requested your seniority will be terminated.

Employee Signature _____    Date _____

HR Representative _Dawn Ford_    Date _5/13/05_

Comments: Your submitted documentation is missing the following:

___ Letterhead w/physician's name & phone#    ___ Date statement was written

_X_ Diagnosis or diagnostic code    _X_ Statement of total disability

___ Physician's signature    _X_ Return to work date or estimated return to work date

___ Dates of treatment to include Start and End Dates of Medical Coverage

_X_ original notes

Personnel Office
Hours of Operation
(Inactive Employees)

9:00am-11:30am
and
1:30pm-3:00pm

**A280**

CHRYSLER 100

**DaimlerChrysler Corporation
Newark Assembly Plant
Personnel Office**

# Memo

| | |
|---|---|
| **To:** | Labor Relations |
| **From:** | Dawn Ford |
| **CC:** | Dan Mykolenko |
| | Todd Frohner |
| **Date:** | May 13, 2005 |
| **Re:** | David Smiley |

---

On May, 6, 2005, Mr. David Smiley was issued a substantiation letter to report to the personnel office for missing his medical appointment on May 4, 2005.

He reported to the personnel office on Friday, May 13, 2005 at 10:12 a.m. with all of the letters within the envelope. He presented copies of his doctors' notes to me and I asked him where the originals are. He responded that he didn't feel like caring all of the notes, so he copied them, but he has them at home and he can bring them back to the office. I had informed him that the notes did not meet the criteria for proper substantiation and that he needed to bring back notes that met the requirement. In addition, I also asked him why he missed his medical appointment. Mr. Smiley said that he was unaware of the medical appointment. Until he had received the note, he did not know that he had an appointment.

I asked him if he had contacted medical to reschedule an appointment, and he told me that that was why he came down here. I filled out the Substantiation Denial form and explained to him what he was missing and that he had until 3:00 pm today to present proper documentation or his seniority will be terminated. If he refused to sign, just write RTS and date. He said "its okay dear, you can do that, and pushed the paper back under the glass and claimed that he will be back.

He came back with the same copied 4 notes around 11:40 a.m. and tried to present it to Angenella Fleming. Again she had explained to Mr. Smiley that she could not resolve this issue but she will give this form to me when I get back.

In addition, he was not given 24 hours due to fact that he already was given 5 days to report and presented the requirements to the personnel office. He was well aware of the procedures and he was taken advantage of them.

**A281**

CHRYSLER 099

1

# DAIMLERCHRYSLER



DEPOSITION EXHIBIT
Smiley 15
KAH 4/9/06

DaimlerChrysler Corporation
Newark Assembly Plant

May 13, 2005

David Smiley
1956 Seneca Road
Wilmington, DE 19805

DC id # 241681

Dear David Smiley:

On May 13, 2005, you reported to the Plant Personnel office with medical documentation for the purpose of substantiating your absences. Your medical documentation was insufficient, and consequently, you were issued a "Substantiation Denial Form." You were instructed to obtain new medical documentation listing all (7) reinstatement and substantiation requirements, and report back on the next working day, May 13, 2005, by 3p.m.

As a result of your failure to report as instructed, your seniority was terminated effective May 13, 2005.

Sincerely,

Dawn Ford
HR Generalist

**SENT VIA CERTIFIED MAIL**

**A282**

A Company of the DaimlerChrysler Group

DaimlerChrysler Corporation
550 South College Avenue  CIMS 114-00-00
Newark DE USA  19713-1385

# Grievance Form

| LOCAL NO. | DISTRICT NO. | UNIT NO. | DATE | GRIEVANCE NO. |
|---|---|---|---|---|
| 1183 | | | | 2005 - 146 |

| PLANT | | LOCATION CODE | GRIEVANCE CODE | FINAL DISPOSITION STEP | MO. | DAY | YEAR | CLASS NUMBER |
|---|---|---|---|---|---|---|---|---|
| | | | | | AGREE SECTION | SUBSECTION | LOCAL AGREE | OTHER |

| GRIEVANT - LAST NAME, INITIALS | DEPT. NUMBER | CLOCK NO. | SHIFT | AGREE SECTION | SUBSECTION | LOCAL AGREE | OTHER |
|---|---|---|---|---|---|---|---|
| SMILEY, D. | 9110 | 241681 | 2 | | | | |

| SENIORITY (MO. / DAY / YR) | RATE | CLASS TITLE AND / OR NUMBER |
|---|---|---|
| 4/6/89 | 26.30 | Assembler |

**NATURE OF GRIEVANCE** UN Just Discharge

| CONTRACT SECTION OR LOCAL AGREEMENT INVOLVED, IF ANY | Total grievants in this matter. (If more than one, list complete group on reverse) |
|---|---|

| DISCUSSION 1 | Date Held: Numerous | Mgt. Rep. Name: J. ASQUITH | Union Rep. Name: J. Mehalstick |
|---|---|---|---|
| DISCUSSION 2 | Date Held: Numerous | Mgt. Rep. Name: S. HEITZMAN | Union Rep. Name: J. Mehalstick |

**STATEMENT OF GRIEVANCE** (Include dates, times, parties involved, etc. If a claim of discrimination is alleged, written evidence setting forth facts must be attached.)

We the union charge management with the above violation on 5/13/05 employee D. Smiley was unjustly discharged.

**ADJUSTMENT REQUESTED** We the union demand that this violation stop immediately and bring employee D. SMILEY back with a clear record and full pay (continue on reverse if necessary)

**MANAGEMENT'S ANSWER** (Include facts taken into account)

Management finds no violation in this instance employee Smiley reported to plant personnel in response to a letter from personnel to substantiate his absence. Employee Smiley responded but did not follow the proper procedures for substantiation. Employee Smiley was issued a substantiation denial form and awarded the opportunity to provide the necessary documentation. Employee Smiley failed to follow established procedures and was therefore separated by employment. This grievance and its demands are denied.

**A283**

CHRYSLER 097

(continue on reverse if necessary)

| SIGNATURE | GRIEVANCE PRESENTED BY UNION REP. | DATE 5/18/05 | SIGNATURE | GRIEVANCE RECEIVED BY MGT. REP. | DATE 5/18/05 |
|---|---|---|---|---|---|
| | ANSWER RECEIVED BY UNION REP. | DATE 5/20/05 | | ANSWER PRESENTED BY MGT. REP. | DATE 5/20/05 |

84-170-1623 (REV. 4/2000) DaimlerChrysler Corporation

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | 050Y03524 |
| ☐ EEOC | 170A500505 |

and EEOC (if applicable)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| David Smiley | (302) 426-0395 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1956 Seneca Road | Wilmington DE 19805  NCC | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS 100+ | TELEPHONE NUMBER (incl. Area Code) |
|---|---|---|
| Daimler Chrysler Corporation | | (302) 453-5350 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 550 South College Ave., Newark, DE 19711 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE
☐ RETALIATION ☒ DISABILITY ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | 5/13/2005 |
| LATEST | 5/13/2005 |
| ☐ CONTINUING ACTION | |

**DEPOSITION EXHIBIT 9**
Smiley
KAH 4/9/08

THE PARTICULARS ARE (if additional space is needed, attached extra sheet(s)):

Jurisdiction: Charging Party worked for Respondent since 04/06/99, most recently as a Tech I

Charging Party's protected class: Disability

Adverse employment action: Denied Reasonable Accommodation, Terminated

Brief statement of allegations: Charging Party alleges he was injured on the job and was considered and accepted initially for workman's compensation. At some point Charging Party was no longer eligible for workman's compensation and he ceased to receive these benefits. Charging Party alleges that he returned to work to perform an accommodated position but the assignment aggravated his impairment. It was at this time that it was determined that Charging Party would again go out of work on a medical leave. During this most recent medical leave Charging Party had a number of medical appointments with both Respondent's physician as well as his own, all of which he kept. During this time period Charging Party alleges that Respondent failed to provide him with another position which would be an accommodation so that he could return to work. Respondent stated that Charging Party failed to make one of the scheduled medical appointments and therefore was terminated. Charging Party alleges that Respondent terminated his employment because of his disability.

Respondent's explanation: Missed a medical appointment and failure to return to work

Applicable law(s): Americans with Disabilities Act and the Delaware Handicapped Persons Employment Protection Act

Comparator(s) or other specific reason(s) for alleging discrimination: None.

Additional information and verification of these facts are provided by the attached Verification.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT

_[signature]_  5/19/05

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

RM B-05
REV.01-05

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

A284

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM

David Smiley
1956 Seneca Road
Wilmington, DE 19805

Case No. 05080352W

vs.

DAIMLER CHRYSLER CORPORATION
550 S. College Ave.
Newark, DE 19711

FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

*No-Cause Determination and Dismissal with Corresponding Right to Sue Notice.*

In this case, the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred. The Department hereby issues a No-Cause Determination and Dismissal and provides the Charging Party with a Delaware Right to Sue Notice.

This No Cause determination is based on the following facts:

In this discrimination case, Charging Party must demonstrate that he has a disability and that he informed Respondent of this disability. Charging Party must also show that Respondent was aware of his disability and need for an accommodation and failed to grant the accommodation regardless. Charging Party must further show that Respondent failed to accept his medical documentation to substantiate his medical leave and rather terminated his employment because of his disability. Charging Party can show this by demonstrating that he advised Respondent of his disability and requested an accommodation which was denied and resulted in Charging Party having to take a medical leave. He can show this by demonstrating that he was treated more harshly and the policies regarding medical leave were applied more harshly towards Charging Party because of his disability. The evidence and information provided during the investigation revealed that Respondent did provide accommodations to Charging Party's disability but that even with the accommodations Charging Party was unable to perform the essential functions of his position. The evidence and information further indicates that because of this inability, Charging Party was placed on an approved medical leave. The evidence demonstrates that Charging Party had been on medical leave more than once during his tenure with Respondent and was well versed in the policies and knew what was expected of his to remain on medical leave. Finally, the evidence and information provided demonstrates that Charging Party failed to adhere to policies surrounding a continued approved medical leave and therefore his employment was ended. Charging Party's witnesses failed to corroborate his allegations and he did not provide any supportive documentation to demonstrate disability discrimination. Therefore, Charging Party has failed to establish illegal disability discrimination occurred.

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program.

_____5/31/06_____
Date issued

_For JKC, Thow J. Sir.K._
Julie Klein Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

17C_DDOL_C-12-NC - No Cause Determ_DOC: 3/06

**A285**

## NOTICE OF DELAWARE RIGHTS

*The Department of Labor Discrimination Unit provides the following excerpt from 19 Del. C. § 710, et seq. as information regarding the Delaware Right to Sue Notice. If you need legal advice, please seek your own legal counsel.*

**§ 714. Civil action by the Charging Party; Delaware Right to Sue Notice; election of remedies.**

    (a)    A Charging Party may file a civil action in Superior Court, after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same.

    (b)    The Delaware Right to Sue Notice shall include authorization for the Charging Party to bring a civil action under this Chapter in Superior Court by instituting suit within ninety (90) days of its receipt or within ninety (90) days of receipt of a Federal Right to Sue Notice, whichever is later.

    (c)    The Charging Party shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A Charging Party is barred by this election of remedies from filing cases in both Superior Court and the federal forum. If the Charging Party files in Superior Court and in a federal forum, the Respondent may file an application to dismiss the Superior Court action under this election of remedies provision.

## NOTICE OF FEDERAL RIGHTS

    1.    If your case was also filed under federal law and resulted in a "No Cause" finding, you have additional appeal rights with the Equal Employment Opportunity Commission. Under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the DDOL's final finding. To obtain this review, you must request it by writing to EEOC within *15 days of your receipt* of DDOL's final finding in your case. Otherwise, EEOC will generally adopt the DDOL's findings.

    2.    If your case was also filed under federal law, you have the right to request a federal Right to Sue Notice from the EEOC. To obtain such a federal Right to Sue Notice, you must make a written request directly to EEOC at the address shown below. Upon its receipt, EEOC will issue you a Notice of Right to Sue and you will have ninety (90) days to file suit. The issuance of a Notice of Right to Sue will normally result in EEOC terminating all further processing.

    3.    Requests to the EEOC should be sent to:

Equal Employment Opportunity Commission
The Bourse, Suite 400
21 S. Fifth Street
Philadelphia, PA 19106-2515

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To:  David Smiley
1956 Seneca Road
Wilmington, DE 19805

From:  Philadelphia District Office - 530
21 South 5th Street
Suite 400
Philadelphia, PA 19106

| | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR § 1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2005-00503 | Charles Brown, III,<br>State & Local Coordinator | (215) 440-2842 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

|   |   |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [ ] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [X] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other *(briefly state)* |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Marie M. Tomasso* _____    _____ October 4, 2006

Enclosure(s)

**Marie M. Tomasso,**
**District Director**

*(Date Mailed)*

cc:  DAIMLER CHRYSLER CORP
Lori Otis, EEO Consultant
Corporate Diversity Office
1000 Chrysler Drive
Auburn Hills, MI 48326

**A287**